EXHIBIT M

172 FERC ¶ 61,221
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Neil Chatterjee, Chairman;
Richard Glick, and James P. Danly.


| | |
|---|---|
| Basin Electric Power Cooperative | Docket Nos.  ER20-2441-000 |
| | ER20-2442-000 |
| | EL20-68-000 |


ORDER DISMISSING RATE SCHEDULE, ACCEPTING RATE SCHEDULE AND
WHOLESALE POWER CONTRACTS, INSTITUTING SECTION 206 PROCEEDING,
AND ESTABLISHING HEARING AND SETTLEMENT JUDGE PROCEDURES

(Issued September 14, 2020)

1.     On July 16, 2020, Basin Electric Power Cooperative (Basin) filed, pursuant to section 205 of the Federal Power Act (FPA)[1] and part 35 of the Commission's regulations:[2]  (1) Rate Schedules No. 1 through No. 19, representing long-term, wholesale power supply contracts (Wholesale Power Contracts) between Basin and 19 of its electric cooperative, municipality, and public power district members (Members); and (2) two versions of Rate Schedule A,[3] Basin's stated rate that establishes rates for the service Basin provides to its Members pursuant to the terms of the Wholesale Power Contracts.[4]

---

[1] 16 U.S.C. § 824d.

[2] 18 C.F.R. pt. 35 (2020).

[3] One version of Basin's Rate Schedule A is intended to be effective from November 1, 2019 through December 31, 2019 (2019 Rate Schedule A), and the other is intended to be effective from January 1, 2020 forward (2020 Rate Schedule A).

[4] For purposes of this order, at times we refer to Basin's Rate Schedule A and Wholesale Power Contracts filings collectively as Basin's Filings.

Docket No. ER20-2441-000, et al.                                            - 2 -

2.     As discussed below, we dismiss as moot Basin's 2019 Rate Schedule A and accept Basin's 2020 Rate Schedule A and the Wholesale Power Contracts, effective September 15, 2020.  We also institute an investigation pursuant to FPA section 206[5] in Docket No. EL20-68-000 to determine whether Basin's 2020 Rate Schedule A and Wholesale Power Contracts are just and reasonable.  In addition, we establish a refund effective date, and we establish hearing and settlement judge procedures.

## I.     **Background**

3.     Basin is a consumer-owned electric generation and transmission cooperative that provides wholesale electricity to its 140 Members at cost-based rates pursuant to long-term wholesale contracts.  Basin's membership structure includes 18 Class A Members, 1 Class B Member, 120 Class C Members, and 1 Class D Member.[6]  An 11-seat Board of Directors (Board) controls Basin.

4.     Basin's Members consist of rural electric and small municipal electric systems in Colorado, Iowa, Minnesota, Montana, Nebraska, New Mexico, North Dakota, South Dakota, and Wyoming.  Basin's Members' systems serve approximately three million consumers in the Eastern Interconnection[7] and the Western Interconnection.  Basin supplies power to its Members through a portfolio of ownership interests in generation and power purchase agreements and has about 6,000 megawatts (MW) of capacity in its generation portfolio.  Further, Basin has three subsidiaries:  Basin Cooperative Services, Dakota Coal Company, and Dakota Gasification Company (DGC).

5.     Basin explains that it had been exempt from the Commission's jurisdiction under Part II of the FPA[8] because it was wholly owned by entities that were themselves exempt

---

[5] 16 U.S.C. § 824e.

[6] Class A Members are generation and transmission cooperatives and distribution cooperatives that have entered into long-term wholesale power contracts with Basin; Class B Members are municipalities that are members of and purchase power from a Class A Member; Class C Members are distribution cooperatives and public power districts that are members of and purchase power from a Class A Member; and Class D Members are electric cooperatives or municipalities that purchase power directly from Basin on a basis other than the Class A long-term power contracts.

[7] Basin notes that, on October 1, 2015, Basin joined the Southwest Power Pool, Inc. (SPP) as a Transmission Owner and placed its transmission facilities in the Eastern Interconnection under the functional control of SPP.

[8] 16 U.S.C. §§ 824-824w.

Docket No. ER20-2441-000, et al.                                                - 3 -

from the Commission's jurisdiction under FPA section 201(f).[9]  However, Basin states that it became subject to the Commission's jurisdiction in November 2019, when two events occurred:  (1) Basin readmitted a Class A Member that no longer qualified under FPA section 201(f) for exemption from Commission regulation; and (2) an existing Class A Member ceased to qualify for such exemption.[10]

6.      Basin states that it readmitted Tri-State Generation and Transmission Association, Inc. (Tri-State)[11] as a Class A Member, effective November 1, 2019.[12]  Basin explains that, in July 2019, Tri-State, then a Class A Member of Basin, submitted filings to the Commission indicating that it would no longer qualify for an exemption from Commission regulation under the FPA because it would be admitting a new, non-exempt member in September 2019.  Basin states that, on August 29, 2019, Tri-State informed Basin that it planned to admit the new member, and Basin and Tri-State agreed that Tri-State would withdraw its membership in Basin before Tri-State admitted the new member.  Basin states that, on September 3, 2019, in anticipation of Tri-State's admission of a new member, Tri-State withdrew its membership in Basin, and Tri-State informed

---

[9] For ease of reference, where both of Basin's transmittals include similar language, we cite to only the Docket No. ER20-2441-000 Transmittal as an example. Transmittal, Docket No. ER20-2441-000, at 10.  FPA section 201(f) provides as follows:

> No provision in this subchapter shall apply to, or be deemed to include, the United States, a State or any political subdivision of a State, an electric cooperative that receives financing under the Rural Electrification Act of 1936 (7 U.S.C. 901 et seq.) or that sells less than 4,000,000 megawatt hours [MWh] of electricity per year, or any agency, authority, or instrumentality of any one or more of the foregoing, or any corporation which is wholly owned, directly or indirectly, by any one or more of the foregoing, or any officer, agent, or employee of any of the foregoing acting as such in the course of his official duty, unless such provision makes specific reference thereto.

16 U.S.C. § 824(f).

[10] Transmittal, Docket No. ER20-2441-000, at 10-12.

[11] Tri-State is a wholesale generation and transmission cooperative that provides wholesale electricity to its member electric distribution cooperatives and public power districts.

[12] Transmittal, Docket No. ER20-2441-000, at 10-11 (citation omitted).

Docket No. ER20-2441-000, et al.                                                                    - 4 -

the Commission of its admission of the new member, Mieco, Inc. (Mieco).[13]  Basin states that, on September 6, 2019, Tri-State applied for readmission as a Class A Member to be effective November 1, 2019, which the Board approved on September 8, 2019.[14]

7.      Basin also states that it has confirmed that a Class C Member that does not hold any Rural Utilities Service (RUS) debt sold more than four million MWh of electricity by the end of November 2019.[15]  Basin explains that as a result, Upper Missouri Power Cooperative (Upper Missouri), the Class A Member to which that Class C Member belongs, no longer is wholly owned by entities that qualify for an exemption from Commission regulation under FPA section 201(f).  Basin further explains that, similarly, because Upper Missouri is a Class A Member of Basin, Basin also is no longer wholly owned by exempt entities.[16]

8.      On September 30, 2019 and October 1, 2019, in anticipation of losing its exemption under FPA section 201(f), Basin filed a package of FPA section 205 filings (Basin 2019 Filings) and requests for extensions of filing deadlines and waivers.  On November 26, 2019, the Commission rejected, without prejudice, the Basin 2019 Filings, finding that they were patently deficient because Basin provided insufficient cost support for its proposed rates and had failed to comply with the Commission's filing requirements.[17]

---

[13] *Id.* at 11.  Tri-State has represented that Mieco is not an electric cooperative or governmental entity, and it is not owned by electric cooperatives or governmental entities in the United States.  *Tri-State Generation & Transmission Ass'n, Inc.,* 170 FERC ¶ 61,224, at P 14, *order on reh'g,* 172 FERC ¶ 61,173 (2020).

[14] Transmittal, Docket No. ER20-2441-000, at 11 (citation omitted).

[15] *Id.* at 11-12.

[16] *Id.* at 12.

[17] *Basin Elec. Power Coop.*, 169 FERC ¶ 61,158 (2019) (November 2019 Order).  The Commission recently issued orders on Basin's most recent FPA section 205 filings, its Order No. 845 compliance filing, and its requests for extensions and waivers.  *Basin Elec. Power Coop.*, 172 FERC ¶ 61,210 (2020); *Basin Elec. Power Coop.*, 172 FERC ¶ 61,212 (2020); *Basin Elec. Power Coop.*, 172 FERC ¶ 61,211 (2020).

Docket No. ER20-2441-000, et al.                                               - 5 -

II.   **Basin's Filings**

      A.     **Rate Schedule A**

9.      In Docket No. ER20-2441-000, Basin submitted its Rate Schedule A, which
establishes a comprehensive cost of service rate for the service that Basin provides to its
Class A and D Members pursuant to the terms of the Wholesale Power Contracts.  Basin
states that all of Basin's Wholesale Power Contracts with its 18 Class A Members extend
through 2075, with the exception of the Wholesale Power Contracts with Tri-State,
Minnesota Valley Electric Cooperative, and Wright-Hennepin Cooperative Electric
Association, which extend through 2050.[18]  Basin notes that, after maturity in 2050 or
2075, as applicable, the Wholesale Power Contracts remain in effect until terminated by
either party giving the contractually required notice of its intention to terminate.[19]

10.     According to Basin, the Board establishes rates to produce revenue to:  (1) pay the
cost of operation and maintenance of all of Basin's facilities; (2) pay the cost of capacity
and energy purchased for resale; (3) pay the cost of transmission services; (4) pay the
cost of lease payments; (5) pay interest expense and depreciation expense or principal
payments; and (6) provide for the establishment and maintenance of reasonable financial
reserves.  Basin states that the Wholesale Power Contracts require these rates to be
reviewed and revised at least annually.[20]  Basin explains that Rate Schedule A is
ultimately approved by its Members through their representatives to the Board and that
any disputes concerning the rates are resolved through the democratic cooperative
governance process.[21]  Basin states that the rates set forth in Rate Schedule A are
attachments to each of Basin's Wholesale Power Contracts with its Members.[22]

11.     Basin states that, for Basin's 2020 Rate Schedule A, the Board elected to hold the
base demand rate for the 2075 Contracts the same as it was in Basin's 2019 Rate
Schedule A, reduce the rate on average by one mill per kWh, and reduce the fixed charge
by half.  Basin states that most of the special purpose rates decreased or remained the
same, while the standby rate increased to avoid subsidizing Members that self-supply a

---

       [18] Basin's Wholesale Power Contracts with a term through 2050 are referred to as
2050 Contracts, and those with a term through 2075 are referred to as 2075 Contracts.

       [19] Transmittal, Docket No. ER20-2441-000, at 4-5.

       [20] *Id.* at 5.

       [21] *Id.* at 16, 20.

       [22] *Id.* at 20-21.

Docket No. ER20-2441-000, et al.                                                      - 6 -

portion of their load for standby service.[23]  Basin explains that the Member revenue requirement is comprised of the forecasted (a) total cost of electric service, (b) margin before income taxes, and (c) non-Member revenue, which consists of non-operating revenue, miscellaneous operating revenue and sales to non-Members.  Basin notes that, based on Basin's forecasted cost of electric service, the Member revenue requirement is $1,583,360,299 for 2019 and $1,713,622,414 for 2020.[24]

12.     Basin further states that, in order to maintain an A credit rating, the 2019 and 2020 net margin requirements were set at $165,873,855, and $161,825,240 respectively.  Basin explains that the net margin before income taxes can be derived by combining the forecasted expenses and revenue included in the forecasted operating budget.[25]  The Board resolved to allocate the combined allocable margin of $59,470,185 for the fiscal year ended December 31, 2019 to its Members on a patronage basis.[26]  Basin explains that its rates were designed to result in an average rate of 63.7 mills per kWh in 2019 and an average rate of 61.50 mills per kWh in 2020.  Basin further explains that Rate Schedule A has separate rates based on the term of the Member's Wholesale Power Contract.  Basin states that Rate Schedule A also assesses a fixed charge based on certain criteria, as described below, has five special purpose rates,[27] and charges three of its Members a firm Contract Rate of Delivery (CROD) for deliveries with a fixed hourly pattern.[28]

13.     Basin states that its monthly rate components are calculated in accordance with Board Policy 10, which is included as part of Rate Schedule A.[29]  Basin explains that because certain coal and gas generation resources committed prior to December 31, 2015 (Applicable Generation Assets) have depreciable lives that will extend past 2050, the rate

---

[23] *Id.* at 17-20.

[24] *Id.* at 21.

[25] *Id.* at 23.

[26] *Id.*

[27] Basin also offers one special purpose rate, two purchase rates, and, in 2019, three other rates (in 2020, four other rates) all of which are not subject to the Commission's jurisdiction and are not included in Basin's 2019 or 2020 Rate Schedule A.  Basin factors the forecasted usage of and expense associated with those rates into its forecasted expenses.  *Id.* at 24 & n.58.

[28] *Id.* at 23-24.

[29] *Id.* (citing Attach. C at 34-35; Attach. D at 34-35).

Docket No. ER20-2441-000, et al.                                              - 7 -

components for the 2050 Contracts recover depreciation expense on the Applicable Generation Assets on the earlier of December 31, 2050 or the end of the asset's established depreciable life.[30]

14.     Additionally, Basin states that, for at least 20 years, at the request of its Members, it employed a 50-50 demand-energy split in Rate Schedule A for its base rate monthly charge and a 56-44 demand-energy split for its CROD rate.[31]  Basin explains that the Board and its Members have determined that maintaining a 50-50 demand-energy split minimizes cost shifts among the Members across the nine-state region served by Basin. Basin provides calculations that it states confirm that the demand-energy split remains relatively close to 50-50 over the long-term, and Basin states that the Board and its Members determined that revising the 56-44 demand energy split for the CROD rate would result in an overall rate increase to those Members that make purchases under the CROD.[32]

15.     Basin explains that, under its 2019 Rate Schedule A, it assesses what it refers to as a "fixed charge" to each Class A Member that can take the form of a monthly charge or a mill/kWh charge.[33]  Specifically, Class A Members with Class B, C, and D Members in their organizational structure are assessed a $1,500 monthly charge plus an additional $2,900 monthly charge, for each Class B, C, and D Member, whereas Class A Members without Class B, C, and D Members are assessed a monthly charge of $4,400.  Basin further explains that, under its 2020 Rate Schedule A, these monthly charges have been reduced to $750 plus an additional $1,450 for each Class B, C, and D Member in a Class A Member's organizational structure and $2,200 per month for Class A Members without Class B, C, and D Members.[34]  Basin affirms that, under both Basin's 2019 and 2020 Rate Schedule A, for those Members assessed a mill rate, the energy charge is determined by dividing the revenue from the monthly charge assessment by the projected Basin energy sales related to those Members.[35]

---

[30] *Id.* at 24-25.

[31] *Id.* at 25 (citing Attach. E at 20-22; Attach. R at 13-14).

[32] *Id.* (citing Attach. E at 20-22; Attach. R at 13-14).

[33] *Id.* at 25-26.

[34] *Id.*

[35] *Id.* (citing Attach. C at 2-3; Attach. D at 2-3).

Docket No. ER20-2441-000, et al.                                                      - 8 -

16.     Basin states that it has a number of special purpose incentive rates that are available to its Class A Members, designed to achieve certain Member-driven goals.[36] Basin explains that anticipated revenue from the special purpose rates is subtracted from the Member revenue requirement when calculating the monthly rate components to ensure that there is no double recovery of costs.[37]  These special purpose rates include: (1) a non-controlled electric/dual space heat rate to encourage the installation and use of electric space heating; (2) an interruptible rate designed to minimize load control periods and increase the power supply availability to interruptible loads; (3) a Midcontinent Independent System Operator (MISO) wind resources station power rate for Members for station service power to wind generation resources directly interconnected to the MISO transmission system; (4) a standby rate designed to cover anticipated costs of providing standby service; and (5) a load incentive rate for Members who directly or via their distribution cooperative members enter into new long term power supply contracts with the ultimate retail load, provided certain rate criteria are met.[38]

## B.    Wholesale Power Contracts

17.     In Docket No. ER20-2442-000, Basin submitted 19 Wholesale Power Contracts, filed as Rate Schedules Nos. 1 through 19, that represent existing long-term, wholesale power supply contracts between Basin and its 18 Class A Members and one Class D Member.[39]  Basin states that the Wholesale Power Contracts are bilateral agreements between Basin and its Members pursuant to which Basin sells and delivers to each Class A Member all of that Member's capacity and energy requirements over and above certain specifically enumerated amounts available to the Member from other specified sources.[40] Basin states that it is submitting conformed versions of its Wholesale Power Contracts, which are not intended to change any of the terms of or otherwise replace the existing Wholesale Power Contracts between Basin and its Members.[41]

---

[36] *Id.* at 26 (citing Attach. C at 6; Attach. D at 6).

[37] *Id.*

[38] *Id.* at 26-27.

[39] Transmittal, Docket No. ER20-2442-000, at 1.

[40] Basin notes that Tri-State is the only exception here, in that Basin serves Tri-State's full requirements in the Eastern Interconnection and Tri-State buys a fixed amount of power from Basin through a firm CROD in the Western Interconnection.  *Id.* at 5.

[41] *Id.* at 14.

Docket No. ER20-2441-000, et al.                                                          - 9 -

18.     The Wholesale Power Contracts are between Basin and the following Members:
(1) Central Montana Electric Power Cooperative (Central Montana); (2) Central Power
Electric Cooperative, Inc. (Central Power); (3) Corn Belt Power Cooperative (Corn Belt);
(4) Crow Wing Cooperative Power and Light Company; (5) East River Electric Power
Cooperative (East River); (6) Grand Electric Cooperative, Inc. (Grand Electric); (7) KEM
Electric Cooperative, Inc. (KEM Electric); (8) L & O Power Cooperative; (9) Members
1st Power Cooperative; (10) Minnesota Valley Cooperative Light & Power Association;
(11) Minnesota Valley Electric Cooperative; (12) Mor-Gran-Sou Electric Cooperative,
Inc. (Mor-Gran-Sou); (13) Northwest Iowa Power Cooperative (Northwest Iowa); (14)
Rosebud Electric Cooperative, Inc.; (15) Rushmore Electric Power Cooperative, Inc.
(Rushmore); (16) Tri-State; (17) Upper Missouri; (18) Wright-Hennepin Cooperative
Electric Association; and (19) Flathead Electric Cooperative, Inc. (Flathead).[42]

        C.      **Standard of Review**

19.     Basin requests that, given the nature of its Wholesale Power Contracts and the
important role they and the rates Basin charges under Rate Schedule A play in the
structure of the cooperative, the Commission apply the public interest standard under the
*Mobile-Sierra* doctrine in its review of Rate Schedule A and the Wholesale Power
Contracts.[43]

20.     Basin asserts that in *Northern Virginia Electric Cooperative, Inc. v. Old Dominion
Electric Cooperative*, the Commission applied the public interest standard and rejected a
complaint by Northern Virginia Electric Cooperative, Inc. (NOVEC) requesting that the
Commission modify NOVEC's wholesale power agreement with Old Dominion Electric
Cooperative (Old Dominion).[44]   Basin points out that the Commission stated that there
was no evidence that the contract "caused financial distress sufficient to threaten

---

[42] *Id.* at 14-15.   Flathead is Basin's sole Class D Member.

[43] Transmittal, Docket No. ER20-2441-000, at 14 (citing *United Gas Pipe Line
Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332 (1956); *FPC v. Sierra Pac. Power Co.*, 350
U.S. 348 (1956) (together, *Mobile-Sierra*)).   Under the *Mobile-Sierra* doctrine, the
Commission must presume that the rate established in a freely negotiated wholesale-
energy contract meets the "just and reasonable" requirement imposed by the FPA.   The
presumption may be overcome only if the Commission concludes that the contract
seriously harms the public interest.   *NRG Power Mktg., LLC v. Me. Pub. Util. Comm'n*,
558 U.S. 165, 167 (2010) (*NRG Power*) (citation omitted); *Morgan Stanley Capital Grp.
Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cty.*, 554 U.S. 527, 530 (2008) (*Morgan
Stanley*).

[44] Transmittal, Docket No. ER20-2441-000, at 14 (citing *N. Va. Elec. Coop., Inc. v.
Old Dominion Elec. Coop.*, 114 FERC ¶ 61,240 (2006) (*NOVEC*)).

Docket No. ER20-2441-000, et al.                                                      - 10 -

[NOVEC's] ability to continue service, that the contract casts an excessive burden on its customers, or that the contract is unduly discriminatory."[45]

21.     Basin asserts that the application of the public interest standard is appropriate here for a number of reasons.  First, Basin asserts that the Wholesale Power Contracts are freely negotiated bilateral agreements between Basin and each Member.[46]  Basin states that the Wholesale Power Contracts were formed at the behest of its Members to permit them to satisfy their collective needs more effectively than if the Members acted independently, in part by taking advantage of economies of scale.  Basin explains that the rates charged under each Wholesale Power Contract are described and detailed in Rate Schedule A and that Rate Schedule A is designed to ensure that Basin is able to meet its obligations under the Wholesale Power Contracts.  In addition, with respect to Basin's Wholesale Power Contracts, Basin asserts that there are numerous substantial differences in contract terms and options negotiated by the Members:

> For example, some of the Wholesale Power Contracts extend through December 31, 2050, some through January 1, 2075, and some through December 31, 2075.  Some of the Wholesale Power Contracts require six months' notice for termination while others require five years' notice.  Certain of the Wholesale Power Contracts permit the Member to obtain service from another supplier (other than [Western Area Power Administration (WAPA)]).  Other Wholesale Power Contracts permit the Member to purchase a fixed amount of electric power and energy at a CROD.  Still other Wholesale Power Contracts include negotiated terms, conditions, and rates that apply only to service to certain of the Member's own members.  Further, certain of the Wholesale Power Contracts limit or specify patronage allocations.  In some of the Wholesale Power Contracts, [Basin] has the right to bid on assets in the event that a Member decides to sell, transfer, or otherwise dispose of all or a substantial portion of its system or assets.  Further, several of the Wholesale Power Contracts include modifications to the rates that the Member pays for service from [Basin].[47]

---

[45] *Id.* (quoting *NOVEC*, 114 FERC ¶ 61,240 at P 18).

[46] *Id.* at 14-15.

[47] Transmittal, Docket No. ER20-2442-000, at 63 (citations omitted).

Docket No. ER20-2441-000, et al.                                          - 11 -

Basin argues that the differences in contract terms and options available to Members demonstrate that there was no unfair dealing when Basin and each Member entered into and later modified their Wholesale Power Contracts.[48]

22.     Second, Basin asserts that Rate Schedule A and the Wholesale Power Contracts are not part of any tariff of general applicability.[49]  Basin notes that only those Basin Members that have agreed, through a Wholesale Power Contract, to pay for services under Rate Schedule A are affected by the stated rate contained in Rate Schedule A. Basin states that, in other words, Rate Schedule A's applicability is restricted to the bilateral Wholesale Power Contracts between Basin and each of its 18 Class A Members and its one Class D Member.  Further, Basin argues that while the 19 individual Wholesale Power Contracts call for the application of Rate Schedule A to determine rates, they are not identical, and are the result of individual negotiations.  Basin asserts that, in similar circumstances, the Commission rejected attempts to impose upon Old Dominion provisions that are required for tariffs of general applicability "since the Revised Formula Rate is strictly confined to the [wholesale power contracts] between [Old Dominion] and its Member Cooperatives, which will be able to familiarize themselves with both the rate filing and the supporting data."[50]  Basin notes that, here, the 19 Members that take service under Rate Schedule A were granted the opportunity to review and provide input into Basin's 2019 and 2020 Rate Schedule A.[51]

23.     Third, Basin argues that Rate Schedule A and the Wholesale Power Contracts promote stability and eliminate volatility by ensuring that Basin can provide and the Members receive electric service.[52]  Basin notes that the Supreme Court has explained that "[t]he FPA recognizes that contract stability ultimately benefits consumers, even if short-term rates for a subset of the public might be high by historical standards—which is why it permits rates to be set by contract and not just by tariff."[53]

---

[48] Transmittal, Docket No. ER20-2441-000, at 14.

[49] *Id.* at 15.

[50] *Id.* (quoting *Old Dominion Elec. Coop.*, Opinion No. 553, 158 FERC ¶ 61,045, at P 117 (2017) (*ODEC*), *reh'g denied*, Opinion No. 553-A, 162 FERC ¶ 61,262 (2018)).

[51] *Id.* at 15-16.

[52] *Id.* at 16.

[53] *Id.* (quoting *Morgan Stanley*, 554 U.S. at 551).

### D.     Request for Waiver of the Prior Notice Requirement and Effective Date

24.    Basin requests that the Commission accept its Rate Schedule A and Wholesale Power Contract filings and grant waiver of the prior notice requirement[54] to allow: (1) an effective date for its 2019 Rate Schedule A and Wholesale Power Contracts of November 1, 2019, the date on which Basin states that it became subject to the Commission's jurisdiction under section 201(f) of the FPA;[55] and (2) an effective date for its 2020 Rate Schedule of January 1, 2020.[56]  In the alternative, Basin requests that the Commission accept its filings effective September 14, 2020, 60 days after the date of filing.[57]

25.    Basin states that it has made a good faith effort to comply with the prior notice requirement, noting that it submitted its 2019 Filings 60 days before it expected to become subject to the Commission's jurisdiction after Tri-State admitted Mieco.[58]  Basin further states that granting waiver of the prior notice requirement will not have adverse effects on its customers because there is no change to its existing rate.  Finally, Basin asserts that it is similarly situated to other entities that have been previously granted waiver of the prior notice requirement because the entities' extenuating circumstances

---

[54] 16 U.S.C. § 824d(d); 18 C.F.R. § 35.11; *Cent. Hudson Gas & Elec. Corp.*, 60 FERC ¶ 61,106, at 61,339, *reh'g denied*, 61 FERC ¶ 61,089, at 61,353-54 & n.3 (1992).

[55] Basin explains that 2019 Rate Schedule A was approved by the Board with an effective date of January 1, 2019, but because Basin ceased to qualify for an exemption from Commission regulation under the FPA on November 1, 2019, Basin is submitting it for Commission approval with a requested November 1, 2019 effective date. Transmittal, Docket No. ER20-2441-000, at 1.

[56] *Id.*

[57] *Id.* at 34.

[58] *Id.* at 36-37 & n.89.

Docket No. ER20-2441-000, et al.                                                           - 13 -

have precluded compliance,[59] including where previously non-jurisdictional cooperatives have transitioned to Commission jurisdiction.[60]

## III. Notice of Filings and Responsive Pleadings

26.     Notice of the Rate Schedule A filing in Docket No. ER20-2441-000 was published in the *Federal Register*, 85 Fed. Reg. 44,297 (July 22, 2020), with interventions and protests due on or before August 6, 2020.  Notice of the Wholesale Power Contracts filing in Docket No. ER20-2442-000 was published in the *Federal Register*, 85 Fed. Reg. 44,297-44,298 (July 22, 2020), with interventions and protests due on or before August 6, 2020.  The Appendix to this order lists the entities that filed motions to intervene, motions to intervene out-of-time, protests, comments, and answers.

## IV. Discussion

### A. Procedural Matters

27.     Pursuant to Rule 214 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.214 (2020), the timely, unopposed motions to intervene serve to make the entities that filed them parties to the proceedings in which they filed them. Pursuant to Rule 214(d) of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.214(d) (2020), the Commission grants Roughrider Electric Cooperative, Inc.'s (Roughrider) late-filed motion to intervene given its interest in the proceedings, the early stage of the proceedings, and the absence of undue prejudice or delay.[61]

28.     Rule 213(a)(2) of the Commission's Rule of Practice and Procedure, 18 C.F.R. § 385.213(a)(2) (2020), prohibits an answer to a protest or answer unless otherwise

---

[59] *Id.* at 34 (citing *Panda Stonewall LLC*, 162 FERC ¶ 61,261, at P 12 (2018); *Appalachian Power Co.*, 63 FERC ¶ 61,165, at 62,150 (1993); *Nev. Power Co.*, 141 FERC ¶ 61,254, at P 29 (2012); *Midwest Energy, Inc.*, 74 FERC ¶ 61,096, at 61,293-94 (1996)).

[60] For example, Basin notes that the Commission waived prior notice and accepted an agreement to be effective six months prior to the date of filing.  *Id.* at 36 n.88 (citing *Sussex Rural Elec. Coop.*, 102 FERC ¶ 61,335 (2003)).

[61] In its motion to intervene in Docket Nos. ER20-2441-000 and ER20-2442-000, Charles Mix Electric Assn., Inc. also sought to intervene in Docket Nos. ER20-1-000 and ER20-2-000.  We note that the proceedings in Docket Nos. ER20-1-000 and ER20-2-000 have been closed, and in any event, the Commission has already granted Charles Mix Electric Assn., Inc. party status in those proceedings.  November 2019 Order, 169 FERC ¶ 61,158 at P 17.

Docket No. ER20-2441-000, et al.                                    - 14 -

ordered by the decisional authority.  We accept Basin's, McKenzie's, and Tri-State's answers because they have provided information that assisted us in our decision-making process.

### B.    Substantive Matters

29.    As discussed further below, we dismiss as moot Basin's 2019 Rate Schedule A, and we accept Basin's 2020 Rate Schedule A and Wholesale Power Contracts, effective September 15, 2020.  We also institute an investigation pursuant to FPA section 206 in Docket No. EL20-68-000 to determine whether Basin's 2020 Rate Schedule A and Wholesale Power Contracts are just and reasonable.  In addition, we establish a refund effective date, and we establish hearing and settlement judge procedures.

### 1.    Threshold Issues

#### a.    Initial Rate vs. Changed Rate

##### i.    Comments

30.    Sierra Club argues that Basin's rates should be considered changed rates rather than initial rates.[62]  Accordingly, Sierra Club requests that the Commission reject Basin's Rate Schedule A filing for failing to include the supporting information required by section 35.13 of the Commission's regulations (i.e., the section of the Commission's regulations pertaining to the filing of changed rates under the FPA).[63]

31.    Sierra Club asserts that the legally established benchmark for "initial rates" is that the rates "cover new services rendered to new customers."[64]  Sierra Club asserts that Basin's Rate Schedule A filing does not satisfy the Commission's narrow definition of an initial rate because, according to Sierra Club, Basin is neither proposing to serve new customers nor proposing to provide new services.  Sierra Club notes that in *Nevada Power*, the Commission refused to treat certain power agreements as "initial rates" since "the customers receiving service under the supplemental firm power agreements with

---

[62] Sierra Club Protest at 14.

[63] *Id.*; *see also infra* Section IV.B.2.b.

[64] Sierra Club Protest at 14 & n.50 (quoting *Otter Tail Power Co. v. FERC*, 583 F.2d 399, 406 (D.C. Cir. 1978) (*Otter Tail*)) (citing *Sw. Electric Power Co.*, 39 FERC ¶ 61,099 at 61,293 (1987); *San Francisco Bay Area Rapid Transit Dist. v. Pac. Gas & Elec. Co.*, 154 FERC ¶ 61,025, at P 11 (2016); *Nev. Power Co.*, 55 FERC ¶ 61,379, at 62,152 (1991) (*Nevada Power*); *Fla. Power & Light Co.*, 65 FERC ¶ 61,411, at 63,128, n.28 (1993); *N. States Power Co.* (*Minnesota*), 74 FERC ¶ 61,106, at 61,345 (1996)).

Docket No. ER20-2441-000, et al.                                                    - 15 -

Nevada Power are not new" and "Nevada Power has been providing these customers with other services under other agreements."[65]  Sierra Club argues that, likewise, because each of Basin's Members have previously received wholesale power from Basin pursuant to Wholesale Power Contracts, the Rate Schedule A filing does not satisfy the "new customer" element of the Commission's strict initial rate definition.[66]  Further, Sierra Club observes that Basin has been providing service to its Members for decades and argues that given the length of time over which the Wholesale Power Contracts have been in effect, the proposed rate in Rate Schedule A cannot be found to offer a new service.[67]

### ii.        **Basin's Answer**

32.        Basin argues that it properly filed Rate Schedule A as an initial rate.[68]  Basin states that this is consistent with the Commission's discussion of the requirements in section 35.12 of the Commission's regulations and with the Commission's suggestion that Basin resubmit its Rate Schedule A.[69]  Further, Basin argues that, while the Rate Schedule A filing is a continuation of the rate Basin charges to its Members, it is an initial rate with respect to the Commission's jurisdiction.

### iii.       **Commission Determination**

33.        Contrary to Sierra Club's arguments, we find that Basin's Rate Schedule A is an initial rate.

34.        We agree with Sierra Club that an initial rate must cover a new service to a new customer.[70]  We find that Basin's Rate Schedule A filing meets this standard because it covers new jurisdictional services to new customers—i.e., customers, who, for the first time, are taking jurisdictional services from Basin.  Although Sierra Club emphasizes the length of time over which Basin has provided wholesale service to its Members, Sierra Club does not acknowledge the importance of Basin becoming a newly jurisdictional entity under the FPA.  The significance of the distinction between an initial rate vis-à-vis

---

[65] *Id.* at 15 (quoting *Nevada Power*, 55 FERC ¶ 61,379 at 62,152).

[66] *Id.*

[67] *Id.* at 16.

[68] Basin Aug. 21, 2020 Answer at 59.

[69] *Id.* (citing November 2019 Order, 169 FERC ¶ 61,158 at P 20).

[70] *See supra* note 64.

Docket No. ER20-2441-000, et al.                                         - 16 -

a changed rate stems from the FPA itself.[71]  Specifically, unlike with a changed rate, the Commission lacks the authority under FPA section 205 to suspend an initial rate.[72]  This distinction between an initial rate and a changed rate ties directly to the FPA and the limitation under the FPA that the Commission may suspend a changed rate but not an initial rate.  Therefore, it follows that a recent change in jurisdictional status under this statute is pertinent to determining whether a filing reflects an initial rate or a changed rate.

35.    Moreover, unlike here, *Nevada Power* did not involve an entity that had been providing wholesale service but that had formerly been exempt from the Commission's jurisdiction under the FPA section 201(f) exemption.  Thus, *Nevada Power* is inapposite.

### b.    Standard of Review

### i.    Comments

36.    Big Flat Electric Cooperative, Inc. (Big Flat), Black Hills Electric Cooperative, Inc. (Black Hills), Central Power, Grand Electric, KEM Electric, Members 1st Power Cooperative and Powder River Energy Corporation (collectively, Members 1st), Mor-Gran-Sou, Northern Plains Electric Cooperative, Inc. (Northern Plains), Northwest Iowa, Roughrider, Slope Electric Cooperative, Inc. (Slope), Verendrye Electric Cooperative (Verendrye), and West River Electric Association Inc. (West River) argue that, considering the unique nature of cooperatives and the important role their wholesale power contracts play in securing a long-term source of power for the member and allowing the cooperative access to capital, the Commission should employ the more rigorous public interest application of the just and reasonable standard of review when considering Basin's Wholesale Power Contracts and the associated rates.[73]  These commenters argue that the numerous and substantial differences in contract terms and options negotiated by the Members detailed in Basin's Wholesale Power Contracts filing

---

[71] *See Otter Tail*, 583 F.2d at 405 (finding that the text of FPA sections 205(d), 205(e), and 206 "make it clear that the initial rate/changed rate dichotomy is relevant only in the context of the Commission's power to ensure that utility rates are just and reasonable.").

[72] *See, e.g.*, *id.* at 404; *Middle S. Energy, Inc. v. FERC*, 747 F.2d 763, 765, 772 (1984).

[73] Big Flat Comments at 4; Black Hills Comments at 5-6; Central Power Comments at 5-6; Grand Electric Comments at 4; KEM Comments at 5-6; Members 1st Comments at 4-5; Mor-Gran-Sou Comments at 6; Northern Plains Comments at 5-6; Northwest Iowa Comments at 4; Roughrider Comments at 7; Slope Comments at 6; Verendrye Comments at 5-6; West River Comments at 5-6.

demonstrate that the agreements were freely negotiated. They assert that those differences also establish that Basin's Class A and D Members are sophisticated parties who have had and have taken the opportunity to modify the rates, terms, and conditions under which they take service from Basin. Further, these commenters argue that Basin's Wholesale Power Contracts are not generally applicable tariffs or rates; they explain that, instead, each Member has negotiated its own Wholesale Power Contract, which applies only to the relationship between Basin and that Member.

37.     In addition, Big Flat, Black Hills, Central Power, Grand Electric, KEM, Members 1st, Mor-Gran-Sou, Northern Plains, Northwest Iowa, Roughrider, Slope, Verendrye, and West River contend that the Commission should approve Rate Schedule A as just and reasonable.[74] These commenters contend that, like the Wholesale Power Contracts, Basin's Rate Schedule A is also freely negotiated between Basin and its Members and is not a tariff of general applicability because it applies only to sales by Basin to its Members. They note that under Basin's Wholesale Power Contracts, the Board, which is comprised of representatives of the same Members who executed the Wholesale Power Contracts, reviews and approves the rate structure detailed in Rate Schedule A, and as required under the Wholesale Power Contracts, Rate Schedule A also is reviewed at least annually and updated accordingly. These commenters assert that, because of this, and because the rates charged under Rate Schedule A are agreed to by Basin's Members, benefit Basin's Members, and do not harm the public interest, the Commission should find Rate Schedule A to be just and reasonable.

38.     Central Montana, East River, and Rushmore state that they strongly support Basin's position advocating the Commission's application of the "public interest" standard in determining whether the Wholesale Power Contracts and Rate Schedule A are just and reasonable under the FPA.[75] They assert that application of the public interest standard is particularly appropriate here, given, the direct involvement and supervision of Basin's Members in formulating and annually reviewing the rates under the Wholesale Power Contracts. Central Montana, East River, and Rushmore argue that, without a doubt, the Wholesale Power Contracts and Rate Schedule A were drafted through freely-

---

[74] Big Flat Comments at 6; Black Hills Comments at 7; Central Power Comments at 8; Grand Electric Comments at 6; KEM Comments at 7-8; Members 1st Comments at 5-6; Mor-Gran-Sou Comments at 7; Northern Plains Comments at 7; Northwest Iowa Comments at 5-6; Roughrider Comments at 8; Slope Comments at 7-8; Verendrye Comments at 7; West River Comments at 7.

[75] Central Montana Comments at 7; East River Comments as 7; Rushmore Comments at 7.

Docket No. ER20-2441-000, et al.                                      - 18 -

negotiated, arm's-length bargaining between Basin and each of its Class A Members.[76] These commenters agree with Basin that the rates set forth in Rate Schedule A are designed to ensure that Basin is able to meet its obligations under the Wholesale Power Contracts.  Further, they agree with Basin that the Wholesale Power Contracts and Rate Schedule A promote stability and allow the Members to benefit from economies of scale. Central Montana, East River, and Rushmore assert that the Commission should accept each of the Wholesale Power Contracts and Rate Schedule A as is, without reforming, modifying or abrogating any rate, term or condition therein.[77]

39.    In contrast, McKenzie Electric Cooperative, Inc. (McKenzie), Sierra Club, and Tri-State argue that the proposed Rate Schedule A and the Wholesale Power Contracts do not meet the standard for *Mobile-Sierra* treatment.  McKenzie, Sierra Club, and Tri-State disagree with Basin's assertions that the Wholesale Power Contracts are freely negotiated bilateral agreements between Basin and each Member and that Rate Schedule A is not part of any tariff of general applicability.[78]  McKenzie, Sierra Club, and Tri-State explain that Rate Schedule A applies generally to all Class A and Class D Members and is not negotiated on an individualized basis, and the Wholesale Power Agreements are effectively service agreements under the generally applicable Rate Schedule A. McKenzie and Sierra Club argue that the circumstances in the Tri-State Stated Rate Tariff proceeding are identical, or nearly identical, to the circumstances in Basin's Rate Schedule A and Wholesale Power Contracts filings.[79]  McKenzie and Sierra Club further argue that, just as the Commission found in the Tri-State Stated Rate Order, Basin's Wholesale Power Contracts are remarkably similar with only a handful of modest variations across its entire portfolio of agreements, are akin to service agreements rather than separately negotiated agreements, and Rate Schedule A is a generally applicable tariff to which the *Mobile-Sierra* presumption of reasonableness does not apply.[80]  Tri-

---

[76] Central Montana Comments at 8; East River Comments as 8; Rushmore Comments at 7.

[77] Central Montana Comments at 1, 8; East River Comments as 1, 8; Rushmore Comments at 1, 8.

[78] McKenzie Protest at 26; Sierra Club Protest at 5; Tri-State Protest at 15.

[79] McKenzie Protest at 26; Sierra Club Protest at 5-6; Tri-State Protest at 15 (all citing *Tri-State Generation and Transmission Ass'n, Inc.*, 170 FERC ¶ 61,221, at P 44 (Tri-State Stated Rate Order), *order on reh'g*, 172 FERC ¶ 61,180 (2020)).

[80] McKenzie Protest at 26; Sierra Club Protest at 5-6 (both citing Tri-State Stated Rate Order, 170 FERC ¶ 61,221 at P 44).  Sierra Club contends that one modest variation is, for example, that Basin only offered two term lengths (i.e., 2050 and 2075) for all 19 Wholesale Power Contracts.  Sierra Club Protest at 8-9.

Docket No. ER20-2441-000, et al.                                    - 19 -

State states that the Wholesale Power Contracts are "almost entirely conforming" with only "minor differences" and thus should not be considered individualized contracts.[81]

40.     McKenzie explains that it has no representation on the Board and its ability to influence the Board through Upper Missouri is extremely limited.  According to McKenzie, the disputed costs associated with DGC and termination provisions in the Wholesale Power Contracts are indicative of the unequal bargaining power between Basin and its customers who have "no way out of the spiraling costs in an increasingly uncooperative system."[82]

## ii.     **Answers**

41.     Basin argues that its Wholesale Power Contracts qualify for the *Mobile-Sierra* presumption because they contain differences in contract terms and options available to Members, are not part of any tariff of general applicability, and were freely negotiated on an arm's-length basis.[83]  Basin asserts that, though McKenzie, Tri-State, and Sierra Club point to the similarities in the Wholesale Power Contracts, they dismiss significant differences.  Basin argues that, unlike Tri-State's identical Wholesale Electric Service Contracts, Basin's 19 Wholesale Power Contracts vary from agreement to agreement.[84]  Basin notes that, for example, three of the Wholesale Power Contracts permit the Member to purchase a fixed amount of electric power and energy at a CROD.[85]  Further, Basin notes that three Wholesale Power Contracts permit the Member to obtain service from another supplier.[86]  Basin explains that while several Members are entitled to receive preference power deliveries from WAPA, only three Members have negotiated Wholesale Power Contracts that permit them to purchase non-preference power.

42.     In addition, Basin states that five of its 19 Wholesale Power Contracts include special provisions addressing service to specific members of the Member and that these provisions are not identical to each other.[87]  Basin explains that, for example, its

---

[81] Tri-State Protest at 15 & n.55.

[82] McKenzie Protest at 26.

[83] Basin Aug. 21, 2020 Answer at 29.

[84] *Id.*

[85] *Id.* at 29-30.

[86] *Id.* at 30.

[87] *Id.* at 30-31.

Docket No. ER20-2441-000, et al.                                        - 20 -

Wholesale Power Contract with Corn Belt provides that Basin shall sell and deliver to
Corn Belt and Corn Belt shall purchase and receive from Basin all the electric power and
energy needs that Corn Belt shall require to serve Grundy County Rural Electric
Cooperative's service to the City of Dike, Iowa.  Basin also explains that under the
Wholesale Power Contract with East River, there are separate terms and conditions
governing Basin's provision of power and energy to East River to serve Agralite Electric
Cooperative, Meeker Cooperative Light & Power Association (Meeker), Redwood
Electric Cooperative, and South Central Electric Association.

43.     Finally, Basin asserts that an illustration that the Wholesale Power Contracts are
freely negotiated is the fact that some of the Wholesale Power Contracts extend through
December 31, 2050, some through January 1, 2075, and some through December 31,
2075.[88]  Basin argues that, contrary to Sierra Club's statement, the difference in term
exists not because Basin offered only two contract lengths, but instead because certain
Members elected to extend their agreements while others did not.  Basin contends that the
above descriptions demonstrate that the differences among the Wholesale Power
Contracts are not "minor" and that the Wholesale Power Contracts are not "almost
entirely conforming," but rather that the Wholesale Power Contracts are individualized to
reflect the needs and circumstances of each individual Member.[89]

44.     McKenzie reiterates that the *Mobile-Sierra* presumption should not apply to
Basin's Rate Schedule A or the Wholesale Power Contracts.[90]  McKenzie asserts that
because Rate Schedule A is determined by Basin's Board, there is no basis to determine
that Rate Schedule A was negotiated between Basin and its Members on an
individualized basis.[91]  Further, McKenzie argues that the language in Basin's Wholesale
Power Contracts is almost identical.  McKenzie asserts that, had the Wholesale Power
Contracts been the product of adversarial negotiations, a wider range of terms and
conditions would have resulted.  Moreover, McKenzie argues that Basin's Wholesale
Power Contracts are not materially different from Tri-State's Wholesale Electric Service
Contracts denied the *Mobile-Sierra* presumption.[92]

45.     Similarly, Tri-State argues that neither Basin's Rate Schedule A nor Basin's
Wholesale Power Contracts meet the Commission's standards for *Mobile-Sierra*

---

[88] *Id.* at 33 (citations omitted).

[89] *Id.* at 31.

[90] McKenzie Answer at 3-4.

[91] *Id.* at 4.

[92] *Id.* (citing Tri-State Stated Rate Order, 170 FERC ¶ 61,221 at PP 45-46).

Docket No. ER20-2441-000, et al.                                         - 21 -

treatment.[93]  Tri-State argues that Basin's Rate Schedule A and Wholesale Power
Contracts are generally applicable.[94]  Tri-State argues that the differences between
Basin's Wholesale Power Contracts do not meaningfully reflect individualized rates,
terms or conditions.  Tri-State asserts that a review of the Wholesale Power Contracts
makes clear that each document overwhelmingly conforms to the others.  According to
Tri-State, that Basin offers two types of contracts generally covered by the same rate
schedule (i.e., fixed CROD and full-requirements contracts), and that certain Wholesale
Power Contracts reference Class B and/or C Members of Basin, are not meaningful
distinctions.  Further, Tri-State contends that the public interest standard should not
attach to Rate Schedule A because Rate Schedule A sets out rates that apply to all of the
Wholesale Power Contracts, regardless of any perceived differences, and which are not
individually negotiated by Members.[95]

46.     In addition, Tri-State argues that Basin's Filings were not freely negotiated under
circumstances that assure justness and reasonableness.[96]  Tri-State contends that Basin's
Rate Schedule A was not subject to negotiation at all, and discussion around the
Wholesale Power Contracts was not accomplished on an even playing field.[97]  Tri-State
asserts that the negotiations surrounding the extensions to Basin's Wholesale Power
Contracts were not held at arm's-length.[98]  Tri-State asserts that, underlying Basin's
efforts to extend Wholesale Power Contracts with Members from 2050 to 2075, were
several interrelated proposals, including, *inter alia*, Board Policy 10 and other rate
modifications.  Tri-State asserts these proposals benefitted those Members who extended
their Wholesale Power Contracts and harmed those who did not.  Tri-State states that it
significantly objected to the institution of Board Policy 10 and other policies which,
according to Tri-State, would have similar discriminatory, cost-shifting consequences.
However, Tri-State asserts that it, and other Members with 2050 Contracts, had no
leverage given that these proposals were considered ratemaking policies over which
Basin retained sole discretion.[99]

---

[93] Tri-State Answer at 8-14.

[94] *Id.* at 9.

[95] *Id.* at 10 (citation omitted).

[96] *Id.* at 10-14.

[97] *Id.* at 14.

[98] *Id.* at 12.

[99] *Id.* at 13.

Docket No. ER20-2441-000, et al.                                               - 22 -

### iii.    **Commission Determination**

47.    As discussed below, we find that Basin's Rate Schedule A, which includes, *inter alia*, Board Policy 10, is not eligible for the *Mobile-Sierra* "public interest" presumption, but that we do not have a sufficient record to determine whether the presumption applies to Basin's Wholesale Power Contracts.

48.    The *Mobile-Sierra* "public interest" presumption applies only if an agreement has certain characteristics that justify the presumption.  In ruling on whether the characteristics necessary to justify a *Mobile-Sierra* presumption are present, the Commission must determine whether the agreement at issue embodies either: (1) individualized rates, terms, or conditions that apply only to sophisticated parties who negotiated them freely at arm's-length; or (2) rates, terms, or conditions that are generally applicable or that arose in circumstances that do not provide the assurance of justness and reasonableness associated with arm's-length negotiations.  Unlike the latter, the former constitute contract rates, terms, or conditions that necessarily qualify for a *Mobile-Sierra* presumption.[100]

49.    We find that the *Mobile-Sierra* presumption does not apply to Basin's Rate Schedule A because it is generally applicable to all Members with Wholesale Power Contracts and is not negotiated between Basin and a Member on an individualized basis.  Rather, as Basin has explained, Rate Schedule A is ultimately approved by its Members through their representatives to the Board and that any disputes concerning the rates are resolved through the democratic cooperative governance process.[101]

50.    We disagree with Basin that the fact that Rate Schedule A's applicability is restricted to the bilateral Wholesale Power Contracts between Basin and each of its 18 Class A Members and its one Class D Member demonstrates that Rate Schedule A is not generally applicable.  To the contrary, we find that the proper scope of the inquiry of general applicability here concerns Basin's wholesale customers (i.e., its Class A and D Members).  Contrary to Basin's assertions, we find *ODEC* to be inapposite.  *ODEC* addressed the filing by Old Dominion of a cost-of-service rate schedule, which reflected

---

[100] *E.g., Linden VFT, LLC v. Pub. Serv. Elec. and Gas Co.*, 161 FERC ¶ 61,264, at P 27 (2017), *order on reh'g*, 170 FERC ¶ 61,023 (2020); *PJM Interconnection, L.L.C.*, 161 FERC ¶ 61,262, at P 46 (2017), *order on reh'g*, 170 FERC ¶ 61,021 (2020); *Sw. Power Pool, Inc.*, 144 FERC ¶ 61,059, at P 127 (2013), *order on reh'g and compliance*, 149 FERC ¶ 61,048, at P 94 (2014) (citations omitted); *Midwest Indep. Transmission Sys. Operator, Inc.*, 142 FERC ¶ 61,215, at P 177 (2013), *order on reh'g and compliance*, 147 FERC ¶ 61,127, at P 108 (2014) (citations omitted).

[101] Transmittal, Docket No. ER20-2441-000, at 16, 20.

Docket No. ER20-2441-000, et al.                                                    - 23 -

various revisions to its prior formula rate.[102]  No party raised the argument, and the Commission did not find, that the *Mobile-Sierra* presumption applied to Old Dominion's prior formula rate or to its new cost-of-service rate schedule.

51.     In contrast, we find that we do not have a sufficient record to determine whether the *Mobile-Sierra* presumption applies to Basin's Wholesale Power Contracts. Accordingly, we include this issue as part of the hearing and settlement judge procedures ordered below.[103]

### 2.   **Wholesale Power Contracts and Rate Schedule A**

### a.   **Wholesale Power Contracts**

### i.   **Comments**

52.     McKenzie asserts that because Basin's withdrawal and termination procedures are a practice or regulation affecting its wholesale rates, Basin was required to file its withdrawal and termination procedures when it became a public utility.[104]  McKenzie argues that Basin's failure to file such procedures does not strip the Commission of jurisdiction over such procedures, asserting that the Commission has a duty to ensure the procedures are just and reasonable because they directly affect the wholesale rates at issue in these proceedings.[105]  Further, McKenzie states that the Commission has recognized that the assessment of cooperative exit charges falls within its jurisdiction "as a rule or practice directly affecting . . . jurisdictional wholesale rates."[106]

53.     McKenzie contends that Basin has placed its withdrawal and termination procedures at issue in this proceeding.[107]  McKenzie asserts that Basin coerced and misled McKenzie and other Members into agreeing to amendments of their wholesale contracts that extended them to 100-year terms, and McKenzie also asserts that Basin refused to provide any estimate of its exit charges when requested by McKenzie.

---

[102] *ODEC*, 158 FERC ¶ 61,045 at P 2.

[103] *See infra* Section IV.B.2.c.

[104] McKenzie Protest at 28 (citing 16 U.S.C. § 824d(c)).

[105] *Id.* at 28-29 (citations omitted).

[106] *Id.* at 28 (quoting *Tri-State Generation & Transmission Ass'n, Inc.*, 170 FERC ¶ 61,224 at P 119).

[107] *Id.* at 29.

Docket No. ER20-2441-000, et al.                                                                     - 24 -

McKenzie states that Basin made membership dependent on the wholesale contracts and Rate Schedule A and vice versa—i.e., access to Rate Schedule A and the wholesale contracts was contingent on membership.[108]  McKenzie argues that, in short, the withdrawal and termination procedures and exit charges are an essential part of, and directly affect, Basin's wholesale rates and that, therefore, the Commission has a duty to consider them in this proceeding and to ensure that they are just and reasonable.[109]

54.     Further, McKenzie argues that Basin's Wholesale Power Contracts are unjust and unreasonable because they do not provide any mechanism for Members to withdraw from the cooperative system and terminate their wholesale contracts and thereby their participation in Rate Schedule A.[110]  McKenzie argues that the Basin Bylaws clearly allow for voluntary withdrawal from Basin, noting that section 7 of Basin's Bylaws provides: "'[i]f . . . any Member shall voluntarily withdraw from membership in the Cooperative . . . the membership of such Member shall forthwith be canceled.'"[111]  McKenzie also quotes the following section 8 of Basin's Bylaws:

> Subject to the provisions of Section 7 of this Article I, a Member may withdraw from membership upon compliance with such equitable terms and conditions as the [Board] may prescribe; provided, however, that no Members shall be permitted to withdraw until it has met all its contractual obligations to the Cooperative.[112]

McKenzie states that Basin also maintains an approval right with respect to McKenzie's withdrawal from Upper Missouri.[113]  McKenzie concludes that, therefore, obtaining Basin's terms and conditions for withdrawal and approval are the principal barriers McKenzie faces in evaluating its termination and withdrawal options.

---

[108] *Id.*

[109] *Id.* at 28-29.

[110] *Id.* at 27; *see also id.* at 5, 29-33.

[111] *Id.* at 29 (quoting Attach. 15, Basin Bylaws, at sec. 7).

[112] *Id.* at 29-30 (quoting Attach. 15, Basin Bylaws, at sec. 8).

[113] *Id.* at 30 (citing Attach. 5, Upper Missouri Policy Number C-9).

Docket No. ER20-2441-000, et al.                                                                  - 25 -

55.      McKenzie contends that Basin has refused to provide the terms of a withdrawal or
to reasonably engage in discussions on the topic.[114]  McKenzie states that, in early 2019,
it asked Upper Missouri to contact Basin and obtain an exit charge for McKenzie—i.e.,
the price at which Basin would approve a termination agreement and would allow
McKenzie to exit the cooperative system.  McKenzie asserts that when Upper Missouri
followed through on McKenzie's request by asking Basin for "the process and parameters
that Basin would utilize to calculate the financial liability (of Basin & associated business
units) to each of the Member Systems," Basin refused.[115]  McKenzie also asserts that
when another Class C Member, Meeker, requested a buy-out number from Basin, Basin's
response was to ask its Class A Members to sign joint defense agreements, which,
according to McKenzie, was an apparent effort to hide business information from and
stymie the strategic planning of its own Members.[116]

56.      McKenzie argues that Basin's response to its Members' requests demonstrates the
lack of relative bargaining power between Basin and its Members.[117]  McKenzie argues
that cooperatives, like itself, that are considering withdrawal are left weighing the
unsuitable options of paying potentially staggering exit charges or continuing to be
subject to their supplier's unrestrained spending.  McKenzie states that its situation is
worse because the withdrawal policies of Basin and Upper Missouri only permit a
Member to withdraw upon terms and conditions determined by Basin, and Basin refuses
to provide the terms of its approval.  McKenzie argues that this dual-key withdrawal
system has locked McKenzie in the Basin-Upper Missouri system with little or no ability
to escape without the Commission's intervention.[118]

57.      McKenzie contends that, in sum, the termination provisions are essential to
Basin's Filings and are unjust and unreasonable because they violate the principle of
voluntary and open membership.[119]  McKenzie argues that the termination provisions
result in a dynamic that unreasonably restricts competition by preventing McKenzie from
evaluating other generation options.  McKenzie contends that the Commission should
find that the withdrawal and termination provisions, as implemented by Basin, are unjust

---

[114] *Id.*

[115] *Id.* (quoting Attach. 10, Letter from McKenzie to Upper Missouri, dated
Jan. 30, 2019).

[116] *Id.* at 30-31.

[117] *Id.* at 31.

[118] *Id.* at 31-32.

[119] *Id.* at 32.

Docket No. ER20-2441-000, et al.                                                                 - 26 -

and unreasonable and should direct Basin to provide to its Members, in response to any such request, an estimate of their costs to buy-out of their contracts and exit the cooperative.[120]

58.     Dakota Energy and Meeker each adopt and incorporate McKenzie's protest, stating that the issues and concerns that McKenzie identified apply equally to their relationship with Basin.  Dakota Energy and Meeker each request that the Commission accept Basin's Filings subject to the outcome of an investigation under FPA section 206 and evidentiary hearing or settlement judge procedures.[121]

## ii.    Answers

59.     Basin asserts that terminations pursuant to the Wholesale Power Contracts are just and reasonable and that the Commission should dismiss arguments in McKenzie's protest concerning the termination provisions of the Wholesale Power Contracts as outside the scope of the proceeding.[122]  Basin contends that because the Wholesale Power Contracts are clear on their face and include termination provisions that are just and reasonable, Basin does not have in place separate Board Policies governing early termination or voluntary load reductions.[123]

60.     Basin argues that the Commission should dismiss McKenzie's argument that the Wholesale Power Contracts are not just and reasonable because they do not provide a mechanism for Members to withdraw from the cooperative system and terminate their wholesale contracts.[124]  Basin contends that this is demonstrably false because each Wholesale Power Contract includes clear termination provisions, which require notice of termination for the end of the contract term, allowing the Member to ensure that the contract does not remain in effect beyond 2075, or 2050, as the case may be.[125]  Further, Basin argues that the term of the Wholesale Power Contracts is just and reasonable because it is designed to cover Basin's investment in new infrastructure to serve the

---

[120] *Id.* at 32-33.

[121] Dakota Energy Protest at 5; Meeker Protest at 3.

[122] Basin Aug. 21, 2020 Answer at 17.

[123] *Id.*

[124] *Id.* (citation omitted).

[125] *Id.* at 18 (citing Filing, Docket No. ER20-2441-000, Attach. AI, FERC Rate Schedule No. 17, Wholesale Power Contract by and between Basin Electric Power Cooperative and Upper Missouri G. & T. Electric Cooperative, Inc., section 10).

Docket No. ER20-2441-000, et al.                                         - 27 -

Member, and the length of the notice requirements are just and reasonable (five years in some cases, and six months in others) because Basin requires sufficient time to make appropriate arrangements for the orderly unwinding of any commitments and to ensure that remaining Members do not unfairly bear the costs associated with an exiting Member.[126]

61.    Basin observes that "it appears that McKenzie's true complaint is that the Wholesale Power Contracts do not allow for *early* termination."[127]  Basin asserts that McKenzie's claim that Basin has wrongfully refused to provide the terms and conditions for a Member's withdrawal and contract termination supports this interpretation.  Basin contends that its Members had the opportunity to negotiate a different provision that would allow for early termination and set forth the terms of such early termination and any applicable buy-outs.  Basin further contends that the lack of any such provision demonstrates that Basin and its Members determined that no such provision was necessary.[128]  Basin argues that the lack of an early termination provision supports Basin's determination that a request for a buy-out of the Wholesale Power Contracts is inappropriate and that it therefore need not furnish an exit charge.[129]

62.    Further, Basin argues that McKenzie mischaracterizes Basin's Bylaws as including withdrawal provisions.[130]  Basin states that McKenzie conflates the withdrawal provisions in sections 7 and 8 of Basin's Bylaws with Wholesale Power Contract withdrawal provisions.  Basin states that the Bylaws address only the termination of membership in Basin, and do not govern the termination of the Wholesale Power Contract, which creates rights and obligations separate from those created by membership alone.  Basin further asserts that the Bylaw provisions cited by McKenzie have no effect upon the termination provision in the Wholesale Power Contracts, and, instead, it is the Wholesale Power Contract termination provision that affects the membership termination provisions under the Bylaws.  Basin explains that, for instance, if Upper Missouri were to give notice of its intent to terminate its Wholesale Power Contract on December 31, 2070, the Wholesale Power Contract would terminate on December 31, 2075, at which time, pursuant to the Bylaws, Upper Missouri could terminate its membership in Basin,

---

[126] *Id.* at 20-21.

[127] *Id.* at 22 (emphasis in original).

[128] *Id.* at 23.

[129] *Id.* (citation omitted).

[130] *Id.* at 24.

Docket No. ER20-2441-000, et al.                                                          - 28 -

provided that Upper Missouri has paid all amounts outstanding under that Wholesale Power Contract.[131]

63.     Basin argues that McKenzie's arguments regarding the Upper Missouri termination and withdrawal provisions are outside the scope of these proceedings and should be disregarded.[132]  Basin asserts that the Commission should disregard McKenzie's arguments that Basin's terms and conditions for withdrawal are the principal barrier facing McKenzie as McKenzie evaluates termination and withdrawal options, as the provisions in Basin's Wholesale Power Contracts apply only to the bilateral agreement it has in place with the Member that signed the agreement.  Rather, Basin asserts the principal barrier is McKenzie's own contract with Upper Missouri.[133]

64.     Basin further states that the Commission should consider its Wholesale Power Contracts separately and apart from Rate Schedule A because, as noted in each Wholesale Power Contract, Rate Schedule A will be reviewed and updated by the Board at least annually.[134]  Basin asserts that Rate Schedule A can be, and is, modified by the Board independently of any modifications made to the Wholesale Power Contracts, and thus, Basin's Rate Schedule A and the Wholesale Power Contracts should be considered separately by the Commission.[135]

65.     McKenzie asserts that the Commission should find that Basin's termination provisions are anticompetitive and are unjust and unreasonable.[136]  McKenzie agrees that Basin's Wholesale Power Contract is directly with Upper Missouri and that, though the Wholesale Power Contract does contain language providing for expiration in 2075, it does not explicitly provide Upper Missouri with an exit prior to then.  McKenzie maintains, however, that there are no provisions in the Wholesale Power Contract that prevent Upper Missouri from allowing McKenzie or other members to withdraw from membership, or that prevent Upper Missouri from terminating its wholesale contract with

---

[131] *Id.* at 25.

[132] *Id.* at 26 (citation omitted).

[133] *Id.* at 27.

[134] *Id.* at 34-35.

[135] *Id.*

[136] McKenzie Answer at 5-6.

Docket No. ER20-2441-000, et al.                                         - 29 -

McKenzie.  McKenzie further asserts that Basin's Bylaws do not prevent McKenzie from withdrawing its membership from Basin or Upper Missouri.[137]

66.     McKenzie also asserts that, if as Basin claims, Upper Missouri's contract with McKenzie is the principal barrier to withdrawal, then Basin should not stand in the way of McKenzie's withdrawal.[138]  McKenzie states that its recent request—that Upper Missouri consult with Basin to provide McKenzie with a buy-out number that would allow it to exit membership—was denied and resulted in Basin issuing a Board resolution instructing Class A Members that they have no obligation to consider withdrawal requests.  McKenzie argues that Basin's terms and conditions for withdrawal affect not only its Class A Members, but also its Class C Members, such as McKenzie, and that these terms and conditions stifle competition and restrict customers' access to open markets.  McKenzie states, in sum, that Basin should be required to file all of its policies and procedures that address customer withdrawal, whether directly through its own membership or those that Basin enforces indirectly through its Class A Members.[139]

67.     In addition, McKenzie contends that the Commission must consider the Wholesale Power Contracts and Rate Schedule A together and should reject Basin's request that it consider the Wholesale Power Contracts and Rate Schedule A separately from one another.[140]  McKenzie asserts that the Wholesale Power Contracts and Rate Schedule A, together, define the power services that Basin provides to its Members, and McKenzie argues that one is meaningless without the other.  McKenzie argues that Basin ignores that the Commission considered Tri-State's Wholesale Electric Service Contracts and Stated Rate Tariff together, though they were filed in separate dockets.

68.     Similarly, Tri-State argues that the Commission should consolidate the instant proceedings.[141]  Tri-State asserts that Basin's Filings include interdependent rates, terms and conditions of service, all of which have never been approved by the Commission, and all of which, according to Tri-State, would be most efficiently considered in a consolidated docket.  Tri-State disagrees with Basin's contention that the proposed Rate Schedule A can be, and is, modified independently of the Wholesale Power Contracts.  Tri-State states that both Rate Schedule A and Basin's Wholesale Power Contracts with Tri-State reference Board Policy 10, which Tri-State notes it has specifically challenged.

---

[137] *Id.* at 5.

[138] *Id.* at 5-6.

[139] *Id.* at 6.

[140] *Id.* at 2-3.

[141] Tri-State Answer at 5-8.

Docket No. ER20-2441-000, et al.                                                    - 30 -

Tri-State asserts that modification of these terms cannot be accomplished independently.[142]

### b.   Rate Schedule A

### i.   Comments

69.   Big Flat, Black Hills, Central Power, Grand Electric, KEM, Members 1st, Mor-Gran-Sou, Northern Plains, Northwest Iowa, Roughrider, Slope, Verendrye, and West River argue that, if the Commission were to decline to apply the public interest application of the just and reasonable standard of review in its review of Rate Schedule A, the Commission nonetheless should approve Rate Schedule A as just and reasonable because the costs recovered through Rate Schedule A all have been incurred as part of Basin's service to its Members and have been approved by the Board.[143]  These commenters also explain that because Basin is a not-for-profit cooperative, there are no shareholders from which to recover disallowed costs.

70.   McKenzie and Sierra Club requests that the Commission dismiss the filing as deficient because it lacks sufficient information to determine whether the proposed rates are just and reasonable.[144]  Sierra Club explains that the Commission's regulations require initial rate schedules to provide detailed information and data including, but not limited to, estimates of the transactions and revenues, the basis of the rate with an explanation of how it was derived, a summary statement of all cost computations involved in arriving at and justifying the rate, and a comparison of the proposed initial rate with other rates filed by the utility for similar services.[145]  Sierra Club states that Basin did not address the concerns raised by the Commission in the November 2019 Order, such as providing sufficient details regarding its costs, a cost-of-service study that was explicitly requested by the Commission, and breakdown of its costs beyond the high-level summaries, nor did Basin provide high-level summaries of cost estimates that

---

[142] *Id.* at 8.

[143] Big Flat Comments at 6; Black Hills Comments at 7; Central Power Comments at 8-9; Grand Electric Comments at 6; KEM Comments at 8; Members 1st Comments at 5-6; Mor-Gran-Sou Comments at 8; Northern Plains Comments at 7; Northwest Iowa Comments at 6; Roughrider Comments at 9; Slope Comments at 8; Verendrye Comments at 7; West River Comments at 7.

[144] McKenzie Protest at 3-6, 41-49; Sierra Club Protest at 10-14.  As noted above, Dakota Energy and Meeker adopt and incorporate McKenzie's protest as it relates to Basin's Filings.  *See supra* para. 58.

[145] Sierra Club Protest at 10.

Docket No. ER20-2441-000, et al.                                                          - 31 -

would allow the Commission, Sierra Club, or any other party to review, for example, the fixed, variable, and capital costs associated with each generating unit, accumulated provision for depreciation, long-term debt, operation and maintenance expenses, taxes, and transmission costs.[146]

71.     As noted above, Sierra Club asserts that Rate Schedule A should more appropriately be considered a changed rate, and argues that the filing fails to meet the filing requirements for that standard.[147] Sierra Club argues that for a proposed change in rate, the utility is required to submit information more directly related to the rate base, such as the cost of the plants, operation and maintenance expenses, wages and salaries, working expenses, plant-in-service costs, cost of capital, depreciation expense, capital costs and operation and maintenance by plant or plant category.[148] Sierra Club notes that the lack of such information in Basin's Rate Schedule A filing renders the filing deficient, and therefore Sierra Club requests that the Commission reject the Rate Schedule A filing as facially deficient and noncompliant, or, at minimum, issue a deficiency notice.

72.     Sierra Club asserts that while Basin's Rate Schedule A filing is so deficient that it is impossible to determine if the rates are just and reasonable, publicly available information supports a finding that many of the Basin generation assets are economically obsolete.[149] Sierra Club explains that it reviewed three Basin RUS annual reports with some expert assistance to compute the fuel and non-fuel operation and maintenance costs for the Leland Olds, Laramie River, Dry Fork, and Antelope power plants.[150] Sierra Club states that a comparison of the costs of these plants with current market energy prices indicates that these four plants are likely economically obsolete and including the plants' costs in Rate Schedule A is not just and reasonable.

73.     McKenzie states that Basin's rates include an inflated margin to cover losses from DGC which operates a coal gasification and fertilizer plant entirely unrelated to Basin's utility services.[151] McKenzie argues that Basin must be required to file the 2019 income and balance sheet for DGC and its other non-utility affiliates that account for the

---

[146] *Id.* at 11-12.

[147] *See supra* Section IV.B.1.a.

[148] Sierra Club Protest at 16-17.

[149] *Id.* at 17-24.

[150] *Id.* at 18.

[151] McKenzie Protest at 5, 33.

projected losses in 2020, and provide prepared testimony justifying its proposed margin of 10% of its proposed revenue requirement.[152]  McKenzie argues that Basin's requiring McKenzie to fund DGC as a condition of obtaining power under the Wholesale Power Contracts constitutes an unlawful and anticompetitive tying arrangement, and an attempt by Basin to subsidize non-jurisdictional activities using wholesale electricity rates.[153]

74.     Tri-State states that the rate design associated with 2050 Contract rates under proposed Rate Schedule A and Board Policy 10 materially deviates from the Commission's depreciation standards.[154]  Tri-State argues that the depreciation for recovery of the Applicable Generation Assets with respect to the 2050 Contract rates over the term of the 2050 Contracts though the Applicable Generation Assets are expected to continue operating beyond 2050, amounts to forced subsidization of future production—an unduly discriminatory result.[155]  Tri-State further states that the depreciation and allocation issue was not meaningfully negotiated and was largely imposed on those customers with pre-existing contracts that chose not to extend their terms.  Tri-State and McKenzie request that the Commission set these matters for settlement and hearing procedures subject to refund.[156]  Sierra Club states that the Commission should reject Basin's Rate Schedule A filing, or alternatively, the Commission should set these matters for hearing for further investigation concerning the justness and reasonableness of Basin's proposed rates.[157]

75.     Wheat Belt Public Power District (Wheat Belt) states that Tri-State procures 100% of the power that it delivers to Wheat Belt from Basin and that Wheat Belt is concerned that if Basin refuses to honor reductions that result from implementation of Tri-State's Contract Termination Payment (CTP) Methodology[158] and Buy Down Payment

---

[152] *Id.* at 43-44.

[153] *Id.* at 5-6, 37-38.

[154] Tri-State Protest at 9.

[155] *Id.* at 12.

[156] McKenzie Protest at 51; Tri-State Protest at 15-16.

[157] Sierra Club Protest at 24-25.

[158] *See generally Tri-State Generation & Transmission Ass'n, Inc.,* 171 FERC ¶ 61,207, *order on reh'g*, 172 FERC ¶ 61,178 (2020).

Docket No. ER20-2441-000, et al.                                              - 33 -

Methodology,[159] Wheat Belt will be subject to undue discrimination as compared to those Tri-State members that Tri-State serves using its own generation resources.[160]  Wheat Belt requests that the Commission either require Basin to confirm that it will honor, or condition any acceptance or approval of Basin's proposals on a requirement to honor, Tri-State's CTP Methodology and Buy Down Payment Methodology.  Wheat Belt states that if Basin does not honor these methodologies, Wheat Belt will be subject to undue discrimination as compared to those Tri-State members that Tri-State serves using its own generation resources.[161]

## ii.    Answers

76.    Basin argues that its use of separate rates for Members with different contract terms is just and reasonable and not discriminatory.[162]  Basin explains that it uses different depreciation expenses for calculating Rate Schedule A rate components for the 2050 Contracts and the 2075 Contracts because it has extended the depreciable life of the Applicable Generation Assets past 2050.[163]  Basin notes that the original end life dates for the Applicable Generation Assets were all in or before 2050 with the exception of Pioneer Generation Station (PGS) Phase III and Lonesome Creek Station (LCS) Phase III, to which Basin assigned a 50-year original life because those assets were not RUS financed.  Basin explains that if it had used RUS financing, as it did for all other Applicable Generation Assets, it would have been required to use a 33.3-year original life, which would have led to all of the Applicable Generation Assets being fully depreciated by the end of 2050.  According to Basin, because PGS Phase III and LCS Phase III have a 50-year original life, the depreciable lives of the Applicable Generation Assets, for purposes of determining rate components for the 2050 Contracts, will end on the earlier of December 31, 2050, or the end of the asset's established life for financial reporting purposes.[164]  Basin states that Members with 2075 Contracts will pay the same amount of depreciation expense for these assets, with a lower contract rate commensurate with their longer contract term.  Basin avers that the lower contract rate of the 2075 Contract cannot be used as evidence that the 2050 Contract rate is unjust and

---

[159] *See generally Tri-State Generation & Transmission Ass'n, Inc.,* 172 FERC ¶ 61,216 (2020).

[160] Wheat Belt Protest at 1-2, 5-6.

[161] *Id.* at 5-6.

[162] Basin Aug. 21, 2020 Answer at 35-36 (citations omitted).

[163] *Id.* at 37 (citations omitted).

[164] *Id.* at 37-38.

Docket No. ER20-2441-000, et al.                                                  - 34 -

unreasonable.[165]  Basin notes that Tri-State agreed to Board Policy 10 and executed its
Wholesale Power Contract, specifically committing Tri-State to pay for these assets,
including any applicable depreciation expense for assets in service beyond 2050.  Basin
asserts that Board Policy 10 ensures that Members do not overpay or double pay for
depreciation when there are two rates.[166]

77.     Basin asserts that its margin requirement is just and reasonable and consistent with
the provisions of the Wholesale Power Contracts.[167]  Basin argues that it is appropriate to
set its margin on a consolidated basis because all external financial statements are
prepared on a consolidated basis, and lenders evaluate Basin's capital requirements on a
consolidated basis, and to do otherwise would affect Basin's ability to meet its Board-
directed goal of maintaining an A credit rating.  According to Basin, its margins comprise
only a small part of the annual revenue requirement and the resulting rates, inclusive of
the margin, are below the average rate for a generation and transmission cooperative and
within the realm of reason for the cooperative rates.[168]

78.     Basin argues that, contrary to McKenzie's assertions, its rates do not include
imprudently incurred expenses for a gasification and fertilizer plant (i.e., DGC) that are
unrelated to Basin's utility service.[169]  Basin explains that its revenue requirement is
determined by adding together forecasted costs and expenses with a margin, and
subtracting projected amounts for non-operating revenue, miscellaneous operating
revenue, and sales to non-Members.  Basin asserts that the total cost of electric service on
which Rate Schedule A is based does not include any costs incurred by Basin's
subsidiaries.  Basin rejects McKenzie's argument that the costs of DGC cannot be
included within the margin.  Basin argues that, because DGC produces natural gas that is
used as fuel for Basin's generation fleet, which is used to supply power to Basin's
Members, these costs are associated with "used and useful" assets that are a part of the
costs incurred to supply power to its Members.[170]

79.     Basin asserts that it did not force Members to fund investments, as alleged by
McKenzie.  Basin explains that its decision to acquire the DGC assets in 1988 was fully

---

[165] *Id.* at 39.

[166] *Id.* at 41.

[167] *Id.*

[168] *Id.* at 42-43.

[169] *Id.* at 45.

[170] *Id.* at 45-46.

Docket No. ER20-2441-000, et al.                                                                    - 35 -

supported by its Members, including McKenzie, who did not object to the acquisition during a special Members' meeting on August 24, 1988 to discuss the acquisition.[171] Basin further explains that its decision to acquire the DGC assets in 1988 was prudent at that time, due to the belief that domestic natural gas production was on the decline and due to the prevailing high natural gas prices. According to Basin, the DGC assets were viewed as sound investment, which provided measurable benefits to its Members for an almost 30-year period in the form of lower rates and decreased costs. Basin asserts that, even after taking into account the losses identified by McKenzie, DGC has provided a net benefit of $900 million to $1 billion to its Members and continues to be used and useful in the provision of service under the Wholesale Power Contracts. Basin further argues that, by not increasing its rates since 2016, it is not increasing the rates it charges to cover the losses associated with the DGC assets.[172]

80.     Basin asserts that Sierra Club's argument that Basin's generation is economically obsolete does not have a basis in Commission precedent, lacks merit, and should be rejected.[173] Basin states that the Commission has interpreted its authority to review rates under the FPA as limited to an inquiry into whether the rates proposed by a utility are reasonable, and not whether a proposed rate schedule is more or less reasonable than alternative rate designs. Basin argues that it has shown its rates are just and reasonable, and thus another purportedly just and reasonable alternative need not be considered by the Commission in this proceeding. Basin avers that Sierra Club's argument regarding the costs of Basin's generation as compared to other alternatives also borders on a prudency argument, but that Sierra Club fails to make the required showing that Basin has actually acted imprudently.[174]

81.     Basin asserts that its filing included sufficient information to demonstrate the justness and reasonableness of its proposal and complied with the requirements for an initial rate.[175] According to Basin, Rate Schedule A is based on a cost of service study involving the analysis of historical expenses and projecting future cash flow needs to arrive at a revenue requirement. Basin explains that its Rate Schedule A filing describes in detail Basin's methodology to derive rates, Basin's process to forecast revenues and costs, the demand-energy split and depreciation differences. Basin asserts that its FERC Form No. 1 and RUS Form No. 12, which is information that Sierra Club claimed was

---

[171] *Id.* at 46-47.

[172] *Id.* at 46-55.

[173] *Id.* at 56.

[174] *Id.* at 58-59.

[175] *Id.* at 59.

Docket No. ER20-2441-000, et al.                                          - 36 -

unavailable, is in fact on file with the Commission.  Basin explains that it discusses its rates with and solicits feedback from the Board, its Member managers, and its general membership multiple times per year.  Basin asserts that its Members have the opportunity to review all inputs to the rates included in Rate Schedule A, which is ultimately approved by its Members through their representatives to the Board.[176]

82.     Finally, Basin argues that the Commission should dismiss Wheat Belt's protest because it raises issues outside the scope of these proceedings.[177]  Basin asserts that to the extent Wheat Belt is concerned that Tri-State will not honor its own CTP Methodology and Buy Down Payment Methodology with respect to certain of Tri-State's members, Wheat Belt should address those concerns through the ongoing Tri-State proceedings.[178]

83.     McKenzie contends Basin's rates are not just and reasonable because they include the costs of and losses from DGC.[179]  McKenzie asserts that Basin's margin is set too high because Basin subsidizes DGC's costs.[180]  McKenzie disagrees with Basin's contention that Members have received benefits from DGC.  McKenzie argues that Basin has made and continues to make imprudent investments in DGC, asserting that Basin has not explained why Members should continue to subsidize DGC when, according to McKenzie, DGC is not used and useful and continues to experience heavy losses.[181]

84.     Additionally, Tri-State contends that Board Policy 10 is unduly discriminatory and violates the Commission's regulations and Commission precedent.[182]  Tri-State argues that Basin neither sufficiently explained why the term of the Wholesale Power Contracts is a reasonable basis on which to deviate from cost causation principles, nor explained why subsidizing production that will benefit customers that will take service after 2050 is an appropriate cost allocation practice among different customer groups.  Tri-State asserts that Board Policy 10 inappropriately recovers costs from current customers for future service and that such inequity should be corrected in the event a Member wishes to extend its contract.  Tri-State states that Board Policy 10 contemplates that depreciation

---

[176] *Id.* at 64-65.

[177] *Id.* at 27-28.

[178] *Id.*

[179] McKenzie Answer at 7.

[180] *Id.* at 7-8.

[181] *Id.* at 8-11.

[182] Tri-State Answer at 14-19.

Docket No. ER20-2441-000, et al.                                                         - 37 -

expense for all capital additions to the Applicable Generation Assets made up until 2045 will be proportionally recovered in 2050 Contract rates over the term of the 2050 Contracts.  Tri-State argues that accelerated depreciation of future investments over the term of the 2050 Contracts amounts to forced subsidization of future production.[183]

### c.      Commission Determination

85.      Our preliminary analysis indicates that Basin's 2020 Rate Schedule A and Wholesale Power Contracts have not been shown to be just and reasonable and may be unjust, unreasonable, unduly discriminatory or preferential, or otherwise unlawful.  We find that Basin's 2020 Rate Schedule A and Wholesale Power Contracts raise issues of material fact that cannot be resolved based on the record before us and are more appropriately addressed through hearing and settlement judge procedures.  Basin's Rate Schedule A and Wholesale Power Contracts are closely linked.  Though they cover distinct portions of the arrangement between Basin and its Members, they jointly specify rates, terms, and conditions of Basin's service to its Member as constituent (and related) parts of a larger whole.  Therefore, because we consider Basin's 2020 Rate Schedule A and Wholesale Power Contracts filings to be initial rates,[184] we accept Basin's proposed 2020 Rate Schedule A and Wholesale Power Contracts,[185] effective September 15, 2020, and we institute a proceeding pursuant to FPA section 206 in Docket No. EL20-68-000 to determine the justness and reasonableness of Basin's 2020 Rate Schedule A and

---

[183] *Id.* at 17-18.

[184] *See supra* Section IV.B.1.a.

[185] As discussed below, because we deny Basin's request for waiver of the 60-day prior notice requirement, we dismiss as moot Basin's 2019 Rate Schedule A.  *See infra* Section IV.B.3.a.

Docket No. ER20-2441-000, et al.                                             - 38 -

Wholesale Power Contracts.[186]  We also establish a refund effective date and establish hearing and settlement judge procedures in Docket No. EL20-68-000.[187]

86.    Although we are setting Basin's Rate Schedule A and Wholesale Power Contracts for hearing and settlement judge procedures, we address here certain arguments raised by protestors.  We disagree with the arguments of McKenzie, Dakota Energy, and Meeker that Basin's purported lack of withdrawal and termination procedures renders the Wholesale Power Contracts unjust and unreasonable.  As an initial matter, we disagree with McKenzie's argument that Basin's Rate Schedule A and Wholesale Power Contracts do not provide any mechanism for Members to withdraw from the cooperative system and terminate their Wholesale Power Contracts and thereby their participation in Rate Schedule A.  Each Wholesale Power Contract includes termination provisions requiring notice of termination for the end of the contract term, which allows the Member to ensure that the contract does not remain in effect beyond 2050 or 2075, depending on the contract.[188]  Neither McKenzie nor any other protestor challenges this language.

---

[186] Our investigation of Basin's 2020 Rate Schedule A and Wholesale Power Contracts does not entitle Basin to any evidentiary presumption of justness and reasonableness or reduction in its burden to establish just and reasonable rates.  *See Otter Tail*, 583 F.2d at 405 ("Under the statutory scheme, it would appear that initial rates are, in effect, presumed just and reasonable until the Commission determines otherwise."); *id.* at n.27 ("In making this observation, we do not mean to imply that merely because a rate schedule is in effect that an evidentiary presumption of reasonableness attaches.").

[187] As noted above, we include the issue of whether the *Mobile-Sierra* presumption applies to Basin's Wholesale Power Contracts as part of the hearing and settlement judge procedures.  *See supra* para. 51.

[188] *See, e.g.*, FERC Rate Schedule No. 17, Wholesale Power Contract by and between Basin Electric Power Cooperative and Upper Missouri G. & T. Electric Cooperative, Inc., section 10:

> This Agreement shall remain in effect until December 31, 2075.  If either Party desires to terminate the Agreement on December 31, 2075, it shall provide written notice of intent to terminate by December 31, 2070.  If notice of termination is not received by either party prior to December 31, 2070, this Agreement shall remain in effect unless terminated by either party giving to the other not less the five (5) years prior written notice of its intention to terminate.

Docket No. ER20-2441-000, et al.                                                                                                                                          - 39 -

87.     Rather than challenging the express language regarding termination in Basin's Wholesale Power Contracts, McKenzie instead essentially argues that Basin's Wholesale Power Contracts are not just and reasonable because they do not contemplate early termination—and the associated withdrawal from the cooperative—prior to the expiration of their respective terms (i.e., 2050 or 2075).  We disagree with this argument.  The Commission has not previously mandated that a tariff or agreement include procedures for determining exit charges and withdrawal provisions and has dismissed as premature an FPA section 205 proposal seeking to implement such procedures.[189]  Moreover, contrary to McKenzie's arguments, sections 7 and 8 of Basin's Bylaws quoted by McKenzie do not require that the Wholesale Power Contracts provide for early termination and withdrawal.  Indeed, section 8 of Basin's Bylaws provides, in part, that "no Members shall be permitted to withdraw until it has met all its contractual obligations to the Cooperative."[190]

88.     Further, as Basin's Rate Schedule A and Wholesale Power Contracts do not contemplate an early-termination process, we find that the issues that McKenzie has raised regarding withdrawal of its membership from Upper Missouri and termination of its wholesale contract with Upper Missouri—including any assessment of exit charges—to be outside the scope of these proceedings.  We therefore do not include these issues as part of the hearing and settlement judge procedures.

89.     We remind Basin that, as a new jurisdictional entity, it is required to maintain its future books and records in accordance with the Commission's Uniform System of Accounts (USofA), such that information reported in the FERC Form No. 1 and the FERC Form No. 3-Q, and information referenced in all rate schedules and tariff records should fully conform to the Commission's USofA, and not adopt alternative accounting treatment and/or systems.  In an order issued on September 8, 2020, the Commission granted Basin temporary waiver of this requirement, for rate purposes, until Basin has completed conversion of its accounting and record keeping systems to comply with the Commission's USofA.[191]  Further, we remind Basin that, pursuant to FPA section 205, any future revisions to Rate Schedule A or the Wholesale Power Contracts must be filed with the Commission.

90.     As discussed above, we are instituting an FPA section 206 investigation in Docket No. EL20-68-000 to determine the justness and reasonableness of Basin's 2020 Rate Schedule A and Wholesale Power Contracts.  In cases where, as here, the Commission institutes a section 206 investigation on its own motion, section 206(b) of the FPA

---

[189] *Pub. Serv. Co. of Colo.*, 156 FERC ¶ 61,187 (2016).

[190] McKenzie Protest at 29-30 (quoting Attach. 15, Basin Bylaws, at sec. 8).

[191] *See Basin Elec. Power Coop.*, 172 FERC ¶ 61,211 at P 23.

Docket No. ER20-2441-000, et al.                                      - 40 -

requires that the Commission establish a refund effective date that is no earlier than the date of publication by the Commission of notice of its intention to initiate such proceeding nor later than five months after the publication date.  In such cases, in order to give maximum protection to customers, and consistent with our precedent, we have historically tended to establish the section 206 refund effective date at the earliest date allowed by section 206**,** and we do so here as well.[192]  That date is the date of publication of notice of initiation of the section 206 proceeding in Docket No. EL20-68-000 in the *Federal Register.*

91.     FPA section 206(b) also requires that, if no final decision is rendered by the conclusion of the 180-day period commencing upon initiation of the section 206 proceeding, the Commission shall state the reason why it has failed to render such a decision and state its best estimate as to when it reasonably expects to make such a decision.  As we are setting the section 206 proceeding in Docket No. EL20-68-000 for hearing and settlement procedures, we expect that, if the proceeding does not settle, we would be able to render a decision within 12 months of the date of filing of briefs opposing exceptions to the Initial Decision.  Thus, if the Presiding Judge were to issue an Initial Decision by September 14, 2021, we expect that, if the proceeding does not settle, we would be able to render a decision by November 4, 2022.

92.     While we are setting these matters for a trial-type evidentiary hearing,[193] we encourage efforts to reach settlement before hearing procedures commence.  To aid settlement efforts, we will hold the hearing in abeyance and direct that a settlement judge be appointed, pursuant to Rule 603 of the Commission's Rules of Practice and Procedure.[194]  If parties desire, they may, by mutual agreement, request a specific judge as the settlement judge in the proceeding.  The Chief Judge, however, may not be able to designate the requested settlement judge based on workload requirements which determine judges' availability.[195]  The settlement judge shall report to the Chief Judge and the Commission within 60 days of the date of the appointment of the settlement

---

[192] *See, e.g.*, *Idaho Power Co.*, 145 FERC ¶ 61,122 (2013); *Canal Electric Co.*, 46 FERC ¶ 61,153, *order on reh'g*, 47 FERC ¶ 61,275 (1989).

[193] Trial Staff is a participant in the hearing and settlement judge procedures. *See* 18 C.F.R. § 385.102(b), (c) (2020).

[194] 18 C.F.R. § 385.603 (2019).

[195] If the parties decide to request a specific judge, they must make their joint request to the Chief Judge by telephone at (202) 502-8500 within five (5) days of this order.  The Commission's website contains a list of Commission judges available for settlement proceedings and a summary of their background and experience (http://www.ferc.gov/legal/adr/avail-judge.asp).

Docket No. ER20-2441-000, et al.                                                      - 41 -

judge, concerning the status of settlement discussions.  Based on this report, the Chief
Judge shall provide additional time to continue settlement discussions or provide for
commencement of a hearing by assigning the case to a presiding judge.

### 3.   Request for Waiver of the Prior Notice Requirement and Effective Date

#### a.   Waiver of the Prior Notice Requirement

93.     We deny Basin's request for waiver of the prior notice requirement.  FPA section
205 requires that proposed rates be filed with the Commission at least 60 days in advance
of their proposed effective date.[196]  Basin has not justified waiver of the prior notice
requirement.  Thus, we deny Basin's request for waiver of the 60-day prior notice
requirement and requested effective dates.  We accept Basin's 2020 Rate Schedule A and
Wholesale Power Contracts, effective September 15, 2020, 61 days after filing.  Also, we
dismiss as moot Basin's 2019 Rate Schedule A because Basin's 2019 Rate Schedule A
was no longer applicable as of January 1, 2020 (i.e., prior to the September 15, 2020
effective date) when it was replaced by Basin's 2020 Rate Schedule A.

#### b.   Time Value Refunds

94.     Although we deny Basin's request for waiver of the prior notice requirement, we
will not require refunds in light of Basin's cooperative ownership structure.

95.     The Commission has noted that if a utility files less than 60 days prior to the
proposed effective date of new service, and waiver is denied, the Commission will
require the utility to refund to its customers the time value of the revenues collected,
calculated pursuant to section 35.19a of the Commission's regulations,[197] for the entire
period that the rate was collected without Commission authorization.[198]

96.     Imposition of time value refunds is the Commission's method of encouraging
compliance by public utilities with the requirements of FPA section 205, and
compensating customers that have been deprived of the use of their monies for the period
that the rates had not been filed.  The time value refund is paid, not to the Commission,
but to the ratepayers who paid the rates that had not been filed.  In the instance where the

---

[196] 16 U.S.C. § 824d(d); *see also El Paso Elec. Co.*, 105 FERC ¶ 61,131, at PP 9-
11 (2003).

[197] 18 C.F.R. § 35.19a (2019).

[198] *Prior Notice and Filing Requirements Under Part II of the Federal Power Act*,
64 FERC ¶ 61,139, at 61,980, *order on reh'g*, 65 FERC ¶ 61,081 (1993).

customer is the same entity as the owner, the objective of requiring the time value of refunds would not be served.  Therefore, we will not order refunds under the Wholesale Power Contracts, which are agreements between Basin's Members, which are owners of Basin, and Basin.  This result is consistent with previous Commission orders in which we did not order refunds between affiliates.[199]

The Commission orders:

(A)     Basin's 2019 Rate Schedule A is hereby dismissed as moot, as discussed in the body of this order.

(B)     Basin's 2020 Rate Schedule A and Wholesale Power Contracts are hereby accepted for filing, effective September 15, 2020, as discussed in the body of this order.

(C)     Pursuant to the authority contained in and subject to the jurisdiction conferred upon the Commission by section 402(a) of the Department of Energy Organization Act and the FPA, particularly section 206 thereof, and pursuant to the Commission's Rules of Practice and Procedure and the regulations under the FPA (18 C.F.R. Chapter I), a public hearing shall be held in Docket No. EL20-68-000 concerning the justness and reasonableness of Basin's 2020 Rate Schedule A and Wholesale Power Contracts, as discussed in the body of this order.  However, the hearing shall be held in abeyance to provide time for settlement judge procedures, as discussed in Ordering Paragraphs (D) and (E) below.

(D)     Pursuant to Rule 603 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.603, the Chief Judge is hereby directed to appoint a settlement judge in these proceedings within 45 days of the date of this order.  Such settlement judge shall have all powers and duties enumerated in Rule 603 and shall convene a settlement conference as soon as practicable after the Chief Judge designates the settlement judge. If parties decide to request a specific judge, they must make their request to the Chief Judge within five days of the date of this order.

(E)     Within 60 days of the appointment of the settlement judge, the settlement judge shall file a report with the Commission and the Chief Judge on the status of the settlement discussions.  Based on this report, the Chief Judge shall provide participants with additional time to continue their settlement discussions, if appropriate, or assign this case to a presiding judge for a trial-type evidentiary hearing, if appropriate.  If settlement discussions continue, the settlement judge shall file a report at least every 60 days

---

[199] *See, e.g.*, Tri-State Stated Rate Order, 170 FERC ¶ 61,221; *AC Landfill Energy, LLC*, 127 FERC ¶ 61,112 (2009) (denying waiver of prior notice but declining to order refunds where refunds would have effectively gone from one affiliate to another).

Docket No. ER20-2441-000, et al.                                              - 43 -

thereafter, informing the Commission and the Chief Judge of participants' progress toward settlement.

     (F)    If settlement judge procedures fail and a trial-type evidentiary hearing is to be held, a presiding judge, to be designated by the Chief Judge, shall, within 45 days of the date of the presiding judge's designation, convene a prehearing conference in these proceedings in a hearing room of the Commission, 888 First Street NE, Washington, DC 20426, or remotely (by telephone or electronically), as appropriate.  Such a conference shall be held for the purpose of establishing a procedural schedule.  The presiding judge is authorized to establish procedural dates, and to rule on all motions (except motions to dismiss) as provided in the Commission's Rules of Practice and Procedure.

     (G)    The Secretary shall promptly publish in the *Federal Register* a notice of the Commission's initiation of the proceeding under FPA section 206 in Docket No. EL20-68-000.

     (H)    The refund effective date in Docket No. EL20-68-000 established pursuant to FPA section 206 shall be the date of publication in the Federal Register of the notice discussed in Ordering Paragraph (G) above.

     (I)    Given that the circumstances caused by the COVID-19 pandemic may disrupt, complicate, or otherwise change the ability of participants to engage in normal hearing procedures, the Chief Judge is hereby authorized to set or change the dates for the commencement of the hearing and the issuance of the initial decision as may be appropriate.

By the Commission.  Commissioner Danly is dissenting in part with a separate statement attached.

( S E A L )


                         Nathaniel J. Davis, Sr.,
                         Deputy Secretary.

Docket No. ER20-2441-000, et al.                                                    - 44 -

**Appendix**

| Entity | Docket Number(s) | Filing | Date Filed |
|---|---|---|---|
| Agralite Electric Cooperative | ER20-2441-000 ER20-2442-000 | Motion to Intervene | Aug. 6, 2020 |
| Basin Electric Power Cooperative | ER20-2441-000 | Answer to Request for Filing Deadline Extension | Aug. 5, 2020 |
| | ER20-2441-000 ER20-2442-000 | Answer to Protests | Aug. 21, 2020 |
| | ER20-2441-000 ER20-2442-000 | Answer to Answers | Sept. 10, 2020 |
| Big Flat Electric Cooperative, Inc. | ER20-2441-000 ER20-2442-000 | Motion to Intervene | July 27, 2020 |
| | ER20-2441-000 ER20-2442-000 | Comments | July 27, 2020 |
| Black Hills Electric Cooperative, Inc. | ER20-2441-000 ER20-2442-000 | Motion to Intervene | Aug. 5, 2020 |
| Bon Homme Yankton Electric Association, Inc. | ER20-2441-000 ER20-2442-000 | Motion to Intervene | Aug. 5, 2020 |
| Butler County Rural Electric Cooperative | ER20-2441-000 ER20-2442-000 | Motion to Intervene | Aug. 5, 2020 |
| Butte Electric Cooperative, Inc. | ER20-2441-000 ER20-2442-000 | Motion to Intervene | Aug. 3, 2020 |
| Central Electric Cooperative, Inc. | ER20-2441-000 ER20-2442-000 | Motion to Intervene | Aug. 5, 2020 |
| Central Montana Electric Power Cooperative, Inc. | ER20-2441-000 ER20-2442-000 | Motion to Intervene | Aug. 5, 2020 |
| Central Power Electric Cooperative, Inc. | ER20-2441-000 ER20-2442-000 | Motion to Intervene | Aug. 6, 2020 |
| | ER20-2441-000 ER20-2442-000 | Comments | Aug. 6, 2020 |
| Charles Mix Electric Assn., Inc. | ER20-1-000 ER20-2-000 ER20-2441-000 ER20-2442-000 | Motion to Intervene | July 27, 2020 |
| Clay-Union Electric Corporation | ER20-2441-000 ER20-2442-000 | Motion to Intervene | Aug. 5, 2020 |
| Codington-Clark Electric Cooperative, Inc. | ER20-2441-000 ER20-2442-000 | Motion to Intervene | Aug. 5, 2020 |
| Corn Belt Power Cooperative | ER20-2441-000 ER20-2442-000 | Motion to Intervene | Aug. 5, 2020 |

Docket No. ER20-2441-000, et al.                                                  - 45 -

| | | | |
|---|---|---|---|
| Dakota Energy Cooperative, Inc. | ER20-2441-000 ER20-2442-000 | Motion to Intervene | Aug. 6, 2020 |
| | ER20-2441-000 ER20-2442-000 | Protest | Aug. 6, 2020 |
| East River Electric Power Cooperative | ER20-2441-000 ER20-2442-000 | Motion to Intervene | Aug. 5, 2020 |
| | ER20-2441-000 ER20-2442-000 | Comments | Aug. 5, 2020 |
| Franklin Rural Electric Cooperative | ER20-2441-000 ER20-2442-000 | Motion to Intervene | Aug. 5, 2020 |
| Grand Electric Cooperative, Inc. | ER20-2441-000 ER20-2442-000 | Motion to Intervene | Aug. 5, 2020 |
| | ER20-2441-000 ER20-2442-000 | Comments | Aug. 6, 2020 |
| | ER20-2441-000 ER20-2442-000 | Comments | Aug. 6, 2020 |
| Grundy County Rural Electric Cooperative | ER20-2441-000 ER20-2442-000 | Motion to Intervene | Aug. 5, 2020 |
| Harrison County Rural Electric Cooperative | ER20-2441-000 ER20-2442-000 | Motion to Intervene | Aug. 6, 2020 |
| H-D Electric Cooperative, Inc. | ER20-2441-000 ER20-2442-000 | Motion to Intervene | July 28, 2020 |
| Iowa Lakes Electric Cooperative | ER20-2441-000 ER20-2442-000 | Motion to Intervene | Aug. 5, 2020 |
| | ER20-2441-000 ER20-2442-000 | Motion to Intervene | Aug. 6, 2020 |
| KEM Electric Cooperative, Inc. | ER20-2441-000 ER20-2442-000 | Motion to Intervene | Aug. 6, 2020 |
| | ER20-2441-000 ER20-2442-000 | Comments | Aug. 6, 2020 |
| L&O Power Cooperative | ER20-2441-000 ER20-2442-000 | Motion to Intervene | Aug. 6, 2020 |
| Lacreek Electric Association, Inc. | ER20-2441-000 ER20-2442-000 | Motion to Intervene | July 29, 2020 |
| Lake Region Electric Association, Inc. | ER20-2441-000 ER20-2442-000 | Motion to Intervene | Aug. 5, 2020 |
| Lyon-Lincoln Electric Cooperative. Inc. | ER20-2441-000 ER20-2442-000 | Motion to Intervene | Aug. 5, 2020 |
| McKenzie Electric Cooperative, Inc. | ER20-2441-000 ER20-2442-000 | Motion to Intervene | Aug. 6, 2020 |
| | ER20-2441-000 ER20-2442-000 | Protest | Aug. 6, 2020 |

Docket No. ER20-2441-000, et al.                                        - 46 -

|  | ER20-2441-000 ER20-2442-000 | Answer to Basin's Aug. 21, 2020 Answer | Sept. 3, 2020 |
|---|---|---|---|
| Meeker Cooperative Light & Power Association | ER20-2441-000 ER20-2442-000 | Motion to Intervene | Aug. 5, 2020 |
|  | ER20-2441-000 ER20-2442-000 | Protest | Aug. 6, 2020 |
| Members 1st Power Cooperative and Powder River Energy Corporation | ER20-2441-000 ER20-2442-000 | Motion to Intervene | Aug. 6, 2020 |
|  | ER20-2441-000 ER20-2442-000 | Comments | Aug. 6, 2020 |
| Midland Power Cooperative | ER20-2441-000 ER20-2442-000 | Motion to Intervene | Aug. 5, 2020 |
| Minnesota Valley Electric Cooperative | ER20-2441-000 ER20-2442-000 | Motion to Intervene | Aug. 5, 2020 |
| Moreau-Grand Electric Cooperative, Inc. | ER20-2441-000 ER20-2442-000 | Motion to Intervene | July 28, 2020 |
| Mor-Gran-Sou Electric Cooperative, Inc. | ER20-2441-000 ER20-2442-000 | Motion to Intervene | Aug. 6, 2020 |
|  | ER20-2441-000 ER20-2442-000 | Comments | Aug. 6, 2020 |
| Mountrail-Williams Electric Cooperative | ER20-2441-000 ER20-2442-000 | Motion to Intervene | Aug. 6, 2020 |
| Nishnabotna Valley Rural Electric Cooperative | ER20-2441-000 ER20-2442-000 | Motion to Intervene | Aug. 6, 2020 |
| North Iowa Municipal Electric Cooperative Association | ER20-2441-000 ER20-2442-000 | Motion to Intervene | Aug. 5, 2020 |
| North West Rural Electric Cooperative | ER20-2441-000 ER20-2442-000 | Motion to Intervene | Aug. 6, 2020 |
| Northern Electric Cooperative | ER20-2441-000 ER20-2442-000 | Motion to Intervene | Aug. 3, 2020 |
| Northern Plains Electric Cooperative, Inc. | ER20-2441-000 ER20-2442-000 | Motion to Intervene | Aug. 4, 2020 |
| Northwest Iowa Power Cooperative | ER20-2441-000 ER20-2442-000 | Motion to Intervene | July 31, 2020 |
|  | ER20-2441-000 ER20-2442-000 | Comments | Aug. 6, 2020 |
| NorVal Electric Cooperative, Inc. | ER20-2441-000 ER20-2442-000 | Motion to Intervene | July 27, 2020 |
| Oahe Electric Cooperative | ER20-2441-000 ER20-2442-000 | Motion to Intervene | Aug. 6, 2020 |
| Powder River Energy Corporation | ER20-2441-000 ER20-2442-000 | Motion to Intervene | Aug. 6, 2020 |

| | ER20-2441-000<br>ER20-2442-000 | Comments | Aug. 6, 2020 |
|---|---|---|---|
| Prairie Energy Cooperative | ER20-2441-000<br>ER20-2442-000 | Motion to Intervene | Aug. 5, 2020 |
| Raccoon Valley Electric Cooperative | ER20-2441-000<br>ER20-2442-000 | Motion to Intervene | Aug. 5, 2020 |
| Renville Sibley Cooperative Power Association | ER20-2441-000<br>ER20-2442-000 | Motion to Intervene | July 31, 2020 |
| Rosebud Electric Cooperative, Inc. | ER20-2441-000<br>ER20-2442-000 | Motion to Intervene | Aug. 5, 2020 |
| Roughrider Electric Cooperative, Inc. | ER20-2441-000<br>ER20-2442-000 | Motion to Intervene (Out of Time) | Aug. 13, 2020 |
| | ER20-2441-000<br>ER20-2442-000 | Comments (Out of Time) | Aug. 13, 2020 |
| Rushmore Electric Power Cooperative, Inc. | ER20-2441-000<br>ER20-2442-000 | Motion to Intervene | Aug. 5, 2020 |
| Sierra Club | ER20-2441-000 | Motion to Intervene | Aug. 3, 2020 |
| | ER20-2441-000 | Request to Extend Filing Deadline | Aug. 3, 2020 |
| | ER20-2441-000 | Protest | Aug. 6, 2020 |
| Sioux Valley-Southwestern Electric, Inc. | ER20-2441-000<br>ER20-2442-000 | Motion to Intervene | Aug. 5, 2020 |
| Slope Electric Cooperative, Inc. | ER20-2441-000<br>ER20-2442-000 | Motion to Intervene | Aug. 6, 2020 |
| | ER20-2441-000<br>ER20-2442-000 | Motion to Intervene | Aug. 6, 2020 |
| Southeastern Electric Cooperative, Inc. | ER20-2441-000<br>ER20-2442-000 | Motion to Intervene | July 24, 2020 |
| | ER20-2441-000<br>ER20-2442-000 | Motion to Intervene | July 30, 2020 |
| The Calhoun County Electric Cooperative Association | ER20-2441-000<br>ER20-2442-000 | Motion to Intervene | Aug. 5, 2020 |
| Traverse Electric Cooperative, Inc. | ER20-2441-000<br>ER20-2442-000 | Motion to Intervene | Aug. 5, 2020 |
| Tri-State Generation and Transmission Association, Inc. | ER20-2441-000<br>ER20-2442-000 | Motion to Intervene | Aug. 6, 2020 |
| | ER20-2441-000<br>ER20-2442-000 | Comments and Protest | Aug. 6, 2020 |
| | ER20-2441-000<br>ER20-2442-000 | Answer to Basin's Aug. 21, 2020 Answer | Sept. 8, 2020 |
| Union County Electric Cooperative, Inc. | ER20-2441-000<br>ER20-2442-000 | Motion to Intervene | July 31, 2020 |

Docket No. ER20-2441-000, et al.                                      - 48 -

| Upper Missouri Power Cooperative | ER20-2441-000 ER20-2442-000 | Motion to Intervene | July 21, 2020 |
|---|---|---|---|
| Verendrye Electric Cooperative, Inc. | ER20-2441-000 ER20-2442-000 | Motion to Intervene | Aug. 4, 2020 |
| | ER20-2441-000 ER20-2442-000 | Comments | Aug. 4, 2020 |
| West River Electric Association Inc. | ER20-2441-000 ER20-2442-000 | Motion to Intervene | Aug. 5, 2020 |
| Western Iowa Municipal Electric Cooperative Association | ER20-2441-000 ER20-2442-000 | Motion to Intervene | Aug. 6, 2020 |
| Western Iowa Power Cooperative | ER20-2441-000 ER20-2442-000 | Motion to Intervene | Aug. 6, 2020 |
| Wheat Belt Public Power District | ER20-2441-000 ER20-2442-000 | Motion to Intervene | Aug. 6, 2020 |
| | ER20-2441-000 ER20-2442-000 | Protest | Aug. 6, 2020 |
| Whetstone Valley Elec. Coop., Inc. | ER20-2441-000 ER20-2442-000 | Motion to Intervene | Aug. 3, 2020 |
| Woodbury County Rural Electric Cooperative | ER20-2441-000 ER20-2442-000 | Motion to Intervene | Aug. 6, 2020 |
| Wright-Hennepin Cooperative Electric Association | ER20-2441-000 ER20-2442-000 | Motion to Intervene | Aug. 6, 2020 |

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Basin Electric Power Cooperative                    Docket Nos.    ER20-2441-000
                                                                   ER20-2442-000
                                                                   EL20-68-000

(Issued September 14, 2020)

DANLY, Commissioner, *dissenting in part*:

1.      I support the holdings in the Commission's order in this case, except for the
Commission's decision to set for hearing the question of whether the *Mobile-Sierra*
presumption[1] should attach to Rate Schedules No. 1 through No. 19 (Wholesale Power
Contracts).  My disagreement with that decision stems from my general disagreement as
to the analysis applied by the Commission in considering whether and when the *Mobile-Sierra* presumption should apply.

2.      The Commission's order describes its analysis of this question as follows:

> The *Mobile-Sierra* "public interest" presumption applies only if an
> agreement has certain characteristics that justify the presumption.  In ruling
> on whether the characteristics necessary to justify a *Mobile-Sierra*
> presumption are present, the Commission must determine whether the
> agreement at issue embodies either:  (1) individualized rates, terms, or
> conditions that apply only to sophisticated parties who negotiated them
> freely at arm's-length; or (2) rates, terms, or conditions that are generally
> applicable or that arose in circumstances that do not provide the assurance
> of justness and reasonableness associated with arm's-length negotiations.
> Unlike the latter, the former constitute contract rates, terms, or conditions
> that necessarily qualify for a *Mobile-Sierra* presumption.[2]

---

[1] As described herein, the *Mobile-Sierra* presumption has its genesis in the twin
Supreme Court cases of *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*, 350 U.S.
332 (1956) and *FPC v. Sierra Pac. Power Co.*, 350 U.S. 348 (1956) (together, *Mobile-Sierra*).

[2] *Basin Elec. Power Coop.*, 172 FERC ¶ 61,221, at P 48 (2020) (Commission
Order) (citing *Linden VFT, LLC v. Pub. Serv. Elec. & Gas Co.*, 161 FERC ¶ 61,264, at P
27 (2017), *order on reh'g*, 170 FERC ¶ 61,023 (2020); *PJM Interconnection, L.L.C.*, 161
FERC ¶ 61,262, at P 46 (2017), *order on reh'g*, 170 FERC ¶ 61,021 (2020); *Sw. Power*

Docket No. ER20-2441-000, et al.                                                   - 2 -

3.      I concede that this analysis follows Commission precedent issued over a number of years.  However, the approach taken in this precedent is not supported by the court cases addressing *Mobile-Sierra*.  Further, this approach is inconsistent with the basis for the Supreme Court's holdings establishing the *Mobile-Sierra* doctrine.

4.      As an initial matter, the Commission provides no citation to a court decision for the proposition that the *Mobile-Sierra* public interest presumption applies only if an agreement has certain characteristics that justify the presumption.  Nor am I aware of any case so holding.  Presumably, it is intended to flow from the Supreme Court's statement in *Morgan Stanley*,[3] and quoted in *NRG*,[4] that "[u]nder the *Mobile-Sierra* doctrine, the Federal Energy Regulatory Commission (FERC or Commission) must presume that the rate set out *in a freely negotiated wholesale-energy contract* meets the 'just and reasonable' requirement imposed by law."[5]

5.      I accept, as a general principle, that it might be appropriate to impose a requirement that contracts be freely negotiated in order to be entitled to the *Mobile-Sierra* presumption.  But I cannot accept the Commission's apparent reliance on the "freely negotiated" language in *Morgan Stanley* and *NRG* to hold that the presumption applies only to contracts with individualized rates, terms, or conditions, and not to contracts with standard rates, terms, or conditions entered into with multiple counterparties.  I find no support for such a conclusion in any court decision.[6]  And it is in making this distinction that I think the Commission has violated the basic purpose of the *Mobile-Sierra* doctrine.

---

*Pool, Inc.*, 144 FERC ¶ 61,059, at P 127 (2013), *order on reh'g & compliance*, 149 FERC ¶ 61,048, at P 94 (citations omitted); *Midwest Indep. Transmission Sys. Operator, Inc.*, 142 FERC ¶ 61,215, at P 177 (2013), *order on reh'g & compliance*, 147 FERC ¶ 61,127, at P 108 (2014) (citations omitted)).

   [3] *Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cty.*, 554 U.S. 527 (2008) (*Morgan Stanley*).

   [4] *NRG Power Mktg., LLC v. Me. Pub. Util. Comm'n*, 558 U.S. 165, 167 (2010) (*NRG*);

   [5] *Morgan Stanley*, 554 U.S. at 530 (emphasis added); *accord NRG*, 558 U.S. at 167 (quoting, in part, *Morgan Stanley*, 554 U.S. at 530) (emphasis added).

   [6] The D.C. Circuit described the Commission's approach in *Okla. Gas & Elec. Co. v. FERC*, 827 F.3d 75, 78–80 (D.C. Cir. 2016).  However, although the court went on to uphold the Commission's determination that the *Mobile-Sierra* presumption does not apply to the right of first refusal provision in the Southwest Power Pool Membership Agreement, the court did not rule on the Commission's approach.  Instead, the court's ruling was based on its conclusion that "FERC did not err in determining that the doctrine

Docket No. ER20-2441-000, et al.                                            - 3 -

6.      In *Morgan Stanley*, the Court reversed the Ninth Circuit's holding that the *Mobile-Sierra* presumption does not apply to market-based rate contracts not initially approved by the Commission.  In so doing, the Court explained the important public policy benefits of this doctrine:

> The Ninth Circuit's standard would give short shrift to the important role of contracts in the FPA, as reflected in our decision in *Sierra*, and *would threaten to inject more volatility into the electricity market by undermining a key source of stability*.  The FPA recognizes that contract stability ultimately benefits consumers, even if short-term rates for a subset of the public might be high by historical standards—which is why it permits rates to be set by contract and not just by tariff.  As the Commission has recently put it, its "first and foremost duty is to protect consumers from unjust and unreasonable rates; however, ... *uncertainties regarding rate stability and contract sanctity can have a chilling effect on investments and a seller's willingness to enter into long-term contracts and this, in turn, can harm customers in the long run*."[7]

Similarly, in *NRG*, the Court referenced "*the essential role of contracts* as a key factor fostering stability in the electricity market, to the long-run benefit of consumers."[8]

7.      These benefits are provided by *all* contracts, not only by contracts with individualized rates, terms, or conditions.  One can easily understand why sellers of power would prefer to use standardized form contracts.  And one can also understand why purchasers would freely agree to such contracts if the price and the standard contract terms are reasonable.  I see no justification for depriving a seller of the protections of contract sanctity simply for using form contracts.  The Commission's glosses on *Mobile-Sierra* have inevitable consequences: to chill investments and to reduce utilities' willingness to enter into further contracts.

8.      To be sure, as the Supreme Court held in *Morgan Stanley*, we have "ample authority to set aside a contract where there is unfair dealing at the contract formation stage—for instance, if [we] find[] traditional grounds for the abrogation of the contract

---

does not extend to anti-competitive measures that were not arrived at through arms-length bargaining."  *Id*. at 79.

[7] *Morgan Stanley*, 554 U.S. at 551 (quoting *Market–Based Rates for Wholesale Sales of Electric Energy, Capacity and Ancillary Services by Public Utilities*, Order No. 697, 72 Fed. Reg. 39,904, 119 FERC ¶ 61,295, at P 6 (2007)) (emphasis added).

[8] *NRG*, 558 U.S. at 174 (citing *Morgan Stanley*, 554 U.S. at 547-48, 551) (emphasis added).

Docket No. ER20-2441-000, et al.                                                    - 4 -

such as fraud or duress."[9]  But unfair dealing at contract formation should be the sole inquiry in determining whether the presumption applies—not whether a contract has standard terms and conditions.

9.      As explained in the Commission's order, Basin's counterparties under the Wholesale Power Contracts almost uniformly: (1) agree that "without a doubt" the Wholesale Power Contracts were freely negotiated;[10] (2) stress "the important role their wholesale power contracts play in securing a long-term source of power for the member and allowing the cooperative access to capital,"[11] and (3) assert that "application of the public interest standard is particularly appropriate here, given, the direct involvement and supervision of Basin's Members in formulating and annually reviewing the rates under the Wholesale Power Contracts."[12]  Only one counterparty—Tri-State Generation and Transmission Association, Inc. (Tri-State)—asserts that the negotiation of its contract "was . . . not accomplished on an even playing field."[13]  But Tri-State is a large, sophisticated entity, and merely claiming an uneven playing field does not amount to a showing of the fraud or duress that would impair contract formation.

10.     Given the near universal support for the Wholesale Power Contracts other than Tri-State's generalized complaint about bargaining positions, there is no credible claim of infirmity in the formation of the Wholesale Power Contracts that would lead us to conclude that they do not represent the fully voluntary agreement of the parties.  This issue should not be set for hearing.  In so doing, the Commission subjects these contracts to scrutiny on matters not contemplated by the holdings establishing the Supreme Court's *Mobile-Sierra* doctrine, thereby defeating the very purpose of the doctrine: to ensure that—absent extraordinary circumstances that would justify a public interest finding—contracts can be relied upon.

        For these reasons, I respectfully dissent in part.

_____

James P. Danly
Commissioner

_____

[9] *Morgan Stanley*, 554 U.S. at 547.

[10] Commission Order, 172 FERC ¶ 61,221 at P 38; *see also id.* P 36.

[11] *Id.* P 36.

[12] *Id.* P 38.

[13] Tri-State September 8, 2020 Answer at 14.