# EXHIBIT N

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

### UNITED STATES OF AMERICA
### BEFORE THE
### FEDERAL ENERGY REGULATORY COMMISSION

|  |  |  |  |
|---|---|---|---|
| | ) | | |
| Basin Electric Power Cooperative | ) | Docket Nos. | ER20-2441-000 |
| | ) | | ER20-2442-000 |
| | ) | | |

## MOTION TO INTERVENE AND PROTEST
## OF MCKENZIE ELECTRIC COOPERATIVE, INC.

Pursuant to Rules 211 and 214 of the Federal Energy Regulatory Commission's (the "Commission") Rules of Practice and Procedure,[1] McKenzie Electric Cooperative, Inc. ("McKenzie") respectfully moves to intervene in the above-caption proceedings and protests the rate schedules filed by Basin Electric Power Cooperative ("Basin" or "Basin Electric"). McKenzie requests that the Commission accept the rate schedules for filing, impose a refund obligation, and establish a section 206 investigation and hearing/settlement procedures. In doing so the Commission should only then issue a final order approving the initial rate proposals following hearing and/or settlement procedures whereby an evidentiary record can be developed that supports a finding that the initial rate schedules are just and reasonable and not unduly discriminatory.[2]

### I.    COMMUNICATIONS

All communications, correspondence, and documents related to this proceeding should be directed to the following persons and such persons should be placed on the official service list maintained by the Commission's Secretary for this proceeding:

---

[1] 18 C.F.R. §§ 385.211, 385.214.

[2] 16 U.S.C. § 824d(e).

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

| | |
|---|---|
| Jason Johns | John Skurupey |
| Jessica Bayles | CEO |
| Stoel Rives LLP | McKenzie Electric Cooperative, Inc. |
| 760 SW Ninth Avenue, Suite 3000 | 3817 23rd Avenue NE |
| Portland, OR 97205 | Watford City, ND 58854 |
| Tel: 503-294-9618 | Tel: 701-444-9288 |
| jason.johns@stoel.com | jskurupey@mckenzieelectric.com |
| jessica.bayles@stoel.com | |

## II.    MOTION TO INTERVENE

McKenzie is a member-owned rural electric cooperative that serves approximately 4,400 residential, commercial, and industrial member-owners in portions of seven counties in North Dakota and Montana.  McKenzie is a Class C member of Basin and purchases the entirety of its power requirements under an all-requirements contract with Upper Missouri G. & T. Electric Cooperative, Inc. d/b/a Upper Missouri Power Cooperative ("Upper Missouri"), which is a Class A member of Basin Electric.[3]  Upper Missouri, in turn, is a Class A member of Basin and has a similar all-requirements power contract with Basin.[4]  Both agreements extend until 2075.  Under this arrangement, the primary component of McKenzie's costs for electric service is Basin's cost-

---

[3] Upper Missouri's all-requirements contract with McKenzie was previously filed as Rate Schedule No. 5 in Docket No. ER19-2820 but was rejected by the Commission.  *Upper Missouri G. & T. Electric Cooperative, Inc.*, Docket No. ER19-2820-000, Initial Filing of Rate Schedules FERC Nos. 1 through No. 11 (Wholesale Electric Service Contracts) at 60 (Sept. 16, 2019) ("UM WPCs"); *Upper Missouri G. & T. Electric Cooperative, Inc.*, 169 FERC ¶ 61,197 at P 17 (2019).

[4] *Basin Electric Power Cooperative*, Docket No. ER20-2442-000, Submission of Wholesale Power Contract FERC Rate Schedules Nos. 1 through 19 at 142 (July 16, 2020) ("Basin WPCs" or "WPCs").  The wholesale power contracts were previously filed by Basin Electric in September 2019 but were rejected by the Commission.  *Basin Electric Power Cooperative*, Docket No. ER20-2-000, Submission of Wholesale Power Contract FERC Rate Schedules Nos. 1 through 19 at 1881 (Sept. 30, 2019); *Basin Electric Power Cooperative*, 169 FERC ¶ 61,158 (2019).

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

of-service rate for all-requirements service,[5] which is passed through to McKenzie in Upper Missouri's rates. McKenzie is the largest (as measured by load) of the eleven member-owners of Upper Missouri.

McKenzie allocates the costs that it incurs under its all-requirements contract to its own member-owners, *i.e.*, residential, commercial, and industrial consumers, through retail rates. McKenzie therefore has a direct and substantial interest in the outcome of this proceeding and cannot be adequately represented by any other participant. For these reasons, McKenzie respectfully requests that the Commission grant its motion to intervene and grant it full party status.

**III.    PROTEST**

These proceedings represent the Commission's first opportunity to substantively review Basin's all-requirements wholesale power contracts, which have been in existence for more than 40 years and extend until 2075, as well as Basin's related wholesale rates. In the first go-round of these proceedings, the Commission rejected Basin's rate schedules as deficient approximately eight months ago.[6] McKenzie was hopeful Basin would respond by filing something remotely in line with the Commission's requirements, setting forth in detail the various components that comprise Basin's wholesale rates. But the refiled rate schedules still fail to comply with the Commission's requirements and insufficiently support Basin's rates. For example, Basin's filing almost completely ignores its failed non-utility investments that translate to a significant percentage of the rates under consideration by the Commission. Burying such investments and losses—which exceed ███████ dollars—by merely noting that "they're within our consolidated margin" is a remarkable omission that is wholly inconsistent with Basin's obligations before the

---

[5] *Basin Electric Power Cooperative*, Docket No. ER20-2441-000, Submission of Rate Schedule A (July 16, 2020) ("Basin COS Rate").

[6] *Basin Electric Power Cooperative*, 169 FERC ¶ 61,158 (2019).

**PUBLIC VERSION – PRIVILEGED AND CONFIDENTIAL INFORMATION HAS BEEN REMOVED PURSUANT TO 18 C.F.R. § 388.112**

Commission. Clearly Basin does not recognize that it is subject to a new regime of regulation—one that need not "honor the cooperative way" when the cooperative way is not just and reasonable. Rather, Basin is now subject to standards and rules formed over decades to protect consumers from excessive costs and that require transparency and accountability. Nevertheless, McKenzie requests that the Commission accept the rate schedules, impose a refund obligation, and establish a section 206 investigation and hearing/settlement procedures to determine whether the subject rate schedules are just and reasonable.[7]

For too long, Basin has evaded regulatory oversight and created a sham of its "democratic cooperative governance process,"[8] using it to impose ever-increasing and unjust and unreasonable rates on its members. But no more. McKenzie is relieved that after years of Basin's unrestrained spending at the expense of its member-customers, Basin is finally subject to oversight. The cooperative principles that were essential to the creation of Basin's contracts decades ago and that were supposed to provide a self-regulating function unfortunately no longer exist in the Basin system. In the absence of a functioning cooperative model, McKenzie and other customers have been left to bear excessive and seemingly inescapable financial burdens resulting from Basin's repeated imprudent decisions. As explained further below, the wholesale power contracts and Basin's rates thereunder are unjust and unreasonable and should be the subject of a section 206 investigation and hearing and/or settlement procedures.

---

[7] *Tucson Electric Power Company, et al.*, 76 FERC ¶ 61,235, ¶ 62,147 (1996) ("It is the Commission's policy that rate applications should generally be suspended for the maximum period permitted by statute where preliminary study leads the Commission to believe that the filing may be unjust and unreasonable . . . absent circumstances where a maximum suspension may lead to harsh and inequitable results. The purpose of this suspension policy is to provide consumers with maximum protection." (citations omitted)).

[8] Basin WPCs at 16.

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

Although Basin Electric purports to be an electric cooperative with open and voluntary membership, it has enforced a system of membership that equates to a financial suicide pact as the result of its refusal, *contrary to its own policies*, to provide the rates, terms, and conditions for a member's withdrawal and the termination of the member's wholesale power contract. In essence, Basin has manipulated the cooperative model and used its overwhelming bargaining power to foist contracts on its members that extend for over 100 years, locking members into a century-long commitment to act as Basin's captive piggy bank. The lack of any mechanism for members to withdraw from the cooperative and terminate their wholesale power contracts is unjust and unreasonable. The Commission has jurisdiction over Basin's withdrawal and termination practices because they directly affect Basin's wholesale rates and the Commission should require Basin to file its termination and withdrawal procedures pursuant to the requirements of the Federal Power Act ("FPA") section 205(c) and 205(d) to have an exit charge on file. And in response, the Commission has a duty to ensure Basin's withdrawal and termination policies are just and reasonable.

More fundamentally, Basin's standard wholesale power rates charged to its members are unjust and unreasonable because they include an inflated margin to cover massive losses from Basin's non-utility businesses, including Dakota Gasification Company ("DGC"), which operates a coal gasification and fertilizer plant entirely unrelated to Basin's utility services. Such losses are far outside of the scope of costs Basin's members agreed to shoulder in their all-requirements contracts and, further, they are totally unrelated to any services that are used and useful in providing electric service to Basin's members. Despite McKenzie's many protests, Basin has persisted in forcing its members to pay inflated power rates to cover losses in the gasification and fertilizer facility as a condition to its provision of electric service. This constitutes an unlawful

PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112

and anticompetitive tying arrangement that the Commission should not permit.  Moreover, the shocking sums of money that Basin has imprudently both spent and lost on the gasification and fertilizer facility (well north of ████████ dollars) should be rejected as a component to Basin's wholesale power rates, in large measure because Basin knowingly ignored clear economic and market signals in chasing returns with these failed assets.  For all of these reasons, the Commission should reject Basin's efforts to subsidize non-jurisdictional activities using its wholesale electricity rates.

Finally, Basin's filings fail to justify such inflated rates.  On the contrary, they once again fail to comply with the Commission's regulations and provide insufficient cost support for Basin's $1.778 billion revenue requirement and the resulting power rates, particularly with respect to its unlawfully included non-utility businesses.  Basin attempts to hide the impact of its non-utility subsidiaries in the provided documentation and requests waivers it is clearly not eligible for to avoid having to submit information that would reveal the true impact of its non-utility subsidiaries on its rates.

### A. Background

#### 1. General

McKenzie's membership in Upper Missouri and Basin Electric dates back to 1971.  Prior to 1971, McKenzie was a member of Dakotas Electric Cooperative, Inc., ("Dakotas") and received a portion of its wholesale electric service from Dakotas and a portion from the United States Bureau of Reclamation.  On December 9, 1971, however, McKenzie signed a binding Letter of Intent with Dakotas, Upper Missouri, and Basin under which (1) McKenzie would cancel its membership in Dakotas and shift its load to Upper Missouri and (2) Basin, which supplied power to Upper Missouri, would agree to add the loads of McKenzie to its existing contract with Upper

**PUBLIC VERSION – PRIVILEGED AND CONFIDENTIAL INFORMATION HAS BEEN REMOVED PURSUANT TO 18 C.F.R. § 388.112**

Missouri.[9]  Consistent with this Letter of Intent, McKenzie then entered an all-requirements Contract with Upper Missouri in 1972 (the "UM Contract)[10] and Basin amended its existing contact with Upper Missouri (the "Basin Contract").[11]

When these agreements were executed, Upper Missouri was a Class A member of Basin. As such, Upper Missouri was required under Basin's bylaws to purchase all of its electric requirements from Basin (other than a small fraction of its supply that was met under an existing allocation of hydropower resources owned and operated by the Western Area Power Administration).  By virtue of purchasing power from Upper Missouri, McKenzie was eligible under Basin's bylaws to become a Class C member of Basin, which it did.

The original Basin and UM Contracts through which McKenzie began receiving power in 1972 were both first signed in the 1960s and 1970s, had terms of 38 and 40 years, respectively, and permitted termination upon six months' notice thereafter.  Both contracts also provided identical language regarding the scope of costs that Basin and Upper Missouri were permitted to use in formulating their power rates, which were required to be set to:

> produce revenue which shall be sufficient, **but only sufficient**, with the revenues of Seller from all other sources, to meet the cost of the operation and maintenance (including, without limitation, replacement, insurance, taxes and administrative and general overhead expenses) of the generating plant, transmission system and related facilities of the Seller, the cost of any power and energy purchased for resale hereunder by the Seller, the cost of transmission service, make payments on account of principal of and interest on all indebtedness of the Seller, and to provide for the establishment and maintenance of reasonable reserves.[12]

---

[9]  Letter of Intent, dated December 9, 1971, Attachment No. 6.

[10]  UM Contract, Attachment No. 2.

[11]  Basin Contract, Attachment No. 1.

[12]  Attachment Nos. 1 and 2.

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

These provisions remained unchanged after McKenzie became a Class C member of Basin with the exception of the term and termination provisions, which were modified in 2005 to extend the term to 2050 and again in 2015. The 2015 revisions extended the term of the agreements until 2075 and the termination provisions were revised to require five-years' notice, which cannot be delivered until 2070 at the earliest.[13] These coordinated amendments unfortunately had the effect of locking McKenzie into Upper Missouri's and, indirectly, Basin's rates until 2075—over 100 years from when the agreements were originally signed. Through these and similar contracts with other members, Basin controls virtually all of the power generation available to approximately three million customers in nine states, who are members of approximately 129 different distribution cooperatives and public power districts.[14]

As a Class C member of Basin, McKenzie has little to no influence over either the rates Basin actually sets or its management decisions. McKenzie has no voting rights in Basin, no direct representation on Basin's Board of Directors, and no more than a single seat on Upper Missouri's board, which, in turn, has only a single seat on Basin's eleven-member board. This is true even though McKenzie accounts for over 40 percent of Upper Missouri's load and Upper Missouri accounts for approximately 30 percent of Basin's load.

This lack of influence coupled with the extended term and draconian termination provisions of the UM and Basin Contracts has unfortunately left McKenzie hostage to Basin's financial recklessness and imprudence in managing its for-profit subsidiary, DGC. Since 2015, DGC has piled up nearly ████████ in losses, leading Basin to impose a massive 22 percent rate

---

[13] *See* Attachment Nos. 7 and 8.

[14] Basin operates approximately 5,200 MW of electric generating capacity, has approximately 6,800 MW of capacity in its generation portfolio, owns approximately 2,400 miles of electric transmission lines and equipment, and leases additional transmission facilities from its members. Basin COS Rate at 5-7.

increase along with hundreds of millions of dollars in revenue deferrals, write-offs, and equity infusions that have directly harmed McKenzie and other members of Basin, causing them to pay wholesale power rates that are clearly out-of-market. In taking these actions, Basin has acted in flagrant disregard of both the facts before it and the voices of members such as McKenzie who have repeatedly called on Basin to staunch the bleeding. This history is discussed more fully below.

## 2. Dakota Gasification Company

DGC owns and operates the Great Plains Synfuels Plant ("Synfuels Plant") near Beulah, North Dakota. The Synfuels Plant is the only commercial-scale coal gasification facility in the United States attempting to manufacture natural gas from coal on a profitable basis. It was originally developed by a group of five interstate pipeline companies starting in 1972 and cost more than ▮▮▮▮▮ to construct. After starting production in 1984, it was almost immediately projected to lose ▮▮▮▮▮ over its first ten years of operation due to falling natural gas prices. Just one year later, it was acquired by the United States Department of Energy, which had acted as a guarantor of the initial developers, for less than half of its original cost. Basin then acquired the plant from DOE in 1988 at an even more deeply reduced price. Even at this steep discount, members such as McKenzie questioned the prudency of the purchase.[15]

Without a significant debt burden, Basin was initially able to operate the plant at a profit in most years, but by 2012 future losses were once again imminent due to the substantially increased supply of natural gas from fracking and resulting long-term decreases in gas prices. Yet as the prospect of those losses loomed closer in 2014, Basin ignored this long-term shift in the market and chose to double down on its investment. Instead of developing plans to shut down,

---

[15] *See* infra note 76.

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

sell, or mothball the Synfuels Plant, Basin elected to plough an additional ████████ in it so it could also produce urea fertilizer and diesel exhaust fluid (used to reduce the amount of air pollution created by a diesel engine). By using the out-of-market natural gas produced by the facility in a more diverse range of products, Basin hoped to make DGC profitable. At the time, the Basin board optimistically reported that this expansion would yield a dizzying █ percent return on investment.

Unfortunately, reality soon began to set in. Even as the Basin board was still considering expanding the Synfuels Plant in January 2014, Basin's overall consolidated revenues for the year were projected to fall short of its 3 percent target level and the level required under its debt covenants—largely as a result of losses from DGC. As a result, the Board voted to defer ███ ████ of 2013 revenue to 2014 to make up the shortfall. By July of 2014, there were continuing signs of deterioration as the Board was informed that there was a danger that it could lose its "A" bond rating with financial rating agencies under the metrics they used to assess financial performance unless it increased its margins or engaged in further revenue deferrals.[16] These warnings were reiterated in September of 2014, when the Board was informed of the negative financial consequences of a ratings agency downgrade.[17] The Basin board, however, apparently assumed that any problems would evaporate once the Synfuels plant began producing urea and DEF. Unfazed by the warnings, Basin's Board forged ahead on other capital expenditures as well, including a ████████ headquarters expansion, approved in December of 2014.

These increased capital expenditures led Basin to buy out and refinance its existing debt with the Rural Utility Service ("RUS") to secure low-cost financing. As part of this process in

---

[16] Basin Board Minute Meeting Notes July 15-17, 2014, Attachment No. 16.

[17] Financial Services Presentation September 8, 2014, Attachment No. 17.

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

early 2015, Basin sought to extend the depreciation on one of its coal generating facilities, the Dry Fork Station, as well as potential new facilities, which required extending its contracts with Class A members, including Upper Missouri. Failing to sign such extensions, the Class A members were told, would result in a 3 mill rate increase.[18] In light of this, Upper Missouri agreed to the extension but only after gaining assurance that its own members, such as McKenzie, would agree to the same extension.

By the spring of 2015, things were continuing to deteriorate. In March, it was clear that the budget for completing the Synfuels Plant expansion would have to be revised based on the general contractor bids DGC was receiving, and by April the plant had a year-to-date loss of ████. By mid-May of 2015, the board was told that the plant would probably come in ████ ████ (or 25 percent) over the original estimates and a new budget of ████ was proposed and approved. This cost increase was projected to cut anticipated returns from the facility to █ percent. Nonetheless, in May, Basin elected to move forward and approve DGC's expansion with a ████ private placement long-term debt that Basin itself guaranteed on an unsecured and unconditional basis up to ████.[19] This represented the first time that Basin had any material debt in the Synfuels Plant.

The reaction by financial ratings agencies was swift and dramatic. On May 26, 2015, Moody's issued a credit opinion shifting Basin's financial outlook from stable to negative, specifically noting that:

> Basin's ongoing expansion of DGC, and related financing of those activities, including a Basin unsecured guarantee of DGC's recent private debt placement, represents incremental credit risk in the consolidated entity's business profile. A deterioration in the consolidated operating and financial performance of Basin, against

---

[18] Basin Board Minute Meeting Notes January 13-15, 2015, Attachment No. 18.

[19] Basin Board Minute Meeting Notes May 12, 2015, Attachment No. 19.

PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112

the backdrop of the less conservative approach to funding growth initiatives for DGC may negatively impact Basin's ratings in the future. Prior to providing an unsecured guarantee to fund DGC's expansion activities, Basin's core electric generation and transmission business had been following more conservative financial management practices and its rate setting autonomy and other strategies, on average, have supported generally sound historical financial metrics that have largely been above the minimum levels established in its mortgage indenture and bank credit agreements. . . . Basin's rating outlook is negative primarily reflecting an increase in the business risk profile as best demonstrated by the unsecured guarantee provided to lenders for financing the debt portion of the urea and diesel exhaust fluid plant construction . . . .[20]

Fitch's issued a similar report shortly thereafter, noting that the consistently poor performance from Basin's non-electrical subsidiary without any corresponding growth on the electric side of the business was exerting a downward pressure on Basin's rating.

Things failed to improve going forward. At the July 2015 Basin Manager's Advisory Committee meeting, members were told that while DGC had been budgeted to earn $▉▉▉▉ for the year, it was now projected to lose $▉▉▉▉▉▉, due primarily to falling commodity prices. At the January 2016 meeting, members were provided a financial update indicating that DGC ended the year $▉▉▉▉▉▉ below budget and that despite aggressive cost-cutting measures, Basin management believed the cooperative's financial rating would be downgraded and a mid-year rate increase could be required to make up for DGC's ongoing losses. At least one member asked if the plant should be shut down, but Basin management continued to insist that it made more sense to keep it running despite the losses.[21] By March 2016, some members suggested that an outside analysis should be done to consider how the losses from DGC could be limited, but a Basin board member swiftly rejected the notion, commenting that "we have been spending about

---

[20] May 26, 2015 Moody Report, Attachment No. 20.

[21] Managers Advisory Committee Meeting January 20, 2016, Attachment No. 21.

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

$███████ per year on consultants since 2006, not to mention our own staff time doing all sorts of research. What we really need is for some prices to rise. Also, the urea sales next year should be a big help."[22] Relevant commodity prices at the time, however, were not predicted to rise.[23]

Given the continued deterioration, Moody's issued a further press release on March 30, 2016, putting Basin on review for a downgrade. The review reflected:

> weak consolidated financial coverage metrics for fiscal year 2015 and our expectations that metrics will continue to remain weak owing to commodity price driven pressures on consolidated net margins and increase debt to fund Basin's sizeable consolidated capital expenditures . . . The non-utility subsidiary business, Dakota Gasification Company (DGC) has been particularly hard hit by the weak commodity price environment, which we expect will persist. * * * The review also incorporates our view that Basin's ongoing expansion of DGC, and related financing of those activities, which includes a Basin unsecured guarantee of DGC's private debt placement, represents incremental credit risk in the consolidated entity's business profile.[24]

Following issuance of this press release, the weak metrics persisted. At the April 2016 Basin board meeting, it was reported that DGC had lost over $███████ in the first three months of the year, but once again, rather than proposing a shut down, Basin management gave the board a presentation on possible opportunities to expand the plant still further to market new products, including jet fuel or registered renewable natural gas.[25] By the end of April 2016, however, the plant had lost an additional $██████ for the year-to-date despite aggressive cost-cutting measures and there was still no prospect of natural gas prices rising. As one Basin board member noted,

---

[22] Basin Update, March 2016 by Allen Thiessen, Attachment No. 22.

[23] Basin Board Minute Meeting Notes March 15-17, 2016, Attachment No. 23.

[24] Basin Board Minute Meeting Notes April 12-13, 2016, Attachment No. 24.

[25] Basin Update by Allen Thiessen April 2016, Attachment No. 25.

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

there "is so much surplus natural gas in the Bakken area" that it "won't fit in the pipeline."[26]  As a result of these losses Basin was already falling $▯▯▯▯▯ short of the revenue requirements necessary to meet its 3 percent margin policy and debt covenants, making a mid-year rate increase all but inevitable.

That inevitable rate increase was put in place at the June 2016 Basin board meeting.  The Basin board was informed that even assuming the recognition of $▯▯▯▯▯ in remaining deferred revenue from prior years (money that otherwise would have been credited to members), Basin would still need to raise nearly $▯▯▯▯ through increased rates by the end of the year to meet its 3 percent margin requirement.[27]  In addition, the Board was alerted that ratings agency downgrades would increase Basin's interest expenses, that DGC would likely require one or more equity infusions, and that Basin had no remaining deferred revenue to apply to the future.  As a result, the Basin board approved a massive 22 percent rate increase of 7 mills to be effective on August 1, 2016, hoping both to address the DGC losses and to avoid a ratings agency downgrade.[28]  This rate increase meant that Basin would be producing margins on its electric power sales far beyond the 3 percent called for by its fiscal policy (which had to be abandoned in January 2017) and charging rates higher than the cost of self-generation for many customers, all to fund the ongoing and staggering losses from DGC.

Not surprisingly, members such as McKenzie reacted negatively to the announced rate increase.  As John Skurupey, the CEO of McKenzie, stated in a June 14, 2016 email to Claire Vigesaa, the General Manager of Upper Missouri:

---

[26] Basin Update by Allen Thiessen May 2016, Attachment No. 26.

[27] Basin Board Minute Meeting Notes June 14-15, 2016, Attachment No. 27

[28]  Basin Update by Allen Thiessen June 2016, Attachment No. 28.

PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112

Case 4:20-cv-04192... Document... Filed... Page 16 of 211 PageID #: 658
Document Accession #...

> Seems to me our members are being led down the wrong garden
> path. DGC needs to stand on its own two feet – go to the market
> and get interim stand-alone DGC financing to cover its shortfall.
> Right now, Basin is covering all risk and that's not a good business
> move! When an arm is dying you need to come to terms with
> cutting it off or die – keeping the arm because it has a tattoo of
> your mother is simply stupid. * * * is what I and many others
> believe. I think we're in trouble Claire – save this email for the day
> I say "I told you so."[29]

Basin's hope of avoiding a ratings agency downgrade also proved illusory. Within days of

the announced rate increase, on June 17, 2016, Moody's issued a draft press release announcing a

two-notch downgrade explicitly citing the losses from DGC and noting that while the announced

rate increase would help mitigate some of the financial pressures, uncertainties remained given the

potential weakness of DGC which appeared likely to persist for the foreseeable future. When this

draft press release was circulated to Basin members, it spawned yet additional calls for action to

divest DGC. In response to a June 17, 2016 email from Basin board member Al Thiessen

forwarding a copy of the draft press release, McKenzie's CEO, John Skurupey said the following:

> As we discussed, I believe the Basin Board of Directors should
> consider directing (mandating if necessary) staff to put together a
> plan to split off the subsidiaries into independent, standalone
> entities. It would be a shame to have any one, or several, of those
> "investments" pull the parent into a costly hole – though that bus
> may have already left the station. We all need to remember that the
> core purpose and business of Basin ELECTRIC Cooperative is
> generating and transmitting electricity. It may be time for Basin to
> get back to doing what it does best, and spinning off the subsidiaries
> would be a logical first step in that direction.[30]

In response to the same email, Upper Missouri board member Travis Thompson wrote Thiessen

stating:

> This is starting to get real serious. Basin Electric is our power
> supplier that is their first obligation. Lowest cost power with the

---

[29] June 14, 2016 Email, Attachment No. 29.

[30] June 17, 2016 Email, Attachment No. 30.

PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112

> best service, period. All the other subsidiaries that Basin has are a sideline from that core goal. Or as I call them disposable assets that need to stand alone. From what you have been sending in emails, it looks like those other entities are starting to pull Basin down and cost the people at the end of the line extra costs. And with our commercial load we need stable rates and not the yoyo effect. I know I may not have all the facts, but I think Basin needs to explain why we are not looking harder at companies for profitability. As you and I both know in our own businesses we can't keep funding something that drags you down.[31]

On July 15, 2016, McKenzie's CEO also wrote directly to Thiessen stating:

> All-in-all all, though I appreciate the position you're in trying to make a boat full of holes float, I really question the ability of Basin to function as a business given the fact that all there believe and rely on the fact that the saving parachute is the pocketbooks of the end consumers on our systems. I suppose it's easy to be optimistic when one believes the members will always be there to catch you when you fall. Maybe the Basin PR group should quit making everything about the employees at Basin and the charities it funnels member money to (as I think that's what Basin seems to be all about) and instead focus on the member at the end of the line. In the end, it's not about DGC, Charities, Basin Employees or being the best place to work in Bismarck, ITS ALL ABOUT THE MEMBER!!![32]

Despite the expression of these and other similar concerns, Basin management continued to tout the illusory benefits of DGC. For example, at a July 20, 2016 Manager's Advisory Committee meeting, Basin management cited the fact that DGC had been profitable most years before 2013 while sidestepping the fact that it was projected to continue losing money for at least 8 more years given foreseeable commodity prices. Management also continued to cite the supposed benefits from things like selling power and coal to DGC and summarily concluded that closing DGC would require a write-off of more than $■■■■■, making it financially impossible. This presentation, however, did little to allay member concerns, and on August 26, 2016, a group

---

[31] June 17, 2016, Email Attachment No. 31.

[32] June 15, 2016, Email Attachment No. 32.

of Class A members sent a list of questions to Basin's General Manager Paul Sukut seeking frank responses on a range of issues, including alternative scenarios for closing DGC where the cost impact would not be as high.[33]  On October 18, 2016, Basin management emailed the Class A members a lengthy PowerPoint presentation in response to the questions, but it was devoid of any substantive financial analysis of alternatives for closing DGC.[34]

Meanwhile, the financial picture for DGC continued to deteriorate.  The 25 percent construction budget increase from $███████ to $███████ approved just over a year earlier was proving insufficient.  At the January 2017 Basin board meeting, the board considered the options for DGC in an executive session and once again decided to double down on its investment, electing to fire the existing construction contractor but continue the expansion and increase the construction budget to $███████ even though the forecast for natural gas prices remained low and the forecast for urea prices was on the decline.  Management justified this decision on grounds that the projected rate of return on the expansion was still positive assuming price forecasts did not continue to deteriorate.

Once again, this decision led to questions and objections from Basin's members.  At the January 18, 2017, Manager's Advisory Committee meeting, one member asked what the cost difference would be between allowing the plant to go into default versus continuing to sink money into it.[35]  An answer was promised by the next Manager's Advisory Committee meeting but never seems to have been provided.  And while Basin did present information on the value of DGC at the May 2017 Manager's Advisory Committee meeting, the focus was almost entirely on retaining

---

[33]  August 26, 2016 Email and Class A Questions to Basin, Attachment No. 33.

[34]  October 18, 2016 Email Attachment, No. 34.

[35] January 18, 2016 Manager's Advisory Committee Meeting Notes, Attachment No. 35.

# PUBLIC VERSION - PRIVILEGED AND CONFIDENTIAL INFORMATION HAS BEEN REMOVED PURSUANT TO 18 C.F.R. § 388.112

DGC without meaningfully addressing the cost savings that could result from closing it. The basic take-aways of the valuation were that sales proceeds of approximately $█████ would be required to avoid a book loss on DGC given Basin's investment in the company and that it would be difficult to sell DGC "as is" in the current market.

Meanwhile, losses at DGC continued to mount. At the July 2017 Basin board meeting, the board was informed that projected end of year losses for DGC were $█████. Board members were also given a draft 2018-2027 Financial Forecast showing projected DGC losses of $████ in 2018, $█████ in 2019, $█████ in 2020, $█████ in 2021 and $████ █████ in 2022. Member discontent with such losses quickly began to bubble up. Upper Missouri presented a resolution to the Basin board recommending that Basin create a fund with any excess revenues from the 2016 rate increase to retire assets, namely DGC.[36] At the July Basin Manager's Advisory Committee meeting, Upper Missouri's General Manager, Claire Vigesaa also made remarks that he demanded to have placed in the record stating in part as follows:

> Cost does matter, whether a large or small share of Basin. We pay lots of attention and are going to continue to ask questions….97.8% of Upper Missouri's cost are Basin Power supply costs! Again, we aren't looking for subsidies, but perhaps this will help you understand our grave concern over the DGC financial forecast and associated consolidated financials. Upper Missouri member-consumer-owners have over $█████ in patronage on Basin's books; $███ of the $█████…or about 14%. I share this as I lead into the next topic; Basin's wholesale power rate verses market forecast over the next year, 5 years and 10 years. * * * [T]his long term "out of the market" situation is dire! Our discussions and presentations should all come back to this today, in every board and staff meeting…what in the world can we do re-engineer, restructure, or reimagine our organization? Ladies and gentlemen, this "delta" is not austerity, it is not tweaking but we need a fundamental change, a plan and strategy at the Basin level. * * * Would a structured bankruptcy be a way out? Other ideas? It's serious, that is why our UMPC board unanimously supported resolution that asks the Basin

---

[36] Basin Board Minute Meeting Notes July 11-12, 2017, Attachment No. 36.

Document Accession #: 20180806-5073

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

board and staff to develop a financial plan that will provide the financial strength to decouple DGC from the Basin financials.[37]

Following this meeting, on August 1, 2017, Mr. Vigesaa also gathered commentary at a meeting of Upper Missouri's members. Among the comments he recorded from members were that "It's high time, past time actually, to decouple DGC from Basin," that "Basin has lost touch with the member owner at the end of the line," and "Can't believe that Basin continues 'business as usual' when operating in such dire financial condition."[38] He also addressed many of these concerns in a presentation at Upper Missouri's August board meeting, which was attended by Basin's General Manager, Paul Sukut, noting that Upper Missouri was desperately concerned and that merely hoping for better commodity prices to lift DGC was not a strategy. During this same time period, John Skurupey, the CEO of McKenzie sought comments from other Class C members of Basin, who echoed many of the same concerns and eventually formed a group of "Concerned C Class Members" in an effort to gain a greater voice with Basin.

Their voices, however, were not heard and DGC's financial outlook continued to darken. Basin's Financial Forecast for 2018-2027 issued in September 2017 showed DGC's net losses after tax averaging over $■■■■ per year every year through 2027, even though the urea and diesel exhaust fuel plant were now operational:

---

[37] Members Manager's Conference Summary July 19, 2017, Attachment No. 37.

[38] UMPC MAC Round Table Commentary August 1, 2017, Attachment No. 38.

**PUBLIC VERSION – PRIVILEGED AND CONFIDENTIAL INFORMATION HAS BEEN REMOVED PURSUANT TO 18 C.F.R. § 388.112**


[39]

At the September 2017 Basin Board meeting, various members again expressed concern that Basin's elevated rates were putting Basin's load at risk, including the load of McKenzie's largest customer, Oneok, which reported that it could save $███████ a year by going to the market rather than purchasing Basin power through McKenzie and Upper Missouri.[40] At the same board meeting, the Finance Committee of the board was warned that given the dire financial circumstances, Basin could be required to write-down a portion of DGC's assets if commodity prices did not improve.

---

[39]  BEPC and Subsidiaries Financial Forecasts 2018-2027, Attachment No. 39.

[40]  Basin Board Minute Meeting Notes September 12-14, 2017, Attachment No. 40.

# PUBLIC VERSION – PRIVILEGED AND CONFIDENTIAL INFORMATION HAS BEEN REMOVED PURSUANT TO 18 C.F.R. § 388.112

Following this meeting, on September 15, 2017, Upper Missouri board member Travis Thompson emailed Al Thiessen of the Basin Board to comment on an upcoming Basin board strategic planning meeting, noting that "We still need to see some relief on wholesale rates to make Basin competitive. And I know it's a tough decision, but I don't see how we can let DGC bleed much longer."[41] Thiessen curtly replied that he had been told it would not be financially possible to do rate relief and shut down DGC at the same time, and that he did not yet know what would be considered at the strategy session given that the materials were confidential and would not be distributed in advance. In a subsequent email following the meeting on September 20, 2017, Thiessen again failed to provide any details, simply noting that "Because of the equity hit that Basin would take, shutting [DGC] down at this time and under these conditions is not an option."[42] He did, however, note that there was a growing likelihood that Basin would have to write off a large amount of DGC's equity in any event because of its lost value.

Later that fall, Claire Vigesaa of Upper Missouri provided McKenzie with a summary of the Basin Manager's Advisory Committee's October 2017 meeting, which focused on strategy around DGC. The summary primarily concerned strategies to avoid an impairment through further subsidization of DGC by Basin and concluded by summarizing several statements by Basin CEO Paul Sukut indicating that DGC would have already been closed if Basin's members had not been providing it with a financial backstop and that it did not make sense to continue operating DGC under the forecasted losses.[43] But a shut down or divestiture was still not considered.

---

[41] September 15, 2017, Email Attachment No. 41.

[42] Basin Strategic Planning Session #2 by Allen Thiessen September 20, 2017, Attachment No. 42.

[43] Summary of Basin Electric Manager's Advisory Committee Meeting on October 19–20, 2017, Attachment No. 9.

**PUBLIC VERSION – PRIVILEGED AND**
**CONFIDENTIAL INFORMATION HAS BEEN REMOVED**
**PURSUANT TO 18 C.F.R. § 388.112**

Instead, in an effort to avoid impairment and ease the financial burden on DGC, starting in approximately December 2017, Basin began charging DGC lower rates for electricity and coal than it had in the past, reducing some of the income that Basin obtained from DGC that purportedly benefitted members.[44]  By charging less, Basin was able to reduce DGC's forecasted loss for the year from $█████████ to $█████████, but it was unable to forestall the need for a write-down.  By the July 2018 Basin board meeting, the need for an impairment was clear.  In preparation, the Basin board passed a resolution forgiving $█████████ of the outstanding principal amounts due from DGC to Basin.  Similar to its rate reduction, Basin improved DGC's financial position on paper, but it also eliminated the likelihood that Basin's members would ever see the money again, much less the interest they had been receiving on such funds.  The Board also laid plans to amend Basin's bylaws to increase the amount of revenue it could defer to $█████████ so that a larger portion of the write-down could be offset with deferred revenues generated by Basin's out-of-market rates.  The impairment then occurred, reducing the book value of DGC by $█████████.

These events caused further unrest among Basin's members.  Reporting on a July 17, 2018 conference call among the Concerned C Class members, McKenzie CEO John Skurupey noted that there were a "lot of upset folks," some of whom "were wanting blood in the form of first sending a resolution that they're going to stop paying Basin for DGC; followed by going to the local government officials; ending finally with contacting the rating agencies."[45]  Others characterized "the last four years of Basin's business model as 'crisis management.'"  Skurupey also noted that there was a preference among the members for "'short-term pain, long-term gain'"

---

[44]  Basin Update by Allen Thiessen December 2017, Attachment No. 43.

[45]  CEO Report July 25, 2018, Attachment No. 44.

**PUBLIC VERSION - PRIVILEGED AND CONFIDENTIAL INFORMATION HAS BEEN REMOVED PURSUANT TO 18 C.F.R. § 388.112**

meaning a preference to "sell or close DGC" to "deal with the financial troubles now, knowing there's a light at the end of the dark tunnel."[46]  Finally, there was a call for resolutions from members to address the issues.

This call was heeded, and several members submitted or attempted to submit resolutions to the Basin board seeking change.  For example, on August 13, 2018, Upper Missouri submitted two resolutions calling for various actions including directing Basin staff "to develop a strategy and achievable timelines to reduce rates and divest non-utility assets."[47]  Other Class C members, including Iowa Lakes Electric Cooperative and Meeker Cooperative Light and Power Association, urged the Class A members from whom they purchased power to submit similar resolutions.  At least two of the Class A members attempted to advance the resolutions but to no avail.[48]

Indeed, despite these calls for action, neither the Basin board nor Basin management took any action to seriously study the potential of closing DGC.  Instead, they continued to attack the problem from the edges by cutting  costs and considering alternatives short of a shutdown, including spending more than $██████████ in additional funds to add a reformer to the Synfuels Plant that would allow it to manufacture urea using purchased natural gas rather than out-of-market gas generated by the plant itself.  Basin management also continued to tout the illusory benefits of owning DGC without regard for the financial devastation it had caused.  Meanwhile, Basin planned to convert still more of DGC's debt to equity so that by 2029 a cumulative total of $██████████ in debt would be forgiven.  These actions seem to reflect in part the overlapping management of

---

[46] *Id.*

[47] UMPC Resolution August 13, 2018, Attachment No. 45.

[48] Iowa Electric Cooperative and Meeker Cooperative Light and Power Resolutions, Attachment No. 46.

# PUBLIC VERSION – PRIVILEGED AND CONFIDENTIAL INFORMATION HAS BEEN REMOVED PURSUANT TO 18 C.F.R. § 388.112

Basin and DGC in which Paul Sukut was the functioning CEO of both organizations and Al Thiessen was both a member of the Basin board and chairman of the DGC board.

Faced with the inability or refusal of Basin's management to address this ongoing financial disaster, McKenzie sought in early 2019 to explore the potential of withdrawing from Upper Missouri and ceasing to be a Class C member of Basin. Accordingly, it asked Upper Missouri to explore the potential with Basin. Such withdrawal would be consistent with the bylaws of both Upper Missouri and Basin, which both provide that a "Member may withdraw from membership upon compliance with such equitable terms and conditions as the Board of Directors may prescribe; provided, however, that no Member shall be permitted to withdraw until it has met all its contractual obligations to the Cooperative."[49] In response, on February 13, 2019, Basin's board adopted a resolution indicating that it had been advised by counsel that "the all-requirements contracts of both the Class A Members with the Cooperative and the Class C Members with the Class A Members do not contain any provision permitting the member to buy-out of its all-requirements contract with the Cooperative or the Class A Member,"[50] and that therefore it has no obligation to develop, calculate or furnish any information in connection with a buy-out or to allow a buy-out. This resolution was communicated to all Class A members on February 15, 2019, snuffing out any potential of a voluntary buy-out.

Given the intolerable nature of this situation and Basin's steadfast refusal to address it, McKenzie has been forced to seek other avenues of relief, including filing suit in North Dakota state court, *McKenzie Electric Cooperative v. Basin Electric Power Cooperative, Inc.* et al., McKenzie County Dist. Court No. 27-2019-CV-00490, and intervening in these proceedings once

---

[49] Attachment Nos. 15 & No. 47 (the Basin bylaws are quoted here but the Upper Missouri bylaws are substantively the same).

[50] Basin Board Minutes Meeting Notes February 12-13, 2019, Attachment No. 48.

**PUBLIC VERSION – PRIVILEGED AND CONFIDENTIAL INFORMATION HAS BEEN REMOVED PURSUANT TO 18 C.F.R. § 388.112**

Basin became subject to the Commission's jurisdiction. Meanwhile, the losses from DGC continue. Between 2015 and 2019, the losses totaled $█████████ and projected losses from last year's forecast predict an additional $████████ in losses over between 2019 and 2029—a prediction that is likely conservative given the extremely low level of natural gas prices. Indeed, current end-of-year losses for DGC for 2020 are projected at $█████████, $████████ beyond what was projected in Basin's budget[51] and Basin has been forced to forgive an additional $████████ in DGC's debt, bringing the total amount of debt forgiven to $████████. Because the inclusion of such losses in Basin's rates—which are passed directly on to McKenzie—is neither just nor reasonable, McKenzie asks that the Commission accept the rate schedules for filing, impose a refund obligation, and establish a section 206 investigation and hearing/settlement procedures. In addition, the Commission should also require that Basin file an exit charge consistent with the Commission's rules and regulations.

### B. Basin's Rate Schedules Are Subject to the Just and Reasonable Standard of Review

Basin's rate schedules are subject to the just and reasonable standard of review and are not entitled to the *Mobile-Sierra* presumption. In determining whether the characteristics necessary to justify a *Mobile-Sierra* presumption are present, the Commission must determine whether the agreement at issue embodies either: (1) individualized rates, terms, or conditions that apply to sophisticated parties who negotiated them freely at arms-length; or (2) rates, terms, or conditions that are generally applicable or that arose in circumstances that do not provide the assurance of justness and reasonableness associated with arms-length negotiations.[52] The latter is not afforded

---

[51] Basin Update July 2020, Attachment No. 49.

[52] *Tri-State Generation and Transmission Association, Inc*, 170 FERC ¶ 61,221 at P 44 (2020) ("*Tri-State*").

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

the *Mobile-Sierra* presumption. Here, as it did recently in response to Tri-State's wholesale power

contracts and stated rate,[53] the Commission should find that the *Mobile-Sierra* presumption does

not apply to Basin's various filings and instead apply the just and reasonable standard of review.

Neither Rate Schedule A, the WPCs, or Basin's bylaws (those filed and that should be

filed) are the product of "fair, arms-length negotiations," nor were they freely negotiated. Rate

Schedule A is set by the board of Basin Electric.[54] McKenzie has no representation on Basin's

board and therefore no ability to engage in any negotiations at all. And McKenzie's ability to

influence the board through Upper Missouri is extremely limited. Ultimately, Basin can

unilaterally impose a rate on McKenzie, as is evident from the experience of McKenzie and others

in disputing costs associated with DGC. And as explained more fully below,[55] the termination

provisions in the Basin WPCs compound this unequal bargaining power because Basin's

customers have no way out of the spiraling costs in an increasingly uncooperative system. While

Basin states that disputes are "resolved through the democratic cooperative governance process,"[56]

that description fails to capture the tenuous position of cooperatives like McKenzie, who disagree

with the direction of the cooperative but are not permitted any opportunity to leave.

Nor can Basin escape this conclusion by claiming that the Basin WPCs are bespoke

arrangements merely because of a handful of modest variations across its entire portfolio of

agreements. Those few minor variations aside, the Basin WPCs are remarkably similar overall

and bear the clear hallmarks of form agreements, namely they do not include individualized rates,

terms, or conditions that are the result of free, arms-length negotiations. Basin's argument also

---

[53] *Id.*

[54] Basin COS Rate at 20.

[55] *See infra* Section III.C.2.

[56] Basin COS Rate at 16, 20.

**PUBLIC VERSION – PRIVILEGED AND CONFIDENTIAL INFORMATION HAS BEEN REMOVED PURSUANT TO 18 C.F.R. § 388.112**

ignores recent Commission precedent that found, in nearly-identical circumstances, that full-requirements contracts and a generally-applicable rate schedule among Tri-State Electric Cooperative and its members did *not* qualify for a *Mobile-Sierra* public interest presumption.[57] There, the Commission found that the relationship between Tri-State's stated rate tariff and its wholesale power contracts was akin to service agreements under a generally applicable stated rate tariff rather than separately negotiated agreements. There is no substantive difference here. Consequently, for the same reasons the Commission denied Tri-State the *Mobile-Sierra* presumption, it should also deny Basin the same presumption. There is simply no reason for the Commission to reach a different conclusion here than it did in its Tri-State orders. Neither Basin's Rate Schedule A nor the Basin WPCs should be afforded the *Mobile-Sierra* presumption.

### C. *Basin's Withdrawal and Termination Procedures Directly Affect Its Jurisdictional Rates and Are Unjust and Unreasonable*

Notably absent from Basin's filings are its bylaws and policies addressing withdrawal from the cooperative and termination of the WPCs. This Commission has made clear that cooperative exit charges are a rule or practice directly affecting wholesale power rates, and the courts have made clear that the Commission has jurisdiction over and a duty to ensure that rates and practices affecting wholesale rates are just and reasonable. Basin's rate schedules are unjust and unreasonable because they do not provide any mechanism for members to withdraw from the cooperative system and terminate their wholesale contracts, and thereby their participation in Rate Schedule A. The Commission must act to remedy this injustice.

---

[57] *Tri-State*, 170 FERC ¶ 61,221 (2020).

**PUBLIC VERSION – PRIVILEGED AND CONFIDENTIAL INFORMATION HAS BEEN REMOVED PURSUANT TO 18 C.F.R. § 388.112**

> **1. The Commission Must Ensure Basin's Withdrawal and Termination Procedures Are Just and Reasonable**

As this Commission has recognized, the assessment of cooperative exit charges falls within its jurisdiction "as a rule or practice directly affecting . . . jurisdictional wholesale rates."[58] The Supreme Court has stated that, under the FPA, the Commission "has the authority—and, indeed, *the duty*—to ensure that rules or practices 'affecting' wholesale rates are just and reasonable."[59] Since the Commission's orders in the *Tri-State* proceedings, the D.C. Circuit has held that FERC has "*exclusive* authority over the regulation of 'the sale of electric energy at wholesale in interstate commerce,' including both wholesale electricity rates and any rule or practice 'affecting' such rates" and must ensure that "both wholesale rates and the panoply of rules and practices affecting them" are just and reasonable.[60] In short, the Commission has jurisdiction over all wholesale rates and all rules and practices that directly affect wholesale rates. Basin's withdrawal procedures and termination charges are one such rule or practice directly affecting its wholesale rates and the Commission therefore has a duty to ensure they are just and reasonable.

Basin was required to file its withdrawal and termination procedures when it became a public utility. Under the Federal Power Act, every public utility must "file with the Commission . . . schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges."[61] Basin's withdrawal and termination procedures are a practice or regulation affecting its wholesale rates and therefore were required to be filed. Basin's failure to

---

[58] *Tri-State Generation and Transmission Association, Inc.*, 170 FERC ¶ 61,224 at P 119 (2020).

[59] *Id.* (citing *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 774 (2016)) (emphasis added).

[60] *Nat'l Ass'n of Regulatory Util. Commissioners v. FERC*, Case No. 19-1142, slip op. at 3 (U.S. June 10, 2020) (emphasis added) (citations omitted).

[61] 16 U.S.C. § 824d(c).

**PUBLIC VERSION – PRIVILEGED AND**
**CONFIDENTIAL INFORMATION HAS BEEN REMOVED**
**PURSUANT TO 18 C.F.R. § 388.112**

file its procedures does not strip the Commission of jurisdiction over such procedures. To the contrary, the Commission has a duty to ensure they are just and reasonable because they directly affect the wholesale rates at issue in these proceedings.

Furthermore, Basin has placed its exit procedures at issue in this proceeding. Basin coerced and misled McKenzie and other members into the amendments of their wholesale contracts, extending them to 100-year terms, and then refused to provide any estimate of its exit charges when requested by McKenzie. Basin made membership dependent on the wholesale contracts and Rate Schedule A, and, vice versa—access to Rate Schedule A and the wholesale contracts was contingent on membership. In short, the withdrawal and termination procedures and charges are an essential part of, and directly affect, Basin's wholesale rates. The Commission, therefore, has a duty to consider them in this proceeding and ensure they are just and reasonable.

### 2. Basin's Withdrawal and Termination Procedures Are Not Just and Reasonable

Basin's withdrawal and termination procedures are not just and reasonable. Basin's bylaws clearly allow for voluntary withdrawal from Basin, yet Basin refuses to acknowledge as much or provide members with information necessary to evaluate withdrawal. Basin's bylaws state that "[i]f . . . any Member shall voluntarily withdraw from membership in the Cooperative . . . the membership of such Member shall forthwith be cancelled."[62] The provisions also require the Cooperative to repay the Member the value of its membership and state:

> Subject to the provisions of Section 7 of this Article I, a Member may withdraw from membership upon compliance with such equitable terms and conditions as the Board of Directors may prescribe; provided, however, that no Member shall be permitted to

---

[62] Basin Bylaws, Attachment No. 15 at Sec. 7.

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

withdraw until it has met all its contractual obligations to the
Cooperative.[63]

In addition, Basin maintains an approval right with respect to McKenzie's withdrawal from Upper

Missouri.[64]  Therefore, obtaining Basin's terms and conditions for withdrawal and approval are

the principal barriers McKenzie faces in evaluating its termination and withdrawal options.

Despite the Withdrawal Policy's clear and express requirements, Basin has refused to

provide the terms of a withdrawal or even reasonably engage in discussions on the topic.  In early

2019, McKenzie requested that Upper Missouri contact Basin to obtain an exit fee—the price at

which Basin would approve a termination agreement pursuant to the Withdrawal Policy and allow

McKenzie to exit the cooperative system.[65]  But when Upper Missouri followed through on

McKenzie's request by asking Basin for "the process and parameters that Basin would utilize to

calculate the financial liability (of Basin & associated business units) to each of the Member

Systems,"[66] Basin refused.  Basin stated that it had no obligation to develop or furnish the requested

information and that "it is not in the best interests of [Basin] or its membership to allow any buy

out of any all-requirements contracts with [Basin] or any of its Class A Members."[67]  In other

words, Basin told McKenzie to "pound sand."

This experience was not confined to McKenzie alone.  When another Class C member of

Basin, Meeker Cooperative Light and Power Association ("Meeker"), requested a buyout number

from Basin, Basin's response was to ask that its Class A members sign joint defense agreements,

---

[63] *Id.* at Sec. 8 (in combination with Sec. 7, the "Withdrawal Policy").

[64] *See* Upper Missouri Policy Number C-9, Attachment No. 5.

[65] Letter from McKenzie to Upper Missouri, dated January 30, 2019, Attachment No. 10.

[66] Letter from Upper Missouri to Basin Electric, dated February 6, 2019, Attachment No. 11.

[67] Letter from Basin Electric to Class A Members providing resolutions, dated February 15,
2019, Attachment No. 12.

in an apparent endeavor to hide business information from its own member-owners, stymie the strategic planning of its own member-owners, and "share information only among those member/owners who have signed the Joint Defense Agreement while keeping those who have not signed in the dark."[68] Nor is this the only example of Basin trying to flex its muscle to preserve the status quo. Indeed, in response to McKenzie's efforts to effect some change in Basin's governance and rates through these proceedings, Basin has even offered to pay the legal fees of members who would support its positions in litigation.

Basin's responses to its members' requests and litigation tactics are a clear demonstration of the relative bargaining power among the parties involved and the breakdown of the cooperative system that the all-requirements contracts were based on. Cooperatives like McKenzie lack any reasonable amount of bargaining power in negotiations because they are caught between a rock and a hard place. Withdrawing from membership in a cooperative can result in oppressive fees, and even getting a fee calculation can require years of costly litigation. In several states and before the Commission, the costs of cooperative withdrawal have played out with withdrawing members paying tens of millions of dollars in fees.[69] Cooperatives like McKenzie that are considering withdrawal are therefore left weighing the unsuitable options of paying potentially staggering exit fees or continuing to act as the piggy bank for their supplier's unrestrained spending, *i.e.*, the rock and hard place. In McKenzie's case, the situation is even worse. The withdrawal policies of Basin (and Upper Missouri) only permit a member to withdraw upon terms and conditions determined by Basin. But Basin refuses to provide the terms of its approval. This dual-key withdrawal system

---

[68] Letter from Meeker Cooperative, dated July 22, 2019, Attachment No. 13.

[69] *See e.g.*, *Delta-Montrose Elec. Ass'n v. Tri-State Generation & Transmission Ass'n, Inc.*, CO PUC Docket 18F-0866E, Formal Complaint of Delta-Montrose Electric Ass'n (filed Dec. 6, 2018). In 2016, a New Mexico-based Tri-State member, Kit Carson Electric Cooperative, withdrew from Tri-State after paying a $37 million exit charge. *See id.* at 3.

Document Accession #: 418206666-5175

**PUBLIC VERSION – PRIVILEGED AND CONFIDENTIAL INFORMATION HAS BEEN REMOVED PURSUANT TO 18 C.F.R. § 388.112**

has locked McKenzie in the Basin-Upper Missouri system with little—or no—ability to escape without the Commission's intervention.

The facts make clear that the cooperative system in this case is broken and the very premise of the all-requirements contracts—that the members have a say in, and access to, information regarding the functioning of the cooperative—is not working. The essential cooperative principles include "voluntary and open membership," "democratic member control," and "cooperation among the cooperatives."[70] These characteristics no longer exist in Basin's system. The tripartite relationship among the three levels of cooperatives has become tantamount to a financial suicide pact: All are bound to go down together paying for DGC's ever-increasing losses, because Basin refuses to consider the concerns of its members regarding DGC and will never agree to allow any member to withdraw.

In sum, the termination provisions (which are essential to, but not included with, Basin's filings) are unjust and unreasonable because they violate the principle of voluntary and open membership. The provisions hold the member electric cooperatives hostage, requiring them to make an impossible choice between remaining in the cooperative and continuing to fund failing non-utility assets, or terminating and being subject to unknown and potentially exorbitant termination fees that are unilaterally determined by Basin. This dynamic unreasonably restricts competition by preventing McKenzie from evaluating other generation options and renders the Withdrawal Policy useless. The Commission should find the withdrawal and termination provisions and procedures, as implemented by Basin, unjust and unreasonable. In setting just and reasonable terms for withdrawal, the Commission should direct Basin to provide to its members,

---

[70] Upper Missouri Power Cooperative, *Cooperative Principles*, http://www.uppermo.com/content/cooperative-principles (last visited Sept. 30, 2019).

in response to any such request, an estimate of their costs to buy-out of their contracts and exit the cooperative once and for all.

### D. The Inclusion of Costs Related to DGC Is Unjust and Unreasonable

Basin's cost-of-service rate includes a grossly inflated margin to cover the costs for DGC, which are passed through to McKenzie by Upper Missouri. As more fully explained below, the inclusion of such costs is unjust and unreasonable for three reasons.

- The costs of DGC are outside the scope of costs that Basin's members agreed to fund under the wholesale power contracts and are not used and useful in providing electric service. McKenzie agreed to purchase all of its energy requirements from Upper Missouri, and likewise Upper Missouri agreed to purchase the bulk of its energy supply from Basin. But none of them agreed to fund a gasification and fertilizer plant through the all-requirements contracts; rather, they agreed to pay rates that produce revenue sufficient, but only sufficient, to meet the cost of operation and maintenance of the generating plant, transmission system, and related facilities. DGC does not fall into any of those categories; nor is DGC used or useful in supplying power under the all-requirements contract.

- The costs associated with DGC were not prudently or reasonably incurred. McKenzie has objected to the investment in DGC since its inception and the economic indicators have plummeted since that time, yet Basin refuses to re-evaluate its investment.

- Basin's insistence that McKenzie pay DGC costs in order to procure power through the all-requirements contracts is an unlawful tying arrangement.

- Finally and along these same lines, McKenzie respectfully asserts that the Commission's jurisdiction under FPA section 205 is limited such that its ratemaking authority cannot be utilized in a manner that would permit DGC and the Synfuels Plant—i.e., non-jurisdictional assets that are neither used for utility service nor inputs used to produce electricity—to remain financially solvent by virtue of Basin's wholesale power rates.

1. **McKenzie Did Not Agree to Pay for DGC and DGC Is Not Used and Useful for Providing Wholesale Electric Service to Upper Missouri or Electric Service to McKenzie**

The costs for DGC cannot be imposed on McKenzie because Basin's wholesale power contracts do not allow Basin to recover costs for a gasification and fertilizer facility. Nor can the costs be included in Basin's rates, because the facility is not used and useful in providing electric service. Basin's contract with Upper Missouri allows Basin to charge rates that:

> produce revenue which shall be sufficient, **but only sufficient**, with the revenues of Seller from all other sources, to meet the cost of the operation and maintenance (including, without limitation, replacement, insurance, taxes and administrative and general overhead expenses) of the generating plant, transmission system and related facilities of the Seller, the cost of any power and energy purchased for resale hereunder by the Seller, the cost of transmission service, to make payments on account of principal of and interest on all indebtedness of the Seller, and to provide for the establishment and maintenance of reasonable reserves.[71]

McKenzie's all-requirements contract with Upper Missouri mirrors this provision. Basin's costs for DGC are not properly included in the rates under the wholesale power contracts. DGC is not an electric generating plant. It is an industrial facility that produces fertilizers, petrochemical

---

[71] Basin WPCs at Rate Schedule No. 17.

PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112

products, and synthetic natural gas.[72]  While at least some of the synthetic gas produced at DGC

may be used as a start-up fuel at one of Basin's generating plants, that plant's primary fuel source

is coal.[73]  And even then, DGC's synthetic gas cannot be even remotely considered an economic

fuel source for start-up purposes.  The Synfuels Plant is going to great expense to produce natural

gas from coal—a bizarre choice seeing that it is surrounded by shale gas producers that flare their

natural gas.  Nor can DGC be classified as transmission plant.  In short, DGC's costs are outside

the scope of the costs that Basin's members have agreed to pay through their wholesale power

contracts.

　　　　Nor are the costs associated with DGC properly included in rates under Basin's proposed

cost-of-service rate schedule.  The costs for DGC do not satisfy the Commission's "used and

useful" standard and therefore should not be included in Basin's rates.[74]  The DGC assets are not

a cost-effective source of natural gas for any generation facility to serve Basin's customers and

therefore are not useful in providing electric service—imagine going to great lengths and expense

to turn coal into natural gas at a facility located in the heart of the Bakken Shale Formation.[75]

Further, a great portion of the investment in DGC has been to fund a fertilizer plant, which is of

no use at all in providing electric service to customers.  In short, DGC is neither used or useful in

---

[72] Basin Elec. Power Coop., 2018 Annual Report at 12, *available at* https://www.dakotagas.com/about-us/financial.

[73] *Id.* at 28.  And although DGC may initially purchase that coal, such as pass-through cannot magically render an otherwise non-utility asset used and useful for utility services.

[74] *See New England Power Co.*, Opinion No. 295, 42 FERC ¶ 61,016, at 61,078 (1988) ("In general, the used and useful standard provides that an asset may be included in a utility's rate base only when the item is used and useful in providing service," because "current ratepayers should bear only the costs incurred in providing service to them.") (citing *NEPCO Mun. Rate Comm. v. FERC*, 668 F.2d 1327 (D.C. Cir. 1981)); *see also Williston Basin Interstate Pipeline Co.*, Opinion No. 331-A, 50 FERC ¶ 61,420, at 62,286 (1990) (pipeline prohibited from including in its rate base cost of storage basins that were not used and useful to its customers).

[75] Naturally, the coal used at DGC comes from yet another for-profit subsidiary of Basin.

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

providing electric service, nor did Basin's customers agreed to pay for its costs in the wholesale power contracts. Consequently, the costs associated with DGC cannot be included in Basin's rates.

### 2. DGC's Costs Were Not Reasonably or Prudently Incurred

The costs Basin has incurred to purchase and maintain DGC were not prudently incurred, and therefore cannot be included within Basin's rates. A detailed history of the failures occurring at DGC and Basin's blind eye to the same, as well as the members' concerns over DGC's spiraling costs, is provided in the Background section to this protest. But to summarize, Basin's repeated investments in DGC were imprudent when they were made and have only become worse with time as DGC continues to experience heavy losses and Basin persists in injecting more money into its failed investment.

The Commission should reject Basin's cost-of-service rate to the extent that it permits the imposition of costs for DGC. In Basin's and Upper Missouri's view, a member cooperative that signs an all-requirements contract can be forced fund any investment made by the generation and transmission cooperative, no matter how ill-advised, imprudent, unlawful, and unrelated to the provision of electric power.[76] But that is not the law. Public utilities with cost-of-service rates must demonstrate that their investments are prudently incurred.[77] And Basin cannot do so here. The Commission should find that Basin's investments in DGC were imprudent and, as a result, their inclusion in Basin's rates is unjust and unreasonable.

---

[76] McKenzie objected to the acquisition of DGC as early as 1988, and Basin summarily dismissed McKenzie's concerns then as it does now. *See* Attachment Nos. 3 and 4.

[77] *New England Power Co.*, 31 FERC ¶ 61,047, at 61,084 (1985) ("[M]anagers of a utility have broad discretion in conducting their business affairs and in incurring costs necessary to provide services to their customers. In performing our duty to determine the prudence of specific costs, the appropriate test to be used is whether they are costs which a reasonable utility management [] would have made, in good faith, under the same circumstances, and at the relevant point in time.").

### 3. Requiring McKenzie to Fund DGC as a Condition of Obtaining Power under the Contracts Is an Unlawful Tying Arrangement

Basin's attempt to include DGC's costs in the power rates paid by its members constitutes an unlawful tying arrangement, in that McKenzie is being forced to fund DGC as a condition of purchasing electric service from Basin through Upper Missouri. "The Commission has broad authority under the public interest standard of Sections 202 through 207 of the Federal Power Act to consider any anticompetitive consequences of a public utility's practices as they affect the public interest."[78] One such anticompetitive practice is tying arrangements, whereby the provision of a desired form of service is conditioned upon the purchase of another, usually unwanted form of service.[79] "An arrangement becomes *per se* an unreasonable and unlawful restraint on trade whenever the seller has sufficient economic power over the tying product to appreciably restrain free competition in the market for that product, and a 'not insubstantial' amount of interstate commerce is affected."[80]

Here, McKenzie entered into the requirements contract and became a member of Basin in order to purchase electric generation and transmission service. The purchase of electric generation and transmission is the desired form of service. Beginning in 1988, as a condition of membership and of receiving electric service, Basin has also required members to fund DGC. Consequently, in order to receive the desired service—electricity—members have also been required to fund unwanted, non-utility investments in DGC. McKenzie has objected to the investment since 1988 when it requested to be indemnified for Basin's purchase of DGC; Basin turned an all-too-familiar

---

[78] *Bos. Edison Co.*, 1 FERC ¶ 63,010, 65,066 (Oct. 4, 1977) (citing *Gulf States Utilities Co. v. F.P.C.*, 411 U.S. 747 (1973)).

[79] *Id.*

[80] *Id.* at 65,067.

Document Access: 41-18106666-5373 Filed: 08/06/2020 Page 69 of 211 PageID #: 681
Case 4:20-cv-04192-LLP Document 41-14 Filed: 08/06/2020 Page 69 of 211 PageID #: 681

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

cold shoulder to that objection.[81]  In short, Basin has created an unlawful tying arrangement because to procure electric power from Basin, one must also purchase an interest in DGC's gasification and fertilizer plant.

In this case, the arrangement is *per se* an unreasonable and unlawful restraint on trade.  This is true for two reasons.  First, Basin has sufficient economic power over the tying product (*i.e.*, electric generation and transmission service) to appreciably restrain free competition in the market for electric service.  At the time of the investment, Basin's members were already locked into decades of service from Basin and had no ability to procure power elsewhere as a result.  McKenzie's ineffective request for indemnification is clear evidence of Basin's economic power even in 1988.  And the structure of the cooperative and Basin's contracts, *i.e.*, Basin's purported ability to veto any member's withdrawal, provides further evidence of Basin's continuing ability to restrain free competition in the market.

Second, a "not insubstantial" amount of interstate commerce is affected.  Neither the investment in DGC nor the purchase of its synthetic gas would occur in the absence of Basin's anticompetitive tying arrangement.  Without captive investors and purchasers for its synthetic gas, DGC would not be able to compete with other natural gas suppliers.  In fact, Basin's CEO, Paul Sukut, confirmed as much in a Basin Manager's Advisory Committee meeting in October 2017, stating that DGC would have already been closed if Basin's members had not been providing it with a financial backstop.[82]  Despite significant subsidization from Basin Electric, from 2013 to 2018, Dakota Gas lost over $█████.  Further, DGC lost $█████ in 2019 and projects total losses of $█████ from 2020 to 2024.

---

[81] *See* Attachment Nos. 3 and 4.

[82] Summary of Basin Electric Manager's Advisory Committee Meeting on October 19–20, 2017, Attachment No. 9.

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

The impact of these arrangements is compounded by DGC's poor credit, which has required Basin to guarantee (and ultimately forgive) its loans. In total, Basin has forgiven approximately $ ██████ in loans to DGC—most recently $ ██████ in 2019 and an additional $ █████ so far in 2020.[83] In the absence of a guaranteed rate recovery through the wholesale power contracts, McKenzie suspects that Basin itself would divest from DGC and purchase start-up fuel elsewhere.[84] In short—DGC would not survive if Basin's members were not required to fund it as a condition of purchasing power from Basin. The Commission should require Basin to untie the investment in DGC from its provision of electric service in order to protect competitive markets.

### 4. The Commission's FPA Section 205 Jurisdiction Is Not Limitless

The Commission's authority under the FPA is limited to ensure that "'rates and charges made, demanded, or received by any public utility for or in connection with' interstate wholesale [electric] sales," as well as the "rules and regulations affecting or pertaining to such rates or

---

[83] DGC Board Minutes dated June 16, 2020, Attachment No. 50 at 5.

[84] While the Commission has held that its affiliate abuse restrictions in 18 C.F.R. § 35.39 are not applicable to electric cooperatives, that analysis has been based on the premise that the cooperatives' ratepayers are its shareholders and therefore, there is no danger of shifting benefits. *Market-Based Rates for Wholesale Sales of Electric Energy, Capacity and Ancillary Services by Public Utilities*, Order No. 697, 119 FERC ¶ 61,295 at P 526 (2007), *order on clarification*, 121 FERC ¶ 61,260 (2007), *order on reh'g and clarification*, Order No. 697-A, 123 FERC ¶ 61,055 (2008), *clarification order*, 124 FERC ¶ 61,055 (2008), *order on reh'g and clarification*, Order No. 697-B, 125 FERC ¶ 61,326 (2008), *order on reh'g and clarification*, Order No. 697-C, 127 FERC ¶ 61,284 (2009), *order on reh'g and clarification*, Order No. 697-D, 130 FERC ¶ 61,206 (2011), *aff'd sub nom. Mont. Consumer Counsel v. FERC*, 659 F.3d 910 (9th Cir. 2011), *cert. denied*, 133 S. Ct. 26 (2012). That logic no longer applies where a ratepaying cooperative such as McKenzie is disproportionately burdened by such decisions due to its large size within the cooperative and has no influence over affiliate transactions due to the cooperative governance structure.

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

charges" are just and reasonable and not unduly discriminatory or preferential.[85] "Taken for all it's worth, that statutory grant could extend [the Commission's] power to some surprising places," including the "inputs" used to produce electricity, such as "steel, fuel, and labor."[86] However, the Supreme Court has interpreted the FPA to restrict the Commission's authority to the wholesale electricity sector, finding that the Commission may regulate only those rules or practices that "directly affect the wholesale rate."[87] Consequently, the Supreme Court has interpreted the FPA as preventing the Commission from subsidizing or regulating in industries that fall outside of its limited jurisdiction.

If the Commission were to accept Basin's rates as-is, with hundreds of millions of dollars of investments and losses in DGC buried solely within its margins, it would be utilizing its authority under FPA section 205 to keep an unquestionably non-jurisdictional enterprise financially afloat. For years now, Basin has forced DGC's bailout on its membership—even Basin's own CEO, Paul Sukut, has admitted that DGC would be unable to survive in the absence of revenue recovery through Basin's wholesale electricity rates.[88] But now that Basin is subject to the standards of the FPA, it must demonstrate to the Commission that the costs it seeks to recover through its rates are for, or in connection with, interstate wholesale electricity sales. And yet Basin cannot find anywhere within over 2,000 pages of its filing other than its "consolidated margin" to account for the combined billions spent and lost at DGC.

---

[85] *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 773 (2016), *as revised* (Jan. 28, 2016) (quoting 16 U.S.C. § 824d(a) (2018)).

[86] *Id.* at 774.

[87] *Id.*

[88] *See* Summary of Basin Electric Manager's Advisory Committee Meeting on October 19–20, 2017, Attachment No. 9.

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

Furthermore, it *is* within the Commission's authority under FPA section 205 to protect consumers from excessive prices.[89] The "cooperative way" does not permit Basin to escape the requirements of the FPA simply because it operates on a not-for-profit basis. And conversely, in reviewing the subject filings, the Commission must assert its duty to protect consumers in order to restrain excessive and unchecked spending by a public utility.

McKenzie respectfully asserts that if the Commission were to allow Basin to recover costs associated with DGC in its rates, the Commission would, in effect, be subsidizing a business that falls outside of its jurisdictional purview and subjecting to consumers to rates that are demonstrably excessive. Nothing in the FPA, however, permits such extra-jurisdictional activity or such a callous disregard of consumers. Consequently, the confines of FPA section 205 do not permit Basin to recover the costs and losses associated with DGC through its wholesale electricity rates.

### E. Basin's Rate Schedules Lack Cost Support, Purposefully Obscure the Impact of Dakota Gas, and Are Not Just and Reasonable

Basin's Rate Schedule A filing and associated documentation lack essential information required by 18 C.F.R. § 35.12, purposefully obscure the impact of Dakota Gas on Basin's rates to members, and make clear that Basin does not set rates on the basis of costs for electric service but rather includes non-utility assets.

First, Basin fails to comply with the Commission's requirements, among others, to "submit a summary statement of all cost computations involved in deriving the rates in sufficient detail to

---

[89] *See, e.g.*, *Pa. Water Power Co. v. FPA*, 342 U.S. 414, 418 (1952) ("A major purpose of the whole [Federal Power] Act is to protect power consumers against excessive prices."); *New England Power Generators Ass'n v. ISO New England Inc.*, 146 FERC ¶ 61,038 at P 26 & n.33 (2014) (the Commission's "statutory mandate under the [Federal Power Act] entails protecting consumer interests").

justify the rates, including, but not limited to, ***detailed work papers***"[90] and to submit summary cost analysis and cost-of-service support.[91]  While over 2,000 pages long, Basin's stated rate filing is devoid of any meaningful cost support for the majority of the cost categories encompassed in the $1.778 billion revenue requirement.   In fact, it appears that Basin's entire stated revenue requirement is based on no more than conjectured numbers: while Basin's cost and revenue accounts refers to RUS account numbers rather than FERC's Uniform System of Accounts, the numbers used in its revenue requirement are "forecasted" income and expenses that generally lack support for the projections.[92]  The revenue requirement is based on these speculative numbers and devoid of any meaningful actual or historical cost data.

Basin failed to provide any supporting documentation that would allow these figures to be traced back to verifiable cost of service data, documentation, or other information that interested parties or the Commission might use to determine whether the requested rates are just and reasonable.  Basin fails to provide audited financial income and balance sheets for 2019 that may have been used as a basis for its projection of its 2020 Operating Budget to support its $1.778 billion revenue requirement.  And it has not gone unnoticed that these very same failures prevented

---

[90] *Basin Electric Power Cooperative*, 169 FERC ¶ 61,158 at P 20 (2019); 18 CFR § 35.12(b)(2)(ii) (emphasis added).

[91] 18 CFR § 35.12(b)(5); 18 CFR § 35.13(h)(36)-(37).

[92] Basin COS at 22 ("The total cost of electric service that Basin Electric must recover through its annual revenue requirement is comprised of the ***forecasted*** operating expenses, maintenance expenses, and fixed costs. . . . The operating expenses Basin Electric must recover through its annual revenue requirement are comprised of costs recorded in RUS accounts associated with production operation; fuel; rents; other power supply; transmission operations; and administration. To ***estimate these operating expenses,*** Basin Electric added the expenses ***forecasted to be included in RUS account numbers***….") (emphasis added); *see also* Basin COS at 23 ("Basin Electric currently forecasts its expenses by RUS account. It then applies a margin to ensure it maintains sufficient financial reserves.").

**PUBLIC VERSION – PRIVILEGED AND**
**CONFIDENTIAL INFORMATION HAS BEEN REMOVED**
**PURSUANT TO 18 C.F.R. § 388.112**

the Commission from finding Tri-States wholesale rates to be just and reasonable.[93]    At a

minimum, Basin should have provided financial statements to duplicate the Commission's Form

1 balance sheet and income statement, including 2019 audited financial income and balance sheets

that were used as a basis for its projection of its 2020 Operating Budget, and should have clearly

reflected FERC account and sub-account numbers as presented in the Commission's Uniform

System of Accounts, Part 101.  Basin's filing instead relies only on estimates of amounts that Basin

theoretically might include in RUS Form 12, and as a result the Commission and interested parties

are prevented an opportunity to scrutinize Basin's proposed rates.   Further, Basin uses RUS

account numbers both in its supporting data for the 2019 income statement, Attachment F, pages

2 and 3, and its proposed Revenue Requirement Statement, Attachment S, pages 2 and 3, that

excluded account names, further adding to the deficiencies in the rate filing.

Basin's lack of cost support and obfuscation is at its height when it comes to DGC.  For

example, Statement BL, which purports to explain the rate design, makes virtually no mention of

Basin's subsidiaries including DGC, despite the fact that they were estimated to account for $95

million in losses in 2019.[94]  Instead Basin conceals the impact of DGC and merely says that the

"consolidated margin" is what "takes into account the profits and losses of" Basin's subsidiaries,

including DGC.[95]   But there are no workpapers describing any of the cost inputs to this margin,

and Basin does not even bother to breakout how much of the margin DGC accounts for in its 2020

estimates.[96]  Basin should be required to file the 2019 income and balance sheet for DGC and its

---

[93] *Tri-State Gen. and Trans. Assoc., Inc.*, 170 FERC ¶ 61,221 at PP 56, 80 (2020).

[94] Basin COS Rate Attachment E at 2; *id.* Attachment O at cell E47.

[95] Basin COS Rate Attachment E at 7.

[96] Basin COS Rate Attachment S at 1 (listing only the margin with no breakout of the losses from Basin's subsidiaries).

other non-utility affiliates that account for the projected losses in 2020 that are incorporated within Basin's projected budget. Without such financial records the parties to this proceeding cannot reasonably evaluate the financial obligation Basin is requiring its customers to bear. Such accounting and financial records are necessary and essential for the Commission and the parties hereto to hold Basin's filing up to applicable legal standards.

Second, Basin requests waivers of Commission requirements that it is clearly not entitled to in an effort to keep data from the Commission and parties—specifically data related to DGC. Basin's request for a waiver of the requirement to submit Period II data is a calculated move to avoid any transparency regarding its cost of service and the cost of DGC.[97] The Commission should promote transparency, particularly where a rate has never been reviewed under the FPA. Basin should accordingly be required to provide Period II data that would include, among other items, cost of service data providing: (a) original cost data for its plant investment itemized by major functions in a format designed to facilitate review and analysis, (b) the allocated cost of service for each customer rate group itemized and summarized by major functions and clear and logical workpapers reflecting allocated or assigned component elements, (c) a fully distributed cost of service study disclosing the principal determinants for allocation of total electric costs among the wholesale customer groups, and (d) a comparison of the fully distributed cost of service with the revenues for the total electric service and for each customer rate group, showing the revenue excess or deficiency.[98] Finally, Basin needs to provide prepared testimony justifying its requested margin of ten percent of its proposed revenue requirement—which is more than three

---

[97] Period I data is "the most recent twelve consecutive months, or the most recent calendar year, for which actual data are available." 18. C.F.R. § 35.13(d)(3)(i). Period II data is "any period of twelve consecutive months after the end of Period I that begins" between 9 months prior and 3 months after the proposed rate change. *Id.* § 35(d)(3)(ii).

[98] 18 CFR § 35.13(d)(36).

**PUBLIC VERSION – PRIVILEGED AND CONFIDENTIAL INFORMATION HAS BEEN REMOVED PURSUANT TO 18 C.F.R. § 388.112**

times the margin of three percent adhered to prior to the financial demise of DGC. Such information is absolutely essential to fully analyze and understand Basin's rates.

The Commission should also reject Basin's requested waiver of the requirement to submit Period I and Period II rate schedules.[99] Basin simply does not qualify for such a waiver under the Commission's clear precedent. Basin alleges that the Commission has previously granted such a waiver when the applicant uses publicly available documents and data included in company records, which together provide enough information to allow for an understanding and analysis of the rate filing.[100] What Basin fails to mention is that the Commission's past precedent, including the very cases cited by Basin, concerns formula rates based on FERC Form No. 1.[101] Basin's rate is a stated rate and does not rely on FERC Form No. 1, nor does Basin include sufficient records

---

[99] Pursuant to 18 C.F.R. § 35.12(b)(5), Basin is required to submit "the same material required to be furnished pursuant to § 35.13(h)(37) Statement BL" and "a complete explanation as to the method used in arriving at the cost of service allocated to the sales and service for which the rate or charge is proposed, and showing the principal determinants used for allocation purposes." Section 35.13(h)(37) Statement BL requires that the utility provide a "narrative statement describing and justifying the objectives of the design of the changed rate" and "a summary cost analysis . . . consistent with, derived from, and cross-referenced to the data in cost of service Statement BK." Statement BK, in turn, requires "a statement of the claimed fully allocated cost of service of the utility developed and shown for Period I and Period II," including "a tabular comparison of Period II total electric fully distributed cost items with those of Period I." § 35.13(h)(36). Basin admits that it is subject to these requirements. Basin COS at 33.

[100] Basin COS Rate at 33.

[101] *Pac. Gas & Elec. Co.*, 165 FERC ¶ 61,194, 61708 at P 33 (2018) ("Contrary to protestors' contentions, the Commission has granted such requests for waiver where, as here, the applicant used both FERC Form No. 1 data and data included in company records."); *S. California Edison Co.*, 136 FERC ¶ 61,074, at P 7 (2011) (also noting that the applicant had submitted both Company Plant Records and FERC Form No. 1 data to support its formula rate); *Pub. Serv. Co. of New Mexico*, 142 FERC ¶ 61,168 at P 29 (2013); *Kansas City Power & Light Co.*, 130 FERC ¶ 61,009 at P 36 (2010) ("The Commission has granted waivers of the requirements to provide such data previously in a series of cases involving transmission formula rates."); *Pub. Serv. Co. of Colorado*, 166 FERC ¶ 61,156 at P 37 (2019); *Duke Energy Carolinas, LLC*, 152 FERC ¶ 61,028 at P 16 (2015) ("Although the Commission has granted waiver of cost support in formula rate cases, in those cases the formula rate was populated by FERC Form No. 1 data and, therefore, full Period I and Period II data were not needed to evaluate the proposal.").

## PUBLIC VERSION – PRIVILEGED AND CONFIDENTIAL INFORMATION HAS BEEN REMOVED PURSUANT TO 18 C.F.R. § 388.112

to allow for an understanding and analysis of the rate.[102]   In such circumstances, the Commission has not hesitated to reject the same type of waiver that Basin is seeking.[103]   The Commission has also rejected such waiver requests where the formula rates would be updated "using a substantial amount of costs that are not from its FERC Form No. 1 data or publicly-available documents."[104]   These same flaws are present in Basin's stated rates.  Basin has not filed FERC Form No. 1, nor has it provided documentation to support its costs, particularly its non-utility costs.

The data Basin failed to provide is essential to understanding Basin's cost of service.  While not exhaustive, the following is a tentative list of the deficiencies in the data Basin provided, primarily to obscure the costs of DGC:[105]

---

[102] Basin COS Rate at 15 (referencing "the stated rate contained in Rate Schedule A").

[103] *PacifiCorp*, 158 FERC ¶ 61,121 at P 46 (2017) ("We deny PacifiCorp's request for waiver of Part 35.13 of the Commission's regulations. While PacifiCorp characterizes its filing as a proposed formula rate, the fact remains that PacifiCorp's proposal is a stated rate based upon a production cost template which is modeled after PacifiCorp's transmission cost formula rate. Accordingly, PacifiCorp's filing does not warrant similar treatment of the filing requirements that the Commission has provided formula rate proposals." (footnotes omitted)).

[104] *Tampa Elec. Co.,* 133 FERC ¶ 61,023 at P 53 (2010); *see also New York Indep. Sys. Operator, Inc*, 151 FERC ¶ 61,004 at P 192 (2015) ("Prior Commission orders have granted waiver of cost support in formula rate cases because the formula rates used FERC Form No. 1 data and, therefore, additional data were not needed to evaluate those proposals.  However, unlike those cases, NY Transco's formula rates will be updated using a substantial amount of costs that are not contained in its FERC Form No. 1 or publicly-available documents, much of which will be based on services provided by affiliated transmission owners. Therefore, NY Transco's formula rates do not qualify for waiver of the filing requirements set forth in section 35.13 of the Commission's regulations as it applies to amounts not supported by FERC Form No. 1 data.")

[105] While McKenzie focuses here on DGC's operating costs, McKenzie submits that the full cost support requested herein would reveal further detail necessary to assess the justness and reasonableness of Basin's rates.  For example, McKenzie suspects that full cost support might show that DGC both receives discounted electricity from Basin and sells over-priced gas to Basin's generators.  *See e.g.,* Attachment I-9 at 11 ("Basin Power Markets Group purchases all of the gas for the [Deer Creek Station] plant from Dakota Gasification Company."); Basin COS Rate at 9 ("Dakota Gas is Basin Electric's largest non-member customer.").  McKenzie reserves the right to protest these and any other issues that may arise when further cost support is provided for Basin's rate.

# PUBLIC VERSION – PRIVILEGED AND
## CONFIDENTIAL INFORMATION HAS BEEN REMOVED
## PURSUANT TO 18 C.F.R. § 388.112

- Statement AA balance sheets and Statement AB income statements filed in accordance with the annual report form for electric utilities under Part 141 would have included public utility property separated from its non-utility subsidiaries like DGC. 18 C.F.R. § 35.13(h)(1) - (2). Such data is essential to understanding DGC's impact on Basin's rates.

- Basin did not provide Statements AD (cost of plant), AH (operations and maintenance), AI (wages and salaries), and AJ (a statement listing depreciable assets with appropriate depreciation and amortization rates that calculate to a number that support the depreciation and amortization expense included in the revenue requirement) and the documentation it did provide does not provide enough detail to separate out non-utility assets like DGC or link the costs provided to Basin's claimed overall cost-of-service.

- Basin did not provide any data to fulfill the requirements and support its claimed costs for Statements AK (taxes other than income), AP (interest rates associated with each bond and bank loan outstanding that calculates total interest that ties into the claimed interest expense included in the revenue requirement) AX (potential rate refunds for taxes other than income), AY (tax rate statement), BC (reliability data), BI (fuel cost adjustments), or BM (construction program).

It is essential that Basin be required to submit all necessary data for separating its utility from non-utility activities. Without such information interveners will not have sufficient information to propose cost alternatives such as mothballing or decommissioning DGC as a cost savings to all utility customers.

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

The absence of this data makes it impossible to conclude that Basin's rates are just and reasonable and not unduly discriminatory. Therefore, Basin's waiver request should be denied, and Basin should be required to provide full cost support, particularly as it relates to its non-utility assets. McKenzie further requests that the Commission reject Basin's requested waiver from the requirement of section 35.13(c)(1) to provide a comparison of rates subdivided by each delivery point or set of delivery points that constitutes a billing unit. Consistent with the importance of promoting transparency, this information is essential to ensuring some members are not cross-subsidizing other members, particularly due to the uneven scope of the transmission facilities placed under the control of SPP.[106] McKenzie requests that the Commission require this data to be submitted as part of the hearing proceedings.[107]

Finally, while Basin's filing obscures the impact of DGC, Basin is transparent in Rate Schedule A's detachment from actual utility costs. The brazenness with which Basin admits that its rate-making decisions are not based on any cost-causation principles but merely on the whims of the Board and wishes of favored members is shocking. To begin, Basin admits that its rates were not designed to recover its cost-of-service but simply to achieve a desired rate, stating: "Basin Electric's Rate Schedule A was designed to result in an average rate of 63.7 mills per

---

[106] Basin Update July 2015, Attachment 51.

[107] *See Duke Energy Carolinas, LLC*, 152 FERC ¶ 61,028 at P 16 (2015) ("Consequently, we deny waiver of the requirements of section 35.13 . . . , and require Duke to provide full cost support . . . , including statements necessary to support the [expenses], and require this data to be submitted as part of the hearing proceedings ordered herein, in addition to whatever additional discovery may be deemed appropriate."); *PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,156, at 59 (2013) ("We will deny the PHI Companies' requested waiver of section 35.13 and require the filing of full Period I and Period II data along with cost support, including testimony, exhibits, and workpapers supporting its application as part of the case-in-chief in the settlement and hearing proceedings discussed herein within 30 days of the date of this order.").

Document Access Con #: 11206888-5173

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

kWh."[108]  Similarly, the revised rates for 2020 included a rate decrease because "the Basin Electric Board decided to reduce the rate on average by 1 mill per-kilowatt hour and the Fixed Charge by half."[109]  Basin fails to provide any explanation or cost-justification for why the Fixed Charge was cut in half -- the Basin Board just decided to do it.  Presumably, the Board made that decision to avoid the deficiencies in its initial rate filing by availing itself of the abbreviated filing requirements that apply when a public utility proposes a rate increase.  In any event, Basin admits with no trepidation that the demand-energy splits in its rates are not designed to follow any cost-causation principles, but rather are employed "at the request of its Members" to "minimize[] cost shifts" from their original instatement 20 years ago or because "revising it would result in an overall rate increase" to certain members.[110]  Basin's rate-design process is therefore completely untethered from its cost-of-service.

The risk of undue discrimination is patently obvious in such a rate-making process and the "democratic cooperative governance process" Basin attempts to use to shield its rate-making process from scrutiny is a sham.  Basin alleges that "the rate structure . . . is approved by the Basin Electric Board, which is comprised of representatives of the same Members who executed the Wholesale Power Contracts."[111]  But McKenzie has no representative on Basin's board; the Upper Missouri board has never brought the Basin rates up for discussion at Upper Missouri for the purpose of garnering a consensus opinion; and neither McKenzie nor Upper Missouri have agreed to Basin's rates.  Basin then alleges "Rate Schedule A also is reviewed at least annually and

---

[108] Basin COS Rate at 23.

[109] *Id.* at 17.

[110] *Id.* at 25

[111] *Id.* at 16.

**PUBLIC VERSION - PRIVILEGED AND CONFIDENTIAL INFORMATION HAS BEEN REMOVED PURSUANT TO 18 C.F.R. § 388.112**

updated."[112]  But McKenzie has never been given access to sufficient information to evaluate Basin's rates despite repeated requests for such information from McKenzie and other members.[113] Finally, Basin alleges that "[a]ny disputes concerning the rates included in Rate Schedule A are resolved through the democratic cooperative governance process."[114]  As is evident from this protest, McKenzie's disputes regarding the rates have certainly not been resolved through the democratic process.  In short, there is no democratic process.  Basin is running a dictatorship and the lack of any cost-support documentation in the attached filing serves to further that dictatorship by keeping its members in the dark.

In light of these facts, the Commission should also hold, and instruct Basin to clearly state in its rate schedules, that the stated rate in Rate Schedule A may not be changed by Basin's Board without Commission approval.  The WPCs allow Basin's board to change the rate under Rate Schedule A using an annual review process and do not indicate that Commission approval is required.[115]  Basin's rate filing also explains its annual rate review and approval update process, which does not include Commission approval.[116]  A public utility with stated rates must file and obtain Commission approval to revise its rate.[117]  Notably, McKenzie raised this issue in response

---

[112] *Id.*

[113] *See* Manager's Advisory Committee Meeting dated October 19, 2017, Attachment No. 52.

[114] Basin COS Rate at 16.

[115] *See e.g., id.* at Rate Schedule 17, Sec. 4(b).

[116] Basin COS Rate at 20.  Other portions of Basin's filing also indicate that it intends to change stated rates without Commission approval.  *See e.g.,* Rate Schedule A at 8 (Non-Controlled Electric/Dual Space Heat Rate) ("The 2020 through 2023 rates do not constitute a guarantee. They represent the intent of the Basin Electric Board and may be modified at the Board's discretion at any time.").

[117] *See e.g., Public Utility Transmission Rate Changes to Address Accumulated Deferred Income Taxes*, 165 FERC ¶ 61,117 at PP 10, 15 (2018) (explaining that "[w]hen a public utility uses stated rates, if the public utility seeks to change its rate, it files a rate case at the Commission to

(continued . . .)

**PUBLIC VERSION – PRIVILEGED AND CONFIDENTIAL INFORMATION HAS BEEN REMOVED PURSUANT TO 18 C.F.R. § 388.112**

to Basin's first attempt to file its rate schedules and Basin has failed to make any changes in response.[118] The Commission should clarify that Basin must make a Section 205 filing and receive Commission approval to change the stated rate.

For all the foregoing reasons, the Commission should accept the rate schedules for filing, impose a refund obligation, and establish a section 206 investigation and hearing/settlement procedures. As part of such an order, Basin should also be required to submit full workpapers and cost support for its filing, including audited financial statements, including for its non-utility subsidiaries, and Period I and Period II data along with cost support and associated documentation and workpapers, within 30 days of the Commission's order.

## IV. REQUEST FOR CONFIDENTIAL TREATMENT OF PRIVILEGED INFORMATION

McKenzie requests confidential treatment of the privileged information contained in the Protest and attachments pursuant to sections 33.8 and 388.112 of the Commission's regulations. The privileged information has been marked according to the Commission's instructions. McKenzie asserts that the privileged materials contains confidential information that is customarily treated as commercially sensitive and could cause business injury if disclosed.

## V. CONCLUSION

The Commission is faced with an opportunity to determine whether Basin's rates, terms, and conditions of service are just and reasonable. Basin's prior non-jurisdictional status allowed it to skirt oversight, impose unjust and unreasonable terms on its members through abuses of the

---

establish the cost of service revenue requirement, allocate costs to various customer groups, and calculate rates" and that stated rates "are updated only through a rate case initiated by a FPA section 205 application by the public utility or an FPA section 206 action by the Commission or a complaining third party").

[118] Motion to Intervene and Protest of McKenzie Electric Cooperative, Inc. at 24-25, Docket No. ER19-2909 et al. (filed Oct. 21, 2019).

**PUBLIC VERSION – PRIVILEGED AND CONFIDENTIAL INFORMATION HAS BEEN REMOVED PURSUANT TO 18 C.F.R. § 388.112**

cooperative system, and close its members and itself off from the competitive wholesale markets. Basin's terms and conditions of service, specifically its pass-through of DGC's costs and the unfiled termination and withdrawal provisions that apply to the WPCs, are not just and reasonable.

McKenzie respectfully requests that the Commission grant its motion to intervene and grant it full party status in this proceeding. McKenzie further requests that the Commission accept Basin's rate schedules for filing, impose a refund obligation, require Basin to submit the supporting cost documentation described herein, and establish a section 206 investigation and hearing/settlement procedures to determine whether the rates schedule and just and reasonable. McKenzie submits that the WPCs and Rate Schedule A are not just and reasonable because they fail to provide McKenzie with any real or usable means for withdrawing, impose unjust and unreasonable costs associated with non-utility assets, and are not based on the costs of providing utility service.

Respectfully submitted,

*/s/ Jason Johns*
Jason Johns
Jessica Bayles
Stoel Rives LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Tel: 503-294-9618
jason.johns@stoel.com
jessica.bayles@stoel.com

*Counsel for McKenzie Electric Cooperative, Inc.*

Dated: August 6, 2020.

Case 4:20-cv-04192-LLP Document 1-5 Filed 08/08/2020 Page 54 of 211 PageID #: 696
Document Accession #: 20200806-5175

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| Basin Electric Power Cooperative | ) | Docket Nos.   ER20-2441-000 |
| | ) | ER20-2442-000 |
| | ) | |
| | ) | |

### AFFIDAVIT OF JOHN SKURUPEY

1. My name is John Skurupey.  I am the Chief Executive Officer of McKenzie Electric Cooperative, Inc. ("McKenzie").  I am authorized to make this Affidavit on behalf of McKenzie, and I have personal knowledge of the matters set forth herein.

2. I have reviewed the Motion to Intervene and Protest of McKenzie, filed in the dockets referenced above (the "Protest").  The factual statements set forth in the Protest are true and accurate, to the best of my knowledge, information, and belief.

3. The Attachments to the foregoing Protest are true and complete copies of documents kept in the files and records of McKenzie.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in _____person_____, on this 6th day of August 2020.

By: _____
John Skurupey
Chief Executive Officer
McKenzie Electric Cooperative, Inc.

# PUBLIC VERSION – PRIVILEGED AND
## CONFIDENTIAL INFORMATION HAS BEEN REMOVED
## PURSUANT TO 18 C.F.R. § 388.112

Subscribed and sworn to before me, the undersigned Notary Public, this 6th day of August 2020.

SEAL:

_____
Notary Public

Zane M. Frick
_____

Watford City, ND
_____
Address

ZANE M. FRICK
Notary Public
State of North Dakota
My Commission Expires Dec. 23, 2023

2

**PUBLIC VERSION – PRIVILEGED AND**
**CONFIDENTIAL INFORMATION HAS BEEN REMOVED**
**PURSUANT TO 18 C.F.R. § 388.112**

**ATTACHMENTS TO PROTEST**
**OF MCKENZIE ELECTRIC COOPERATIVE, INC.**

| No. | Description |
|-----|-------------|
| 1 | Wholesale Power Contract between Basin Electric and Upper Missouri, dated May 22, 1962 |
| 2 | Wholesale Power Contract between Upper Missouri and McKenzie, dated March 17, 1972 |
| 3 | Letter from McKenzie to Basin Electric, dated October 31, 1988 |
| 4 | Basin Electric's Response to McKenzie's Letter, published in McKenzie News in February 1989 |
| 5 | Upper Missouri Policy Number C-9, Termination of Membership in Upper Missouri, adopted July 7, 2006, last reviewed and revised March 6, 2008 |
| 6 | Letter of Intent, dated December 9, 1971 |
| 7 | Amendment to Wholesale Power Contract between Basin Electric and Upper Missouri, dated August 19, 2015 |
| 8 | Amendment to Wholesale Power Contract between Upper Missouri and McKenzie, dated September 2, 2015 |
| 9 | **Confidential/Non-Public** Summary of Basin Electric Manager's Advisory Committee Meeting on October 19–20, 2017 from Claire Vigesaa, General Manager of Upper Missouri |
| 10 | Letter from McKenzie to Upper Missouri, dated January 30, 2019 |
| 11 | Letter from Upper Missouri to Basin Electric, dated February 6, 2019 |
| 12 | Letter from Basin Electric to Class A Members providing resolutions, dated February 15, 2019 |
| 13 | Letter from Meeker Cooperative, dated July 22, 2019 |
| 14 | **Confidential/Non-Public** Basin Electric Power Cooperative and Subsidiaries 2020–2029 Financial Forecasts Book |

# PUBLIC VERSION – PRIVILEGED AND
## CONFIDENTIAL INFORMATION HAS BEEN REMOVED
## PURSUANT TO 18 C.F.R. § 388.112

### ATTACHMENTS TO PROTEST
### OF MCKENZIE ELECTRIC COOPERATIVE, INC.

| | |
|---|---|
| 15 | Amended and Restated Bylaws of Basin Electric Power Cooperative, last amended November 7, 2018 |
| 16 | **Confidential/Non-Public** Basin Electric Board Minute Meeting Notes dated July 15-17, 2014 |
| 17 | **Confidential/Non-Public** Financial Services Presentation dated September 8, 2014 |
| 18 | **Confidential/Non-Public** Basin Electric Board Minute Meeting Notes dated January 13-15, 2015 |
| 19 | **Confidential/Non-Public** Basin Electric Board Minute Meeting Notes dated May 12, 2015 |
| 20 | **Confidential/Non-Public** Basin Electric Power Cooperative Moody's Investors Service Report dated May 26, 2015 |
| 21 | **Confidential/Non-Public** Managers Advisory Committee Meeting Summary dated January 20, 2016 |
| 22 | **Confidential/Non-Public** Basin Electric Cooperative Update by Allen Thiessen dated March 2016 |
| 23 | **Confidential/Non-Public** Basin Electric Board Minute Meeting Notes dated March 15-17, 2016 |
| 24 | **Confidential/Non-Public** Basin Electric Board Minute Meeting Notes dated April 12-13, 2016 |
| 25 | **Confidential/Non-Public** Basin Electric Cooperative Update by Allen Thiessen dated April 2016 |
| 26 | **Confidential/Non-Public** Basin Electric Cooperative Update by Allen Thiessen dated May 2016 |
| 27 | **Confidential/Non-Public** Basin Electric Board Minute Meeting Notes dated June 14-15, 2016 |
| 28 | **Confidential/Non-Public** Basin Electric Cooperative Update by Allen Thiessen dated June 2016 |
| 29 | **Confidential/Non-Public** Email Chain dated June 14, 2016 |

# PUBLIC VERSION – PRIVILEGED AND
# CONFIDENTIAL INFORMATION HAS BEEN REMOVED
# PURSUANT TO 18 C.F.R. § 388.112

### ATTACHMENTS TO PROTEST
### OF MCKENZIE ELECTRIC COOPERATIVE, INC.

| | |
|---|---|
| 30 | **Confidential/Non-Public** Email Chain dated June 17, 2016 |
| 31 | **Confidential/Non-Public** Email Chain dated June 17, 2016 |
| 32 | **Confidential/Non-Public** Email Chain dated June 15, 2016 |
| 33 | **Confidential/Non-Public** Email Chain and Attachment of Class A Questions to Basin Electric dated August 26, 2016 |
| 34 | **Confidential/Non-Public** Email Chain and Attachment of Membership Responses All August 2016 dated October 18, 2016 |
| 35 | **Confidential/Non-Public** Manager's Advisory Committee Meeting Notes dated January 18, 2016 |
| 36 | **Confidential/Non-Public** Basin Electric Board Minute Meeting Notes dated July 11-12, 2017 |
| 37 | **Confidential/Non-Public** Members Manager's Conference Summary dated July 19, 2017 |
| 38 | **Confidential/Non-Public** UMPC MAC Round Table Commentary dated August 1, 2017 |
| 39 | **Confidential/Non-Public** Basin Electric Power Cooperative & Subsidiaries Financial Forecasts 2018-2027 |
| 40 | **Confidential/Non-Public** Basin Board Minute Meeting Notes dated September 12-14, 2017 |
| 41 | **Confidential/Non-Public** Email Chain dated September 15, 2017 |
| 42 | **Confidential/Non-Public** Basin Electric's Strategic Planning Session #2 by Allen Thiessen dated September 20, 2017 |
| 43 | **Confidential/Non-Public** Basin Electric Cooperative Update by Allen Thiessen dated December 2017 |
| 44 | **Confidential/Non-Public** CEO Report dated July 25, 2018 |
| 45 | UMPC Resolution dated August 13, 2018 |

# PUBLIC VERSION - PRIVILEGED AND
# CONFIDENTIAL INFORMATION HAS BEEN REMOVED
# PURSUANT TO 18 C.F.R. § 388.112

## ATTACHMENTS TO PROTEST
## OF MCKENZIE ELECTRIC COOPERATIVE, INC.

| | |
|---|---|
| 46 | **Confidential/Non-Public** Iowa Lakes Electric Cooperative and Meeker Cooperative Light and Power Resolutions |
| 47 | Upper Missouri G & T Electric Cooperative, Inc. By-Laws dated April 22, 2015. |
| 48 | **Confidential/Non-Public** Basin Electric Board Minute Meeting Notes dated February 12-13, 2019. |
| 49 | **Confidential/Non-Public** Basin Electric Cooperative Update by Allen Thiessen dated July 2020 |
| 50 | **Confidential/Non-Public** DGC Board Minutes dated June 16, 2020 |
| 51 | **Confidential/Non-Public** Basin Electric Cooperative Update by Allen Thiessen dated July 2015 |
| 52 | **Confidential/Non-Public** Manager's Advisory Committee Meeting dated October 19, 2017 |

**CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Basin Electric Power Cooperative                   Docket No.  ER20-2441-000
                                                              ER20-2442-000

PROTECTIVE ORDER

(Issued            )

1.      Participants in this proceeding(s) may exchange documents or materials that are deemed to contain Privileged Material and/or Critical Energy/Electric Infrastructure Information (CEII), as those terms are defined herein.  Accordingly, IT IS ORDERED THAT this Protective Order shall govern the use of all such material produced by, or on behalf of, any Participant in the above-captioned proceeding(s).

2.      The Commission's regulations[1] and its policy governing the labelling of controlled unclassified information (CUI),[2] establish and distinguish the respective designations of Privileged Material and CEII.  As to these designations, this Protective Order provides that a Participant:

   A.   *may* designate as Privileged Material any material which customarily is treated by that Participant as commercially sensitive or proprietary or material subject to a legal privilege, which is not otherwise available to the public, and which, if disclosed, would subject that Participant or its customers to risk of competitive disadvantage or other business injury; and

   B.   *must* designate as CEII, any material that meets the definition of that term as provided by 18 C.F.R. §§ 388.113(a), (c).

3.      For the purposes of this Protective Order, the listed terms are defined as follows:

---

[1] *Compare* 18 C.F.R. § 388.112, *with* 18 C.F.R. § 388.113.  This Protective Order does not alter the respective requirements imposed by these sections on Privileged Material or CEII.

[2] *Notice of Document Labelling Guidance for Documents Submitted to or Filed with the Commission or Commission Staff*, 82 Fed. Reg. 18,632 (Apr. 20, 2017) (issued by Commission Apr. 14, 2017).

Case 4:20-cv-04192-LLP   Document #: 1-8   Filed: 06/08/20   Page 61 of 211 PageID #: 703
Document Accession #: 20200608-5173   Filed Date: 06/08/2020

Docket No. ER20-2441-000 et al.                                               - 2 -

A.   Participant(s):  As defined at 18 C.F.R. § 385.102(b).

B.   Privileged Material:[3]

   i.   Material (including depositions) provided by a Participant in response to discovery requests or filed with the Commission, and that is designated as Privileged Material by such Participant;[4]

   ii.   Material that is privileged under federal, state, or foreign law, such as work-product privilege, attorney-client privilege, or governmental privilege, and that is designated as Privileged Material by such Participant;[5]

   iii.   Any information contained in or obtained from such designated material;

   iv.   Any other material which is made subject to this Protective Order by the Presiding Administrative Law Judge (Presiding Judge) or the Chief Administrative Law Judge (Chief Judge) in the absence of the Presiding Judge or where no presiding judge is designated, the Federal Energy Regulatory Commission (Commission), any court, or

---

[3] The Commission's regulations state that "[f]or the purposes of the Commission's filing requirements, non-CEII subject to an outstanding claim of exemption from disclosure under FOIA will be referred to as privileged material."  18 C.F.R. § 388.112(a).  The regulations further state that "[f]or material filed in proceedings set for trial-type hearing or settlement judge proceedings, a participant's access to material for which privileged treatment is claimed is governed by the presiding official's protective order." 18 C.F.R. § 388.112(b)(2)(v).

[4] *See infra* P 11 for the procedures governing the labeling of this designation.

[5] The Commission's regulations state that "[a] presiding officer may, by order . . . restrict public disclosure of discoverable matter in order to . . . [p]reserve a privilege of a participant. . . ." 18 C.F.R. § 385.410(c)(3).  To adjudicate such privileges, the regulations further state that "[i]n the absence of controlling Commission precedent, privileges will be determined in accordance with decisions of the Federal courts with due consideration to the Commission's need to obtain information necessary to discharge its regulatory responsibilities." 18 C.F.R. § 385.410(d)(1)(i).

Docket No. ER20-2441-000 et al.                                                    - 3 -

> other body having appropriate authority, or by agreement of the
> Participants (subject to approval by the relevant authority);

> v.    Notes of Privileged Material (memoranda, handwritten notes, or any
> other form of information (including electronic form) which copies
> or discloses Privileged Material);[6] or

> vi.   Copies of Privileged Material.

> vii.  Privileged Material does not include:

>> a.    Any information or document that has been filed with and
>> accepted into the public files of the Commission, or contained
>> in the public files of any other federal or state agency, or any
>> federal or state court, unless the information or document has
>> been determined to be privileged by such agency or court; or

>> b.    Information that is public knowledge, or which becomes
>> public knowledge, other than through disclosure in violation
>> of this Protective Order.

C.    Critical Energy/Electric Infrastructure Information (CEII): As defined at 18
C.F.R. §§ 388.113(a), (c).

D.    Non-Disclosure Certificate: The certificate attached to this Protective
Order, by which Participants granted access to Privileged Material and/or
CEII must certify their understanding that such access to such material is
provided pursuant to the terms and restrictions of this Protective Order, and
that such Participants have read the Protective Order and agree to be bound
by it.  All executed Non-Disclosure Certificates must be served on all
Participants on the official service list maintained by the Secretary of the
Commission for this proceeding.

E.    Reviewing Representative: A person who has signed a Non-Disclosure
Certificate and who is:

> i.    Commission Trial Staff designated as such in this proceeding;

---

[6] Notes of Privileged Material are subject to the same restrictions for Privileged
Material except as specifically provided in this Protective Order.

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

Docket No. ER20-2441-000 et al.                                                    - 4 -

      ii.      An attorney who has made an appearance in this proceeding for a Participant;

      iii.     Attorneys, paralegals, and other employees associated for purposes of this case with an attorney who has made an appearance in this proceeding on behalf of a Participant;

      iv.     An expert or an employee of an expert retained by a Participant for the purpose of advising, preparing for, submitting evidence or testifying in this proceeding;

      v.      A person designated as a Reviewing Representative by order of the Presiding Judge, the Chief Judge, or the Commission; or

      vi.     Employees or other representatives of Participants appearing in this proceeding with significant responsibility for this docket.

4.      Privileged Material and/or CEII shall be made available under the terms of this Protective Order only to Participants and only to their Reviewing Representatives as provided in Paragraphs 6-10 of this Protective Order. The contents of Privileged Material, CEII or any other form of information that copies or discloses such materials shall not be disclosed to anyone other than in accordance with this Protective Order and shall be used only in connection with this specific proceeding.

5.      All Privileged Material and/or CEII must be maintained in a secure place. Access to those materials must be limited to Reviewing Representatives specifically authorized pursuant to Paragraphs 7-9 of this Protective Order.

6.      Privileged Material and/or CEII must be handled by each Participant and by each Reviewing Representative in accordance with the Non-Disclosure Certificate executed pursuant to Paragraph 9 of this Protective Order. Privileged Material and/or CEII shall not be used except as necessary for the conduct of this proceeding, nor shall they (or the substance of their contents) be disclosed in any manner to any person except a Reviewing Representative who is engaged in this proceeding and who needs to know the information in order to carry out that person's responsibilities in this proceeding. Reviewing Representatives may make copies of Privileged Material and/or CEII, but such copies automatically become Privileged Material and/or CEII. Reviewing Representatives may make notes of Privileged Material, which shall be treated as Notes of Privileged Material if they reflect the contents of Privileged Material.

7.      If a Reviewing Representative's scope of employment includes any of the activities listed under this Paragraph 7, such Reviewing Representative may not use

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

Docket No. ER20-2441-000 et al.                                    - 5 -

information contained in any Privileged Material and/or CEII obtained in this proceeding for a commercial purpose (e.g. to give a Participant or competitor of any Participant a commercial advantage):

>    A.    Energy marketing;
>
>    B.    Direct supervision of any employee or employees whose duties include energy marketing; or
>
>    C.    The provision of consulting services to any person whose duties include energy marketing.

8.    If a Participant wishes to designate a person not described in Paragraph 3.E above as a Reviewing Representative, the Participant must seek agreement from the Participant providing the Privileged Material and/or CEII.  If an agreement is reached, the designee shall be a Reviewing Representative pursuant to Paragraph 3.D of this Protective Order with respect to those materials.  If no agreement is reached, the matter must be submitted to the Presiding Judge for resolution.

9.    A Reviewing Representative shall not be permitted to inspect, participate in discussions regarding, or otherwise be permitted access to Privileged Material and/or CEII pursuant to this Protective Order until three business days after that Reviewing Representative first has executed and served a Non-Disclosure Certificate.[7]  However, if an attorney qualified as a Reviewing Representative has executed a Non-Disclosure Certificate, any participating paralegal, secretarial and clerical personnel under the attorney's instruction, supervision or control need not do so.  Attorneys designated Reviewing Representatives are responsible for ensuring that persons under their supervision or control comply with this Protective Order, and must take all reasonable precautions to ensure that Privileged Material and/or CEII are not disclosed to unauthorized persons.  All executed Non-Disclosure Certificates must be served on all Participants on the official service list maintained by the Secretary of the Commission for the proceeding.

10.    Any Reviewing Representative may disclose Privileged Material and/or CEII to any other Reviewing Representative as long as both Reviewing Representatives have executed a Non-Disclosure Certificate.  In the event any Reviewing Representative to

---

[7] During this three-day period, a Participant may file an objection with the Presiding Judge or the Commission contesting that an individual qualifies as a Reviewing Representative, and the individual shall not receive access to the Privileged Material and/or CEII until resolution of the dispute.

PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112

Docket No. ER20-2441-000 et al.                                    - 6 -

whom Privileged Material and/or CEII are disclosed ceases to participate in this proceeding, or becomes employed or retained for a position that renders him or her ineligible to be a Reviewing Representative under Paragraph 3.D of this Protective Order, access to such materials by that person shall be terminated. Even if no longer engaged in this proceeding, every person who has executed a Non-Disclosure Certificate shall continue to be bound by the provisions of this Protective Order and the Non-Disclosure Certificate for as long as the Protective Order is in effect.[8]

11.    All Privileged Material and/or CEII in this proceeding filed with the Commission, submitted to the Presiding Judge, or submitted to any Commission personnel, must comply with the Commission's *Notice of Document Labelling Guidance for Documents Submitted to or Filed with the Commission or Commission Staff*.[9] Consistent with those requirements:

A.    Documents that contain Privileged Material must include a top center header on each page of the document with the following text: CUI//PRIV. Any corresponding electronic files must also include this text in the file name.

B.    Documents that contain CEII must include a top center header on each page of the document with the following text: CUI//CEII. Any corresponding electronic files must also include this text in the file name.

C.    Documents that contain both Privileged Material and CEII must include a top center header on each page of the document with the following text: CUI//CEII/PRIV. Any corresponding electronic files must also include this text in the file name.

D.    The specific content on each page of the document that constitutes Privileged Material and/or CEII must also be clearly identified. For example, lines or individual words or numbers that include both Privileged Material and CEII shall be prefaced and end with "BEGIN CUI//CEII/PRIV" and "END CUI//CEII/PRIV".

12.    If any Participant desires to include, utilize, or refer to Privileged Material or information derived from Privileged Material in testimony or other exhibits during the hearing in this proceeding in a manner that might require disclosure of such materials to

---

[8] *See infra* P 19.

[9] 82 Fed. Reg. 18,632 (Apr. 20, 2017) (issued by Commission Apr. 14, 2017).

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

Docket No. ER20-2441-000 et al.                                    - 7 -

persons other than Reviewing Representatives, that Participant first must notify both counsel for the disclosing Participant and the Presiding Judge, and identify all such Privileged Material. Thereafter, use of such Privileged Material will be governed by procedures determined by the Presiding Judge.

13.     Nothing in this Protective Order shall be construed as precluding any Participant from objecting to the production or use of Privileged Material and/or CEII on any appropriate ground.

14.     Nothing in this Protective Order shall preclude any Participant from requesting the Presiding Judge (or the Chief Judge in the Presiding Judge's absence or where no presiding judge is designated), the Commission, or any other body having appropriate authority, to find this Protective Order should not apply to all or any materials previously designated Privileged Material pursuant to this Protective Order. The Presiding Judge (or the Chief Judge in the Presiding Judge's absence or where no presiding judge is designated), the Commission, or any other body having appropriate authority may alter or amend this Protective Order as circumstances warrant at any time during the course of this proceeding.

15.     Each Participant governed by this Protective Order has the right to seek changes in it as appropriate from the Presiding Judge (or the Chief Judge in the Presiding Judge's absence or where no presiding judge is designated), the Commission, or any other body having appropriate authority.

16.     Subject to Paragraph 18, the Presiding Judge (or the Chief Judge in the Presiding Judge's absence or where no presiding judge is designated), or the Commission shall resolve any disputes arising under this Protective Order pertaining to Privileged Material according to the following procedures. Prior to presenting any such dispute to the Presiding Judge, the Chief Judge or the Commission, the Participants to the dispute shall employ good faith best efforts to resolve it.

    A.     Any Participant that contests the designation of material as Privileged Material shall notify the Participant that provided the Privileged Material by specifying in writing the material for which the designation is contested.

    B.     In any challenge to the designation of material as Privileged Material, the burden of proof shall be on the Participant seeking protection. If the Presiding Judge, the Chief Judge, or the Commission finds that the material at issue is not entitled to the designation, the procedures of Paragraph 18 shall apply.

**PUBLIC VERSION – PRIVILEGED AND CONFIDENTIAL INFORMATION HAS BEEN REMOVED PURSUANT TO 18 C.F.R. § 388.112**

Docket No. ER20-2441-000 et al.                                    - 8 -

      C.      The procedures described above shall not apply to material designated by a Participant as CEII. Material so designated shall remain subject to the provisions of this Protective Order, unless a Participant requests and obtains a determination from the Commission's CEII Coordinator that such material need not retain that designation.

17.     The designator will have five (5) days in which to respond to any pleading requesting disclosure of Privileged Material. Should the Presiding Judge, the Chief Judge, or the Commission, as appropriate, determine that the information should be made public, the Presiding Judge, the Chief Judge, or the Commission will provide notice to the designator no less than five (5) days prior to the date on which the material will become public. This Protective Order shall automatically cease to apply to such material on the sixth (6th) calendar day after the notification is made unless the designator files a motion with the Presiding Judge, the Chief Judge, or the Commission, as appropriate, with supporting affidavits, demonstrating why the material should continue to be privileged. Should such a motion be filed, the material will remain confidential until such time as the interlocutory appeal or certified question has been addressed by the Motions Commissioner or Commission, as provided in the Commission's regulations, 18 C.F.R. §§ 385.714, .715. No Participant waives its rights to seek additional administrative or judicial remedies after a Presiding Judge or Chief Judge decision regarding Privileged Material or the Commission's denial of any appeal thereof or determination in response to any certified question. The provisions of 18 C.F.R. §§ 388.112 and 388.113 shall apply to any requests under the Freedom of Information Act (5 U.S.C. § 552) for Privileged Material and/or CEII in the files of the Commission.

18.     Privileged Material and/or CEII shall remain available to Participants until the later of 1) the date an order terminating this proceeding no longer is subject to judicial review, or 2) the date any other Commission proceeding relating to the Privileged Material and/or CEII is concluded and no longer subject to judicial review. After this time, the Participant that produced the Privileged Material and/or CEII may request (in writing) that all other Participants return or destroy the Privileged Material and/or CEII. This request must be satisfied with within fifteen (15) days of the date the request is made. However, copies of filings, official transcripts and exhibits in this proceeding containing Privileged Material, or Notes of Privileged Material, may be retained if they are maintained in accordance with Paragraph 5 of this Protective Order. If requested, each Participant also must submit to the Participant making the request an affidavit stating that to the best of its knowledge it has satisfied the request to return or destroy the Privileged Material and/or CEII. To the extent Privileged Material and/or CEII are not returned or destroyed, they shall remain subject to this Protective Order.

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

Docket No. ER20-2441-000 et al.                                          - 9 -

19.     Regardless of any order terminating this proceeding, this Protective Order shall remain in effect until specifically modified or terminated by the Presiding Judge, the Chief Judge, or the Commission.  All CEII designations shall be subject to the "[d]uration of the CEII designation" provisions of 18 C.F.R. § 388.113(e).

20.     Any violation of this Protective Order and of any Non-Disclosure Certificate executed hereunder shall constitute a violation of an order of the Commission.


Presiding Administrative Law Judge

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Basin Electric Power Cooperative                    Docket No.   ER20-2441-000
                                                                 ER20-2442-000

NON-DISCLOSURE CERTIFICATE

    I hereby certify my understanding that access to Privileged Material and/or Critical Energy/Electric Infrastructure Information (CEII) is provided to me pursuant to the terms and restrictions of the Protective Order in this proceeding, that I have been given a copy of and have read the Protective Order, and that I agree to be bound by it. I understand that the contents of Privileged Material and/or CEII, any notes or other memoranda, or any other form of information that copies or discloses such materials, shall not be disclosed to anyone other than in accordance with the Protective Order.  I acknowledge that a violation of this certificate constitutes a violation of an order of the Federal Energy Regulatory Commission.

By: _____

Printed Name: _____

Title: _____

Representing: _____

Date: _____

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

### CERTIFICATE OF SERVICE

I hereby certify that I have this day served the foregoing document upon each person designated on the official service list compiled by the Secretary in this proceeding.

Dated at Washington, DC this 6th day of August 2020.

*/s/ Jessica Bayles*
Jessica Bayles
Stoel Rives LLP
1150 18th St NW, Suite 325
Washington, DC 20036
Tel: 202-398-1760
Email: jessica.bayles@stoel.com

# PUBLIC VERSION – PRIVILEGED AND
# CONFIDENTIAL INFORMATION HAS BEEN REMOVED
# PURSUANT TO 18 C.F.R. § 388.112

**ATTACHMENT 1**

_____

**WHOLESALE POWER CONTRACT**

**BETWEEN BASIN ELECTRIC AND UPPER MISSOURI,**

**DATED MAY 22, 1962**

# CONFIDENTIAL INFORMATION HAS BEEN REMOVED
# PURSUANT TO 18 C.F.R. § 388.112

## BASIN ELECTRIC POWER COOPERATIVE WHOLESALE POWER CONTRACT

AGREEMENT made as of _____ **May 22** _____, **1962**, between Basin Electric Power Cooperative (hereinafter called the "Seller"), a corporation organized and existing under the laws of the State of North Dakota, and **UPPER MISSOURI G. & T. ELECTRIC COOPERATIVE, INC.**, (hereinafter called the "Member"), a corporation organized and existing under the laws of the State of __**Montana**__.

WHEREAS, the Seller proposes to construct an electric generating plant or transmission system or both, and may purchase or otherwise obtain electric power and energy for the purpose, among others, of supplying electric power and energy to borrowers from the Rural Electrification Administration which are or may become members of the Seller; and

WHEREAS, the Seller contemplates the introduction of the power and energy of such proposed electric generating plant into the transmission system of the Bureau of Reclamation for delivery through facilities of the Bureau of Reclamation, including both transmission lines and substation equipment to its Members; and

WHEREAS, the Seller may, along with other electric cooperatives, enter into a contract with the Bureau of Reclamation to establish a "joint transmission system" including specifically described facilities, and contemplating additions to said joint transmission system under certain conditions, over which said joint transmission system Seller may deliver to Member power and energy under this contract; and

WHEREAS, the Seller has heretofore entered into or is about to enter into agreements for the sale of electric power and energy similar in form to this agreement with all of the borrowers which are members of the Seller, and may enter into similar contracts with other such borrowers who may become members; and

WHEREAS, the Member desires to purchase electric power and energy from the Seller on the terms and conditions herein set forth;

NOW, THEREFORE, in consideration of the mutual undertakings herein contained, the parties hereto agree as follows:

1. General. The Seller shall sell and deliver to the Member and the Member shall purchase and receive from the Seller the electric power and energy which the Member shall require in addition to power and energy available to the Member from the other power sources listed below; provided, however,

   a. The power and energy purchased hereunder shall be furnished in accordance with the normal load pattern of the Member's system;

   b. The maximum demand of the Member supplied by the Seller in the month when the simultaneous maximum demands of the Member and all other Member Cooperatives supplied by the Seller equal in the

# CONFIDENTIAL INFORMATION HAS BEEN REMOVED
# PURSUANT TO 18 C.F.R. § 388.112

aggregate 88% of the test capabilities of the Seller's **First Garrison** /generating unit shall continue during the remainder of the contract term to be the amount of power and energy which the Member shall be obligated to purchase and receive and the Seller shall be obligated to sell and deliver hereunder;

c. Seller's obligation to furnish and the Member's obligation to receive and pay for electric power and energy hereunder shall commence upon completion of the generation and transmission facilities necessary for service hereunder and upon the avail-ability to the Seller of necessary transmission and related facilities, including those of the Bureau of Reclamation;

d. The Member shall have the right during the term of this Agreement to continue to obtain power and energy from the power sources and in the amounts listed below:

|  | Contract | Rate of Delivery |
|---|---|---|
| Bureau of Reclamation | _ _ _ | kw |
| Member's Generating Plant | _ _ _ | kw |
| Other_____ | _ _ _ | kw |

provided, however, that if the Seller at any time and from time to time is unable to sell on a firm power rate basis the entire capacity of the Seller's **First Garrison** generating unit, the Member shall reduce its purchases from the Bureau of Reclamation to the extent requested by the Seller and shall increase its purchases from the Seller in the amount of the requested reduction of purchases from the Bureau of Reclamation. The amount of reduction of Bureau of Reclamation power purchases which the Member shall be requested to make shall either

   i. bear the same ratio to the aggregate of the reductions which all Members shall be requested to make as the contract rate of delivery of the Member under its contract with the Bureau of Reclamation bears to the aggregate of the con-tract rates of delivery to all Members under their contracts with the Bureau of Reclamation; or

   ii. be such other amount as the Seller and the Member may agree upon in order to minimize the loss in wheeling payments from, and billing penalty payments to, the Bureau of Reclamation under all the Members' contracts with the Bureau of Reclamation.

To the extent that the reduction of power purchases from the Bureau of Reclamation by the Member pursuant to such request of the Seller results in:

# CONFIDENTIAL INFORMATION HAS BEEN REMOVED
# PURSUANT TO 18 C.F.R. § 388.112

     i. the loss of wheeling payments which other-
       wise would have been made to the Member by
       the Bureau of Reclamation, or

     ii. in the Member's becoming liable for billing
       penalty payments under its power contract
       with the Bureau of Reclamation which it
       would not have otherwise incurred,

the amounts thereof shall be determined and the effects
spread equitably among all the Members by means of a
surcharge in the Rate Schedule.

e. In addition to the supply under the preceding paragraph
(d), the Member shall have the right to continue to purchase
power and energy under the following contract(s) during the
remainder of the term thereof and shall terminate such con-
tract(s) as soon as it may legally do so if the Seller shall,
with the approval or at the direction of the Administrator
of the Rural Electrification Administration (hereinafter
called the "Administrator"), so request:_____.
_____

f. The Seller shall not be obligated to supply power and
energy hereunder to the Member in excess of that amount which,
together with all amounts of power and energy supplied by the
Seller to all other Members of the Seller, shall equal 88% of
the test capability of the Seller's/generating unit. First Garrison

2. <u>Electric Characteristics and Delivery Point(s)</u>. Electric
power and energy to be furnished hereunder shall be alternating
current, three phase, sixty cycle. The Seller shall deliver such
electric power and energy into the transmission system of the Bureau
of Reclamation, and the Member shall receive such power and energy
at the point(s) of delivery on the transmission system of the Bureau
or the joint transmission system contemplated to be established by a
Pooling Agreement between the Seller, Bureau and others, as shall be
scheduled by the Member, and such other point or points as may be
agreed upon by the Seller and the Member.

3. <u>Substation</u>. Delivery of electric power and energy shall be
through the necessary substation equipment at the point(s) of connec-
tion with the transmission system of the Bureau of Reclamation or the
joint system. The Member shall own and maintain switching and pro-
tective equipment which may be reasonably necessary to enable the
Member to take and use the electric power and energy hereunder.
Meters and metering equipment shall be furnished, maintained and
read by the Bureau of Reclamation and shall be located at the point
of delivery on the low voltage side of such transforming equipment.

4. <u>Rate</u>. (a) The Member shall pay the Seller for all elec-
tric power and energy furnished hereunder as the rates and on the
terms and conditions set forth in Rate Schedule "A", attached hereto
and made a part hereof.

CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112

(b) The Board of Directors of the Seller at such intervals as it shall deem appropriate, but in any event not less frequently than once in each calendar year, shall review the rate for electric power and energy furnished hereunder and under similar agreements with other Members and, if necessary, shall revise such rate so that it shall produce revenues which shall be sufficient, but only sufficient, with the revenues of the Seller from all other sources, to meet the cost of the operation and maintenance (including, without limitation, replacements, insurance, taxes and administrative and general overhead expenses) of the generating plant, transmission system and related facilities of the Seller, the cost of any power and energy purchased for resale hereunder by the Seller, the cost of transmission service, make payments on account of principal of and interest on all indebtedness of the Seller, and to provide for the establishment and maintenance of reasonable reserves. The Seller shall cause a notice in writing to be given to the Member and other Members of the Seller and the Administrator which shall set out all the proposed revisions of the rate with the effective date thereof, which shall be not less than thirty (30) nor more than forty-five (45) days after the date of the notice, and shall set forth the basis upon which the rate is proposed to be adjusted and established. The Member agrees that the rate from time to time established by the Board of Directors of the Seller shall be deemed to be substituted for the rate herein provided and agrees to pay for electric power and energy furnished by the Seller to it hereunder after the effective date any such revisions at such revised rates; provided, however, that no such revision shall be effective unless approved in writing by the Administrator.

5. Meter Readings and Payment of Bills. Appropriate operating procedures shall be established to monthly determine the electric power and energy delivered and to be billed by Seller to the Member. Electric power and energy furnished hereunder shall be paid for at the office of the Seller in Bismarck, North Dakota, monthly within fifteen (15) days after the bill therefor is mailed to the Member. If the Member shall fail to pay any such bill within such fifteen-day period, the Seller may discontinue delivery of electric power and energy hereunder upon fifteen (15) days' written notice to the Member of its intention so to do.

6. Meter Testing and Billing Adjustment. All meters shall be tested and calibrated as provided for in the contract between the Member and the Bureau of Reclamation. The Member shall request a special test of meters delivering power or energy to it under the Member's contract with the Bureau of Reclamation, upon the request of the Seller. If any special meter test made at the Seller's request shall disclose that the meters are recording accurately, the Seller shall reimburse the Member for the cost of such test. Meters registering not more than two per cent (2%) above or below normal shall be deemed to be accurate. The readings of any meter which shall have been disclosed by test to be inaccurate shall be corrected for the ninety (90) days previous to such test in accordance with the percentage of inaccuracy found by such test. If any meter shall fail to register for any period, the Member and the Seller shall agree as to the amount of energy furnished during such period and the Seller shall render a bill therefor.

# CONFIDENTIAL INFORMATION HAS BEEN REMOVED
# PURSUANT TO 18 C.F.R. § 388.112

7. <u>Notice of Meter Reading or Test</u>. The Member shall notify the Seller in advance of the time of any meter reading or test so that the Seller's representative may be present at such meter reading or test.

8. <u>Right of Access</u>. Duly authorized representatives of either party hereto shall be permitted to enter the premises of the other party hereto at all reasonable times in order to carry out the provisions hereof.

9. <u>Continuity of Service</u>. The Seller shall use reasonable diligence to provide a constant and uninterrupted supply of electric power and energy hereunder. If the supply of electric power and energy shall fail or be interrupted, or become defective through act of God or of the public enemy, or because of accident, failure in the joint transmission system, labor troubles, or any other cause beyond the control of the Seller, the Seller shall not be liable therefor or for damages caused thereby.

10. <u>Term</u>. This Agreement shall become effective only upon approval in writing by the Administrator and shall remain in effect until January 1, 2002, and thereafter until terminated by either party's giving to the other not less than six months' written notice of its intention to terminate. Subject to the provisions of Article I hereof, service hereunder and the obligation of the Member to pay therefor shall commence upon completion of the facilities necessary to provide service.

EXECUTED THE day and year first above mentioned.

BASIN ELECTRIC POWER COOPERATIVE, Seller

By _____
President

ATTEST:

_____
Secretary

UPPER MISSOURI G. & T.
ELECTRIC COOPERATIVE, INC. _____, Member

By _____
Henry T. Swenson, President

ATTEST:

_____
C.R. Thiessen, Secretary

## CONFIDENTIAL INFORMATION HAS BEEN REMOVED
## PURSUANT TO 18 C.F.R. § 388.112

To be attached to
Electric Service Contract between
BASIN ELECTRIC POWER COOPERATIVE
and its MEMBERS.

RATE SCHEDULE "A".

IT IS UNDERSTOOD that the rates, terms and conditions
of this Rate Schedule "A" will be determined prior to com-
mencement of service in accordance with Article 4(b) of the
Agreement to which this Rate Schedule "A" is attached.

# CONFIDENTIAL INFORMATION HAS BEEN REMOVED
## PURSUANT TO 18 C.F.R. § 388.112

BASIN ELECTRIC POWER COOPERATIVE

COLUMBUS, NORTH DAKOTA

CERTIFICATE

I, Dennis Lindberg, do hereby certify that I am the duly appointed, elected, qualified, and acting Secretary of Basin Electric Power Cooperative and that the following is a true and correct extract of minutes duly adopted by the Board of Directors of Basin Electric Power Cooperative at its meeting held April 11, 1962.

***Attorney Wisdom reported on conferences with legal and engineering representatives of REA, and the drafting of the proposed wholesale power contract to be entered into between Basin Electric Power Cooperative and its members. The draft of the proposed contract was examined and reviewed in detail.

After a full discussion, on motion by Director Rose, seconded by Director Lindberg, and carried, the following resolution was adopted:

RESOLVED, that the form of wholesale power contract submitted to this meeting be adopted as the form of contract to be entered into between Basin Electric Power Cooperative and its members, and that the officers of the Cooperative be authorized and directed to execute contracts in such form when submitted to Basin by member properly executed and accompanied by an opinion of counsel of such member as to the authority of the member to execute the contract, subject to the approval of the Administrator of the Rural Electrification Administration.

The Chairman urged prompt action by the members to enter into the proposed wholesale power contracts, including a special meeting of the board, if possible, in order that the member contracts may be presented to the Administrator in support of the Basin loan application. ***

and that the action taken and/or resolutions adopted as set out have never been rescinded, altered, amended, modified, or repealed, and are of the date hereof in full force and effect.

IN WITNESS WHEREOF, I have hereunto set my hand and attached the seal of the Corporation this 14th day of June, A.D., 1962.

Dennis Lindberg
Secretary

(CORPORATE SEAL)

# CONFIDENTIAL INFORMATION HAS BEEN REMOVED
# PURSUANT TO 18 C.F.R. § 388.112

## CERTIFICATE

I, C. R. Thiessen, do hereby certify that I am the duly elected, qualified and acting Secretary of the Upper Missouri G. & T. Electric Cooperative, Inc. (hereinafter called the "Cooperative"), and custodian of its records. That the following is a true and correct excerpt of the Minutes of the Cooperative, held on the 10th day of May, A. D., 1962. That said meeting was duly held, in accordance with the Articles of Incorporation and By-Laws of the Cooperative. That at said meeting, a quorum of the Trustees of the Cooperative was present, and acted throughout:

> "RESOLVED that the Upper Missouri G. & T.
> Electric Cooperative, Inc., enter into a
> Wholesale Power Contract for electric
> service from Basin Electric Power Cooperative,
> in the form attached hereto, marked Exhibit "B,"
> and by this specific reference, made a part of
> this resolution, with the addition of rate
> schedule to be attached thereto;

> "BE IT FURTHER RESOLVED that the President
> and Secretary be, and hereby are authorized
> and directed to execute said contract for and
> on behalf of the Upper Missouri G. & T. Electric
> Cooperative, Inc., under its corporate seal,
> subject to the approval of the Administrator
> of the Rural Electrification Administration, with
> such changes and insertions, and in such number
> of copies as said Administrator may deem necessary
> or expedient."

That the form of contract attached to this Certificate is a true and correct copy of the contract submitted to and approved at said meeting, and that the above quoted resolution has never been altered, amended, rescinded or modified, and is presently in full force and effect.

IN WITNESS WHEREOF, I have hereunto subscribed my signature as Secretary of the Cooperative, and affixed its corporate seal, this _28th_ day of May, A. D., 1962.

C. R. Thiessen

(CORPORATE SEAL)        C. R. Thiessen, Sec'y

# CONFIDENTIAL INFORMATION HAS BEEN REMOVED
# PURSUANT TO 18 C.F.R. § 388.112

PRESIDENT
ARTHUR JONES

VICE PRESIDENT
C. B. THIESSEN

SECRETARY-TREASURER
DENNIS LINDBERG

ASSISTANT SECRETARY
HELGE NYGREN

•

DIRECTORS
MARVIN BEYERS
   HOLLAND, MINN
WAYNE BOND
   LODGEPOLE, MONT
B. N. GRAVGAARD
   HAWICK, MINN
ARTHUR JONES
   BRITTON, S. D.
DENNIS LINDBERG
   ODEBOLT, IOWA
JACOB NORDBERG
   JACOBSON, MINN
HELGE NYGREN
   FLASHER, N. D.
JOE V. RIDL
   DICKINSON, N. D.
OLIVER G. ROSE
   NISLAND, S. D.
OTTO SCHNEIDER
   MC LAUGHLIN, S. D.
C. B. THIESSEN
   LAMBERT, MONT

◆

MANAGER
JAMES L. GRAHL

# BASIN ELECTRIC POWER COOPERATIVE

Provident Life Building, Bismarck, North Dakota : Area Code 701   223-0441

June 5, 1964

Mr. Robert M. St. Cyr, Manager
Upper Missouri G&T Electric Cooperative
P. O. Box 1069
Sidney, Montana

Dear Mr. St. Cyr:

Pursuant to article 4, subsection (b) of your wholesale
power contract executed with Basin Electric Power Coop-
erative, please find enclosed two copies of our approved
initial Rate Schedule "A" which may be attached to your
copy of this contract.  This schedule is considered to be
a part of this contract now being held in your files.

Sincerely yours,

James L. Grahl
Manager

JLG:gm
Encls. (2)

# PUBLIC VERSION - PRIVILEGED AND
# CONFIDENTIAL INFORMATION HAS BEEN REMOVED
# PURSUANT TO 18 C.F.R. § 388.112



Pursuant to the Building Electric's North Dakota | San | Colorado | Kansas

Power Marketing Information

Initial Rate Schedule
Approved by REA 1/14/64

## SCHEDULE A

Schedule of Rates for Wholesale Firm Power Service Effective: October 1, 1965.

Available:

To Class "A" Members of Basin Electric Power Cooperative.

Applicable:

To wholesale power customers for power service supplied through one meter at each of one or more points of delivery. Not applicable to standby or auxiliary service, except that service auxiliary to other purchased power supply will be permitted under appropriate contract terms.

Character and Conditions of Service:

Alternating current, sixty cycles, three phase, delivered at specified point(s) of delivery on the Joint Transmission System as defined in the United States Bureau of Reclamation - Basin Electric Power Cooperative Contract and as specified in the respective Member - Basin Contract.

Monthly Rate:

| | |
|---|---|
| Capacity Charge: | $1.10 per kilowatt of billing demand. |
| Energy Charge: | $0.003 per kilowatt hour |

Minimum Annual Capacity Charge:

$10.56 per kilowatt of the highest monthly billing demand within the calendar year.

Basis for Billing:

The billing demand shall be the highest 30-minute integrated demand (or corrected to a 30-minute basis in the event where 15-minute demand registers are installed) measured during the billing period. Inasmuch as power is supplied to Class A Members by both the United States Bureau of

# CONFIDENTIAL INFORMATION HAS BEEN REMOVED
# PURSUANT TO 18 C.F.R. § 388.112

-2-

Reclamation and Basin Electric Power Cooperative through common metering, Basin Electric Power Cooperative billings shall be determined as follows:

Where:

$\underline{D}$ — Shall be defined as the DEMAND - for the current billing period - determined on a basis in accordance with contract (s) in effect between the Member and the United States Bureau of Reclamation.

$\underline{E}$ — Shall be defined as the ENERGY delivered during the billing period, as determined on a basis in accordance with contract (s) in effect between the Member and the United States Bureau of Reclamation.

$\underline{X}$ — Shall be defined as the Contract Rate of firm power delivery as agreed to and as defined by contract (s) in effect between the Member and the United States Bureau of Reclamation.

$\underline{Y}$ — Shall be defined as the Highest Demand (Factor 'D'), determined in accordance with contract (s) in effect between the Member and the United States Bureau of Reclamation.

Then:

$B_D$ = Basin Electric Power Cooperative, Inc. monthly demand (KW) billing.

$B_E$ = Basin Electric Power Cooperative, Inc. monthly energy (Kwh) billing.

$B_D$ = $D (1 - X/Y)$

$B_E$ = $E (1 - X/Y)$

Note: The ratio $X/Y$ shall never be more than one.

## Billing Periods:

Basin Electric Power Cooperative billing periods shall be established to coincide with the meter reading schedules of the United States Bureau of Reclamation.

## Adjustments for Power Factor:

The Member agrees to maintain unity power factor as nearly as practicable and such Member will be required to maintain an average power factor at the point of delivery of between 90% lagging and 90% leading. In the event that Basin determines by test that these tolerances are exceeded; the Member shall at his own expense, remedy the Power Factor to a value within these tolerances.

# PUBLIC VERSION – PRIVILEGED AND
# CONFIDENTIAL INFORMATION HAS BEEN REMOVED
# PURSUANT TO 18 C.F.R. § 388.112

**ATTACHMENT 2**

_____

**WHOLESALE POWER CONTRACT**

**BETWEEN UPPER MISSOURI AND MCKENZIE,**

**DATED MARCH 17, 1972**

# CONFIDENTIAL INFORMATION HAS BEEN REMOVED
# PURSUANT TO 18 C.F.R. § 388.112

## CERTIFICATION

The undersigned, _____ Raymond Skorpil _____, being the duly elected and acting Secretary of ___ McKenzie Electric Cooperative, Inc. ___, organized and existing under the Laws of the State of ___ North Dakota ___, hereby certifies that the following Resolution was duly and legally passed at a _____ regular _____ meeting of the Board of Trustees held on the _____ 17th _____ day of _____ March _____, 1972, namely:

WHEREAS, This Cooperative has heretofore passed a Resolution to become a member of the Upper Missouri G & T Electric Cooperative, Inc. (hereinafter referred to as Upper Missouri), and

WHEREAS, This Cooperative is now a member of Upper Missouri and has assigned its contract with the United States Bureau of Reclamation and has entered into a wholesale power contract with Upper Missouri, and

WHEREAS, it is now the desire of the Rural Electrification Administration, Upper Missouri, and this Cooperative that a new wholesale power contract be executed in order that delivery points can be updated and such contract be made uniform among all of the members, the proposed wholesale power contract being attached hereto and made a specific part of this Resolution.

NOW, THEREFORE, BE IT RESOLVED that the President and Secretary be and hereby are authorized and directed to execute the wholesale power contract with the Upper Missouri (Subject to the approval of the Administrator of the Rural Electrification Administration) copy of which is attached hereto and by this specific reference made a part of this Resolution, and to do such other acts, matters, and things necessary and proper to carry out the purpose and intent of this Resolution.

That such Resolution has not been amended or repealed.

DATED this 17th day of _____ March _____, A.D., 1972.

McKenzie Electric Cooperative, Inc.

By _Raymond Skorpil_
Secretary

# PUBLIC VERSION — PRIVILEGED AND
# CONFIDENTIAL INFORMATION HAS BEEN REMOVED
# PURSUANT TO 18 C.F.R. § 388.112

WHOLESALE POWER CONTRACT

AGREEMENT made as of __March 17, 1972__ between Upper Missouri G & T Electric Cooperative, Inc. (hereinafter called the "Seller"), a corporation organized and existing under the laws of the State of Montana and McKenzie Electric Cooperative, Inc. (hereinafter called the "Member"), a corporation organized and existing under the laws of the State of North Dakota.

WHEREAS, the Seller proposes to construct an electric generating plant or transmission system or both, and may purchase or otherwise obtain electric power and energy for the purpose, among others, of supplying electric power and energy to borrowers from the Rural Electrification Administration which are or may become members of the Seller; and

WHEREAS, the Seller has heretofore entered into or is about to enter into agreements for the sale of electric power and energy similar in form to this agreement with all of the borrowers which are members of the Seller, and may enter into similar contracts with other such borrowers who may become members, and

WHEREAS, the Member desires to purchase electric power and energy from the Seller on the terms and conditions herein set forth;

NOW, THEREFORE, in consideration of the mutual undertakings herein contained the parties hereto agree as follows:

1. _General._ The Seller shall sell and deliver to the Member and the Member shall purchase and receive from the Seller all electric power and energy which the Member shall require for the operation of the Member's system to the extent that the Seller shall have such power and energy and facilities available; provided, however, that the Member shall have the right to continue to purchase electric power and energy under any existing contract or contracts with a supplier other than the Seller as follows: __None__
* * * * * * * * * * * * * * * * * * * * * * * * _____. The Member shall terminate, if the Seller shall, with the approval or at the direction of the Administrator of the Rural Electrification Administration (hereinafter called the "Administrator"), so request, any such existing contract or contracts with a supplier other than the Seller at such times as it may legally do so, provided the Seller shall have sufficient electric power and energy and facilities available for the Member.

PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112

-2-

2. <u>Electric Characteristics and Delivery Point(s)</u>. Electric power and energy to be furnished hereunder shall be alternating current, three phase, sixty Hertz. The points of delivery, delivery voltage, metering voltage, less adjustments and special conditions of service shall be as set forth in Exhibit A attached hereto and made a part hereof. Exhibit A shall be amended from time to time to include such other points of delivery or revised delivery point data as may be agreed upon by Seller and Member.

3. <u>Substation</u>. The Member shall install, own, and maintain the necessary substation equipment at the point(s) of connection. The Member shall own and maintain switching and protective equipment which may be reasonably necessary to enable the Member to take and use the electric power and energy hereunder and to protect the system of the Seller. Meters and metering equipment shall be furnished, maintained or caused to be furnished and maintained and read by the Seller and shall be located at the point of delivery. In accordance with Exhibit A attached hereto and made a part hereof.

4. <u>Rate</u>. (a) The Member shall pay the Seller for all electric power and energy furnished hereunder at the rates and on the terms and conditions set forth in Rate Schedule, Exhibit B, attached hereto and made a part hereof.

(b) The Board of Directors of the Seller at such intervals as it shall deem appropriate, but in any event not less frequently than once in each calendar year, shall review the rate for electric power and energy furnished hereunder and under similar agreements with other Members and, if necessary shall revise such rate so that it shall produce revenues which shall be sufficient, but only sufficient, with the revenues of the Seller from all other sources, to meet the cost of the operation and maintenance (including without limitations, replacements, insurance, taxes and administration and general overhead expenses) of the generating plant, transmission system and related facilities of the Seller, the cost of any power and energy purchase for resale hereunder by the Seller, the cost of transmission service, make payments on account of principal of and interest on all indebtedness of the Seller, and to provide for the establishment and maintenance of reasonable reserves. The Seller shall cause a notice in writing to be given to the Member and other members of the Seller and the Administrator which shall set out all the proposed revisions of the rate with the effective date thereof, which shall be not less than thirty (30) nor more than forty-five (45) days

Document: Case 4:20-cv-00576 Document 99-15 Filed on 01/21/22 in TXSD Page 87 of 211  PageID #: 729

-4-

percent (2%) above or below normal shall deemed to be accurate. The readings
of any meter which shall have been disclosed by test to be inaccurate shall
be corrected for the ninety (90) days previous to such test in accordance
with the percentage of inaccuracy found by such test. If any meter shall
fail to register for any period the Member and the Seller shall agree as to
the amount of energy furnished during such period and the Seller shall render
a bill therefor.

8. <u>Notice of Meter Reading or Test</u>. The Seller shall notify the Member
in advance of the time of any meter reading or test so that the Member's
representative may be present at such meter reading or test.

9. <u>Right of Access</u>. Duly authorized representatives of either party
hereto shall be permitted to enter the premises of the other party hereto at
all reasonable times in order to carry out the provisions hereof.

10. <u>Continuity of Service</u>. The Seller shall use reasonable diligence
to provide a constant and uninterrupted supply of electric power and energy
hereunder. If the supply of electric power and energy shall fail or be
interrupted, or become defective through act of God or of the public
enemy, or because of accident, labor troubles, or any other cause beyond
the control of the Seller, the Seller shall not be liable therefor or
for damages caused thereby.

11. <u>Term</u>. This Agreement shall supersede all existing contracts
between the Seller and the Member, shall become effective only upon approval
in writing by the Administrator and shall remain in effect until January 1,
2010, and thereafter until terminated by either party's giving to the other
not less than six months' written notice of its intention to terminate.
Subject to the provisions of Section 1 hereof, service hereunder and the
obligation of the Member to pay therefor shall commence upon completion of
the facilities necessary to provide service.

12. <u>Resale of Electric Energy</u>. (a) The Member shall not sell at
wholesale any of the electric energy delivered to it hereunder to any
customer of the Member for resale by that customer, unless such resale is
specifically approved by the Board of Directors of the Seller. (b) The
Member acknowledges that it is familiar with the provisions of Article 14
of the Contract for Electric Service dated January 29, 1964, between the
United States of America and the Seller entitled "Resale of Electric Energy"
a copy of such Article 14 being attached hereto and marked Exhibit D and

CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112

–5–

made a part hereof. The Member agrees to comply with and be bound by the
provisions of such Article 14 and to furnish the information required thereby.

EXECUTED THE day and year first above mentioned.

<div style="margin-left:40%">

Upper Missouri G&T Electric
Cooperative, Inc.
          Seller

By *George Rait*
          President

</div>

ATTEST:

*C R Thiessen*
    Secretary

<div style="margin-left:40%">

McKenzie Electric Cooperative, Inc.
          Member

By *J. Robert Chitwood*
          President

</div>

ATTEST:

*Raymond Skorpil*
    Secretary

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

Upper Missouri G & T Electric Cooperative, Inc.

Exhibit A Revision No. ____1____ date __3-17-72__
to
Wholesale Power Contract
With

_____McKenzie Electric Cooperative, Inc._____

Electric Characteristics and Delivery Points

| Delivery Point | Nominal Delivery Voltage | Nominal Measurement Voltage | Adjustment for Low-side Metering | Off-site Metering | Special Facilities Charges | Special Conditions Relating to Service |
|---|---|---|---|---|---|---|
| Killdeer | 41,600 | 12,500 | +2% | -0- | -0- | -0- |
| Halliday | 41,600 | 12,500 | +2% + 1% | -0- | -0- | -*- |
| Killdeer West (Grassy Butte) | 41,600 | 41,600 | -0- | -0- | -0- | -0- |
| Watford City | 34,500 | 34,500 | -0- | -0- | -0- | -0- |
| Watford City | 69,000 | 69,000 | -0- | -0- | -0- | ** |
| Watford City | 69,000 | 69,000 | -0- | -0- | -0- | *** |

    \*   Transformation Bay-Provided for MDU in lieu of Wheeling Charges to McKenzie Electric & West Plains – Killdeer East
        $849.68 per month per Bureau Contract
 \*\*  Transformation assumed by Basin Electric
\*\*\*  This is not a separate sub-station – a point of Emergency Tie –Subtraction of all KW recorded at Four Bears.

# PUBLIC VERSION – PRIVILEGED AND
## CONFIDENTIAL INFORMATION HAS BEEN REMOVED
## PURSUANT TO 18 C.F.R. § 388.112

EXHIBIT B
UPPER MISSOURI G&T ELECTRIC COOPERATIVE, INC.
SCHEDULE A

## AVAILABILITY

Available to all cooperative associations which are or shall be members of
Upper Missouri. The electric power and energy furnished hereunder shall be
separately metered and billed for each delivery point.

## MONTHLY RATE

Demand Charge: $1.15 per kw of billing demand per month, plus
Energy Charge: 3.25 mills per kwh for all energy.

## BILLING DEMAND

The billing demand will be the highest thirty minute integrated demand measured
during the month.

## ADJUSTMENTS

### For Substation Ownership

If the member owns the substation at the point of delivery, such discount
as given by the Bureau of Reclamation for particular delivery points will
be passed on by the Upper Missouri to the member furnishing the facilities
involved.

### For Transformer Losses

If delivery is made at transmission voltage but metered on the low voltage
side of the member's substation, the meter reading will be increased two
percent to compensate for transformer losses.

Document Accession #: 20210315-3020 Filed Date: 03/15/2021

# PUBLIC VERSION - PRIVILEGED AND
# CONFIDENTIAL INFORMATION HAS BEEN REMOVED
# PURSUANT TO 18 C.F.R. § 388.112

Upper Missouri G & T Electric Cooperative, Inc.

Exhibit C Revision No. __1__ Date __3-17-72__
to
Wholesale Power Contract
With

MCKENZIE ELECTRIC COOPERATIVE, INC.

Subtransmission and Substation Credit

| Facility Description | Original Cost of Facility | Annual Credit Equal 4% of original cost | Monthly Credit Equal to 1/12 of annual credit | Effective Date credit Starts |
|---|---|---|---|---|
| TRANSMISSION LINE | | | | |
| 34.5 KV | $ 69,291.38 | | | |
| 41.6 KV | 76,659.84 | | | |
| 69   KV | 329,522.96 | | | |
| | $475,474.18 | $19,018.97 | $1,584.91 | 1/1/73 |
| | | | | |
| SUB STATIONS | | | | |
| Four Bears | $ 85,009.52 | | | 1/1/73 |
| Grassy Butte | 40,226.14 | | | 1/1/73 |
| Halliday | 31,525.05 | | | 1/1/73 |
| Killdeer | 38,774.40 | | | 1/1/73 |
| Johnson Corners | 38,098.77 | | | 1/1/73 |
| Service Pipe Line | 12,039.50 | | | 1/1/73 |
| Swenson | 56,498.03 | | | 1/1/73 |
| Watford City | 34,394.77 | | | 1/1/73 |
| Alexander | 19,820.76 | | | 1/1/73 |
| | $356,386.94 | 14,255.48 | $1,187.96 | |

Total Monthly Credit __$2,772.87__

PUBLIC VERSION - PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112

Exhibit D

EXCERPT FROM CONTRACT BETWEEN THE UNITED STATES OF AMERICA AND UPPER MISSOURI

G & T ELECTRIC COOPERATIVE, INC. DATED JANUARY 29, 1964

<u>RESALE OF ELECTRIC ENERGY</u>

14. (a) <u>Distribution Principles</u>. The parties hereto agree and understand
that the purpose of making low-cost, Federally-generated power available is to
encourage the most widespread use thereof, and the Contractor therefore agrees:

(1) That the benefits of Federally-generated power shall be
made available at fair and reasonable terms to all of
its consumers at the lowest possible rates consistent
with sound business principles.

(2) That it will, to the extent that different rules are not
prescribed by State laws or by State or Federal agencies,
maintain proper books of account in accordance with the
system of accounts prescribed by the Rural Electrification
Administration.

(3) That it will furnish for the information of the contracting
officer copies of schedules of resale rates in effect on
the date of execution of this contract, and will also
furnish for information of the contracting officer schedules
of resale rates hereafter adopted.

(4) That it will provide the contracting officer an annual
statement indicating the financial operations of the
Contractor's system, and indicating that the charges to
consumers are consistent with the principles set forth
in section (1) hereof.

(5) That it will publish annually a report in a newspaper of
general circulation in the area served by the Contractor
and will include in such report the operating and financial
data of the Contractor setting forth in detail the gross
revenues and disposition thereof. The first of such
reports shall be published on or before the 1st day of
May, 1964, and annually thereafter. In lieu of the
published annual report, the Contractor may furnish such
information by mailing copies of the annual report to each
of its consumers and a copy to the contracting officer.

CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112

(b) <u>Sales at Wholesale.</u> The Contractor will encourage its wholesale customers to implement the distribution principles of section (a) (1) of this article and, whenever a wholesale customer contract is executed, modified, or amended, will include in such contract arrangements similar to those set forth in section (a) (1) of this article.

**PUBLIC VERSION – PRIVILEGED AND CONFIDENTIAL INFORMATION HAS BEEN REMOVED PURSUANT TO 18 C.F.R. § 388.112**

**ATTACHMENT 3**

---

**LETTER FROM MCKENZIE TO BASIN ELECTRIC,**

**DATED OCTOBER 31, 1988**

**PUBLIC VERSION - PRIVILEGED AND CONFIDENTIAL INFORMATION HAS BEEN REMOVED PURSUANT TO 18 C.F.R. § 388.112**



0043

ELECTRIC COOPERATIVE, INC.
P. O. BOX 649. — WATFORD CITY, NORTH DAKOTA 58854     (701) 842-2311

October 31, 1988

Mr. Robert McPhail, General Manager
Basin Electric Power Cooperative
1717 E. Interstate Avenue
Bismarck, ND  58501

Mr. McPhail:

The following resolution was passed by the McKenzie REC
membership at the Annual Meeting on October 1, 1988.

    BE IT RESOLVED that the Secretary of McKenzie
    Electric be instructed to send a letter, over the
    signature of the chairman of the McKenzie Electric
    Board, asking Basin Electric to provide a legal and
    binding document to McKenzie Electric absolving McKenzie
    Electric of all obligation that Basin Electric has or
    may in the future incur as a result of the purchase of
    the Great Plains Coal Gasification Plant.

While the vote was not unanimous, it was clearly a majority.

We ask for your timely reply.  We look forward to working with
you so the MEC membership can be notified of the reply in the
best possible manner.

Sincerely,

McKENZIE ELECTRIC COOPERATIVE, INC.

Donald Link, President
Board of Directors

DL/skh

PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112

**ATTACHMENT 4**

_____

**BASIN ELECTRIC'S RESPONSE TO**

**MCKENZIE'S LETTER, PUBLISHED IN**

**MCKENZIE NEWS IN FEBRUARY 1989**

Document Case 4:20-cv-00176 PUBLIC VERSION - PRIVILEGED AND Filed 05/01/21 Page 97 of 211 PageID #: 739
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112



# Basin responds to McKenzie resolution

At McKenzie Electric Cooperative's (MEC's) annual meeting Oct. 1, 1988, Basin Electric Power Cooperative's decision to purchase the Great Plains coal gasification plant was discussed.

Konrad Norstog, a member of MEC from rural Watford City, moved to propose the adoption of the resolution printed below. Garvey Rolla, also of rural Watford City, seconded the motion. The resolution was as follows:

BE IT RESOLVED that the secretary of McKenzie Electric be instructed to send a letter, over the signature of the chairman of the McKenzie Electric board, asking Basin Electric to provide a legal and binding document to McKenzie Electric absolving McKenzie Electric of all obligation that Basin Electric has or may in the future incur as a result of the purchase of the Great Plains coal gasification plant.

Norstog explained his concern for the individual co-op's responsibility if Basin Electric Co-op is unable to meet financial obligations in connection with the purchase. Several other members at the meeting echoed those concerns.

President LeRoy Veeder reviewed the procedure followed by Basin Electric in the purchase of the coal gasification plant and some of the terms and conditions of the Basin purchase. Ken Ziegler of Basin Electric commented on the motion and also reviewed the structure of Basin's purchase. Veeder called for a voice vote on the motion but the results were inconclusive. He then called for a show of hands. The resolution was adopted.

At the board meeting Oct. 31, a letter was written to the board of Basin Electric asking for a legal and binding document absolving McKenzie Electric of all obligation that Basin Electric has or may in the future incur as a result of the purchase of

the Great Plains coal gasification plant. President Don Link signed the letter, which has been mailed.

The following letter is the reply from Basin Electric received by Link and the board:

Mr. Donald Link
President of the Board of Directors
McKenzie Electric Cooperative, Inc.
P.O. Box 649
Watford City, N.D. 58854

Dear Donald:

We appreciate your sharing the resolution by McKenzie Electric consumers concerning the Great Plains coal gasification plant.

I'd like to address that concern and offer some background that I hope will provide additional perspective on the decision to purchase the plant.

The decision to purchase the gasification plant was made by representatives of more than 100 Basin Electric member systems based on their review of detailed information on potential benefits and risks of ownership. Because Basin Electric is a membership cooperative and the decision was made by the membership, we can't provide a document separating individual members from either benefits or risks associated with the gasification plant. However, we did take a number of steps to protect the member systems from liabilities and risks.

The two new Basin Electric subsidiaries—Dakota Gasification Company (DGC) and Dakota Coal Company (DCC)—are now handling the gasification plant properties. DGC owns and operates the gasification plant. DCC is financing and directing operation of the Freedom Mine which supplies lignite for the gasification plant.

The membership decision to buy the gas plant properties represented the best

**(Continued on next page)**

# CONFIDENTIAL INFORMATION HAS BEEN REMOVED
# PURSUANT TO 18 C.F.R. § 388.112

protection for wholesale electric power rate stability as well as the potential for benefitting your power supply system in other ways.

Basin Electric receives revenues and economies from facilities shared with the gasification plant and in return for providing certain services to the plant. These revenues and economies amount to about $37 million annually. Without these, Basin Electric would most likely need a large increase in its wholesale power rates. Basin Electric had no guarantees of what commitment another owner would have to continue to operate the plant or to honor these contracts for services and shared facilities. Basin Electric had the most to lose if the plant shut down. Besides helping to keep wholesale power rates stable, other strengths and benefits seen in the new ownership arrangement include:

• Potential to earn profits from sales of synthetic natural gas and byproducts. Profits earned by subsidiaries can be used to help strengthen the subsidiaries, help stabilize the cost of electricity to Basin Electric member systems or be distributed to members.

• Potential for increased electric loads by developing byproducts, for example, carbon dioxide for enhanced oil recovery. This could benefit cooperative systems like McKenzie Electric and all of western North Dakota.

• Mining rights and equipment acquired enhance the long-term fuel supply for other Basin Electric facilities. The mine contains good-quality lignite that can be produced at an attractive cost.

• Opportunities for additional efficiency gains and savings by cooperation and sharing resources. This can reduce general and administrative costs Basin Electric's members support through their wholesale power rate.

• No mortgage-type payments are required by DGC. When the original project partners defaulted on their federal loan guarantee, the government paid that loan off with revolving funds. The government has an opportunity, however, under the purchase agreement to recover funds through profit sharing with DGC.

• Continued operation of the gas plant helps maintain a base for local, state, regional and national economic well-being. Direct employment from the gas plant, for example, represents about 20 percent of the work population in the county in which the plant is located. Many jobs also have a major part of their base in providing goods and services to the gas plant or for people employed at the facility.

• Basin Electric has excellent experience and expertise in operations, environmental matters and financing to provide for the gasification plant operation through management services contracts. Basin Electric also has a good reputation for working with local, state and national officials to resolve issues and concerns.

• As part of the purchase agreement, the government set aside cash reserve funds which DGC can use for contingencies for the plant. This includes $30 million earmarked to correct environmental shortcomings at the plant. DGC is working closely with the North Dakota Health Department to achieve acceptable levels of emissions from the plant.

• Other than a $30 million line of credit extended from Basin Electric to DGC, no Basin Electric assets were pledged to purchase the gasification plant properties. If the gas plant had to be closed, Basin Electric could be exposed for the loss of as much of that line of credit as DGC might use.

While no business venture is without risk, officials of Basin Electric and its subsidiaries are determined to do everything possible to minimize risks and make the gas plant succeed. Plans are under way to move forward with developing byproducts so DGC doesn't need to rely solely on revenues from the sale of synthetic natural gas. DGC has great incentive to develop byproducts because all profits earned from these sales are retained by DGC.

In the meantime, the plant is operating well, producing record levels of gas with an enthusiastic and highly qualified team of employees in place.

We are sometimes asked what it would cost to remove the plant from service. The possibility for decommissioning the plant is extremely remote for as I've indicated, DGC has every incentive and intent to keep the gas plant operating.

I hope this provides additional perspective on the decision to buy the gas plant. If you have questions or comments, please don't hesitate to contact me.

Sincerely,

Robert L. McPhail

## Statement of non-discrimination

McKenzie Electric Cooperative, Inc., Watford City, N.D., has filed with the federal government a compliance assurance in which it assures the Rural Electrification Administration that it will comply fully with all requirements of Title VI of the Civil Rights Act of 1964 and the rules and regulations of the Department of Agriculture issued thereunder, to the end that no person in the United States shall, on the ground of race, color, or national origin be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination in the conduct of its program and the operation of its facilities. Under this assurance, this organization is committed to not discriminate against any person on the ground of race, color, or national origin in its policies and practices relating to applications for service or any other policies and practices relating to treatment of beneficiaries and participants including rates, conditions and extension of service, use of any of its facilities, attendance at and participation in any meetings of beneficiaries and participants or the exercise of any rights of such beneficiaries and participants in the conduct of the operations of this organization.

Any persons who believes himself, or any specific class of individuals, to be subjected by this organization to discrimination prohibited by Title VI of the act and the rules and regulations issued thereunder may, by himself or a representative, file with the Secretary of Agriculture, Washington, D.C. 20250, or the Rural Electrification Administration, Washington, D.C. 20250, or this organization, or all, a written complaint. Such complaint must be filed not later than 90 days after the alleged discrimination, or by such later date to which the Secretary of Agriculture or the Rural Electrification Administration extends the time for filing. Identity of complainants will be kept confidential except to the extent necessary to carry out the purposes of the rules and regulations.

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

**ATTACHMENT 5**

_____

**UPPER MISSOURI POLICY NUMBER C-9, TERMINATION OF
MEMBERSHIP IN UPPER MISSOURI, ADOPTED JULY 7, 2006,
LAST REVIEWED AND REVISED MARCH 6, 2008**

# PUBLIC VERSION – PRIVILEGED AND CONFIDENTIAL INFORMATION HAS BEEN REMOVED PURSUANT TO 18 C.F.R. § 388.112

UPPER MISSOURI G & T ELECTRIC COOPERATIVE, INC.

POLICY NUMBER C-9

Adopted 7/7/06
Last Revision 3/6/08
Last Review 3/6/08

**SUBJECT:** TERMINATION OF MEMBERSHIP IN UPPER MISSOURI

**PURPOSE:**
It is the purpose of this policy to establish that in the event a member of Upper Missouri desires to terminate its membership in Upper Missouri, certain conditions/provisions would be included in the withdrawal agreement between Upper Missouri and the departing member.

**POLICY:**

In the event that a member desires to terminate its membership in Upper Missouri, the withdrawal agreement between Upper Missouri and the departing member would contain, at a minimum, the following provisions:

1. The Wholesale Power Contract between Upper Missouri and the departing member would be considered to be null and void and the departing member would be required to purchase its electric power from some entity other than Upper Missouri following a reasonable transition period determined by the Board of Directors of Upper Missouri.
2. In no event shall the transition period be greater than one (1) year.
3. Upper Missouri would retain all of the benefits of the W.A.P.A. preference power allocation.
4. The request, if any, by the departing member concerning the sale or transfer of transmission and substation facilities owned by Upper Missouri would be presented by the departing member to the Membership and acted upon by the Membership and not by the Board of Directors.
5. Upper Missouri would agree to "wheel" power over existing Upper Missouri facilities to the departing member as required by State and Federal law for a fee set by the Board of Directors.
6. The departing member would be required to pay all of the expenses incurred by Upper Missouri in connection with the termination of it's membership.
7. The departing member would be paid the capital credits earned by it during it's membership tenure as said capital credits are retired and paid to the membership.
8. The final agreement between Upper Missouri and the departing member would be subject to the approval of Rural Utilities Services (RUS) and Basin Electric Power Cooperative.

# PUBLIC VERSION – PRIVILEGED AND CONFIDENTIAL INFORMATION HAS BEEN REMOVED PURSUANT TO 18 C.F.R. § 388.112

**RESPONSIBILITY:** The Board of Directors

**PROCEDURES:**    The following procedures shall apply to this policy:

1.    If a member or members seek to terminate their  membership in Upper Missouri, Upper Missouri will require written notification of the intent by the  departing member to terminate it's membership in Upper Missouri.

2.    Upon receiving written notification from a member that said member intends to terminate its membership in Upper Missouri, the Board of Directors of Upper Missouri shall direct the manager, the engineer for Upper Missouri and the attorney for Upper Missouri to draft a preliminary withdrawal agreement to be considered by the Board of Directors of Upper Missouri and the Board of Directors of the departing member.  Said preliminary withdrawal agreement shall be submitted to the respective Boards of Directors within sixty (60) days from the date that the written notification from the departing member is received by the Board of Directors of Upper Missouri.

3.    Within ninety (90) days after receiving the written notification from the departing member referred to above, the Upper Missouri Board of Directors shall begin meeting with the Board of Directors of the departing member for the purpose of establishing the equitable terms and conditions upon which the membership in question shall be terminated.

4.    Within nine (9) months after receiving the written notification from the departing member of it's intent to terminate its membership in Upper Missouri, the Board of Directors of Upper Missouri shall establish and present in final form all of the terms and conditions which the departing member must comply with before it's membership in Upper Missouri is terminated.

APPROVED BY THE BOARD OF DIRECTORS

_____
President

PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112

# ATTACHMENT 6

---

# LETTER OF INTENT BETWEEN
# MCKENZIE ELECTRIC COOPERATIVE, INC.
# DAKOTAS ELECTRIC COOPERATIV, INC.
# UPPER MISSOURI G&T ELECTRIC COOPERATIVE INC.
# &
# BASIN ELECTRIC POWER COOPERATIVE
# DATED DECEMBER 9, 1971

PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112

<u>LETTER OF INTENT</u>

THIS LETTER OF INTENT, Executed as of this 9th day of December, A.D.,

1971, by and between the following parties:

> McKenzie Electric Cooperative, Inc., a corporation
> organized and existing under the laws of the State of
> North Dakota, and having its principal place of
> business at Watford City, North Dakota, hereinafter
> referred to as "McKenzie";

> Dakotas Electric Cooperative, Inc., a corporation
> organized and existing under the laws of the State of
> North Dakota, and having its principal place of
> business at Bismarck, North Dakota, hereinafter
> referred to as "Dakotas";

> Upper Missouri G & T Electric Cooperative, Inc., a
> corporation organized and existing under the laws of
> the State of Montana, and having its principal place
> of business at Sidney, Montana, hereinafter referred
> to as "Upper Missouri";

> Basin Electric Power Cooperative, a corporation
> organized and existing under the laws of the State of
> North Dakota, and having its principal place of
> business at Bismarck, North Dakota, hereinafter
> referred to as "Basin Electric":

WHEREAS, McKenzie is presently a member of Dakotas, contracting for a portion

of its wholesale electric service requirements in addition to wholesale electric service

from the United States Bureau of Reclamation, and desires to cancel its membership in

Dakotas and become a member of Upper Missouri and receive all of its wholesale electric

service from Upper Missouri; and

WHEREAS, Dakotas and Upper Missouri are agreeable to this cancellation of

Dakotas membership and the appropriate change in contractual arrangements; and

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

-2-

WHEREAS, Basin Electric is the wholesale electric service supplier above Bureau supply under appropriate contracts with both Dakotas and Upper Missouri, and is agreeable to the transfer of these loads and appropriate contractual relationships from Dakotas to Upper Missouri; and

WHEREAS, The parties desire to effectuate the transfer of these loads for billing purposes as of December 15, 1971, effective with the first billing thereafter, but numerous contracts must be executed and approved, and contracts cancelled and approved:

NOW, THEREFORE, the Parties hereto do hereby execute this Letter of Intent, mutually agreeing to accomplish the following details to fulfill the above expressed transfer of source of wholesale supply of electric service:

1. As of the billing period beginning December 15, 1971, all parties shall consider McKenzie a member of Upper Missouri for its full electric service requirements, and all billings shall be rendered as though such appropriate contract relationships had been accomplished, any necessary adjustments to be accomplished after-the-fact upon completion of said documents.

2. The respective parties shall proceed to accomplish the following documents:

    a. Amendment to Wholesale Power Contract between McKenzie and Upper Missouri, to add substations formerly served by Dakotas

    b. Amendment of Upper Missouri–Basin Electric wholesale power contract to add the loads of McKenzie, formerly served by Dakotas, to the Upper Missouri–Basin Electric contract

Case 4:20-cv-04192-LLP Document Filed Date: 08/06/2020 Page 105 of 211 PageID #: 747

**PUBLIC VERSION — PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

-3-

    c. Assignment of U. S. Bureau contract from McKenzie
       to Upper Missouri

    d. Cancellation of McKenzie membership in Dakotas

    e. Cancellation of wholesale electric power contract
       originally executed between McKenzie and Basin
       Electric, assigned by Basin Electric to Dakotas

    f. Termination of any other wholesale power contracts
       between McKenzie and Dakotas

3. It is understood that the above listing is not necessarily in chronological order, and that various contract items may be proceeding at the same time.

4. It is understood that all of the above contract transactions require the approval of the Administrator of the Rural Electrification Administration.

5. The respective parties shall proceed with the preparation and execution of the various above documents, and the securing of the approval of the U. S. Bureau of Reclamation and Administrator of the Rural Electrification Administration, as appropriate.

Executed as of this 9th day of December, A.D., 1971.

                          McKENZIE ELECTRIC COOPERATIVE, INC.

ATTEST: _____ By _____
         Secretary                          President

**PUBLIC VERSION - PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

-4-

ATTEST:                           DAKOTAS ELECTRIC COOPERATIVE, INC.

_Herbert Weber_                   By _Sam A. Messel_
    Secretary                                President


ATTEST:                           UPPER MISSOURI G & T ELECTRIC COOPERATIVE, INC

_C R Thiessen_                    By _George Rait_
    Secretary                                President


ATTEST:                           BASIN ELECTRIC POWER COOPERATIVE,

_Dennis Lindberg_                 By _____
    Secretary                                President

Case 4:20-cv-04192-LLP Document Filed: 08/06/2020 Page 107 of 211 PageID #: 749
Document Accession #: 20200806-5271



Basin Electric
POWER COOPERATIVE

1717 EAST INTERSTATE AVENUE • BISMARCK, NORTH DAKOTA 58501 • PHONE 701-223-0441 • TWX 910-677-2342

**BOARD OF DIRECTORS**

C.R. THIESSEN
*President*
Upper Missouri
Montana

CLARENCE WELANDER
*Vice President*
Central Power
North Dakota

DENNIS LINDBERG
*Secretary-Treasurer*
NIPCO
Iowa

ANDREW C. MORK
*Assistant Secretary*
District #9
North Dakota

MARVIN BEYERS
L&O Power
Minnesota

WAYNE BOND
Tri-State
Nebraska

ARTHUR JONES
East River
South Dakota

J. WILLIAM KELLER
Central Montana
Montana

WILLIAM HETH
Dakotas Electric
North Dakota

QUENTIN LOUDEN
Rushmore
South Dakota

*General Manager*
JAMES L. GRAHL

May 27, 1977

**RECEIVED
MAY 3 1 1977
UPPER MISSOURI G & T
SIDNEY. MONTANA**

Mr. William Heit
Upper Missouri G&T Electric Cooperative
P. O. Box 1069
Sidney, Montana 59270

SUBJECT: Watford City 115/69 KV Transformer

Dear Mr. Heit:

Enclosed you will find a fully executed copy of the Watford City 115/69 KV Transformer Agreement which was approved by our Board of Directors at their May 12, 1977 Board meeting.

We will forward your REA approved copy to you as soon as we receive it from REA.

Sincerely,

James L. Grahl

James L. Grahl

js
Enclosure
cc: Howard Easton
    Mike Hinman

**PUBLIC VERSION – PRIVILEGED AND CONFIDENTIAL INFORMATION HAS BEEN REMOVED PURSUANT TO 18 C.F.R. § 388.112**

<u>RESOLUTION</u>

The undersigned, C. R. Thiessen, being duly elected and acting Secretary of

Upper M. souri G&T Electric Cooperative, Inc., organized and existing under

the Laws of the State of Montana, hereby certifies that the following Resolution

was duly and legally passed at a Regular Meeting of the Board of Directors held

on the 22nd day of June, 1971; namely:


RESOLVED That an agreement with Basin Electric Cooperative and Upper
Missouri G&T concerning the USBR, Watford City Sub-Station agreement,
was discussed by the Board.  Upon motion made by Pat Plummer, seconded
by Levi Curren, and carried, the President and Secretary of the
Corporation were authorized to execute the agreement.


That such Resolution has not been amended or repealed.

Dated this 22nd day of June, 1971; A.D.


UPPER MISSOURI G&T ELECTRIC COOPERATIVE, INC.


By_____
                    Secretary


SEAL:

PUBLIC VERSION — PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112

A G R E E M E N T

THIS AGREEMENT, Made and entered into as of the 25th day
of _____ May _____, A.D., 19 71 , by and between BASIN ELECTRIC POWER
COOPERATIVE (hereinafter referred to as "Basin Electric"), a corporation duly
organized and existing under the laws of the State of North Dakota, and UPPER
MISSOURI G & T ELECTRIC COOPERATIVE, (hereinafter referred to as the "Member"),
a corporation duly organized and existing under the laws of the State of
Montana.

W I T N E S S E T H :

WHEREAS, the Wholesale Power Contract between the parties hereto
provides for delivery of electric service from the Joint Transmission System
established by Agreement between Basin Electric and the Bureau of Reclamation
and such other point or points as may be agreed upon by the parties hereto; and

WHEREAS, BasinElectric in behalf of its members has contracted with
the United States to provide 9375 KVA of 115/69 kv transformation capacity at
the USBR Watford City Substation; and

WHEREAS, Basin Electric has agreed by its delivery point policy dated
July 13, 1966 to pay a portion of the required investment for said Substation as
outlined by the Bureau of Reclamation letter to Basin Electric dated February 3,
1966, a copy of which is attached, and made a part of this Agreement; and

WHEREAS, the payment by Basin Electric to the USBR in the financial
cost of said facilities in the yearly amount of $8,908.32 is for the purpose of
delivery of electric service originating from Basin Electric by generation or
purchase, and not otherwise;

NOW, THEREFORE, FOR AND IN CONSIDERATION OF THE MUTUAL PROMISES
AND UNDERTAKINGS HEREIN PROVIDED FOR, IT IS HEREBY MUTUALLY AGREED AS FOLLOWS:

1. If, at any time, the Member shall elect to obtain electric service,
including both power and energy, from an electric service supply source other
than Basin Electric, by either self generation or purchase, to supply any electric
service requirements of the Member over and above allocations of firm load factor
hydro electric service from the United States Bureau of Reclamation, the payment
for facilities by Basin Electric of said electric service delivery facilities shall
terminate and the Member shall forthwith pay to Basin Electric fifty percent (50%)
of the cumulative total to that date. Basin Electric shall accept payment of said
sum in full discharge and release of all claims against the Member by reason of said
payment for said delivery facilities.

2. This Agreement shall continue in force until the Wholesale Power
Contract between the parties hereto is terminated in accordance with the terms
thereof.

**PUBLIC VERSION — PRIVILEGED AND**
**CONFIDENTIAL INFORMATION HAS BEEN REMOVED**
**PURSUANT TO 18 C.F.R. § 388.112**

-2-

IN WITNESS WHEREOF, the parties hereto have executed this Agreement dated as of the day and year first above written.

BASIN ELECTRIC POWER COOPERATIVE

BY: _C. R. Thiessen_
                President

ATTEST:

_Dennis Lindberg_
        Secretary

BY: UPPER MISSOURI G&T ELECTRIC COOPERATIVE

ATTEST:

_C. R. Thiessen_

BY: _George Bait_
                President

BASIN ELECTRIC POWER COOPERATIVE
CORPORATE SEAL
NORTH DAKOTA

PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112

RESOLUTION

The undersigned, C. R. Thiessen, being duly elected and acting Secretary of

Upper Missouri G&T Electric Cooperative, Inc., organized and existing under

the Laws of the State of Montana, hereby certifies that the following Resolution

was duly and legally passed at a Regular Meeting of the Board of Directors held

on the 22nd day of June, 1971; namely:

RESOLVED That an agreement with Basin Electric Cooperative and Upper
Missouri G&T concerning the USBR, Watford City Sub-Station agreement,
was discussed by the Board. Upon motion made by Pat Plummer, seconded
by Levi Curren, and carried, the President and Secretary of the
Corporation were authorized to execute the agreement.

That such Resolution has not been amended or repealed.

Dated this 22nd day of June, 1971; A.D.

UPPER MISSOURI G&T ELECTRIC COOPERATIVE, INC.

By _____
                Secretary

SEAL:

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

<u>A G R E E M E N T</u>

THIS AGREEMENT, Made and entered into as of the ___25<u>th</u>___ day
of _____May_____, A.D., 19_71_, by and between BASIN ELECTRIC POWER
COOPERATIVE (hereinafter referred to as "Basin Electric"), a corporation duly
organized and existing under the laws of the State of North Dakota, and UPPER
MISSOURI G & T ELECTRIC COOPERATIVE, (hereinafter referred to as the "Member"),
a corporation duly organized and existing under the laws of the State of
Montana.

W I T N E S S E T H:

WHEREAS, the Wholesale Power Contract between the parties hereto
provides for delivery of electric service from the Joint Transmission System
established by Agreement between Basin Electric and the Bureau of Reclamation
and such other point or points as may be agreed upon by the parties heret; and

WHEREAS, BasinElectric in behalf of its members has contracted with
the United States to provide 9375 KVA of 115/69 kv transformation capacity at
the USBR Watford City Substation; and

WHEREAS, Basin Electric has agreed by its delivery point policy dated
July 13, 1966 to pay a portion of the required investment for said Substation as
outlined by the Bureau of Reclamation letter to Basin Electric dated February 3,
1966, a copy of which is attached, and made a part of this Agreement; and

WHEREAS, the payment by Basin Electric to the USBR in the financial
cost of said facilities in the yearly amount of $8,908.32 is for the purpose of
delivery of electric service originating from Basin Electric by generation or
purchase, and not otherwise;

NOW, THEREFORE, FOR AND IN CONSIDERATION OF THE MUTUAL PROMISES
AND UNDERTAKINGS HEREIN PROVIDED FOR, IT IS HEREBY MUTUALLY AGREED AS FOLLOWS:

1. If, at any time, the Member shall elect to obtain electric service,
including both power and energy, from an electric service supply source other
than Basin Electric, by either self generation or purchase, to supply any electric
service requirements of the Member over and above allocations of firm load factor
hydro electric service from the United States Bureau of Reclamation, the payment
for facilities by Basin Electric of said electric service delivery facilities shall
terminate and the Member shall forthwith pay to Basin Electric fifty percent (50%)
of the cumulative total to that date. Basin Electric shall accept payment of said
sum in full discharge and release of all claims against the Member by reason of said
payment for said delivery facilities.

2. This Agreement shall continue in force until the Wholesale Power
Contract between the parties hereto is terminated in accordance with the terms
thereof.

PUBLIC VERSION - PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112

-2-

IN WITNESS WHEREOF, the parties hereto have executed this Agreement dated as of the day and year first above written.

BASIN ELECTRIC POWER COOPERATIVE

BY: _____
                    President

ATTEST:

_____
            Secretary

ATTEST:                              UPPER MISSOURI G&T ELECTRIC COOPERATIVE

_____      BY: _____
                                                        President

CORPORATE
SEAL

BASIN ELECTRIC POWER COOPERATIVE
NORTH DAKOTA

# PUBLIC VERSION – PRIVILEGED AND
# CONFIDENTIAL INFORMATION HAS BEEN REMOVED
# PURSUANT TO 18 C.F.R. § 388.112

**ATTACHMENT 7**

_____

**AMENDMENT TO WHOLESALE POWER CONTRACT**

**BETWEEN BASIN ELECTRIC AND UPPER MISSOURI,**

**DATED AUGUST 19, 2015**

Case 4:20-cv-0XXXXXXXXXXXXXXXXXXXXXX Filed XXXXXXXXXXXX 15 of 21 PageID #: 757

**PUBLIC VERSION - PRIVILEGED AND CONFIDENTIAL INFORMATION HAS BEEN REMOVED PURSUANT TO 18 C.F.R. § 388.112**



October 21, 2015

**SENT VIA EMAIL AND US MAIL**

Claire Vigessa, General Manager/CEO
Upper Missouri Power Cooperative
111 2nd Ave SW
Sidney, MT 59270

Dear Mr. Vigessa:

Enclosed, please find fully executed copies of the following agreements between Basin Electric Power Cooperative (Basin Electric) and Upper Missouri Power Cooperative (Member).

- Two copies of the Amendment to the Wholesale Power Contract
- One copy of the Scheduling Agreement

Basin Electric is sending you these agreements prior to having the signed Power Services Agreement so you can begin the RUS approval process of the Amendment to the Wholesale Power contract.

As Basin Electric is no longer a RUS borrower, Basin Electric has no need to request approval of the Amendment to the Wholesale Power Contracts contract anymore. If you need RUS approval of the Amendment to the Wholesale Power Contract please forward on to RUS, as appropriate, and please advise Basin Electric when it has been RUS approved.

In returning the executed Amendment to the Wholesale Power Contract at this time, Basin Electric is assuming your cooperative will also be executing the Power Service Agreement..

If you have any questions, please contact me.

Sincerely,

Daryl Delzer on behalf of
David D. Raatz, VP of Cooperative Planning

dmd/ts
Enclosures

cc:     Paul Sukut
        Becky Kern
        Casey Jacobson

**PUBLIC VERSION — PRIVILEGED AND CONFIDENTIAL INFORMATION HAS BEEN REMOVED PURSUANT TO 18 C.F.R. § 388.112**

AMENDMENT TO

THE WHOLESALE POWER CONTRACT

BY AND BETWEEN

BASIN ELECTRIC POWER COOPERATIVE

AND

UPPER MISSOURI POWER COOPERATIVE

This Amendment to Wholesale Power Contract is made as of this ___19___ day of ___August___ 2015, by and between Basin Electric Power Cooperative, 1717 East Interstate Avenue, Bismarck, North Dakota 58501 (**Seller**), a North Dakota electric cooperative corporation, and Upper Missouri Power Cooperative, (**Member**), a Montana cooperative whose principal place of business is located at 111 2nd Ave SW, Sidney, MT 59270.

WITNESSETH:

WHEREAS, Seller and Member entered into a certain Wholesale Power Contract dated May 22, 1962, as amended and

WHEREAS, Seller is joining a Regional Transmission Organization (RTO) named the Southwest Power Pool (SPP) on October 1, 2015; and

WHEREAS, Seller intends to modify its transmission service obligations to pay all Federal Energy Regulatory Commission (FERC) pro forma wheeling assessments related to the Sellers power supply obligations; and

WHEREAS, Seller and Member are entering into this Amendment to modify and define Sellers Points of Delivery to Member; and

WHEREAS, Seller is planning for the eventual retirement of its existing generation sources and replacement with new sources that will require substantial financing; and

# PUBLIC VERSION — PRIVILEGED AND
# CONFIDENTIAL INFORMATION HAS BEEN REMOVED
# PURSUANT TO 18 C.F.R. § 388.112

WHEREAS, Member acknowledges that Seller and potential lenders are relying on the Wholesale Power Contract with Member, and similar commitments from other members to purchase capacity and energy for their present and future load requirement as security for the financing of Sellers facilities; and

WHEREAS, Seller and Member are entering into this Amendment to extend the term of their Wholesale Power Contract:

NOW THEREFORE, in consideration of the mutual undertakings herein contained, the parties hereby agree as follows:

I.  Section 2 of the Wholesale Power Contract shall be amended as follows:

Delivery Points.  The Seller shall deliver and the Member shall receive such power and energy from Seller at any of the following points of interconnection with the Member transmission system (Delivery Points):

   a) With the Southwest Power Pool (SPP)
   b) With the Midcontinent Independent System Operator - Montana Dakota Utilities
   c) Sellers generation within the Members system

Member shall provide necessary time registration metering for each Delivery Point used to determine Sellers power supply obligation to the Member.  The Seller and the Member shall establish appropriate criteria to calibrate, read, and maintain this metering equipment.

II. Section 4 of the Wholesale Power Contract shall be amended as follows:

**Rate**. Member shall pay Seller for all electric power and energy furnished hereunder at the rates and on the terms and conditions set forth in Rate Schedule "A", attached hereto and made a part hereof, as the same may be modified from time to time by Seller. The Board of Directors of Seller, at such intervals as it shall deem appropriate but in any event not less frequently than once in each calendar year, shall review the rate for

PUBLIC VERSION — PRIVILEGED AND CONFIDENTIAL INFORMATION HAS BEEN REMOVED PURSUANT TO 18 C.F.R. § 388.112

electric power and energy furnished hereunder and under similar contract with other members and, if necessary, shall revise such rate so that it shall produce revenues which shall be sufficient, but only sufficient, with the revenues of Seller from all other sources, to meet the cost of the operation and maintenance (including, without limitation, replacement, insurance, taxes and administrative and general overhead expenses) of the generating plants, the transmission system and related facilities of Seller, the cost of any power and energy purchased for resale hereunder by Seller, the cost of transmission service, the cost of lease payments, interest expense and depreciation expense or principal repayments of Seller, and to provide for the establishment and maintenance of reasonable reserves. Seller shall cause a notice in writing to be given to Member and other members of Seller and so long as Seller is contractually obligated to do so, to the Administrator of the Rural Utilities Service which shall set out the proposed revisions of rate with the effective date thereof, which shall not be less than thirty (30) nor more than forty-five (45) days after the date of the notice, and shall set forth the basis upon which the rate is proposed to be adjusted and established. The Member agrees that the rate from time to time established by the Board of Directors of Seller shall be deemed to be substituted for the rate herein provided and agrees to pay for electric capacity and energy furnished by Seller to it hereunder after the effective date of any such revision at such revised rates; provided, however, that for so long as Seller is contractually required to receive such approval, no such revision shall be effective unless approved by the Administrator of the Rural Utilities Service.

III.    Section 10 of the Wholesale Power Contract, shall be amended to read as follows:

10. Term

This Agreement shall remain in effect until December 31, 2075. If either Party desires to terminate the Agreement on December 31, 2075, it shall provide written notice of intent to terminate by December 31, 2070. If notice of termination is not received by either party prior to December 31, 2070, this Agreement shall remain in effect unless terminated by either party giving to the other not less the five (5) years prior written notice of its intention to terminate.

IV.    Effective Date: The terms of this Amendment shall become effective October 1, 2015.

**PUBLIC VERSION — PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

V.   This Amendment is subject to the approval of the Administrator of the Rural Utilities

Services.

**PUBLIC VERSION – PRIVILEGED AND CONFIDENTIAL INFORMATION HAS BEEN REMOVED PURSUANT TO 18 C.F.R. § 388.112**

(SEAL)

BASIN ELECTRIC POWER COOPERATIVE

ATTEST

By: _____
Assistant
Secretary

By: _____
~~President~~ CEO & General Manag

(SEAL)

UPPER MISSOURI POWER CORPORATIVE

ATTEST

By: _Ray Clouse_

Secretary

By: _Travis Thompson_

President

**PUBLIC VERSION - PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

**ATTACHMENT 8**

_____

**AMENDMENT TO WHOLESALE POWER CONTRACT**

**BETWEEN UPPER MISSOURI AND MCKENZIE,**

**DATED SEPTEMBER 2, 2015**

PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112

*Sept 2015*

## AMENDMENT TO WHOLESALE POWER CONTRACT

This **AMENDMENT TO WHOLESALE POWER CONTRACT** (this *"Amendment"*) is made as of *September 2* , 2015, by and between UPPER MISSOURI G. & T. ELECTRIC COOPERATIVE, INC., a Montana cooperative corporation (the *"Seller"*), and MCKENZIE ELECTRIC COOPERATIVE, INC., a North Dakota cooperative corporation (the *"Member"*).

### RECITALS

1.      The Seller and the Member executed a Wholesale Power Contract dated March 17, 1972 (as amended from time to time, the *"Agreement"*);

2.      The Seller is a member of and purchases electric power and energy from Basin Electric Power Cooperative, a North Dakota electric cooperative (*"Basin"*), under that certain Basin Electric Power Cooperative Wholesale Power Contract between Basin and the Seller dated May 22, 1962 (as amended from time to time, the *"Basin Agreement"*);

3.      Basin is planning for the eventual retirement of its existing generation sources and replacement with new sources that will require substantial financing;

4.      Basin has requested from the Seller an amendment to the Basin Agreement to, among other things, extend the term of the Basin Agreement to December 31, 2075;

5.      The Seller is unwilling to extend the Basin Agreement to December 31, 2075 unless the Member agrees to extend the term of the Agreement to December 31, 2075;

6.      The Member acknowledges that existing and potential lenders rely on the Agreement, and similar commitments from other members of the Seller to purchase electric power and energy from the Seller, as security for the financing of the Seller's facilities; and

7.      The Seller and the Member wish to amend the Agreement as provided in this Amendment, including extending the term of the Agreement to December 31, 2075.

### AGREEMENT

**NOW, THEREFORE,** for good and valuable consideration, the receipt and adequacy of which are acknowledged, the Seller and the Member agree as follows:

**Section 1.**    AMENDMENTS.

1.1     Section 4 of the Agreement is amended to read in its entirety as follows:

4.      <u>Rate</u>.  The Member shall pay the Seller for all electric power and energy furnished hereunder at the rates and on the terms and conditions set forth in Rate Schedule, Exhibit B, attached hereto and made a part hereof, as the same may be modified from time to time by the Seller in accordance with this Section 4.  The Board of Trustees of the Seller at such intervals as it shall deem appropriate, but in any event not less frequently than once in each calendar year, shall review the rate for electric power and energy furnished hereunder and under similar agreements with other members and, if necessary, shall revise

Document Accession # 20150928-5185 Filed Date: 09/28/2015

# PUBLIC VERSION — PRIVILEGED AND
# CONFIDENTIAL INFORMATION HAS BEEN REMOVED
# PURSUANT TO 18 C.F.R. § 388.112

such rate so that it shall produce revenues which shall be sufficient, but only sufficient, with the revenues of the Seller from all other sources, to meet the cost of the operation and maintenance (including without limitation, replacements, insurance, taxes and administration and general overhead expenses) of the generating plant, transmission system and related facilities of the Seller, the cost of any power and energy purchased for resale hereunder by the Seller, the cost of transmission service, to make payments on account of principal of and interest on all indebtedness of the Seller, and to provide for the establishment and maintenance of reasonable reserves. The Seller shall cause a notice in writing to be given to the Member and other members of the Seller and, if the Seller is contractually obligated to notify the Administrator, the Administrator, which shall set out all the proposed revisions of the rate with the effective date thereof, which shall be not less than thirty (30) nor more than forty-five (45) days after the date of the notice, and shall set forth the basis upon which the rate is proposed to be adjusted and established. The Member agrees that the rate from time to time established by the Board of Trustees of the Seller shall be deemed substituted for the rate herein provided and agrees to pay for electric power and energy furnished by the Seller to it hereunder after the effective date of any such revisions at such revised rates; provided however, that if the Seller is contractually obligated to obtain the approval of the Administrator for such revisions, then no such revision shall be effective unless approved in writing by the Administrator.

1.2     Section 11 of the Agreement is amended to read in its entirety as follows:

11.     Term.  This Agreement shall supersede all existing contracts between the Seller and the Member and shall remain effective until December 31, 2075.  If either the Seller or the Member desires to terminate this Agreement on December 31, 2075, it shall provide written notice of intent to terminate no later than October 31, 2070.  If notice of termination is not received by either the Seller or the Member on or before October 31, 2070, this Agreement shall remain in effect unless terminated by either the Seller or the Member providing five (5) years and two (2) months prior written notice of termination.

1.3     Exhibit A to the Agreement shall be replaced in its entirety with Exhibit A attached to this Amendment.

**Section 2.**     EFFECTIVE DATE.  This Amendment shall be effective October 1, 2015.

**Section 3.**     RUS APPROVAL.  If the Member is contractually obligated to obtain the approval of the Administrator of the Rural Utility Service (the "*Administrator*"), then this Amendment shall by subject to the approval of the Administrator.

**Section 4.**     AFFIRMATION OF AGREEMENT.  The Seller and the Member each affirm the Agreement, as amended by this Amendment, is ratified and confirmed in all respects and all terms, conditions and provisions of the Agreement, except as amended by this Amendment, shall remain unmodified and in full force and effect.

Case 4:20-cv-04221-ECS Document 44-2 Filed 07/29/24 Page 124 of 211 PageID #: 766

# PUBLIC VERSION – PRIVILEGED AND CONFIDENTIAL INFORMATION HAS BEEN REMOVED PURSUANT TO 18 C.F.R. § 388.112

IN WITNESS WHEREOF, the Seller and the Member have executed this Amendment as of the date first above written.

**SELLER:**

UPPER MISSOURI G. & T. ELECTRIC COOPERATIVE, INC.

By: _____
     SIGNATURE

Name: Travis Thompson
      PRINT OR TYPE NAME

Its: President
    PRINT OR TYPE TITLE


**MEMBER:**

MCKENZIE ELECTRIC COOPERATIVE, INC.

By: _____
     SIGNATURE

Name: Clayton Morse
      PRINT OR TYPE NAME

Its: Chairman
    PRINT OR TYPE TITLE

3

# PUBLIC VERSION – PRIVILEGED AND
# CONFIDENTIAL INFORMATION HAS BEEN REMOVED
# PURSUANT TO 18 C.F.R. § 388.112

**ATTACHMENT 9**

**CONFIDENTIAL**

Protected Materials containing confidential and privileged information
have been removed from the public version.

_____

**SUMMARY OF BASIN ELECTRIC MANAGER'S**

**ADVISORY COMMITTEE MEETING ON OCTOBER 19–20, 2017**

**FROM CLAIRE VIGESAA, GENERAL MANAGER OF UPPER MISSOURI**

Case 4:20-cv-04193-LLP Document 46-10 Filed 09/01/21 Page 1 of 2 PageID #: 768
Document Accession #: 20200824-5097 DRU54-225 Filed Date: 08/24/2020

**ATTACHMENT 10**

———————————————————————

**LETTER FROM MCKENZIE TO UPPER MISSOURI,**

**DATED JANUARY 30, 2019**

# PUBLIC VERSION — PRIVILEGED AND CONFIDENTIAL INFORMATION HAS BEEN REMOVED PURSUANT TO 18 C.F.R. § 388.112



**McKenzie Electric**
**COOPERATIVE**

*908 4th Ave. N.E. • P.O. Box 649 • Watford City, ND 58854-0649*
*Telephone (701) 444-9288 • Fax (701) 444-3002*
*Website: mckenzieelectric.com*

January 30, 2019

Upper Missouri Power Cooperative
Attention: Claire Vigesaa, GM and the UMPC Board of Directors
111 2nd Ave SW
Sidney, MT 59270

Dear Claire and the UMPC Board of Directors,

At their January 30, 2019 board meeting, the McKenzie Electric Cooperative Board of Directors discussed at great length the direction and decision making at Basin Electric Power Cooperative. At the end of that discussion, a motion was made and seconded that McKenzie Electric make inquiry to Upper Missouri Power Cooperative (UMPC) regarding UMPC Policy Number C-9. It is important to state that McKenzie Electric at this time is **not** delivering a notice to terminate its membership in UMPC.

McKenzie Electric Cooperative is asking UMPC what the cost would be to terminate its membership and any existing contracts with UMPC?

Again, the McKenzie Electric Board of Directors is **not** requesting to exit UMPC, we are only interested in understanding the cost and operating implications of proceeding down that road.

Respectfully submitted,

Clayton Monsen, President
McKenzie Electric Cooperative Board of Directors



A Touchstone Energy® Cooperative
*The power of human connections®*

PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112

**ATTACHMENT 11**

_____

**LETTER FROM UPPER MISSOURI TO BASIN ELECTRIC,**

**DATED FEBRUARY 6, 2019**

PUBLIC VERSION — PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112



# UPPER MISSOURI
## POWER COOPERATIVE A Touchstone Energy® Cooperative

111 2nd Ave. SW • Sidney, MT 59270 • 406.433.4100

February 6, 2019

Basin Electric Power Cooperative
Wayne Peltier, President – Basin Trustees, Paul Sukut-CEO
1717 E. Interstate Ave
Bismarck, ND  58503-0564

Mr. Peltier, Basin Trustees & Mr. Sukut:

The Upper Missouri Power Cooperative met for their regular monthly meeting today.  Because 98% of Upper Missouri's expense is Basin power supply, we dedicate significant time each month to Basin issues.  We review in detail, reports provided by Allen Thiessen and others.

While Upper Missouri appreciates recent efforts to reduce non-utility business losses and general business operating costs, we are concerned about non-utility financials and the large gap between our wholesale power rates and market rates.  We read much and hear much about the changing utility landscape; our member-consumers have new options and have new expectations of their electric service providers.

As trustees, representing the member-owners in Eastern Montana and Western North Dakota, we are responsible for the investments made on behalf of our member-owners; prudently utilizing the investments entrusted to us.

To accurately understand the value of our member-owner's investment in Basin Electric Power Cooperative; the Upper Missouri Board of Trustees unanimously supported a motion to request from Basin Electric Power Cooperative the following:

*The process and parameters that Basin would utilize to calculate the financial liability (of Basin & associated business units) to each of the Member Systems.*

As cooperative member-owners, we will find this information helpful as we assess our long-term strategy, ultimately developing a strategy that is in the best interest of the member-owners.

We look forward to working with you on this request.  We understand this will require board discussion; we'd appreciate a discussion timeline with hopes of a conclusive position by June.

Sincerely,

Travis Thompson, President

PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112

**ATTACHMENT 12**

_____

**LETTER FROM BASIN ELECTRIC TO CLASS A MEMBERS**

**PROVIDING RESOLUTIONS,**

**DATED FEBRUARY 15, 2019**

# PUBLIC VERSION – PRIVILEGED AND CONFIDENTIAL INFORMATION HAS BEEN REMOVED PURSUANT TO 18 C.F.R. § 388.112



February 15, 2019

To Class A Members:

I wanted to provide to you a copy of a resolution unanimously adopted by the Board of Directors of Basin Electric Power Cooperative (the "Cooperative") at a meeting held on February 13, 2019. The resolution was adopted following extensive discussion among the members of the Board of Directors, officers of the Cooperative and outside counsel. I believe that the resolution is self-explanatory.

As you know, the Cooperative continues to be focused on providing the most reliable service at the lowest possible cost. We ask for your cooperation in advising any of your members that request buy-out information that it is in conflict with their obligations under their all-requirements contract. It is also important to understand that for you to provide any assistance to your members in buying out of their all-requirements contracts, it would be contrary to your obligations to the Cooperative.

Regards,

Paul M. Sukut
CEO & General Manager

Attachment

Document Accession # 20201230-5318 Prepared by DRS at Page 132 of 211

# PUBLIC VERSION – PRIVILEGED AND
# CONFIDENTIAL INFORMATION HAS BEEN REMOVED
# PURSUANT TO 18 C.F.R. § 388.112

WHEREAS, one of the Cooperative's Class A Members has received requests from two of the Cooperative's Class C Members for a price for those Class C Members to buy out of their all-requirements contracts with the Class A Member;

WHEREAS, the Cooperative also has received a request from one of its Class A Members for the process and parameters to calculate a price if that Class A Member was to buy out of its all-requirements contract with the Cooperative;

WHEREAS, the Cooperative has been advised by both its General Counsel and its outside counsel, Orrick, Herrington & Sutcliffe LLP, that the all-requirements contracts of both the Class A Members with the Cooperative and the Class C Members with the Class A Members do not contain any provision permitting the member to buy-out of its all-requirements contract with the Cooperative or the Class A Member, as applicable;

WHEREAS, as a result, neither the Cooperative nor any Class A Member has any obligation to develop, calculate or furnish any information required in connection with a buy out or otherwise permit any such member to buy-out of its all-requirements contract; and

WHEREAS, the Board of Directors has considered the request of the Class A Member and the advice of counsel and concluded that it is not in the best interests of the Cooperative or its membership to allow any buy out of any all-requirements contracts with the Cooperative or any of its Class A Members;

NOW, THEREFORE, BE IT RESOLVED, that the General Manager and CEO is hereby authorized and directed to furnish a copy of this resolution to all Class A Members of the Cooperative.

PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112

ATTACHMENT 13

_____

LETTER FROM MEEKER COOPERATIVE,

DATED JULY 22, 2019

# PUBLIC VERSION – PRIVILEGED AND
# CONFIDENTIAL INFORMATION HAS BEEN REMOVED
# PURSUANT TO 18 C.F.R. § 388.112



1725 U.S. Hwy. 12 E., Suite 100
Litchfield, MN  55355
320-693-3231
www.meeker.coop

July 22, 2019

«First_Name» «Last_Name», «Position»
«Company_Name»
«Address_Line_1»
«City» «State»  «ZIP_Code»

«GreetingLine»

My name is Karen Becker and I am the Board President of Meeker Cooperative Light and Power Association. Meeker Cooperative is a member of both Basin Electric Power Cooperative (Basin) and East River Electric Power Cooperative (East River). East River is a Class A Member of Basin. Meeker recently learned of a Joint Defense Agreement that Basin has prepared and asked its members to sign.

Our members, like yours, are located in rural areas. Our members have demanded rate stability and cleaner sources of energy. To ensure that Meeker can continue to provide safe, reliable, and environmentally friendly electric service at competitive rates, Meeker is going through a strategic planning process.

In preparation for this CFC led strategic planning session, Meeker's Board of Directors requested a buy-out number from all of its power suppliers (East River, Basin and Great River Energy).  The purpose of this request was to fulfill our fiduciary duties to our member/owners by conducting a thorough strategic planning process.  A process that examines all elements and options of our largest expense, power supply.  Doing less than that would prove to be a worthless and pretend endeavor in strategic planning.  An endeavor that ignores the responsibility of the board regardless of how unpopular any specific issue may be.

After Meeker asked for a buy-out number from Basin/East River, Basin/East River requested that its member/owners execute a Joint Defense Agreement.  Basin/East River has not communicated the purpose of this agreement to Meeker but it is clear that the purpose of the Joint Defense Agreement is to hide information from East River's/Basin's member/owners and stymie strategic planning of its member/owners. It appears that Basin/East River is using the Joint Defense Agreement to share information only among those member/owners who have signed the Joint Defense Agreement while keeping those who have not signed in the dark.

The lack of electric co-op governance is making the headlines nationally.  Cooperatives around the country are under attack because of a lack of transparency. Cooperatives have learned that they need to be open and forthright in dealing with their member/owners. Simply put transparency is paramount.  Unfortunately, it appears that Basin and East River are not willing to be transparent with their member/owners. East River and Basin are hiding behind lawyers and the Joint Defense Agreement by not providing information requested by its member/owners.





Your Touchstone Energy® Partner
The power of human connections®



*Meeker Cooperative is an Equal Opportunity Provider and Employer*

Document Accession #: 20120208-5154 Filed Date: 02/08/2012

# PUBLIC VERSION — PRIVILEGED AND CONFIDENTIAL INFORMATION HAS BEEN REMOVED PURSUANT TO 18 C.F.R. § 388.112

At Basin's 2018 Annual Meeting, Basin's members/owners adopted Resolution B-2. Resolution B-2 talks about member strategic planning and organizational structuring. The text of Resolution B-2 is as follows:

> **Member Strategic Planning and Organizational Structuring.** It is imperative that Basin Electric Power Cooperative (Basin Electric) and its member-systems prepare to deal with the ever-changing electric utility marketplace by planning for the future. Basin Electric supports the efforts of its member-systems to improve their competitive position, and thereby Basin Electric's competitive position, by continuing to support member strategic planning efforts and voluntary organizational restructuring through available means.

> **Background:** The farm economy and changing demographics of rural and urban areas places considerable pressure on electric cooperatives to reduce costs, increase efficiencies, and add value of the consumer. Basin Electric encourages member strategic planning and organizational restructuring of rural electric cooperatives to improve competitive positioning, eliminate duplication, reduce costs, and provide power at competitive rates for the consumers of rural electric cooperatives.

Through this resolution, Basin supports its member/owners strategic planning efforts to reduce costs, improve competitive positioning, and provide power at competitive rates to consumers, yet, Basin and East River are not willing to provide information to its member/owners to assist in this process. In order to plan for the future, Basin's and East River's member owners must know the value of their power contracts. Without knowing the value of these contracts, Basin member/owners cannot effectively perform strategic planning. Because East River and Basin are withholding this information we cannot effectively plan for the future; a future that includes changing technologies, changing economics, changing member expectations, changing public policy, in short changing realities.

Meeker's board of directors is challenged with and responsible for providing the direction of its Cooperative.  It is Meeker's member/owners that have elected and entrusted them to do so, not people hundreds of miles away living in another state. This is local control. Your co-op, like Meeker Co-op, should be allowed to make decisions at the local level for what is best for your Cooperative. What will be the next decision that the G&T will make "for" you and your local cooperative member/owners?

Basin and East River only exist to serve its member/owners. Basin and East River exist because of its member/owners. As member/owners of Basin and East River we deserve transparency and access to information that allows us to effectively plan for the future to ensure the viability of our cooperative.

In closing, I want to be perfectly clear on this, at **no time** has Meeker considered or requested to "buyout" of East River or Basin.  Meeker's request was and still is a simple request for information to help us complete our legal due diligence to strategically plan for the future of the co-op's members. Basin's and East River's creation of a "Joint Defense Agreement" to systematically withhold information from its member owners and purposely pit member co-ops against one another is unproductive and not in any way in the cooperative spirit.

If you have not signed the Joint Defense Agreement, I would ask that you not sign it to show your support for the transparency of cooperatives and to safeguard your right to make decisions locally.  If you have signed the Joint Defense Agreement, I would ask that you reconsider your position and rescind your signature.

Cooperatively,

Karen Becker, Meeker Cooperative Light & Power Association President

# PUBLIC VERSION – PRIVILEGED AND CONFIDENTIAL INFORMATION HAS BEEN REMOVED PURSUANT TO 18 C.F.R. § 388.112

**ATTACHMENT 14**

**CONFIDENTIAL**

Protected Materials containing confidential and privileged information
have been removed from the public version.

_____

**BASIN ELECTRIC POWER COOPERATIVE AND SUBSIDIARIES**

**2020–2029 FINANCIAL FORECASTS BOOK**

PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112

**ATTACHMENT 15**

_____

**AMENDED AND RESTATED BYLAWS**

**OF BASIN ELECTRIC POWER COOPERATIVE,**

**LAST AMENDED NOVEMBER 7, 2018**

# PUBLIC VERSION - PRIVILEGED AND CONFIDENTIAL INFORMATION HAS BEEN REMOVED PURSUANT TO 18 C.F.R. § 388.112

| | |
|---|---|
| Originally Adopted November 1, 1961 | Amended November 3, 2005 |
| Restated November 17, 1995 | Amended November 8, 2007 |
| Amended November 15, 1996 | Amended August 13, 2009 |
| Amended November 7, 1997 | Amended November 10, 2011 |
| Amended March 8, 1998 | Amended November 7, 2013 |
| Amended November 10, 2000 | Amended November 5, 2015 |
| Amended June 28, 2001 | Amended November 10, 2016 |
| Amended November 6, 2003 | Amended November 8, 2017 |
| | Amended November 7, 2018 |

## AMENDED AND RESTATED BYLAWS

### OF

### BASIN ELECTRIC POWER COOPERATIVE

The following Bylaws restate and supersede the Bylaws of Basin Electric Power Cooperative adopted November 1, 1961, and all amendments thereto.

### ARTICLE I
### Members

**Section 1, General.** The limitations, conditions, restrictions and rights pertaining to membership and the privileges, duties and obligations of Members are set forth in these Bylaws.

**Section 2, Classes of Membership.** The Cooperative shall have no stock, but membership in the Cooperative shall be evidenced by a membership certificate. Membership in the Cooperative shall be of four classes as follows:

a.  **Class "A" Membership.** Any incorporated cooperative association organized under the laws of North Dakota, or under a cooperative law in any other state, for the purposes, among other things, of constructing, operating and maintaining electric transmission and distribution lines or systems and transmitting and selling electric energy may become a Class "A" Member, upon compliance with Article I, Section 4, and executing a contract to purchase electric service from the Cooperative's generating units as soon as electric service is needed to meet such Member's electric requirements in excess of such Member's existing generation capacities or contracts for the purchase of electric service, or the obligations to purchase power from others pursuant to Federal or state statute. Class "A" Members may also purchase any other class of electric service, if available.

Each Class "A" Member shall pay for such power and/or energy monthly at rates or on a basis to be determined from time to time in accordance with the Bylaws and contracts entered into between the Cooperative and the Member. Each Class "A" Member shall pay to the Cooperative all other amounts per month, regardless of the amount of electric energy consumed, as shall be fixed by the Board of Directors from time to time. Each Class "A" Member shall also pay all amounts owed to the Cooperative as and when the same shall become due and payable.

1

**PUBLIC VERSION - PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

b.     **Class "B" Membership.** Any municipality or association of municipalities organized under the laws of the State of North Dakota or any other state for the purpose, among other things, of constructing, operating and maintaining electric transmission and distribution lines; transmitting, distributing and selling electric energy and doing business within the geographic area served by a Class "A" Member, which is a member of the cooperative association holding a Class "A" Membership, which contracts for its electric power and/or energy from said Class "A" member and which is not eligible for Class "C" Membership may become a Class "B" Member.

After November 17, 1995, any entity holding a Class "B" Membership which Member does not meet the requirements of this revised Class "B" membership description shall be deemed to be disqualified from membership. The Membership fee of such member shall be returned and the membership certificate shall be deemed to be void. Any accumulated capital credits of such Class "B" Member shall remain the obligation of Basin Electric until retired in the normal course of business.

c.     **Class "C" Membership.** Any incorporated cooperative association organized under the laws of North Dakota, or under a cooperative law in any other state or any Public Power and Irrigation District organized under Chapter 70, Article 6 of the Nebraska Revised Statutes, for the purpose, among other things, of constructing, operating and maintaining electric transmission and distribution lines or systems transmitting, distributing, and selling electric energy and which is a Member of the cooperative association holding a Class "A" Membership in Basin Electric Power Cooperative and contracts for a portion of its electric power and/or energy from said Class "A" Member may become a Class "C" Member.

d.     **Class "D" Membership.** Any incorporated cooperative association, or a municipality or association of municipalities organized under the laws of North Dakota, or under the laws in any other state, for the purposes, among other things, of constructing, operating and maintaining electric transmission and distribution lines or systems and transmitting and selling electric energy, that contracts to purchase electric service from the Cooperative other than as a Class A, B or C Member, may become a Class "D" Member upon complying with Article I, Section 4, and executing a contract to purchase electric service from the Cooperative. Class "D" Members shall be collectively entitled to a single vote in District No. 9."

**Section 3, Membership Fee.** The membership fee for each class of membership in the Cooperative shall be as follows:

a.     Class "A" Membership:          $500.00
b.     Class "B" Membership:          $100.00
c.     Class "C" Membership:          $100.00
d.     Class "D" Membership:          $100.00

No membership certificate in the Cooperative shall be issued for less than the appropriate membership fee, nor until such membership fee has been fully paid for in cash. No dividend shall be paid upon the fee paid for membership in the Cooperative.

# PUBLIC VERSION — PRIVILEGED AND CONFIDENTIAL INFORMATION HAS BEEN REMOVED PURSUANT TO 18 C.F.R. § 388.112

**Section 4, Requirements for Membership.** Any party eligible for a class of membership as provided for in Article I of these Bylaws, upon payment of the appropriate fee for a class of membership applied for, may become a Member in Basin Electric Power Cooperative by:

a.      Executing a written application for the class of membership therein applied for;

b.      Agreeing to purchase electric service from the Cooperative or from a Class "A" Member in accordance with the provisions of these Bylaws for the class of membership applied for; and

c.      Agreeing to comply with and be bound by the Articles of Incorporation and Bylaws of the Cooperative and any rules and regulations adopted by the Board of Directors.

However, no municipality, association of municipalities, or incorporated cooperative association, except the incorporators of the Cooperative, shall become a Member unless and until it has been accepted for membership by the Board of Directors or the Members. No Member may hold more than one Membership in the Cooperative. Membership in the Cooperative shall not be transferable.

**Section 5, Membership Certificates.** Certificates representing membership in the Cooperative, shall state the restrictions or limitations upon its ownership voting, transfer or cancellation, and shall contain such other provisions and be in such form as shall be determined by the Board of Directors. Such certificates shall be signed by the President and by the Secretary of the Cooperative and shall be sealed with its seal. Each certificate, among other things, shall state in substance:

a.      That no dividends shall be payable upon the issuing price of membership in the Cooperative; provided, however, that this limitation shall not prohibit the payment of patronage credits except as provided in these Bylaws; and

b.      That all Members within the same class shall have the same rights, privileges, and duties; and that holders of Class "A" membership shall have one vote, and no more, by a duly authorized representative, as provided in these Bylaws; and

c.      That no membership shall be transferable and all certificates thereof shall be surrendered to the Cooperative upon a Member becoming ineligible for membership or upon the expiration of the corporation existence, dissolution or expulsion of the Member holding such certificate.

In case of a lost, destroyed or mutilated certificate, a new certificate may be issued thereafter upon such terms and such indemnity to the Cooperative as the Board of Directors may prescribe.

**Section 6, Expulsion of Members.** The Board of Directors of the Cooperative may, by the affirmative vote of not less than two-thirds (2/3) of the Members of the Board of Directors, expel any Member of the Cooperative, which shall have willfully violated or refused to comply with any of the provisions of the Articles of Incorporation or the Bylaws of the Cooperative or any rules or regulations promulgated by the Board of Directors or which shall have ceased to engage in or carry on in a substantial degree the business which made it eligible for membership in the Cooperative, or which shall have ceased to engage in or carry on in a substantial degree the business of transmitting, distributing and selling electric energy, or which, shall have failed to

# PUBLIC VERSION – PRIVILEGED AND CONFIDENTIAL INFORMATION HAS BEEN REMOVED PURSUANT TO 18 C.F.R. § 388.112

pay any debt or obligation due the Cooperative when the same shall have become due and payable.

Any Member so expelled who undertakes to comply with all of the provisions of the Articles of Incorporation, the Bylaws, and all rules and regulations promulgated by the Board of Directors may be reinstated as a Member by a vote of the Members at any annual or special meeting of the Members. Except in the instance of fresh violations or refusals to comply with the provisions of the Articles of Incorporation and of these Bylaws and of any rules or regulations promulgated by the Board of Directors, or the substantial cessation of the business which makes a cooperative eligible for membership in the Cooperative, the action of the Members with respect to any such reinstatement shall be final.

**Section 7, Termination of Membership.** If (i) the corporate existence of any Member shall expire or such Member shall be dissolved, (ii) any Member shall voluntarily withdraw from membership in the Cooperative, or (iii) any Member should be expelled from the Cooperative, the membership of such Member shall forthwith be canceled. In any such case, the Cooperative shall pay to such Member the value of its membership as shown by the books of the Cooperative on the date of such cancellation, but in no event shall such payment exceed the amount of the original issuing price of such membership. Such payment shall be made within sixty (60) days after the date of such cancellation. Interest shall not, in any case, be paid upon the value of any such membership determined as hereinabove provided.

**Section 8, Withdrawal of Membership.** Subject to the provisions of Section 7 of this Article I, a Member may withdraw from membership upon compliance with such equitable terms and conditions as the Board of Directors may prescribe; provided, however, that no Member shall be permitted to withdraw until it has met all its contractual obligations to the Cooperative.

**Section 9, Non-liability for Debts of Cooperative.** The property of the Members of the Cooperative shall not be subject to the payment of the corporate debts of the Cooperative, and no Member shall be individually liable for the corporate debts of the Cooperative except as may otherwise be agreed.

## ARTICLE II
### Meetings of Members

**Section 1, Annual Meeting.** Regular Annual Meetings of the Members of the Cooperative shall be held on such date as shall be fixed by the Board of Directors, for the purpose of electing Directors, passing upon reports covering the previous fiscal year and transacting such other business as may come before the meeting. If the election of Directors shall not be held on the day designated herein for any Annual Meeting, or at any adjournment thereof, the Board of Directors shall cause the election to be held at a special meeting of the Members as soon thereafter as conveniently may be. Failure to hold the Annual Meeting at the designated time shall not work a forfeiture or dissolution of the Cooperative.

**Section 2, Special Meetings.** Special meetings of the Members of the Cooperative may be called by the President or the Board of Directors, and the Board shall do so upon the written demand of at least twenty percent (20%) of the Members.

**Section 3, Notice.** Each Member shall be entitled to receive not less than twenty (20) days nor more than thirty (30) days written notice of the time and place of all meetings and of the purpose of all special meetings. The Notice for any Annual Meeting or for any Special Meeting shall

Document Accessed... PUBLIC VERSION — PRIVILEGED AND CONFIDENTIAL INFORMATION HAS BEEN REMOVED PURSUANT TO 18 C.F.R. § 388.112

# PUBLIC VERSION — PRIVILEGED AND CONFIDENTIAL INFORMATION HAS BEEN REMOVED PURSUANT TO 18 C.F.R. § 388.112

contain a copy of proposed amendments to the Articles of Incorporation, amendments to the Bylaws, or any resolutions which would enable the Cooperative to participate in any business purpose not previously authorized. Such notice shall be given by mail directed to each Member at its principal office as shown on the books of the Cooperative. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail, addressed to the Member at its address as it appears on the records of the Cooperative, with postage thereon prepaid. Any Member may waive in writing notice of any meeting of the Members.

**Section 4, Quorum.** Forty percent (40%) of the number of Class "A" Members, plus ten percent (10%) of the Class "C" Members of the Cooperative represented by their duly authorized representatives shall constitute a quorum for the transaction of business at all meetings of the Members of the Cooperative. If less than a majority of the Members shall be so represented at any meeting of the Members, a majority of such representatives present may adjourn the meeting from time to time without further notice.

**Section 5, Rules of Order.** Except as otherwise provided by law or these Bylaws, all regular and special meetings of the members shall be conducted according to Robert's Rules of Order Newly Revised.

**Section 6, Voting.** No Member of the Cooperative shall own more than one (1) membership and each Member shall be entitled to one (1) vote and no more in the affairs of the Cooperative, provided, however, when one or more Members merge or consolidate with another Member, the merged or consolidated entity shall be entitled to one (1) vote in the affairs of the Cooperative for each Member which consolidated or merged for a period of three (3) years after the merger or consolidation. At the expiration of the three (3) years, only the remaining Member shall be entitled to vote. Class B members of each Membership district shall be collectively entitled to one (1) vote per district. The vote of each Member of the Cooperative shall be cast by its duly authorized representative, evidenced by an instrument in writing, executed by its President and Secretary under its corporate seal, pursuant to a resolution duly adopted by the Board of Directors. At all meetings of the Members at which a quorum shall be present all elections shall be had and all questions decided by vote of a majority, except as otherwise specifically provided in these Bylaws or by law, of the authorized representatives of the Members present.

**Section 7, List of Members Entitled to Vote.** The Secretary of the Cooperative shall, at least two (2) days prior to each meeting of the Members of the Cooperative, make a complete list arranged in alphabetical order by district of the Members entitled to vote at such meeting and their respective addresses. Such list shall be produced and kept open at the time and place of each meeting and shall be subject to the inspection of any officer or duly authorized representative of any Member during the time of the meeting.

**Section 8, Order of Business.** The order of business at the regular Annual Meeting of the Members of the Cooperative and, so far as possible, at all other meetings of the Members, shall be as follows:

a.    Call of the roll.

b.    Reading of the notice of the meeting, together with the proof of the due giving thereof or the waiver or waivers of notice of such meeting.

c.    Presentation and reading of unapproved minutes of previous meetings of the Members and the taking of necessary action thereon.

Case 4:20-cv-04192-LLP Document 44-3 Filed 04/01/21 Page 143 of 211 PageID #: 785
Document Accession #: 20120727-5067 Filed Date: 07/27/2012

d.  Presentation and consideration of, and acting upon, reports of officers, directors and committees.

e.  Election of directors.

f.  Unfinished business.

g.  New business.

h.  Adjournment.

## ARTICLE III
### Directors - Territorial Districts

**Section 1, Districts.** The Directors of the Cooperative shall be elected for three (3) year terms from territorial districts. The territorial districts shall be as follows:

**District No. 1** (East River):  All Members organized under a cooperative or municipal law in any state, for the purpose, among other things, of constructing, operating and maintaining electric transmission and distribution lines or systems and whose principal place of business is located in Beadle, Bon Homme, Brown, Charles Mix, Clay, Codington, Davison, Day, Deuel, Douglas, Edmunds, Grant, Hughes, Kingsbury, Lake, Moody, Turner, or Union Counties, all in South Dakota; or Lincoln, Meeker, Redwood, Renville, Swift, Traverse or Watonwan Counties, Minnesota.

**District No. 2** (L&O):  All Members organized under a cooperative law in any state, for the purpose, among other things, of constructing, operating and maintaining electric transmission and distribution lines or systems and whose principal place of business is located in Jackson County, Minnesota; or Lyon or Osceola Counties, Iowa; or Moody County, South Dakota.

**District No. 3** (Central Power):  All Members organized under a cooperative law in any state, for the purpose, among other things, of constructing, operating and maintaining electric transmission and distribution lines or systems and whose principal place of business is located in Bottineau, Burleigh, Foster, McHenry, McLean, Sargent or Ward Counties, North Dakota.

**District No. 4** (NIPCO):  All Members organized under a cooperative or municipal law in any state, for the purpose, among other things, of constructing, operating and maintaining electric transmission and distribution lines or systems and whose principal place of business is located in Carroll, Crawford, Emmet, Harrison, Shelby, Sioux or Woodbury Counties, all in Iowa.

**District No. 5** (Tri-State):  All Members organized under a cooperative law in any state, or Chapter 70 of the Revised Statutes of Nebraska, for the purpose, among other things, of constructing, operating and maintaining electric transmission and distribution lines or systems and whose principal place of business is located in Adams, Chaffee, Delta, Denver, Grand, Gunnison, Larimer, La Plata, Lincoln, Montezuma, Montrose, Morgan, Otero, Phillips, Pueblo, Rio Blanco, Rio Grande or Washington Counties, all in Colorado; Box Butte, Cheyenne, Morrill, Perkins, Scotts Bluff or Sheridan Counties, all in

6

PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112

Nebraska; Cibola, Colfax, Luna, Mora, Otero, Rio Arriba, Sierra, Socorro, Torrance or Union Counties, all in New Mexico; or Big Horn, Carbon, Fremont, Goshen, Laramie, Niobrara, Park or Platte Counties, all in Wyoming.

**District No. 6** (Central Montana):  All Members organized under a cooperative law in any state, for the purpose, among other things, of constructing, operating and maintaining electric transmission and distribution lines or systems and whose principal place of business is located in Cascade, Hill, Park, Phillips, Teton, Toole, Valley or Yellowstone Counties, all in Montana.

**District No. 7** (Rushmore):  All Members organized under a cooperative law in any state, for the purpose, among other things, of constructing, operating and maintaining electric transmission and distribution lines or systems and whose principal place of business is located in Bennett, Butte, Custer, Dewey, Jones, Pennington, Todd or Walworth Counties, all in South Dakota.

**District No. 8** (Upper Missouri):  All Members organized under a cooperative law in any state, for the purpose, among other things, of constructing, operating and maintaining electric transmission and distribution lines or systems and whose principal place of business is located in Burke, Hettinger, McKenzie, Mercer or Williams Counties, all in North Dakota; or Carter, McCone, Richland, Sheridan, Treasure or Wibaux Counties, all in Montana.

**District No. 9:**  All Members which are Government Agencies, or whose principal business is other than the furnishing of electric service for resale whose principal place of business is located other than in the specific areas described in District 1 through 8, 10 and 11.

**District No. 10 (**Members 1st**)**:  All Members organized under the cooperative law in any state, for the purpose, among other things, of constructing, operating and maintaining electric transmission and distribution lines or systems and whose principal place of business is located in Crook County, Wyoming or Fergus or Rosebud Counties in Montana.

**District No. 11 (**Corn Belt**)**:  All Members organized under a cooperative law in any state, for the purpose, among other things, of constructing, operating and maintaining electric transmission and distribution lines or systems and whose principal place of business is located in Humboldt, Butler, Calhoun, Franklin, Carroll, Grundy, Emmet, Greene or Wright Counties, all in Iowa.

Any such member having a principal place of business in a county included in two such Districts described above may vote in each District for the nomination and election of a Director of this Cooperative. Such Member, however, shall have only one vote at meetings of the Membership; furthermore, no Member shall have more than one of their members serving as a Director of the Cooperative.

**Section 2, Amend Description.**

In the event of a merger or consolidation of Class C Members, the Secretary of the Cooperative is authorized to amend the description of the District or Districts in which such members are

PUBLIC VERSION - PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112

located upon approval by the Board of Directors of a new membership certificate in the name of the merged entity and without further action by the Membership to amend these Bylaws.

**Section 3, Nomination and Election of Director.**

The Members in such territorial Districts shall nominate and elect one (1) Director to become a member of the Board of Directors of this Cooperative. Except for District No. 9, in each year in which an election is provided for, the board of directors of the Class A Member in each such District shall set the time (which shall be no more than ninety (90) days prior to the Annual Meeting of the Members of this Cooperative) and place for the members of the District to meet and nominate and elect such Director. The secretary of such meeting shall certify the results of such election to this Cooperative at the Annual Meeting of Members. In each year in which an election is provided for, the Members of District No. 9 shall hold a meeting during the Annual Meeting of the Members of this Cooperative to nominate and elect a Director. The secretary of such meeting shall certify the results of such election to this Cooperative.

Except for District No. 9 and Districts authorized by the membership pursuant to Article III, Section 4, no District shall be entitled to elect a Director unless such District shall include an operating federated cooperative of Member distribution Cooperatives with principal places of business located in the enumerated district and providing to its Members the following minimum services and membership:

a.     Full time staff service.

b.     Central billing under contracts to furnish bulk electric service to its Members.

c.     Perform subtransmission facilities planning for delivery of bulk electric service to its Members.

d.     Maintain at least (3) Member distribution cooperatives.

e.     Hold regular meetings of its Board of Directors, at least quarterly.

Those Member systems that are collectively represented on the federated Cooperative's Board of Directors as one Membership Class or District shall be entitled to one collective vote in the election of the Director from that territorial District.

Except as otherwise provided, any District which shall not provide the minimum service and membership enumerated herein shall be automatically terminated, and the Members of the Cooperative having principal places of business located within the counties enumerated in said District shall thereafter vote in District No. 9.

**Section 4, Increase or Decrease in Membership.** In the case of an increase or decrease in the number of Class "A" Members of this Cooperative which limit their membership to similarly organized cooperative associations, municipalities or associations of municipalities, the Bylaws of the Cooperative shall be amended by increasing or decreasing, as the case may be, the number of Districts and the number of Directors, to the end that each such Class "A" Member

**PUBLIC VERSION - PRIVILEGED AND CONFIDENTIAL INFORMATION HAS BEEN REMOVED PURSUANT TO 18 C.F.R. § 388.112**

which limits its membership to similarly organized cooperative associations, municipalities or associations of municipalities shall constitute one District and elect one Director, and that all other cooperative associations, which are Class "A" Member distribution cooperatives or Class "D" Members of this Cooperative shall constitute one District collectively and elect one Director.

## ARTICLE IV
### Directors

### Section 1, General.

a.   The business and affairs of the Cooperative shall be managed by a Board of not less than five (5) nor more than fifteen (15) Directors; provided that the Bylaws may authorize the Board of Directors to appoint an executive committee from their own number to exercise such of the powers and functions of the Board as the Board may by resolution prescribe.

b.   The Directors from Districts No. 1, 2, 3, 4, 5, 6, 7, 8, 10 and 11 shall be chosen from persons who are directors of both a Class "A" and a Class "C" Member of the Cooperative. The Directors so chosen shall serve for a period of three (3) years as provided in the Bylaws and for so long as they shall be directors of Class "A" and Class "C" Members of the Cooperative, unless sooner removed from office.

c.   The Director from District No. 9 shall be chosen from persons who are directors of a Class "A" Member of the Cooperative. The Director so chosen shall serve for a period of three (3) years as provided in the Bylaws and for so long as they shall be directors of a Class "A" Member of the Cooperative, unless sooner removed from office.

The foregoing provision of this Section 1 which requires that a Director be a director of a Class "C" Member shall apply to all persons nominated and elected for the first time to the Board of Directors following the 1984 Annual Meeting of the Cooperative.

Nothing in this section shall affect in any manner whatsoever the validity of any action taken at any meeting of the Board of Directors.

**Section 2, Election and Tenure of Office.** Directors shall be elected for three (3) year terms and until their respective successors shall have been elected and shall have qualified, in the manner provided in these Bylaws. In the event the Articles of Incorporation of the Cooperative are amended by increasing the number of Directors as provided in Section 4 of Article III, then the number of Districts provided for in these Bylaws shall be increased to provide the same number of Districts as is provided for the number of Directors. No person shall continue to be a Director of the Cooperative after the Member of which such person is a director shall have ceased to be a Member of the Cooperative, or after such person shall have ceased to be a Director of the Member they represent.

**Section 3, Vacancy.** In the event a vacancy shall occur on the Board of Directors at any time more than ninety (90) days prior to the expiration of the term of the Director whose office is vacated, the Cooperative shall, within thirty (30) days after such vacancy shall occur, notify each Member of the Cooperative which is a member of the District that a vacancy exists in the office of Director for that District. No later than thirty (30) days after the date of such notice, the Members of the Cooperative, which are Members of said District, shall convene in caucus at such time and place as shall be agreeable to no less than sixty percent (60%) of those Members. Sixty percent (60%) of the Members located in said District, present by delegate and

# PUBLIC VERSION - PRIVILEGED AND
# CONFIDENTIAL INFORMATION HAS BEEN REMOVED
# PURSUANT TO 18 C.F.R. § 388.112

eligible to vote shall constitute a quorum for the conduct of business at said caucus. The first order of business at said caucus shall be the election of a Chairman and a Recording Secretary. The caucus shall then elect a nominee to fill the unexpired term of the Director for that District. The Recording Secretary of the caucus shall certify said nominee to the Cooperative. If the nominee of the District caucus shall meet the other qualifications provided in the Bylaws of the Cooperative for the office of Director of the Cooperative, the remaining Members of the Board of Directors of the Cooperative shall appoint said nominee to fill the unexpired term of the Director for that District, and until their successor shall have been elected and qualified.

In the event a vacancy shall occur in the Board of Directors at any time less than ninety (90) days prior to the expiration of the term of office of Director for that District, the vacancy shall be filled by the vote of the Members of the District in the manner otherwise provided for election of Directors.

**Section 4, Removal of Directors by Members.** Any Member may bring charges against a Director for cause by filing them in writing with the Secretary, together with a petition signed by at least twenty percent (20%) of the Members requesting the removal of the Director in question. The removal shall be voted upon at the next regular or special meeting of the Members. The Director against whom such charges have been brought shall be informed in writing of the charges 30 days prior to the meeting and shall have an opportunity at the meeting to be heard in person or by counsel and to present evidence; and the person or persons bringing the charges against them shall have the same opportunity. Any vacancy pursuant to this Section 4 may be filled in the manner prescribed in Section 3 of Article IV of these Bylaws.

**Section 5, General Power.** The Board of Directors shall have power to make and adopt such rules and regulations, not inconsistent with these Bylaws of the Cooperative, as it may deem advisable for the management, administration and regulation of the business and affairs of the Cooperative.

**Section 6, Compensation.** The Directors shall not receive salaries for their services, but by resolution of the Board of Directors, a fixed sum may be allowed any Director not otherwise receiving compensation as hereinafter provided, for attendance at each regular or special meeting of the Board of Directors, and expenses of attendance, if any. Any Director representing the Cooperative on any duty authorized by the Board of Directors other than regular or special meetings of the Board of Directors, shall receive such fixed sum and expenses, if any, as shall be fixed by the Board of Directors. Except in emergencies, no Director shall receive compensation for serving the Cooperative in any other capacity, unless authorized by a vote of the Board of Directors.

**Section 7, Conflict of Interest.** No person shall be eligible to become or remain a Director or to hold any position of trust in the Cooperative who is in any way employed by or financially interested in a competing enterprise or a business selling electric energy or supplies to the Cooperative. No person shall be eligible to serve on the Board of Directors of the Cooperative if any member of his/her immediate family is then an employee of the Cooperative; and no person shall be eligible to be employed by the Cooperative if he/she is a member of the immediate family of a Director or the General Manager of the Cooperative. For the purpose of this section, the term "immediate family" shall mean spouse, son, daughter, parent, grandchild, grandfather, grandmother, brother, or sister, and shall include such relatives through marriage. Nothing in this section contained shall, or shall be construed to, affect in any manner whatsoever the validity of any action taken at any meeting of the Board of Directors.

Document accessed via 114-2 LexisNexis Courtlink or 18-21 Filed: 05/11/21 Page 148 of 211

# PUBLIC VERSION – PRIVILEGED AND CONFIDENTIAL INFORMATION HAS BEEN REMOVED PURSUANT TO 18 C.F.R. § 388.112

**Section 8, Accounting Systems and Reports.** The Board of Directors shall cause to be established and maintained a complete accounting system, which, among other things, subject to applicable laws and rules and regulations of any regulatory body, shall conform to such accounting system as may from time to time be designated by the Administrator of the Rural Utilities Service of the United States of America. All accounts of the Cooperative may be examined by a committee of the Board of Directors, as may be directed by the Board of Directors. The Board of Directors shall also, after the close of the fiscal year, cause to be made a full and complete audit of the accounts, books and financial condition of the Cooperative as of the end of such fiscal year. Such audit report shall be submitted to the Members at the following Annual Meeting of Members.

**Section 9, Delegate.** The Board of Directors shall have full power and authority on behalf of the Cooperative to select one or more of the Directors (a) to attend any meeting of the Members or security holders of another cooperative or other corporation of which the Cooperative may be a member or otherwise hold securities, and (b) to vote on behalf of this Cooperative. At such meeting, the Director or Directors so selected shall possess and may exercise the rights and powers incident to the ownership of such membership certificates or securities as the Cooperative possesses. The Board of Directors may, from time to time, confer or delegate such powers to one or more other persons.

**Section 10, Authority to Sell and Encumber.** The Board of Directors shall have full power and authority on behalf of the Cooperative to purchase, sell, transfer or encumber any and all membership certificates or other securities of any other cooperative or corporation owned by the Cooperative, and may execute and deliver such documents as may be necessary to effectuate such purchase, sale, transfer or encumbrance. The Board of Directors may, from time to time, confer or delegate such powers to one or more other persons.

## ARTICLE V
## Meetings of Directors

**Section 1, Regular Meetings.** A regular meeting of the Board of Directors shall be held without notice other than this Bylaw, immediately after, and at the same place, as each regular Annual Meeting of the Members of the Cooperative. A regular meeting of the Board of Directors shall also be held monthly and at such time and place as the Board may provide by resolution. Such regular monthly meeting may be held without notice other than such resolution fixing the time and place thereof.

**Section 2, Special Meetings.** Special meetings of the Board of Directors may be called by the President or any three (3) or more Directors. The President or any three or more Directors who shall, pursuant hereto, call a special meeting of the Board of Directors shall fix the time and place for the holding of any such special meeting of the Board of Directors called by them.

**Section 3, Notice.** Notice of the time, place and purpose of any special meeting shall be given at least two (2) days previous thereto by written notice, delivered personally or mailed to the Directors at their last known address. Any Director may waive notice of any meeting. The attendance of a Director at any meeting shall constitute a waiver of notice of such meeting, except in the event that a Director shall attend a meeting for the express purpose of objecting to the transaction of any business because the meeting shall not have been lawfully called or convened.

11

# PUBLIC VERSION – PRIVILEGED AND
# CONFIDENTIAL INFORMATION HAS BEEN REMOVED
# PURSUANT TO 18 C.F.R. § 388.112

**Section 4, Quorum.** A majority of the Board of Directors shall constitute a quorum for the transaction of business at any meeting of the Board of Directors; provided, that if less than a majority of the Directors shall be present at said meeting, a majority of the Directors present may adjourn the meeting from time to time without further notice. The act of the majority of the Directors present at a meeting at which a quorum is present shall be the act of the Board of Directors.

**Section 5, Presence at Meetings.** Any or all Directors may participate in any meeting of the Board of Directors, or of any duly constituted committee thereof, by any means of communication through which the Directors may simultaneously hear and speak to each other during such meeting. For the purposes of establishing a quorum and taking any action, such Directors participating pursuant to this Section 5 shall be deemed present in person at the meeting.

<div align="center">

**ARTICLE VI**
**Officers**

</div>

**Section 1, Officers.** The officers of the Cooperative shall be a President, Vice President, Secretary, Assistant Secretary, Treasurer, and such other officers as may be determined by the Board of Directors from time to time. The offices of Secretary and of Treasurer may be held by the same person.

**Section 2, Election.** The officers of the Cooperative, except one Assistant Secretary, shall be elected by ballot, annually by and from the Board of Directors at the first meeting of the Board of Directors held after each regular meeting of the Members of the Cooperative. One Assistant Secretary may be elected by the Board of Directors, but shall not be required to be a Member of the Board of Directors. Each officer shall hold office until the next Annual Meeting of the Board of Directors and until their successor shall have been chosen and shall qualify, unless removed as hereinafter provided. The Directors may also choose and may remove such officers and employees as they deem proper.

**Section 3, Removal.** At any meeting called for that purpose, any officer of the Cooperative may be removed by a vote of a majority of the Members of the Cooperative.

**Section 4, Vacancy.** A vacancy in any office may be filled by the Board of Directors for the unexpired portion of the term.

**Section 5, President.** The President:

a.     Shall be the principal executive officer of the Cooperative and shall preside at all meetings of the Members of the Cooperative and of the Board of Directors;

b.     Shall sign, with the Secretary, certificates of membership, the issue of which shall have been authorized by resolution of the Board of Directors, and may sign any deeds, mortgages, deeds of trust, notes, bonds, contracts or other instruments authorized by the Board of Directors to be executed, except in cases in which the signing and execution thereof shall be expressly delegated by the Board of Directors or by these Bylaws to some other officer or agent of the Cooperative, or shall be required by law to be otherwise signed or executed; and

Case 4:20-cv-04212-SOH Document 34 Filed 05/01/21 Page 150 of 211 PageID #: 792

# PUBLIC VERSION – PRIVILEGED AND CONFIDENTIAL INFORMATION HAS BEEN REMOVED PURSUANT TO 18 C.F.R. § 388.112

c.  In general shall perform all duties incident to the office of President and such other duties as may be prescribed by the Board of Directors from time to time.

**Section 6, Vice President.** In the absence of the President, or in the event of their inability or refusal to act, the Vice President shall perform the duties of the President, and when so acting, shall have all powers of and be subject to all restrictions upon the President and shall perform such other duties as from time to time may be assigned to them by the Board of Directors.

**Section 7, Secretary.** The Secretary shall:

a.  Keep the minutes of the meetings of the Members and the Board of Directors in one or more books provided for that purpose;

b.  See that all notices are duly given in accordance with these Bylaws or as required by law;

c.  Be custodian of the corporate records and of the seal of the Cooperative and see that the seal of the Cooperative is affixed to all certificates for membership prior to the issue thereof and to all documents, the execution of which on behalf of the Cooperative under its seal is duly authorized in accordance with the provisions of these Bylaws;

d.  Keep a register of the post office address of each Member which shall be furnished to the Secretary by such Member;

e.  Sign with the President certificates for membership in the Cooperative, the issue of which, subject to the provisions of these Bylaws, shall have been authorized by resolution of the Board of Directors; and

f.  In general perform all duties incident to the office of Secretary and such other duties as from time to time may be assigned to them by the Board of Directors.

**Section 8, Assistant Secretary.** In the absence of the Secretary, or in the event of their inability or refusal to act, the Assistant Secretary shall perform the duties of the Secretary, and when so acting, shall have all the powers of and be subject to all the restrictions upon the Secretary and shall perform such other duties as from time to time may be assigned to them by the Board of Directors.

**Section 9, Treasurer.** The Treasurer shall:

a.  Have charge and custody of and be responsible for all funds and securities of the Cooperative;

b.  Receive and give receipts for monies due and payable to the Cooperative from any source whatsoever, and deposit all such monies in the name of the Cooperative in such banks as shall be selected in accordance with the provisions of Section 2 of Article X of these Bylaws; and

c.  In general perform all the duties incident to the office of Treasurer and such other duties as from time to time may be assigned to them by the Board of Directors.

Case 4:20-cv-04058-KES Document 34-1 Filed 07/01/21 Page 151 of 211 PageID #: 793

# PUBLIC VERSION – PRIVILEGED AND
# CONFIDENTIAL INFORMATION HAS BEEN REMOVED
# PURSUANT TO 18 C.F.R. § 388.112

**Section 10, Non-Director Assistant Secretary.** Should the Board of Directors elect an Assistant Secretary who is not a Member of the Board of Directors, such Assistant Secretary, in the absence of the Secretary and the Assistant Secretary who is a Member of the Board of Directors, shall perform the duties of the Secretary, and when so acting, shall have all the powers of and be subject to all the restrictions upon the Secretary, and perform such other duties as from time to time may be assigned to them by the Board of Directors.

**Section 11, General Manager.** The Board of Directors may appoint a General Manager who may be, but who shall not be required to be, a member of any incorporated cooperative association which is a Member of the Cooperative. The Board of Directors may by resolution designate such additional titles as it deems necessary and as permitted by law. The General Manager shall perform such duties as the Board of Directors may from time to time require and shall have such authority as the Board of Directors may from time to time vest in that position. The salary of the General Manager shall be fixed by the Board of Directors.

**Section 12, Bonds.** The Board of Directors shall require the Treasurer and any Manager and any other officer or employee of the Cooperative charged with responsibility for the custody of any of its funds or property to give bonds for the faithful discharge of their duties, in such form and containing such terms and conditions and with such surety and sureties as the Board of Directors shall determine.

**Section 13, Salary.** The salaries of the officers of the Cooperative shall be fixed from time to time by the Members, and no officer shall be prevented from receiving such salary by reason of the fact that they are also a Director of the Cooperative. The salaries, duties and terms of employment of all other employees of the Cooperative shall be fixed and determined by the Board of Directors.

**Section 14, Fiscal Report.** The officers of the Cooperative shall submit at each regular Annual Meeting of the Members reports covering the business of the Cooperative for the previous fiscal year and showing the condition of the Cooperative at the close of such fiscal year.

## ARTICLE VII
## Board Committees

**Section 1, Appointment of Executive Committee.** The Board of Directors shall have the power, by resolution, to appoint an Executive Committee consisting of four (4) Members of the Board, two (2) of whom shall be the President and Secretary. The Executive Committee shall hold office at the pleasure of the Board of Directors and shall exercise such powers of the Board as the Board may by resolution delegate to it; and it may be given responsibility for the general direction and management of the Cooperative when the Board of Directors is not in session.

**Section 2, Executive Committee Meetings.** The Executive Committee shall make rules for the calling of its meetings and the conduct of its business. Three (3) members of the Executive Committee shall constitute a quorum for the transaction of its business. Record of all business transacted at meetings of the Executive Committee shall be kept by the Secretary and preserved with the minutes of the meetings of the Board of Directors and the Members.

**Section 3, Audit Committee.** The Board of Directors shall have the power, by resolution, to appoint an Audit Committee consisting of a minimum of five (5) members of the Board to such a committee, one of whom shall be the Secretary. The Audit Committee shall: (1) recommend to the Board of Directors the retention and when appropriate, the termination of the independent

# PUBLIC VERSION – PRIVILEGED AND
# CONFIDENTIAL INFORMATION HAS BEEN REMOVED
# PURSUANT TO 18 C.F.R. § 388.112

certified public accounting firm to serve as the Cooperative's outside auditing firm, (2) negotiate and approve compensation of the auditor on behalf of the Board of Directors, (3) confer with the auditor to the satisfaction of the Audit Committee that the financial affairs of the Cooperative are in order, (4) review and determine whether to accept the audit and (5) approve the performance of any non-audit services provided to the Cooperative by the auditing firm. Record of all business transacted at meetings of the Audit Committee shall be kept by the Secretary and preserved with the minutes of the meetings of the Board of Directors and the Members.

**Section 4, Advisory Committees.** The Board of Directors shall have the power, by resolution, to appoint one or more Advisory Committees, each consisting of a minimum of three (3) members of the Board. Advisory Committees may not exercise the authority of the Board of Directors to make decisions on behalf of the Cooperative, but are restricted to making recommendations to the Board of Directors. Each Advisory Committee shall determine its meeting rules and whether minutes shall be kept.

## ARTICLE VIII
## Non-Profit Operation

**Section 1, Interest or Dividends on Capital Prohibited.** The Cooperative shall at all times be operated on a cooperative non-profit basis for the mutual benefit of its patrons. No interest shall be paid or payable by the Cooperative on any capital furnished by its patrons.

**Section 2, Patronage Capital in Connection with Furnishing Electric Service.** In the furnishing of electric service, the Cooperative's operation shall be so conducted that all patrons will, through their patronage, furnish capital for the Cooperative. In order to induce patronage and to assure that the Cooperative will operate on a non-profit basis, the Cooperative is obligated to account on a patronage basis to all its patrons for all amounts received and receivable from the furnishing of electric energy in excess of the sum of (a) operating and maintenance expenses, taxes, depreciation or principal and interest on outstanding obligations, and expenses properly chargeable against the furnishing of electric energy, and (b) to the extent of such amount as may be determined by the Board of Directors, to (i) offset any losses incurred during the current or any prior fiscal year, (ii) to reduce future rates to member patrons, (iii) abate current charges for electric energy, or (iv) otherwise return such amounts to the patrons on a pro-rata basis according to the amount of business done with each patron during the year. Any non-operating margins shall be applied to reduce the operating costs and expenses of furnishing electric service. All such amounts in excess of operating costs and expenses are received with the understanding that they are furnished by the patrons as capital. The Cooperative is obligated to pay by credits to a capital account for each patron all such amounts in excess of operating costs and expenses. The books and records of the Cooperative shall be set up and kept in such a manner that at the end of each fiscal year the amount of capital, if any, so furnished by each patron is clearly reflected and credited in an appropriate record to the capital account of each patron, and the Cooperative shall within a reasonable time after the close of the fiscal year notify each patron of the amount of capital so credited to their account. All such amounts credited to the capital account of any patron shall have the same status as though they had been paid to the patron in cash in pursuance of a legal obligation to do so and the patron had then furnished the Cooperative corresponding amounts for capital.

Subject to the limitations on the use of deferred revenues for the purposes described in this Article VIII, the Board of Directors shall determine the amount of any revenue deferral, not to exceed three hundred million dollars ($300,000,000.00) for the fiscal

**PUBLIC VERSION – PRIVILEGED AND CONFIDENTIAL INFORMATION HAS BEEN REMOVED PURSUANT TO 18 C.F.R. § 388.112**

years ending December 31, 2018 through December 31, 2023 and two hundred million dollars ($200,000,000.00) thereafter, and such deferred revenues must be used for purposes described herein within a period of ten (10) years after the revenue is initially collected and deposited.

All other amounts received by the Cooperative from its operations in excess of costs and expenses shall, insofar as permitted by law, be (a) used to offset any losses incurred during the current or any prior fiscal year, and (b) used to fund such reserves for improvement, new construction, depreciation and contingencies as the Board of Directors may prescribe from time to time, and to the extent not needed for those purposes, such amounts received by the Cooperative from its operations in excess of costs and expenses shall be allocated to its patrons on a patronage basis and any amount so allocated shall be included as part of the capital credited to the accounts of patrons, as herein provided.

The Board of Directors shall have the power to adopt rules providing for the separate retirement of that portion ("other cooperative portion") of capital credited to the accounts of patrons which corresponds to capital credited to the account of the Cooperative by fuel supply or financial services cooperatives of which this Cooperative is a Member. Such rules shall (a) establish a method for determining the other cooperative portion of capital credited to each patron for each applicable fiscal year, (b) provide for separate identification on the Cooperative's books of the other cooperative portion of capital credited to the Cooperative's patrons, (c) provide for appropriate notifications to patrons with respect to the other cooperative portion of capital credited to their accounts, and (d) preclude a general retirement of the other cooperative portion of capital credited to patrons for any fiscal year prior to retirement of such capital credits by such fuel supply or financial services cooperative.

In the event of dissolution or liquidation of the Cooperative, after all outstanding indebtedness of the Cooperative shall have been paid, outstanding capital credits shall be retired without priority on a pro-rata basis before any payments are made on account of property rights of Members. If, at any time prior to the dissolution or liquidation, the Board of Directors shall determine that the financial condition of the Cooperative will not be impaired thereby, the capital then credited to patrons' accounts may be retired in full or in part in the order of priority according to the year in which the capital was furnished and credited, the capital first received by the Cooperative being the first retired. Any such retirements of capital shall be made in accordance with the laws of the state of North Dakota, the Articles of Incorporation, these Bylaws and the financial covenants set forth in the Cooperative's indenture and other financing agreements, provided however, for any fiscal year after December 30, 2018, to the extent the Cooperative's consolidated net margin and earnings for the year exceed the targeted consolidated net margin the Board of Directors deems necessary in order to maintain an "A" rating from the nationally recognized statistical rating agencies, the Board of Directors may retire the capital representing such excess, or a portion of such capital, on a last-in, first-out basis, provided such payment is made in the following fiscal year.

Capital credited to the account of each patron shall be assignable only on the books of the Cooperative pursuant to written instruction from the assignor and only to the successors in interest in the business or the physical assets of such patron served by the Cooperative unless the Board of Directors, acting under policies of general application, shall determine otherwise.

The provisions of the first, second, third, fourth and fifth paragraphs of this Section 2 shall not apply to any patron receiving a class of service not requiring contributions of capital.

PUBLIC VERSION — PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112

The patrons of the Cooperative, by dealing with the Cooperative, acknowledge that the terms and provisions of the Articles of Incorporation and Bylaws shall constitute and be a contract between the Cooperative and each patron, and both the Cooperative and patrons are bound by such contract, as fully as though each patron had individually signed a separate instrument containing such terms and provisions. The provisions of this Article of the Bylaws shall be called to the attention of each patron of the Cooperative by posting in a conspicuous place in the Cooperative's office.

**Section 3, Patronage Refunds in Connection with Furnishing Other Services.** In the event that the Cooperative should engage in the business of furnishing goods or services other than electric service, to patrons other than those receiving such service under a class of service which does not provide for contributions of capital, all amounts received and receivable therefrom which are in excess of costs and expenses properly chargeable against the furnishing of such goods or services may be used to offset any losses associated with the providing of such goods or services incurred during the current or any prior fiscal year or to fund reserves for improvement, new construction, depreciation and contingencies, all in such amounts as may be determined by the Board of Directors, and the remaining excess amount shall, insofar as permitted by law, be prorated annually on a patronage basis and returned to those patrons from whom such amounts were obtained.

**Section 4, Capital Credits.** All capital credited to the account of each Member shall continue to be the obligation of the Cooperative to such Member until paid or otherwise discharged in accordance with the provisions of the Articles of Incorporation and Bylaws of the Cooperative; provided, however, that should any Member (i) voluntarily withdraw from membership in the Cooperative, (ii) be expelled from the Cooperative, or (iii) be dissolved or have its corporate existence expire other than by reason of merger or consolidation with another member, the capital credited to the account of such Member shall be forfeited and the amount thereof shall be credited to the capital account of each remaining Member in the proportion which the capital balance in the account of each such Member on such date bears to the total capital balance in the accounts of all such Members on such date.

### ARTICLE IX
### Fiscal Year

The fiscal year of the Cooperative shall begin on the first (1st) day of January in each year and end on the thirty-first (31st) day of December in each year.

### ARTICLE X
### Deposits, Checks and Execution of Instruments

**Section 1, Checks, Drafts, Etc.** All checks, drafts or other orders for the payment of money, notes, bonds or other evidences of indebtedness in the name of the Cooperative shall be signed by such officer or officers, agent or agents, employee or employees of the Cooperative, as may be authorized so to do by the Board of Directors, and in such manner as shall from time to time be determined by resolution of the Board of Directors.

**Section 2, Deposits.** All funds of the Cooperative shall be deposited from time to time to the credit of the Cooperative in such bank or banks as the Board of Directors may select.

PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112

**Section 3, Authorization to Contract.** The Board of Directors may authorize any officer or officers, agent or agents to enter into any contract or execute and deliver any instrument in the name and on behalf of the Cooperative, and such authority may be general or confined to specific instances.

**Section 4, Indemnification of Officers, Directors and Employees; Insurance.**

a.   The Cooperative shall indemnify any person who was or is a party or is threatened to be made a party to any threatened pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the Cooperative) by reason of the fact that they are or were a Director, officer or employee of the Cooperative, or are or were serving at the request of the Cooperative as a Director, officer or employee of another corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by them in connection with such action, suit or proceeding if they acted in good faith and in a manner they reasonably believed to be in or not opposed to the best interests of the Cooperative and, with respect to any criminal action or proceeding, had no reasonable cause to believe their conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which they reasonably believed to be in or not opposed to the best interests of the cooperative, and, with respect to any criminal action or proceeding, had reasonable cause to believe that their conduct was unlawful.

b.   The Cooperative shall indemnify any person who was or is a party or is threatened to be made a party to any threatened pending or completed action or suit by or in the right of the Cooperative to procure a judgment in its favor by reason of the fact that they are or were a Director, officer or employee of the Cooperative or are or were serving at the request of the Cooperative as a Director, officer or employee of another corporation, partnership, joint venture, trust or other enterprise against expenses (including attorneys' fees) actually and reasonably incurred by them in connection with the defense or settlement of such action or suit if they acted in good faith and in a manner they reasonably believed to be in or not opposed to the best interests of the cooperative and except that no indemnification shall be made in respect to any claim, issue or matter as to which such person shall have been adjudged to be liable for negligence or misconduct in the performance of their duty to the Cooperative unless and only to the extent that the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which such court shall deem proper.

c.   To the extent that a Director, officer or employee of an Cooperative has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in subsections (a) and (b), or in defense of any claim, issue or matter therein, they shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by them in connection therewith.

d.   Any indemnification under the foregoing provision of this section (unless ordered by a court) shall be made by the Cooperative only as authorized in the specific case upon a determination that indemnification of the Director, officer or employee is proper in the

# PUBLIC VERSION - PRIVILEGED AND CONFIDENTIAL INFORMATION HAS BEEN REMOVED PURSUANT TO 18 C.F.R. § 388.112

circumstances because they have met the applicable standard of conduct as set forth in subsections (a) and (b). Such determination shall be made (i) by the Board of Directors by a majority vote of a quorum consisting of Directors who were not parties to such action, suit or proceeding, or (ii) if such quorum is not obtainable, or, even if obtainable a quorum of disinterested Directors so directs, by independent legal counsel in a written opinion, or (iii) by the Members of the Cooperative.

e.   Expenses incurred in defending a civil or criminal action, suit or proceeding may be paid by the Cooperative in advance of the final disposition of such action, suit or proceeding as authorized by the Board of Directors in the specific case upon receipt of an undertaking by or on behalf of the Director, officer or employee to repay such amount unless it shall ultimately be determined that they are entitled to be indemnified by the Cooperative as authorized in this section.

f.   The indemnification provided by this section shall not be deemed exclusive of any other rights to which those seeking indemnity may be entitled under any Bylaw, agreement, vote of Members or disinterested Directors or otherwise, both as to action in their official capacity and as to action in another capacity while holding such office, and shall continue as to a person who has ceased to be a Director, officer or employee and shall inure to the benefit of the heirs, executors and administrators of such a person.

g.   The Cooperative may purchase and maintain insurance on behalf of any person who is or was a Director, officer or employee of the Cooperative, or is or was serving at the request of the Cooperative as a Director, officer or employee of another corporation, partnership, joint venture, trust or other enterprise against any liability asserted against them and incurred by them in any such capacity, or arising out of their status as such whether or not the Cooperative would have the power to indemnify them against such liability under the provisions of this section.

## ARTICLE XI
### Amendments

Except as provided in Article III, Section 2, with respect to amending the description of Districts in the event of merger or consolidation, these Bylaws may be altered, amended or repealed only by the Members at any regular or special meeting. The notice of any meeting of Members at which such action is taken shall contain notice of the proposed alteration, amendment or repeal.

* * * * * * *

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

# ATTACHMENT 16

# <u>CONFIDENTIAL</u>

Protected Materials containing confidential and privileged information have been removed from the public version.

# BASIN ELECTRIC BOARD MINUTE MEETING NOTES DATED JULY 15-17, 2014

Document: ESPROV62570410656 Received 11/17/2018 PM 10:46:03

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

# ATTACHMENT 17

# <u>CONFIDENTIAL</u>

Protected Materials containing confidential and privileged information have been
removed from the public version.

# FINANCIAL SERCICES PRESENTATION DATED
SEPTEMBER 8, 2014

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

# ATTACHMENT 18

# <u>CONFIDENTIAL</u>

Protected Materials containing confidential and privileged information have been removed from the public version.

# BASIN ELECTRIC BOARD MINUTE MEETING NOTES DATED JANUARY 13-15, 2015

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

# ATTACHMENT 19

# <u>CONFIDENTIAL</u>

Protected Materials containing confidential and privileged information have been removed from the public version.

# BASIN ELECTRIC BOARD MINUTE MEETING NOTES DATED MAY 12, 2015

**PUBLIC VERSION – PRIVILEGED AND**
**CONFIDENTIAL INFORMATION HAS BEEN REMOVED**
**PURSUANT TO 18 C.F.R. § 388.112**

# ATTACHMENT 20

# <u>CONFIDENTIAL</u>

Protected Materials containing confidential and privileged information have been removed from the public version.

# BASIN ELECTRIC POWER COOPERATIVE
# MOODY'S INVESTORS SERVICE REPORT
# DATED MAY 26, 2015

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

# ATTACHMENT 21

# <u>CONFIDENTIAL</u>

Protected Materials containing confidential and privileged information have been
removed from the public version.

# MANAGERS ADVISORY COMMITTEE MEETING SUMMARY DATED JANUARY 20, 2016

Document ID: 20170914-0156 Accession No: 20170914-5078

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

# ATTACHMENT 22

# <u>CONFIDENTIAL</u>

Protected Materials containing confidential and privileged information have been
removed from the public version.

# BASIN ELECTRIC COOPERATIVE UPDATE BY ALLEN THIESSEN DATED MARCH 2016

Document ...

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

# ATTACHMENT 23

# <u>CONFIDENTIAL</u>

Protected Materials containing confidential and privileged information have been removed from the public version.

# BASIN ELECTRIC BOARD MINUTE MEETING NOTES DATED MARCH 15-17, 2016

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

# ATTACHEMENT 24

# <u>CONFIDENTIAL</u>

Protected Materials containing confidential and privileged information have been
removed from the public version.

# BASIN ELECTRIC BOARD MINUTE MEETING NOTES
# DATED APRIL 12-13, 2016

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

# ATTACHMENT 25

# <u>CONFIDENTIAL</u>

Protected Materials containing confidential and privileged information have been removed from the public version.

# BASIN ELECTRIC COOPERATIVE UPDATE BY ALLEN THIESSEN DATED APRIL 2016

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

# ATTACHMENT 26

# <u>CONFIDENTIAL</u>

Protected Materials containing confidential and privileged information have been removed from the public version.

# BASIN ELECTRIC COOPERATIVE UPDATE BY ALLEN THIESSEN DATED MAY 2016

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

# ATTACHMENT 27

# <u>CONFIDENTIAL</u>

Protected Materials containing confidential and privileged information have been
removed from the public version.

# BASIN ELECTRIC BOARD MINUTE MEETING NOTES
# DATED JUNE 14-15, 2016

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

# ATTACHMENT 28

# <u>CONFIDENTIAL</u>

Protected Materials containing confidential and privileged information have been removed from the public version.

# BASIN ELECTRIC COOPERATIVE UPDATE BY ALLEN THIESSEN DATED JUNE 2016

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

# ATTACHMENT 29

# <u>CONFIDENTIAL</u>

Protected Materials containing confidential and privileged information have been removed from the public version.

# EMAIL CHAIN DATED JUNE 14, 2016

Document 1:20-cv-01927 Ruhr Document 23-14 Filed 11/20/2016

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

# ATTACHMENT 30

# <u>CONFIDENTIAL</u>

Protected Materials containing confidential and privileged information have been
removed from the public version.

# EMAIL CHAIN DATED JUNE 17, 2016

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

# ATTACHMENT 31

# <u>CONFIDENTIAL</u>

Protected Materials containing confidential and privileged information have been
removed from the public version.

# EMAIL CHAIN DATED JUNE 17, 2016

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

# ATTACHMENT 32

# <u>CONFIDENTIAL</u>

Protected Materials containing confidential and privileged information have been removed from the public version.

# EMAIL CHAIN DATED JUNE 15, 2016

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

# ATTACHMENT 33

# <u>CONFIDENTIAL</u>

Protected Materials containing confidential and privileged information have been
removed from the public version.

# EMAIL CHAIN AND ATTACHMENT OF CLASS A
QUESTIONS TO BASIN ELECTRIC DATED
AUGUST 26, 2016

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

# ATTACHMENT 34

# <u>CONFIDENTIAL</u>

Protected Materials containing confidential and privileged information have been
removed from the public version.

# EMAIL CHAIN AND ATTACHMENT OF MEMBERSHIP RESPONSES – ALL – AUGUST 2016 DATED OCTOBER 18, 2016

Document Case 4:20-cv-04192-LLR Document 23-14 Filed 01/20/21 Page 176

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

# ATTACHMENT 35

# <u>CONFIDENTIAL</u>

Protected Materials containing confidential and privileged information have been
removed from the public version.

# MANAGER'S ADVISORY COMMITTEE MEETING
# NOTES DATED JANUARY 18, 2016

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

# ATTACHMENT 36

# <u>CONFIDENTIAL</u>

Protected Materials containing confidential and privileged information have been
removed from the public version.

# BASIN ELECTRIC BOARD MINUTE MEETING NOTES
# DATED JULY 11-12, 2017

Document Case: 2 iTeV-04192LLR5 Document 23-14 Filed 11/20/2018

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

# ATTACHMENT 37

# <u>CONFIDENTIAL</u>

Protected Materials containing confidential and privileged information have been removed from the public version.

# MEMBERS MANAGER'S CONFERENCE SUMMARY
# DATED JULY 19, 2017

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

# ATTACHMENT 38

# <u>CONFIDENTIAL</u>

Protected Materials containing confidential and privileged information have been removed from the public version.

# UMPC'S MAC ROUND TABLE COMMENTARY DATED AUGUST 1, 2017

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

# ATTACHMENT 39

# <u>CONFIDENTIAL</u>

Protected Materials containing confidential and privileged information have been removed from the public version.

# BASIN ELECTRIC POWER COOPERATIVE & SUBSIDIARIES FINANCIAL FORESCASTS 2018-2027

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

# ATTACHMENT 40

# <u>CONFIDENTIAL</u>

Protected Materials containing confidential and privileged information have been
removed from the public version.

# BASIN ELECTRIC BOARD MINUTE MEETING NOTES
# DATED SEPTEMBER 12-14, 2017

Document Case 4:20-cv-04192-LLR Document 23-14 Filed 01/20/21 Page 2017

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

# ATTACHMENT 41

# <u>CONFIDENTIAL</u>

Protected Materials containing confidential and privileged information have been
removed from the public version.

# EMAIL CHAIN DATED SEPTEMBER 15, 2017

Document Case: 20-cv-04192-LLP Document 23-14 Filed 11/20/2017

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

# ATTACHMENT 42

# <u>CONFIDENTIAL</u>

Protected Materials containing confidential and privileged information have been removed from the public version.

# BASIN ELECTRIC'S STRATEGIC PLANNING SESSION #2 BY ALLEN THIESSEN DATED SEPTEMBER 20, 2017

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

# ATTACHMENT 43

# <u>CONFIDENTIAL</u>

Protected Materials containing confidential and privileged information have been removed from the public version.

# BASIN ELECTRIC COOPERATIVE UPDATE BY ALLEN THIESSEN DATED DECEMBER 2017

Document Case 4:20-cv-04192-LLP Document 23-14 Filed 11/20/20 Page

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

# ATTACHMENT 44

# <u>CONFIDENTIAL</u>

Protected Materials containing confidential and privileged information have been removed from the public version.

# CEO REPORT DATED JULY 25, 2017

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

# ATTACHMENT 45

# UMPC RESOLUTION DATED AUGUST 13, 2018

PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112

## Resolution to Ensure that the Member-Owners of Basin Electric Power Cooperative are the Focus of all Business Decisions

Whereas Basin Electric Power Cooperative (Basin) was created to produce and distribute wholesale power to Rural Electric Cooperatives throughout midwestern United States of America;

Whereas Basin presently provides partial requirements wholesale power to Rural Electric Cooperatives from the Canadian Border to the State of New Mexico under long-term power supply agreements;

Whereas Basin recently modified its Mission and Vision Statements in a manner which places less responsibility and reduced focus on commitment to affordability on the Basin Board of Directors and Staff; now, therefore, be it

*Resolved*, that Upper Missouri Power Cooperative:

1. urges the Basin Electric Power Cooperative to return to a Member-Owner focused Mission Statement by including the former "For the members, by the members, with the members," language;

2. urges the Basin Electric Power Cooperative to return to a Member-Owner focused fiduciary responsibility by including Vision Statement language such as:
   a. Basin Electric Power Cooperative provides reliable, low-cost wholesale power;
   b. We are a Member owned, democratically controlled organization focused on professional excellence and excellent Member service.

_____

President

_____

Secretary

_____

*Aug 13, 2018*

Date

Corporate Seal

**PUBLIC VERSION – PRIVILEGED AND CONFIDENTIAL INFORMATION HAS BEEN REMOVED PURSUANT TO 18 C.F.R. § 388.112**

## Resolution on Improving the Financial Condition of Basin Electric Power Cooperative and Positioning the Company to Better Serve its Member-Owners through Competitive Rates

Whereas Basin Electric Power Cooperative (Basin) was created to produce and distribute wholesale power to Rural Electric Cooperatives throughout midwestern United States of America;

Whereas Basin presently provides partial requirements wholesale power to Rural Electric Cooperatives from the Canadian Border to the State of New Mexico under long-term power supply agreements;

Whereas Basin historically diversified its business portfolio to include non-utility businesses;

Whereas the non-utility businesses of Basin are presently being subsidized through inflated wholesale power rates, making the Member-Owners of Basin uncompetitive;

Whereas the Member-Owners of Basin expect and deserve to be served by the most reliable and lowest cost power possible; now, therefore, be it

*Resolved*, that Upper Missouri Power Cooperative:

1. urges the Basin Board of Directors to establish a Member-Owner focused plan to reduce wholesale power costs;
2. urges the Basin Board of Directors to direct Basin staff to develop a strategy and achievable timelines to reduce rates and divest non-utility assets;
3. urges the Basin Board of Directors to present the strategy to the Member Systems by year end 2019;
4. urges the Basin Board of Directors to direct Basin staff in the timely, proper and clear communication with all Classes of Member-Owners, all plans associated with rate reductions and divestiture of assets including monthly progress reports.

_____
President

_____
Secretary

_____
Aug 13, 2018
Date

Corporate Seal

Document Accession #: 20171106-5038   Filed Date: 11/06/2017

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

# ATTACHMENT 46

# <u>CONFIDENTIAL</u>

Protected Materials containing confidential and privileged information have been
removed from the public version.

# IOWA LAKES ELECTRIC COOPERATIVE AND
MEEKER COOPERATIVE LIGHT AND POWER
RESOLUTIONS

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

# ATTACHMENT 47

---

# UPPER MISSOURI G&T ELECTRIC COOPERATIVE, INC. BY-LAWS DATED APRIL 22, 2015

PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112

Upper Missouri G & T Electric Cooperative, Inc.

# By-Laws

Dates of Revision

February 19, 1980
March 30, 1984
March 11, 1986
December 4, 1987
March 20, 1992
March 14, 2003
March 5, 2013
March 21, 2014
April 22, 2015

Case 4:20-cv-04192-LLP Document 1-1 Filed: 06/06/2020 Page 192 of 211 PageID #: 834

**PUBLIC VERSION – PRIVILEGED AND CONFIDENTIAL INFORMATION HAS BEEN REMOVED PURSUANT TO 18 C.F.R. § 388.112**

PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112

BY-LAWS

OF

UPPER MISSOURI G&T ELECTRIC COOPERATIVE, INC.

ARTICLE I

MEMBERSHIP

SECTION I. <u>Requirements for Membership</u>. Any person, firm, association, corporation, or body politic or subdivision thereof may become a member in UPPER MISSOURI G&T ELECTRIC COOPERATIVE, INC. (hereinafter called the "Cooperative") by:

    (a)    Executing a written application for membership therein;

    (b)    Agreeing to comply with and be bound by the Articles of Incorporation and By-Laws of the Cooperative and any rules and regulations adopted by the Board of Trustees; and

    (c)    Paying the membership fee which shall be $500.00; unless, by a majority vote of the Board of Trustees or members present at any properly called meeting where notice of such proposal shall have stated such action would be submitted to the membership of such meeting, the payment of a membership fee shall have been waived or deferred.

Provided, however, that no applicant shall become a member unless and until he or it has been accepted for membership by a 2/3 vote of the Board of Trustees or a 2/3 vote of all of the members of the Cooperative. No member may hold more than one membership in the Cooperative, and no membership in the Cooperative shall be transferable.

At each meeting of the members held subsequent to the expiration of a period of six months from the date of incorporation of the Cooperative, all applications received more than ninety days prior to such meeting which have not been accepted or which have been rejected by the Board of Trustees shall be submitted by the Secretary to such meeting, and subject to compliance by the applicant with the requirements hereinabove set forth, any such application may be accepted by a 2/3 vote of all of the members of the Cooperative. The Secretary shall give each such applicant at least ten days written notice of the date of the members' meeting to which his application will be submitted and such applicant shall be entitled to be present and heard at the meeting.

SECTION 2. <u>Membership Certificates</u>. Membership in the Cooperative may be evidenced by a membership certificate which shall be in such form and shall contain such provisions as shall be determined by the Board of Trustees. Such certificate shall be signed by the President and by the Secretary of the Cooperative and the corporate seal shall be affixed thereto. No membership certificate shall be issued for less than the membership fee fixed in these By-Laws, nor until such membership fee has been fully paid for in cash. In case a certificate is lost, destroyed or mutilated, a new certificate may be issued therefore, upon such uniform terms and indemnity to the Cooperative

as the Board of Trustees may prescribe.

SECTION 3. <u>Annual Dues</u>. The annual dues may be fixed annually by the Board of Trustees.

SECTION 4. <u>Purchase of Electric Energy</u>. Any member, including an incorporator, shall cease to be a member of the Cooperative if it shall refuse to purchase electric energy tendered to such member by the Cooperative if the amount tendered is adequate for its needs provided that no member shall be required to purchase electric energy where such member has existing at the time the Cooperative is formed contractual obligations to purchase power from other sources.

SECTION 5. <u>Termination of Membership</u>. (a) A member may withdraw from membership upon compliance with such equitable terms and conditions as the Board of Trustees may prescribe, provided, however, that no member shall be permitted to withdraw until he has met all of its or his contractual obligations to the Cooperative. The Board of Trustees may, by the affirmative vote of not less than two-thirds of all the Trustees recommend the expulsion of any member who fails to comply with any of the provisions of the Articles of Incorporation, By-Laws, or rules or regulations adopted by the Board of Trustees from time to time, but only if such member shall have been given written notice by the Secretary of the Cooperative that such failure makes him or it liable to expulsion from membership, and such failure shall have continued for at least ten days after such notice was given. Within thirty days after the Board shall have recommended expulsion of a member, a meeting of the members shall be held at which such member shall be given an opportunity to present his case by counsel or otherwise, and the Board shall have the same opportunity, after which a vote shall be taken on the expulsion of such member. An affirmative vote by two-thirds of the members present at the meeting shall be required in order to expel a member. The resolution of expulsion shall set forth the reasons for the expulsion and shall state the conditions on which the expelled member may be readmitted to membership.

(b) Upon the withdrawal, cession of existence or expulsion of a member, the membership of such member shall thereupon terminate, and the membership certificate of such member shall be surrendered forthwith to the Cooperative. Termination of membership in any manner shall not release a member from any debts due the Cooperative.

<u>ARTICLE II</u>

<u>RIGHTS AND LIABILITIES OF MEMBERS</u>

SECTION 1. <u>Property Interest of Members</u>. Members shall have no individual or separate interest in the property or assets of the Cooperative except that upon dissolution, after (a) all debts and liabilities of the Cooperative shall have been paid, and (b) all capital furnished through patronage shall have been returned, as provided by these By-Laws, the remaining property and assets of the Cooperative shall be distributed among the members and former members in the proportion which the aggregate patronage of each bears to the total patronage of all members during the seven years next preceding the date of the filing of the certificate of dissolution, or if the Cooperative shall not have been in existence for such period during the period of its existence.

Case 4:20-cv-04192-LLP Document 1 Filed 08/06/2020 Page 194 of 211 PageID #: 836
Document Accession #: ...................................................................

SECTION 2. <u>Non-Liability for Debts of the Cooperative</u>. The private property of the members shall be exempt from execution or other liability for the debts of the Cooperative and no member shall be liable or responsible for any debts or liabilities of the Cooperative.

<div align="center">ARTICLE III</div>

<div align="center">MEETINGS OF MEMBERS</div>

SECTION 1. <u>Annual Meeting</u>. The Annual Meeting of the members shall be held on or before September 1 of each calendar year beginning calendar year 2015. The time and place shall be fixed by the Board of Trustees within the territory served by the Cooperative, at least 30 days prior to the notice of the meeting, for the purpose of electing Trustees, passing upon reports for the previous fiscal year and transacting such other business as may come before the meeting.

It shall be the responsibility of the Board of Trustees to make adequate plans and preparations for the Annual Meeting. Failure to hold the Annual Meeting at the designated time shall not work a forfeiture or dissolution of the Cooperative.

SECTION 2. <u>Special Meetings</u>. Special meeting of the members may be called by resolution of the Board of Trustees or upon a written request signed by any three Trustees, by the President, or by three or more of all the members, and it shall thereupon be the duty of the Secretary to cause notice of such meeting to be given as hereinafter provided. Special meetings of the members may be held at any place within the territory served by the Cooperative specified in the notice of the special meeting.

SECTION 3. <u>Notice of Members' Meetings</u>. Written or printed notice stating the place, day and hour of the meeting and, in case of a special meeting or an Annual Meeting at which business requiring special notice is to be transacted, the purpose or purposes for which the meeting is called, shall be delivered not less than ten days nor more than thirty days before the date of the meeting either personally, by mail or by electronic mail or facsimile transmission, by or at the direction of the President or the Secretary or the persons calling the meeting to each member and to each person serving as delegate in accordance with the provisions of Section 4 of this Article. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail, addressed to the member (or to the delegate) at its or his address as it appears on the records of the Cooperative, with postage thereon prepaid. The failure of any member or delegate to receive notice of an Annual or special meeting of the members shall not invalidate any action which may be taken by the members at any such meeting.

SECTION 4. <u>Delegates</u>. The Trustees and Manager of each corporate member or such other representatives as may be elected by the members not exceeding ten in number shall be the delegates of such member and shall represent it at meetings of members of the Cooperative. Not less than fifteen (15) days before each Annual Meeting of the members of the Cooperative, the Secretary of each member shall certify to the Secretary of the Cooperative the number of delegates to which the member is entitled, and the name and address of each delegate, and also the name of a nominee for Trustee from said member. The Secretary of each member shall inform the Secretary of the

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

Cooperative in writing of any change of delegates or nominees.

# PUBLIC VERSION – PRIVILEGED AND
# CONFIDENTIAL INFORMATION HAS BEEN REMOVED
# PURSUANT TO 18 C.F.R. § 388.112

SECTION 5. <u>Quorum</u>. Delegates representing at least a majority of the members, and constituting a body of not less than one delegate from each of such majority of the members of the Cooperative, shall constitute a quorum. If less than a quorum is present at any meeting, a majority of those present in person may adjourn the meeting from time to time without further notice.

SECTION 6. <u>Voting</u>. At all meetings of the members at which a quorum is present all questions shall be decided by vote of a majority of the members voting thereon except as otherwise provided by law, the Articles of Incorporation or these By-Laws. Each member shall be entitled to only one vote upon each matter submitted to a vote at a meeting of the member. Except as hereinafter provided, the vote of each corporate member shall be cast by a chairman selected by and from its delegates. In the absence of an instructed vote on any matter by direction of the Board of Trustees or by the members of a corporate member, the chairman shall poll the delegates representing such member and the vote of such member shall be the vote of a majority of the delegates of the member present at the meeting.

SECTION 7. <u>Proxy and Mail Voting</u>. Voting by proxy or by mail shall not be permitted.

SECTION 8. <u>Order of Business</u>. The order of business at the Annual Meeting of the members and, so far as practicable, at all other meeting of the members, shall be essentially as follows:

1.  Call to Order
2.  Report upon the members represented and the number of delegates present, for the purposes of determining the establishment of a quorum.
3.  Reading of the notice of the meeting and proof of the due mailing thereof, or the waiver or waivers of notice of the meeting, as the case may be.
4.  Reading of unapproved minutes of previous meetings of the members and the taking of necessary action thereon.
5.  Presentation and consideration of reports of Officers, Trustees and Committees.
6.  Nomination and election of Trustees.
7.  Unfinished business.
8.  Adjournment.


## ARTICLE IV

## TRUSTEES AND ALTERNATE TRUSTEES

SECTION 1. <u>General Powers</u>. The business and affairs of the Cooperative shall be managed by a Board of Trustees which shall consist of one Trustee from each member cooperative and which shall have all of the powers conferred upon it by the laws of the State of Montana, the Cooperative's Articles of Incorporation and by these By-Laws.

SECTION 2. <u>Qualifications</u>. No person shall be eligible to become or remain a trustee or alternate trustee who is not a trustee or director of a member cooperative of the Cooperative.

Case 4:20-cv-04192-LLP Document 1 Filed 08/06/2020 Page 197 of 211 PageID #: 839
Document Accession #: 20200806-5272 Filed Date: 08/06/2020 Page 197

SECTION 3. <u>Election and Tenure of Office</u>. Each member shall be entitled to elect one trustee who shall serve at the pleasure of and for such a term as the governing board of that member shall, in its sole discretion, determine.

SECTION 4. <u>Alternate Trustees</u>. Each member shall be entitled to elect one alternate trustee who shall serve at the pleasure of and for such a term as the governing board of that member shall, in its sole discretion, determine. In the event that a trustee is temporarily unable to serve as a member of the Board of Trustees of this Cooperative or is unable or fails to attend any meeting of the Board of Trustees, the trustee who is unable or fails to serve or the governing board(s) of such member organization(s) that elected the trustee who is unable or fails to serve shall notify the alternate trustee elected by such governing board(s) of such member organization(s) who shall act as its temporary trustee.

If there shall be a vacancy other than a temporary inability to serve (as described above), amongst the Trustees appointed by one of the members, that member shall be notified of its obligation to elect a replacement trustee and to notify the Cooperative of that replacement.

SECTION 5. <u>Removal of Trustees by Members</u>. Any member may bring charges against a trustee or alternate trustee and, by filing with the Secretary such charges in writing together with a petition signed by at least three of the members, may request the removal of such trustee or alternate trustee by reason thereof.

Such trustee or alternate trustee shall be informed in writing of the charges at least ten (10) days prior to the meeting of the members at which the charges are to be considered and shall have the opportunity at the meeting to be present in person and/or represented by counsel and to present evidence in respect of the charges. The person or persons bringing the charges against him or her shall have the same opportunity. The question of the removal of such trustee or alternate trustee shall be considered and voted upon at the meeting of the members and any vacancies created by such removal may be filled by vote of a majority of the members at such meeting.

SECTION 5. <u>Compensation</u>. Trustees and alternate trustees shall not receive any compensation for their services as trustees or alternate trustees except that by resolution of the Board of Trustees a fixed sum, including expenses of attendance, if any, may be allowed for: (a) Attending each meeting of the Board of Trustees or any committee thereof; (b) Representing the Cooperative at any meeting or function whenever authorized by the Board of Trustees.

No trustee nor alternate trustee shall receive compensation for serving the Cooperative in any other capacity nor shall any close relative of a trustee or alternate trustee receive compensation for serving the Cooperative unless the payment and amount of compensation is specifically authorized by a vote of the members or the service by such trustees, alternate trustees or close relative shall have been certified by the Board of Trustees as an emergency measure.

**PUBLIC VERSION - PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

<u>ARTICLE V</u>

<u>MEETINGS OF TRUSTEES</u>

SECTION 1. <u>Organization and Regular Meetings</u>. An organizational meeting of the Board of Trustees shall be held without notice, immediately after, and at the same place as the Annual Meeting of the members. A regular meeting of the Board of Trustees shall also be established at such time and place as the Board of Trustees may provide by resolution.-

SECTION 2. <u>Special Meetings</u>. Special meeting of the Board of Trustees may be called by the President or by any three Trustees, and it shall thereupon be the duty of the Secretary to cause notice of such meeting to be given as hereinafter provided. The President or the Trustees calling the meeting shall fix the time and place for the holding of the meeting.

SECTION 3. <u>Notice of Trustees' Meetings</u>. Written notice of the time, place and purpose of any special meeting of the Board of Trustees shall be delivered to each Trustee not less than ten days previous thereto, either personally, by mail or by electronic mail or facsimile transmission, by or at the direction of the Secretary, or upon a default in duty by the Secretary, by the President or the Trustees calling the meeting. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail addressed to the Trustees at his address as it appears on the records of the Cooperative with postage thereon paid.

SECTION 4. <u>Presence of Others</u>. Any Delegate, Manager, Director or Trustee of a member shall be entitled to be present at any Board Meeting and shall have a voice in the proceedings, provided, however, that only Trustees of the Cooperative shall be entitled to vote.

SECTION 5. <u>Vacancies</u>. Subject to the provisions of Article IV, Section 5 of these By-Laws any vacancy occurring on the Board of Trustees shall be filled by the affirmative vote of a majority of the remaining Board members for the unexpired portion of the term. The Board member so appointed shall be a member of the Cooperative from which the vacancy occurred.

<u>ARTICLE VI</u>

<u>OFFICERS</u>

SECTION 1. <u>Number</u>. The officers of the Cooperative shall be a President, Vice-President, Secretary, Treasurer, and such other officers as may be determined by the Board of Trustees from time to time. The officers of Secretary and of Treasurer may be held by the same person.

SECTION 2. <u>Election and Term of Office</u>. The officers shall be elected by ballot, annually by and from the Board of Trustees at the meeting of the Board of Trustees held immediately after the Annual Meeting of the members. If the election of officers shall not be held at such meeting, such election shall be held as soon thereafter as conveniently may be. Each officer shall hold office until

**PUBLIC VERSION — PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

the first meeting of the Board of Trustees following the next succeeding Annual Meeting of the members or until his successor shall have been elected and shall have qualified. A vacancy in any office shall be filled by the Board of Trustees for the unexpired portion of the term.

SECTION 3. <u>Removal of Officers and Agents by Trustees</u>. Any officer or agent elected or appointed by the Board of Trustees may be removed by the Board of Trustees whenever in its judgment the best interests of the Cooperative will be served thereby. In addition, any member of the Cooperative may bring charges against an officer, and by filing with the Secretary such charges in writing together with a petition signed by three of the members, may request the removal of such officer. The officer against whom such charges have been brought shall be informed in writing of the charges at least ten days prior to the Board Meeting at which the charges are to be considered and shall have an opportunity to be present and/or represented by counsel at the meeting and to present evidence in respect of the charges; and the person or persons bringing the charges against him shall have the same opportunity. In the event the Board does not remove such officer, the question of his removal shall be considered and voted upon at the next meeting of the members.

SECTION 4. <u>President</u>. The President shall:

(a)     Be the principal executive officer of the Cooperative and, otherwise determined by the members of the Board of Trustees, shall preside at all meetings of the members and the Board of Trustees.

(b)     Sign, with the Secretary, certificates of membership, the issues which shall have been authorized by the Board of Trustees or the members, and may sign any deeds, mortgages, deeds of trust, notes, bonds, contracts, or other instruments authorized by the Board of Trustees to be executed, except in cases in which the signing and execution thereof, shall be expressly delegated by the Board of Trustees or by these By-Laws to some other officer or agent of the Cooperative, or shall be required by law to be otherwise signed or executed.

(c)     In general perform all duties incident to the office of President and such other duties as may be prescribed by the Board of Trustees from time to time.

SECTION 5. <u>Vice-President</u>. In the absence of the President, or in the event of his inability or refusal to act, the Vice-President shall perform the duties of the President, and when so acting, shall have all the powers of and be subject to all the restrictions upon the President. The Vice-President shall also perform such other duties as from time to time may be assigned to him by the Board of Trustees.

SECTION 6. <u>Secretary</u>. The Secretary shall be responsible for and the supervision thereof:

(a)     Keeping the minutes of the meetings of the members and of the Board of Trustees in one or more books provided for that purpose;

(b)     The giving of all notices given in accordance with these By-Laws as required by law;

Document Accession #: 20200806-5271 Document Filed: 08/06/2020
Case 4:20-cv-04192-LLP Document 1 Filed 08/06/2020 Page 200 of 211 PageID #: 842

(c)     The keeping of the corporate records and of the Seal of the Cooperative and affix the Seal of the Cooperative to all certificates of membership prior to the issue thereof and to all documents, the execution of which on behalf of the Cooperative under its seal is duly authorized in accordance with the provisions of these By-Laws;

(d)      Keeping of a register of the names and post office addresses of all members;

(e)      The signing, with the President, certificates of membership, the issue of which shall have been authorized by the Board of Trustees of the members;

(f)      The books of the Cooperative;

(g)     The keeping on file at all times a complete copy of the Articles of Incorporation and By-Laws of the Cooperative containing all amendments thereof (which copy shall be open to the inspection of any member) and at the expense of the Cooperative, forward a copy of the By-Laws and of all amendments thereto to each member. And; in general perform all duties incident to the Office of Secretary and such other duties as from time to time may be assigned to him by the Board of Trustees.

SECTION 7. Treasurer. The Treasurer shall:

(a)      In general perform all the duties incident to the Office of Treasurer and such other duties as from time to time may be assigned to him by the Board of Trustees.

SECTION 8. Manager. The Board of Trustees may appoint a Manager who shall perform such duties and shall exercise such authority as the Board of Trustees may from time to time vest in him. The Manager shall not be eligible to serve as a Director of the Cooperative.

SECTION 9. Bond of Officers. The Treasurer and any other officer or agent of the Cooperative charged with the responsibility for the custody of any of its funds or property may be required to give bond in such sum and with such surety as the Board of Trustees shall determine. The Board of Trustees in its discretion may also require any other officer, agent or employee of the Cooperative to give bond in such amount as it shall determine.

SECTION 10. Compensation. The powers, duties and compensation of officers, agents and employees shall be fixed by the Board of Trustees, subject to the provisions of the By-Laws with respect to compensation for Trustees and close relatives of Trustees.

SECTION 11. Reports. The Officers of the Cooperative shall submit at each Annual Meeting of the members' reports covering the business of the Cooperative for the previous fiscal year. Such report shall set forth the condition of the Cooperative at the close of such fiscal year.

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

<u>ARTICLE VII</u>

<u>NON-PROFIT OPERATION</u>

SECTION 1. <u>Interest or Dividends on Capital Prohibited</u>. The Cooperative shall at all times be operated on a cooperative non-profit basis for the mutual benefit of its patrons. No interest or dividends shall be paid or payable by the Cooperative on any capital furnished by its patrons.

SECTION 2. <u>Patronage Capital in Connection with Furnishing Electric Energy</u>. In the furnishing of electric energy, the Cooperative's operations shall be so conducted that all patrons will through their patronage furnish capital for the Cooperative. In order to induce patronage and to assure that the Cooperative will operate on a non-profit basis, the Cooperative is obligated to account on a patronage basis to all its patrons for all amounts received and receivable from the furnishings of electric energy in excess of operating costs and expenses properly chargeable against the furnishing of electric energy. All such amounts in excess of operating costs and expenses at the moment of receipt by the Cooperative are received with the understanding that they are furnished by the patrons as capital. The Cooperative is obliged to pay by credits to a capital account for each patron all such amounts in excess of operating costs and expenses.

The books and records of the Cooperative shall be set up and kept in such a manner that at the end of each fiscal year the amount of capital, if any, so furnished by each patron is clearly reflected and credited in an appropriate record to the capital account of each patron, and the Cooperative shall within a reasonable time after the close of the fiscal year notify each patron of the amount of capital so credited to his account. All such amounts credited to the capital account of any patron shall have the same status as though they had been paid to the patron in cash in pursuance of a legal obligation to do so and the patron had then furnished the Cooperative corresponding amounts for capital.

The Cooperative may (a) Establish a method of determining the power supply portion of capital credited to each patron for each applicable fiscal year. (b) Provide for separate identification on the Cooperative's books of the power supply portion of capital credited to the Cooperative's patrons. (c) Provide for appropriate notification to the patrons with respect to the power supply portion of capital credited to their accounts and (d) Preclude a general retirement of the power supply portion of capital credited to patrons for any fiscal year prior to the general retirement of other capital credited to the patrons for the same year of any capital credited to patrons for any prior fiscal year.

In the event of dissolution or liquidation of the Cooperative, after all outstanding indebtedness of the Cooperative shall have been paid, outstanding capital credits shall be retired without priority on a pro rata basis before any payments are made on account of property rights of members.

If, at any time prior to dissolution or liquidation, the Board of Trustees shall determine that the financial condition of the Cooperative will not be impaired thereby, the capital then credited to patrons' accounts may be retired in full or in part. Any such retirements of capital shall be made in order or priority according to the year in which the capital was furnished and credited, the capital first received by the Cooperative being first retired. <u>Notwithstanding any other provision of the By-</u>

**Page
11**

**PUBLIC VERSION — PRIVILEGED AND CONFIDENTIAL INFORMATION HAS BEEN REMOVED PURSUANT TO 18 C.F.R. § 388.112**

Laws, the Board of Trustees, at its discretion, shall have the power to retire capital credits and determine the application and make policy in regard thereto.

Capital credited to the account of each patron shall be assignable only on the books of the Cooperative pursuant to written instruction from the assignor and only to successors in interest in the business or the physical assets of such patron unless the Board of Trustees, acting under the policies of general application shall determine otherwise.

The patrons of the Cooperative, by dealing with the Cooperative, acknowledge that the terms and provisions of the Articles of Incorporation and By-Laws shall constitute and be a contract between the Cooperative and each patron, and both the Cooperative and the patrons are bound by such contract, as fully as though each patron had individually signed a separate instrument containing such terms and provisions. The provisions of this article of the By-Laws shall be called to the attention of each patron of the Cooperative by posting in a conspicuous place in the Cooperative's office.

SECTION 3. <u>Patronage Refunds in Connection with Furnishing Other Services</u>. In the event that the Cooperative should engage in the business of furnishing goods or services other than electric energy, all amounts received and receivable there from which are in excess of costs and expenses properly chargeable against the furnishing of such goods or services shall, insofar as permitted by law, be prorated annually on a patronage basis and returned to those patrons from whom such amounts were obtained.

<u>ARTICLE VIII</u>

<u>DISPOSITION OF PROPERTY</u>

The Cooperative may not sell, mortgage, lease or otherwise dispose of or encumber all or any substantial portion of its property unless such sale, mortgage, lease or other disposition or encumbrance is authorized at a duly held meeting of members thereof by the affirmative vote of not less than two-thirds (2/3) of all the members of the Cooperative, and unless the notice of such proposed sale, mortgage, lease or other disposition or encumbrance shall have been contained in the notice of the meeting' provided, however, that notwithstanding anything herein contained, or any other provisions of law, the Board of Trustees of the Cooperative, without authorization by the members thereof, shall have the full power and authority to authorize the execution and delivery of a mortgage or mortgages, or a deed or deeds of trust upon, or the pledging or encumbrancings of, any or all of the property, assets, rights, privileges, licenses, franchises and permits of the Cooperative, whether acquired or to be acquired, and wherever situated, as well as the revenues and income therefrom, all upon such terms and conditions as the Board of Trustees shall determine, to secure any indebtedness of the Cooperative to the United States of America, or any instrumentality or agency thereof, or to any other financing sources within the United States; provided, further that the Board may, upon the authorization of a majority of those members of the Cooperative voting at a meeting of the members thereof, sell, lease, or otherwise dispose of all or a substantial portion of its

Case 4:20-cv-04192-LLP Document 22-1 Filed 08/06/2020 Page 203 of 211 PageID #: 845
Document Accession #: 20200806-5271

property to another cooperative or foreign corporation doing business in this state pursuant to the act under which the Cooperative is incorporated.

<div align="center">

ARTICLES IX

FINANCIAL TRANSACTIONS

</div>

SECTION 1. <u>Contracts</u>. Except as otherwise provided in these By-Laws, the Board of Trustees may authorize any officer or officers, agent or agents to enter into any contract or execute and deliver any instrument in the name and on behalf of the Cooperative, and such authority may be general or confined to specific instances.

SECTION 2. <u>Checks, Drafts, Etc</u>. All checks, drafts, or other orders for the payment of money, and all notes, bonds or other evidences of indebtedness issued in the name of the Cooperative shall be signed by such officer or officers, agent or agents, employee or employees of the Cooperative and in such manner as shall from time to time be determined by resolution of the Board of Trustees.

SECTION 3. <u>Deposits</u>. All funds of the Cooperative shall be deposited from time to time to the credit of the Cooperative in such bank or banks as the Board of Trustees may select. Nothing herein shall be construed to prohibit the Board of Trustees from investing moneys not required for immediate operations of the Cooperative in interest bearing bonds of the United States government, municipal, county or state political subdivisions, bonds of this or other cooperatives, or any other investment insured by an agency of the United States government.

SECTION 4. <u>Change in Rates</u>. When required by law or contract written notice shall be given to the United States Department of Agriculture Rural Utilities Service or its successor agency ("RUS") not less than ninety days prior to the date upon which any proposed change in the rates charged by the Cooperative for electric energy becomes effective.

SECTION 5. <u>Fiscal Year</u>. The fiscal year of the Cooperative shall begin on the first day of January of each year and shall end on the thirty-first day of December of the same year.

SECTION 6. <u>Restrictions on Power Supply Decisions</u>. The Cooperative shall not (1) enter into any power supply contract in excess of 20% of the Cooperative's existing load, or (2) build generation to be owned by the Cooperative which has an output in excess of 10 MW or of 20% of the Cooperative's projected sales to its members (whichever is less), without such power supply contract or generation project first having been approved by a three-fifths majority of its members. The vote required in this section shall not be taken without the Cooperative having first conducted or commissioned a load forecast study, which study justifies the Cooperative's execution of such a contract or construction of such generation. The load forecast study must be undertaken in conformity with any applicable criteria or guidelines published by RUS. The load forecast study and proposed power supply contract and/or generation project pro forma shall be provided to each of the members no less than thirty (30) days prior to such vote.

**PUBLIC VERSION – PRIVILEGED AND CONFIDENTIAL INFORMATION HAS BEEN REMOVED PURSUANT TO 18 C.F.R. § 388.112**

<u>ARTICLE X</u>

<u>MISCELLANEOUS</u>

SECTION 1. <u>Membership in Other Organizations</u>. The Cooperative shall not become a member of or purchase stock in any other organizations without an affirmative vote of the members at a duly held meeting, the notice of which shall specify that action is to be taken upon such proposed membership or stock purchase, provided, however, that the Cooperative may upon the authorization of the Board of Trustees, purchase stock in or become a member of (a) Any corporation organized on a non-profit basis for the purpose of engaging in or furthering the cause of rural electrification, (b) With the approval of RUS, any other corporation for the purpose of acquiring electric facilities.

SECTION 2. <u>Waiver of Notice</u>. Any member, delegate, or trustee may waive in writing any notice of a meeting required to be given by these By-Laws. The attendance of a member, delegate or trustee at any meeting shall constitute a waiver of notice of such meeting by such member, delegate or trustee, except in case of a member, delegate or trustee shall attend a meeting for the express purpose of objecting to the transaction of any business on the grounds that the meeting has not lawfully called or convened.

SECTION 3. <u>Rules and Regulations</u>. The Board of Trustees shall have power to make and adopt such rules and regulations not inconsistent with law, the Articles of Incorporation or these By-Laws, as it may deem advisable for the management of the business and affairs of the Cooperative.

SECTION 4. <u>Accounting, System and Reports</u>. The Board of Trustees shall cause to be established and maintained a complete accounting system which, among other things, and subject to applicable laws and rules and regulations of any regulatory body, shall conform to such accounting system as may be from time to time designated by RUS. The Board of Trustees shall also, after the close of each fiscal year, cause to be made a full and complete audit of the accounts, books and financial condition of the Cooperative as of the end of such fiscal year. Such audit reports shall be submitted to the members at the next following Annual Meeting.

SECTION 5A. <u>Liability Indemnification</u>. The Cooperative shall indemnify, to the full extent permitted by law, any Trustees, Officers, Employees or Agents of the Cooperative as set forth in Section 35-1-414, M.C.A., as now enacted or hereafter amended.

This right of indemnification shall encompass any proceedings in which said Trustee, Officer, Employee, or Agent of the Cooperative or is or was serving at the request of the Cooperative as a Director, Officer, Partner, Trustee, Employee or Agent of another foreign or domestic corporation, partnership, joint venture, trust, other enterprise, or employee benefit plan provided, however, that:

(a)     He conducted himself in good faith; and

# PUBLIC VERSION – PRIVILEGED AND
# CONFIDENTIAL INFORMATION HAS BEEN REMOVED
# PURSUANT TO 18 C.F.R. § 388.112

(b)      He reasonably believed:

(1)      In the case of conduct in his official capacity with the Cooperative that his conduct was in its best interest; and

(2)      In all other case, that his conduct was at least not opposed to its best interest; and

(3)      In the case of any criminal proceeding he has no reasonable cause to believe his conduct was unlawful.

Indemnification shall be against judgments, penalties, fines, settlements, and reasonable expenses, actually incurred by the Trustee, Officer, Employee or Agent, in connection with the proceeding, and the procedure for determining indemnification shall be that procedure set forth in Section 35-1-414 (5) and (6), M.C.A.

The right of indemnification hereinabove provided shall not be exclusive of any rights to which any Trustee, Officer, Employee or Agent of the Cooperative may otherwise be entitled by law.

Any indemnification of or advance of expenses to a Trustee, Officer, Employee or Agent in accordance with this section, if arising out of a proceeding by or in the right of the corporation, shall be reported in writing to the membership with the notice of the next members meeting or before.

SECTION 5B. <u>Liability Indemnification Insurance</u>. The Cooperative shall have the power to purchase and maintain insurance on behalf of any person who is or was a Trustee, Officer, Employee or Agent of the Cooperative, is or was serving at the request of the Cooperative as a Director, Officer, Partner, Trustee, Employee or Agent of another foreign or domestic corporation, partnership, joint venture, trust or enterprise, or of an employee benefit plan, against any liability asserted against him and incurred by him in any such capacity or arising out of his status of such whether or not the Cooperative would have the power to indemnify him against any such liability.

<u>ARTICLE XI</u>

<u>AMENDMENTS</u>

These By-Laws may be altered, amended or repealed by 2/3 of all the members of the Cooperative at any regular or special meeting, provided the notice of such meeting shall have contained a copy of the proposed alternation, amendment or repeal.

6620792_2

Document Case 4:20-cv-04192-LLR  Document 23-14  Filed 11/20/2019-7tae

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

# ATTACHMENT 48

# <u>CONFIDENTIAL</u>

Protected Materials containing confidential and privileged information have been removed from the public version.

# BASIN ELECTRIC BOARD MINUTE MEETING NOTES DATED FEBRUARY 12-13, 2019

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

# ATTACHMENT 49

# <u>CONFIDENTIAL</u>

Protected Materials containing confidential and privileged information have been removed from the public version.

## BASIN ELECTRIC COOPERATIVE UPDATE BY ALLEN THIESSEN DATED JULY 2015

Document Case 4:20-cv-04192-LLR Document 23-14 Filed 11/20/2020 Page

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

# ATTACHMENT 50

# <u>CONFIDENTIAL</u>

Protected Materials containing confidential and privileged information have been removed from the public version.

# DGC BOARD MINUTES DATED JUNE 16, 2020

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

# ATTACHMENT 51

# <u>CONFIDENTIAL</u>

Protected Materials containing confidential and privileged information have been removed from the public version.

# BASIN ELECTRIC COOPERATIVE UPDATE BY ALLEN THIESSEN DATED JULY 2015

Document-Case 4:20-cv-04192-LLR  Document 23-14  Filed 11/20/24  Page 210 of 211

**PUBLIC VERSION – PRIVILEGED AND
CONFIDENTIAL INFORMATION HAS BEEN REMOVED
PURSUANT TO 18 C.F.R. § 388.112**

# ATTACHMENT 52

# <u>CONFIDENTIAL</u>

Protected Materials containing confidential and privileged information have been removed from the public version.

# MANAGER'S ADVISORY COMMITTEE MEETING
# DATED OCTOBER 19, 2017

Document Content(s)

Public Motion to Intervene and Protest of McKenzie.PDF...................1
PUBLIC Attachments ALL.PDF..............................................70