UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| DAKOTA ENERGY COOPERATIVE, INC., | CIV 20-4192 |
| Plaintiff, | |
| -vs- | MEMORANDUM OPINION AND ORDER GRANTING MOTION TO INTERVENE |
| EAST RIVER ELECTRIC POWER COOPERATIVE, INC., | |
| Defendant, | |
| -vs- | |
| BASIN ELECTRIC POWER COOPERATIVE, | |
| Intervenor. | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

On November 11, 2020, Plaintiff Dakota Energy Cooperative, Inc. ("Dakota Energy") commenced this action in the Third Judicial Circuit Court of South Dakota by service of a Complaint for Anticipatory Breach of Contract, Declaratory Relief, and Jury Trial Demand ("Complaint") against East River. (Doc. 1-1.) Dakota Energy is a South Dakota electric distribution cooperative with its principal place of business in Beadle County, South Dakota. East River is a South Dakota electric generation and transmission ("G&T") cooperative with its principal place of business in Lake County, South Dakota. As a G&T, East River delivers wholesale power to Dakota Energy and other electric distribution cooperatives that are members of East River.

On December 7, 2020, East River removed this case based on federal question jurisdiction under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), which grants federal courts jurisdiction over suits against a person acting under a federal officer.[1] (Doc. 1.)

---

[1] The Eighth Circuit has held that the following four elements are required for removal under § 1442(a)(1): "(1) a defendant has acted under the direction of a federal officer, (2) there was a causal

Dakota Energy is a member of East River and purchases all its power from East River pursuant to a long-term, all-requirements Wholesale Power Contract ("WPC"). (Doc. 1-1, Complaint, pp. 4-5.) The original (1995) WPC between the parties was for a term of 43 years, through December 31, 2038. (*Id*., p. 5.) The parties extended the term to December 31, 2058 and, ultimately, to December 31, 2075. (*Id*.) Dakota Energy is now seeking to withdraw from East River and terminate the WPC before the contract term expires so that it can buy power elsewhere. Dakota Energy sued East River for anticipatorily breaching its Bylaws and violating SDCL 47-21-72 by refusing Dakota Energy's request for a buy-out dollar amount that would allow it to withdraw as a member and terminate the WPC. (*Id*., pp. 9-10.) In addition to its claim for anticipatory breach of contract, Dakota Energy seeks a declaratory judgment on the following issues: "(a) whether the terms of the Bylaws permit Dakota Energy to withdraw from East River on equitable terms and conditions, and if so, (b) what is the amount of an equitable exit charge that Dakota Energy must pay to discharge its contractual obligations to, and withdraw from, East River." (Doc. 1-1, p. 10.)

East River's Answer includes a counterclaim seeking a declaratory judgment that 1) the Wholesale Power Contract between East River and Dakota Energy does not allow for early termination, and 2) East River's Bylaws do not permit Dakota Energy to withdraw before fulfilling its obligations under the Wholesale Power Contract. (Doc. 10, p. 19.)

A Motion to Intervene was filed by Basin Electric Power Cooperative ("Basin Electric") pursuant to Rule 24 of the Federal Rules of Civil Procedure. (Doc. 22.) Basin Electric moves to intervene as of right or, alternatively, to intervene permissively. Its proposed Pleading in

---

connection between the defendant's actions and the official authority, (3) the defendant has a colorable federal defense to the plaintiff's claims, and (4) the defendant is a 'person,' within the meaning of the statute." *Jacks v. Meridian Res. Co., LLC*, 701 F.3d 1224, 1230 (8th Cir. 2012) (citing *Dahl v. R.J. Reynolds Tobacco Co.*, 478 F.3d 965, 967 n.2 (8th Cir. 2007). "The words 'acting under' are broad," and the Supreme Court "has made clear that the statute must be 'liberally construed.'" *Id.* (quoting *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 147 (2007)). In its Notice of Removal, East River asserts that it has outstanding loans and loan guarantees with the Rural Utilities Service ("RUS"), an agency of the federal government that finances the construction of electric distribution, generation, and transmission facilities used to provide electric service in rural areas. According to East River, before extending loans and loan guarantees to a G&T (like East River), RUS requires the G&T to enter into long-term, all-requirements contracts with each of its member distribution cooperatives to guarantee payback of the loans. (Doc. 1, pp. 3-7.) In its Answer to East River's Counterclaim, Dakota Energy admits that East River's allegations are sufficient to confer removal jurisdiction under the federal officer removal statute. (Doc. 17, p. 2, ¶ 7.)

Intervention is an action for declaratory judgment on the following issues: 1) that the Wholesale Power Contract between East River and Dakota does not allow for Dakota to terminate or withdraw prior to December 31, 2075; 2) that the Wholesale Power Contract between Basin and East River does not allow East River to terminate or withdraw prior to December 31, 2075; 3) that Basin's Bylaws require both its Class A Members and Class C Members to fulfill their respective WPC contractual obligations, and 4) that Basin has no obligation to provide a buy-out number to East River to provide to Dakota to allow an early termination of Dakota's WPC with East River. (Doc. 23, p.12.)  In its Pleading in Intervention, Basin Electric invokes subject matter jurisdiction under 28 U.S.C. § 1442(a) (federal question), 28 U.S.C. § 1367 (supplemental jurisdiction), and the Court's ancillary jurisdiction. (Doc. 23, p. 2.)  However, in its reply brief in support of the motion to intervene, Basin states that it has "made an independent showing of diversity jurisdiction." (Doc. 35, p. 11.)  (Basin is a North Dakota cooperative corporation and both East River and Dakota are South Dakota cooperative corporations.)

East River supports Basin Electric's intervention, but Dakota Energy objects.

## BACKGROUND

In deciding the threshold issue whether Basin Electric has standing to intervene, the Court must "construe a motion to intervene in favor of the prospective intervenor, accepting all material allegations as true." *Liddell v. Special Admin. Bd. of Transitional Sch. Dist. of City of St. Louis*, 894 F.3d 959, 965 (8th Cir. 2018) (citing *Am. Civil Liberties Union of Minn. v. Tarek ibn Ziyad Acad.*, 643 F.3d 1088, 1092 (8th Cir. 2011)). The Court also is free to consider materials necessarily embraced by the pleadings, such as attached exhibits. *Id.* at 964.  Keeping these rules in mind, and for the sake of convenience, the factual allegations in Basin Electric's pleading are set forth below almost verbatim.  Dakota's allegations conclude before the "Discussion" section of the Opinion beginning on page nine.

***Background and Contractual Relationship of the Parties.***

Basin generates electric power which it sells and transmits to its Class A Members for resale and retransmission to its Class C Members located in nine states for distribution to over three million users, residential and commercial.  Every Basin Class A Member has a long-term wholesale power contract ("WPC") with Basin pursuant to which Basin sells and transmits power to the Class A

3

Members for resale and retransmission to Class C Members. Each Class C Member, in turn, has a long-term WPC with a Class A Member.

Basin's long-term WPCs are the backbone of the cooperative generation, transmission, and distribution system established by the federal government during the Great Depression and are regulated by the Federal Energy Regulatory Commission ("FERC"). The revenues from the WPCs with Basin's Class A Members are the sole support for Basin's financial ability to operate, maintain, and improve the Basin electrical system. FERC has jurisdiction over Basin's electric generation and transmission activities.

Each of Basin's Class A Members (with one exception), including East River, has a long-term, all-requirements WPC with Basin to purchase electric power. Each of Basin's Class C Members, including Dakota, has a long-term, requirements WPC with a Class A Member of Basin to purchase electric power generated by Basin. Basin's Class C Members, including Dakota, distribute purchased electricity to consumer end-users.

East River, as a Class A Member of Basin, has entered into a WPC with Basin to purchase substantially all of its required electricity from Basin until the expiration of the Basin/East River WPC. On August 6, 2015, the East River board of directors voted unanimously to extend the East River/Basin WPC to December 31, 2075.

The East River board of directors includes a representative from Dakota Energy, Mr. David Allen, who was in 2015, and continues to be, a director and the secretary of Dakota. Mr. David Allen, as Dakota's representative on East River's board of directors, voted on August 6, 2015 to extend East River's WPC with Basin to December 31, 2075.

Dakota, as a Class C Member of East River, has entered into a WPC to purchase substantially all of its required electricity from East River until the expiration of the East River/Dakota WPC. On August 6, 2015, the East River board of directors voted unanimously to extend its WPCs with each of its 25 members, including Dakota, to December 31, 2075. Mr. David Allen voted on August 6, 2015 to extend East River's WPCs with each of its 25 members, including Dakota, to December 31, 2075.

***The Basin/East River WPC.***

East River is a founding Class A Member of Basin. On April 5, 1962, East River entered into a WPC with Basin, which extended through January 1, 2002. The 1962 Basin/East River WPC

provides that "[Basin] shall sell and deliver to [East River] and [East River] shall purchase and receive from [Basin] the electric power and energy which [East River] shall require . . . until January 1, 2002 and thereafter until terminated by either party's giving to the other not less than six months' written notice of its intention to terminate."  In 1968, Basin and East River agreed to amend the Basin/East River WPC and extended the term of the WPC to January 1, 2010.  In 1983, Basin and East River agreed to amend the Basin/East River WPC and extended the term of the WPC to January 1, 2020.  In 1994, Basin and East River agreed to amend the Basin/East River WPC and extended the term of the WPC to December 31, 2039.  In 2006, Basin and East River agreed to amend the Basin/East River WPC and extended the term of the WPC to December 31, 2058.  In 2015, Basin and East River agreed to amend the Basin/East River WPC and extended the term of the WPC to December 31, 2075.  Basin claims that the Basin/East River WPC does not contain any provision providing for termination of the WPC prior to the end of the contract term.

***Basin's Bylaws.***

Upon becoming a Class A Member of Basin, East River agreed to be bound by Basin's Bylaws.  Upon becoming a Class C Member of Basin, Dakota agreed to be bound by Basin's Bylaws.

Article I, Section 2(a) of Basin's Bylaws requires that each of its Class A Members "purchase electric services from [Basin] as soon as such electric service is needed to meet such Member's electric requirements in excess of such Member's existing generation capacities or contracts…."  Basin contends that East River, as a Class A Member of Basin, must comply with Article I, Section 2(a) of Basin's Bylaws.

Article I, Section 2(c) of Basin's Bylaws requires that each of its Class C Members "contract[] for a portion of its electric power and/or energy from [a] Class 'A' Member…."  Basin claims that Dakota Energy, as a Class C Member of Basin, must comply with Article I, Section 2(c) of Basin's Bylaws.

Article I, Sections 7 ("Termination of Membership") and 8 ("Withdrawal of Membership) of Basin's Bylaws provide, in relevant part, that "any Member" may "withdraw from membership" "upon compliance with such equitable terms and conditions as the Board of Directors may prescribe; provided, however, that no Member shall be permitted to withdraw until it has met all its contractual

obligations to the Cooperative [Basin]." Basin asserts that Dakota Energy and East River must comply with Article I, Sections 7 and 8 of Basin's Bylaws.

East River has entered into a WPC with Basin under which it is contractually obligated to "purchase and receive from [Basin] the electric power and energy which [East River] shall require" in addition the power purchased from other specifically enumerated sources "until December 31, 2075." According to Basin, unless and until East River purchases all electric power and energy which East River shall require (in addition to the power purchased from other specifically enumerated sources) through December 31, 2075, East River has not met all of its contractual obligations to Basin, and thus the Basin Bylaws prohibit East River from terminating or withdrawing its membership with Basin.

*The East River/Dakota WPC.*

In January 1995, Dakota became a member of East River. On January 1, 1995, Dakota entered into a WPC with East River. The 1995 East River/Dakota WPC provides that "East River shall sell and deliver to [Dakota] and [Dakota] shall purchase and receive from East River, all electric power and energy which [Dakota] shall require to serve all of [Dakota's] electric loads… until December 31, 2038, and thereafter until terminated by either Party giving to the other not less than six month's written notice of its intention to terminate." In 2006, East River and Dakota agreed to amend the East River/Dakota WPC, which extended the term of the WPC to December 31, 2058. In 2015, East River and Dakota agreed to amend the East River/Dakota WPC, which extended the term of the WPC to December 31, 2075.

*East River's Bylaws.*

Upon becoming a member of East River, Dakota agreed to be bound by East River's Bylaws. Article I, Section 4(a) of East River's Bylaws require that each of its member systems (including Dakota) purchase "all electric power and energy required by the member to serve all its electric loads," with certain inapplicable exceptions. Article I, Section 5(a) of East River's Bylaws provides, in relevant part, that "[a] member may withdraw from membership upon compliance with such equitable terms and conditions as the Board of Directors may prescribe, provided, however, that no member shall be permitted to withdraw until it has met all contractual obligations to the Cooperative." Basin contends that Dakota must comply with Article I, Section 5(a) of East River's Bylaws.

Dakota has entered into a WPC with East River under which it is contractually obligated to purchase "all electric power and energy which [Dakota] shall require to serve all of [Dakota's] electric loads" through December 31, 2075. According to Basin, unless and until Dakota purchases all electric power and energy which Dakota shall require to serve all of its electric loads through December 31, 2075, Dakota has not met all of its contractual obligations to East River.

***The Federal Energy Regulatory Commission Has Determined That a WPC with No Early Termination Provisions Is Neither Unjust Nor Unreasonable.***

Basin asserts that it became subject to the exclusive regulatory jurisdiction of FERC in the fall of 2019. As a result of becoming subject to FERC jurisdiction, Basin was required to and did file its wholesale power rates with FERC for approval. As part of the approval process, FERC reviewed Basin's WPCs with its Class A Members. In response to Basin's submission, Dakota, as a Basin Class C Member, moved to intervene, filed a Protest to be considered by FERC within FERC's exclusive jurisdiction, and joined and "adopt[ed]" the Protest of another Basin Class C Member, McKenzie Electric Cooperative, Inc. ("McKenzie"), arguing that "the issues and concerns that McKenzie identifie[d] as to its relationship with Basin Class A Member Upper Missouri G & T Cooperative, Inc. ("Upper Missouri") apply equally to Dakota Energy's relationship with Basin through East River."

The McKenzie Protest, as adopted by Dakota, effectively alleged that the absence of early termination and withdrawal rights in the WPC Basin has with Upper Missouri (of which McKenzie is a member) rendered the Basin/Upper Missouri WPC "unjust and unreasonable."

McKenzie and Dakota requested FERC to find the withdrawal and termination provisions, as implemented by Basin, to be unjust and unreasonable and that FERC direct Basin to provide to its Members, in response to any such request, an estimate of their costs to buy-out of their contracts and withdraw from the cooperative. FERC, after considering McKenzie's and Dakota's Protests, "disagree[d] with the arguments of McKenzie, Dakota Energy, and [one other Basin Class C Member] that Basin's purported lack of withdrawal and termination procedures renders the [WPC] unjust and unreasonable." FERC also "disagree[d]… that [Basin does] not provide any mechanism for Members to withdraw from the cooperative system and terminate their Wholesale Power Contracts" as "[e]ach Wholesale Power Contract includes termination provisions requiring notice

of termination for the end of the contract term, which allows the Member to ensure that the contract does not remain in effect beyond … 2075." FERC considered that McKenzie and Dakota were "essentially argu[ing] that Basin's Wholesale Power Contracts are not just and reasonable because they do not contemplate early termination—and the associated withdrawal from the cooperative—prior to the expiration of their respective terms (*i.e.*, … 2075)." FERC "disagree[d] with this argument." FERC went on to conclude that, "contrary to McKenzie's [and Dakota's] arguments, sections 7 and 8 of Basin's Bylaws … do not require that the Wholesale Power Contracts provide for early termination and withdrawal. Indeed, section 8 of Basin's Bylaws provides, in part, that 'no Members [sic] shall be permitted to withdraw until it has met all its contractual obligations to the Cooperative.'"

As Dakota pointed out to FERC, the termination provision in the Basin/Upper Missouri WPC is materially identical to the termination provision in the Basin/East River WPC as well as in the East River/Dakota WPC:

> The Basin/Upper Missouri WPC termination provision (as amended) states (in relevant part) "This Agreement shall remain in effect until December 31, 2075. If either Party desires to terminate the Agreement on December 31, 2075, it shall provide written notice of intent to terminate by December 31, 2070. If notice of termination is not received by either party prior to December 31, 2070, this Agreement shall remain in effect unless terminated by either party giving to the other not less the five (5) years prior written notice of its intention to terminate."
>
> The Basin/East River WPC termination provision (as amended) states (in relevant part) "This Agreement… shall remain in effect until December 31, 2075, and thereafter until terminated by either party's giving to the other not less than six month's written notice of its intention to terminate."
>
> The East River/Dakota WPC termination provision (as amended) states "This Agreement shall… remain in effect until December 31, 2075 and thereafter until terminated by either Party giving to the other not less than six month's written notice of its intention to terminate."

Basin alleges that FERC found Dakota's arguments to be unavailing and disagreed with them. Basin asserts that the provisions governing termination and withdrawal of membership in Basin as set forth by Article I, Sections 7 and 8 of the Basin Bylaws are identical to the provisions governing termination and withdrawal of membership in East River as set forth by Article I, Section 5(a) of the East River Bylaws.

8

(Doc. 23, Basin Electric's Pleading in Intervention, pp. 2-11.)

## DISCUSSION

As an initial matter, Basin Electric contends that Dakota Energy is bound by the September 2020 FERC decision concluding that the existing termination and withdrawal provisions in the WPC—and the absence of provisions allowing for early termination or withdrawal in the WPC—do not render the WPC unjust and unreasonable. (Doc. 23-13, FERC Order Sept. 2020.)

Dakota Energy argues that it is not bound by the FERC decision issued in September of 2020. On February 22, 2021, Dakota Energy submitted a pleading entitled "Plaintiff's Citation of Supplemental Authority" (Doc. 36), notifying the Court of an order issued by FERC on February 18, 2021, which clarified FERC's September 2020 order referred to by Basin. (Doc. 36-1.) Dakota Energy contends that, in the February 18, 2021 order, FERC clarified that, although the absence of early termination rights does not, *per se*, render a WPC unjust and unreasonable, whether the termination provisions of the WPCs between Basin and its Class A Members are just and reasonable is yet to be determined. FERC also reiterated that issues regarding termination of WPCs between Basin Class A Members and Basin Class C Members "are outside the scope of these proceedings." FERC further made clear that its September 2020 Order is not final agency action. Thus, according to Dakota Energy, even if Dakota Energy and East River were subject to FERC's jurisdiction, and even if the terms of the WPC between Dakota Energy and East River WPC were at issue, FERC's Order would not control. (Doc. 36, pp. 1-2.)

On March 8, 2021, Basin Electric and East River filed a joint response to Dakota Energy's supplemental authority "in order to correct the mischaracterizations made by Dakota" regarding the effect of the February 18, 2021 FERC order. (Doc. 37, p. 1.) Basin and East River point out that the FERC order reiterates that Basin is not required to "'include early termination provisions [in its] long-term wholesale contract[s],' Order ¶ 34, and that the lack of such provision does not 'render[] the Wholesale Power Contracts unjust and unreasonable,' *Id.* ¶ 7." (Doc. 37, p. 2.)

The parties' preclusion arguments are not fully developed and it would be premature for the Court to examine the binding effect, if any, of the orders issued by FERC in regard to the WPCs. As explained below, for purposes of ruling on a motion to intervene, courts do not resolve factual disputes, the merits of a claim, or the applicability of defenses.

Intervention is governed by Rule 24 of the Federal Rules of Civil Procedure. It provides, in relevant part:

> (a) Intervention of Right. On timely motion, the court must permit anyone to intervene who:
>  (1) is given an unconditional right to intervene by a federal statute; or
>  (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.
>
> (b) Permissive Intervention.
>  (1) **In General**. On timely motion, the court may permit anyone to intervene who:
>    (A) is given a conditional right to intervene by a federal statute; or
>    (B) has a claim or defense that shares with the main action a common question of law or fact.

Fed. R. Civ. P. 24.

## I. Article III Standing

In addition to satisfying the requirements of Rule 24, a party seeking to intervene must establish Article III standing. *F.T.C. v. Johnson*, 800 F.3d 448, 451-52 (8th Cir. 2015). "'To show Article III standing, a [party] has the burden of proving: (1) that he or she suffered an injury-in-fact, (2) a causal relationship between the injury and the challenged conduct, and (3) that the injury likely will be redressed by a favorable decision.'" *South Dakota v. U.S. Dep't of Interior*, 665 F.3d 986, 989 (8th Cir. 2012) (quoting *Pucket v. Hot Springs Sch. Dist. No. 23–2*, 526 F.3d 1151, 1157 (8th Cir. 2008)). An applicant for intervention must submit a pleading stating its claims or defenses, and the court accepts all allegations as true and construes the pleading in favor of the applicant for intervention. *United States v. Metro St. Louis Sewer Dist.*, 569 F.3d 829, 834 (8th Cir. 2009).

### A. Injury in Fact

An injury in fact "must be both concrete and particularized and actual or imminent, not conjectural or hypothetical." *Braitberg v. Charter Comnc'ns, Inc.*, 836 F.3d 925, 929 (8th Cir. 2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). To ensure that an injury is not too speculative, the Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of possible future injury' are

not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (emphasis in original) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

An injury is particularized if it "affect[s] the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1. The claimed injury cannot be a generalized grievance shared by all members of the public. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342–44 (2006) (holding that federal and state taxpayers lack standing as taxpayers to challenge taxing and spending decisions of their governments because their alleged injuries are not sufficiently "concrete and particularized," but rather are grievances these taxpayers would have in common with the general public). Rather, the plaintiff himself must have personally suffered an actual injury or an imminent threat of injury. *Id.*

A concrete injury is one that is "real, and not abstract." *Spokeo, Inc. v. Robins*, — U.S —, 136 S.Ct. 1540, 1548 (2016). Both tangible and intangible injuries can satisfy the concreteness requirement, although tangible injuries are "easier to recognize." *Id.* at 1549.

The Eighth Circuit has noted that, although federal standing "often turns on the nature and source of the claim asserted, it in no way depends on the merits of the [claim]. Rather, we must assume that on the merits the plaintiffs would be successful in their claims." *Miller v. Thurston*, 967 F.3d 727, 734 (8th Cir. 2020) (internal citations and quotations omitted). "At the pleading stage, plaintiffs must 'allege *facts* demonstrating' each element of standing." *Id.* (emphasis in the original) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

Dakota Energy, East River and Basin Electric all are requesting a declaratory judgment regarding whether the WPCs and bylaws allow for early termination. Basin asserts that, if early termination is allowed as requested by Dakota, it will suffer financial harm to its legally protected interest in the revenues that would otherwise flow to Basin through the WPC system, manifesting as unmet costs and the undermining of its financial structure, and that the ability to terminate WPCs early would threaten Basin's $7.2 billion investment in generating enough power to supply its Class A members through 2075. (Doc. 35 at 4–5.) Dakota Energy contends that alleged injury to Basin's financial security does not constitute an injury in fact sufficient to confer Article III standing because Basin does not describe the nature of its feared "unmet costs," "or why such costs would result from the loss of a tiny downstream customer like Dakota that purchases a minuscule percentage of the electricity Basin produces." (Doc. 33 at 7.) Dakota Energy also claims that

Basin's claimed monetary loss is not an actual or imminent injury because it is contingent on several conditions, beginning with Dakota Energy being the prevailing party in this lawsuit.

The Court is not persuaded by Dakota Energy's arguments that Basin Electric's alleged injuries are too speculative and conditional to support standing. Basin benefits financially from the contract between Dakota Energy and East River, so it has a pecuniary interest supporting intervention. There is an identifiable benefit flowing from the contract to Basin. If the Court rules in favor of Dakota Energy, Basin Electric would lose the financial benefits intended by its contract with East River and East River's contract with Dakota Energy.[2]  Basin has a significant interest in the outcome of this case, not only if Dakota Energy is allowed to terminate its WPC with East River with a buyout, but also if such a judgment is relied upon to allow other Members to terminate WPCs. Basin specifically alleged that revenues from its long-term WPCs "are the sole support for Basin's financial ability to operate, maintain, and improve the Basin electrical system." (Doc. 23, p. 3.) Dakota Energy even alleged in its Complaint against East River that the WPCs act as financing instruments that allow the cooperatives to secure debt used to provide member-owners with electric power. (Doc. 1-1, p. 5.) Therefore, Basin Electric has alleged an injury-in-fact which is sufficient to confer Article III standing.

**B. Traceability**

"Traceability requires proof of causation, showing the injury resulted from the actions of the defendant and not . . . [from] the independent action of some third party not before the court." *Oti Kaga, Inc. v. South Dakota Hous. Dev. Auth.*, 342 F.3d 871, 878 (8th Cir. 2003) (internal quotation marks and citation omitted). "Not every infirmity in the causal chain deprives a [party] of standing." *ABF Freight Sys., Inc. v. Int'l Bhd. of Teamsters*, 645 F.3d 954, 961 (8th Cir. 2011) (quoting *St. Pierre v. Dyer*, 208 F.3d 394, 402 (2d Cir.2000)).

There is a causal connection between Basin Electric's alleged injuries and Dakota Energy's attempt to terminate the contract with East River. If the Court grants Dakota Energy's requested relief, Basin will suffer the injuries described above. Basin's injuries are therefore traceable to the relief Dakota Energy requests.

---

[2] As stated above, at this stage of the litigation, Basin need only show that the facts alleged, if proven, would confer standing.

### C. Redressability

In order to demonstrate Article III standing, Basin Electric must show "a likelihood that the requested relief will redress the alleged injury." *Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 934 (8th Cir. 2012). Basin has shown redressability because the injuries alleged—loss of revenue and the instability that would result if Members can terminate their WPCs—would be redressed by a decision in favor of East River in this case. Accordingly, Basin Electric has standing to intervene.

## II. Intervention as a Matter of Right

Under Rule 24, the court must permit a party to intervene on a timely motion[3] if:

> [The movant] claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed.R.Civ.P. 24(a)(2). Thus, Basin is entitled to intervene if 1) it has a "cognizable interest;" 2) its interest "may be impaired as a result of the litigation;" and 3) its interest "is not adequately protected by the existing parties." *Chiglo v. City of Preston*, 104 F.3d 185, 187 (8th Cir. 1997).

"Rule 24 is construed liberally, and we resolve all doubts in favor of the proposed intervenors." *United States v. Union Elec. Co.*, 64 F.3d 1152, 1158 (8th Cir. 1995); *see also Sierra Club v. Robertson*, 960 F.2d 83, 86 (8th Cir. 1992) ("Doubts regarding the propriety of permitting intervention should be resolved in favor of allowing it, because this serves the judicial system's interest in resolving all related controversies in a single action.").

### A. Cognizable Interest

The proposed intervenor's demonstrated interest must be substantial, direct, and legally protectable. *Union Elec. Co.*, 64 F.3d at 1161. Basin argues that it has interests in preserving its

---

[3] Dakota Energy does not challenge the timeliness of Basin's motion to intervene. This case is in the initial pleading stage. After considering all of the circumstances, the Court concludes that the motion to intervene was timely filed. *See Mille Lacs Band of Chippewa Indians v. Minnesota*, 989 F.2d 994, 998 (8th Cir. 1993) ("In determining timeliness, factors that bear particular consideration are the reason for the proposed intervenor's delay in seeking intervention, how far the litigation has progressed before the motion to intervene is filed, and how much prejudice the delay in seeking intervention may cause to other parties if intervention is allowed.") (citing *Arkansas Elec. Energy Consumers v. Middle S. Energy, Inc.*, 772 F.2d 401, 403 (8th Cir. 1985)).

contracted-for revenue and in preserving the power system it heads. It quotes directly from Dakota Energy's own motion to intervene filed in Basin's FERC proceeding:

> East River takes [FERC]-jurisdictional service from Basin Electric under a [WPC] . . . . Pursuant to a [WPC] between Dakota Energy and East River, East River passes on to Dakota Energy a portion of the costs Basin Electric assesses to East River. Dakota Energy recovers those costs from its member-owners. Based on the foregoing, Dakota Energy has a direct interest in the outcome of these proceedings based on its relationship with Basin Electric through East River.

(Doc. 23-12, p. 3, Dakota Energy's Motion to Intervene and Protest.) Dakota Energy's description of its relationship with Basin is an example of why Basin Electric is not a stranger to the WPC between Dakota Energy and East River, how Basin could be injured if Dakota Energy prevails in this case, and why Basin should be allowed to intervene to urge that the cooperative's WPCs and the parties' by-laws do not allow early termination.[4]

Other information in the record demonstrates the interlocking interests between Basin Electric and the parties to this lawsuit and why Basin has a cognizable interest. One example is the May 9, 2006, letter to Dakota Energy from the manager of East River stating that extending the term of the WPC between East River and Dakota Energy to December 31, 2058 "secures East River and Basin Electric's ability to obtain financing for future power supply and transmission facilities for the benefit of their members," including Dakota Energy. (Doc. 1-1.)

Furthermore, in 2015, East River and Dakota Energy executed an amendment which extended the term of its WPC to December 31, 2075. (Doc. 10-4, pp. 34–35.) The amendment acknowledges that Basin Electric "is planning for the eventual retirement of existing generation sources and replacement with new sources that will require substantial financing" and that the extension of the contract between East River and Dakota would provide the means for East River to meet its financial obligations to Basin Electric.

---

[4] In its reply brief, Basin Electric asserts that Dakota Energy has intervened in seven FERC proceedings related to either Basin's or Upper Missouri's (a Basin Class A Member) rates and WPCs with other parties. In addition, Dakota Energy appealed FERC's decisions in the Basin proceedings to the D.C. Court of Appeals. However, Basin says that Dakota Energy recently withdrew from all active FERC proceedings. (Doc. 35, p. 2.)

In addition, on February 15, 2019, Basin Electric forwarded a resolution to East River's manager, explaining that member buyouts would be contrary to their "all-requirements contract." The resolution also explained that East River assisting member buyouts would be contrary to East River's obligations to the cooperative. (Doc. 10-7, p. 4.) The East River manager then wrote to Dakota Energy on March 7, 2019. The letter described the cooperative's "three-tiered cooperative network" and stated, in part:

> Consistent with the seven cooperative principals, your board member on East River's board, along with the other East River directors, chart the course for the organization. The East River member systems collectively elect a director for the Basin Electric board of directors, and both Dakota Energy and East River are member-owners of Basin Electric.

(Doc. 10-7, p. 2.) The letter went on to explain that East River had forwarded Dakota Energy's request for a buyout amount to Basin Electric. (*Id*.) Along with the letter, East River sent Dakota Energy a copy of Basin Electric's resolution stating that the agreements between Class A Members (such as East River) and Class C Members (such as Dakota Energy) do not contain any provision permitting a member buy-out. (*Id*., pp. 2 and 5.)

As the top-tier of the "three-tiered cooperative network," Basin has a direct interest in the continued viability of the contracts between the member-owners of the cooperative, including the contract between East River and Dakota Energy. The record reflects that Basin depends on the revenue from the member-contracts. As stated by Basin, "a balance is struck – Basin makes investments to support a nine-state electrical power system relying on the long-term WPCs to service its generation and transmission costs, and Dakota's consumer end users get electricity at reasonable rates from a long-term, stable source of power." (Doc. 24, p. 5.) The continued existence of WPCs may be jeopardized if Dakota Energy prevails. Basin asserts that should Dakota be allowed to terminate its WPC with East River "the generation & transmission system would begin to unravel: Basin would have unmet costs from Dakota's withdrawal, costs which would be forced upon its remaining members, thereby increasing the cost of electricity for every other member of the cooperative. This upending of the cooperative G&T balance would threaten Basin's ability to meet the electricity needs of all three million of its end users." (*Id*. at pp. 5-6.) The Court concludes that suspension of the flow of revenue to Basin Electric if Dakota Energy is successful in this lawsuit

is direct and substantial enough to justify intervention. In addition, Basin Electric's ability to litigate the enforcement of other members' contracts could be impacted by this Court's decision in this case. Basin has a cognizable interest that supports intervention in this case.

### B. Impairment of Interest

Rule 24 does not require Basin to show to a certainty that its interests will be impaired. It requires only that the disposition of this action "may as a practical matter" impair its interests. The remedy requested by Dakota Energy is to buy out and terminate its contract with East River.[5] At this point it is not clear whether a buy-out would be as favorable to Basin as is the current agreement. For purposes of this motion, the Court must accept Basin's claim that a buyout would be detrimental to Basin. Basin has met the requirement of Rule 24 with a showing that disposition of this action may as a practical matter impair or impede its interest. *See, e.g., Kansas Pub. Employees Ret. Sys. v. Reimer & Koger Assocs., Inc.*, 60 F.3d 1304, 1307–08 (8th Cir. 1995) ("[The intervenor] need not show that, but for its intervention, its interest 'would be' impaired by the operation of res judicata, collateral estoppel, or stare decisis, but rather only that its interest 'may be' so impaired.").

### C. Adequate Representation by Existing Parties

"Usually, Rule 24(a)'s third criterion is easy to satisfy, and the would-be intervenor faces a 'minimal burden' of showing that its interests are not adequately represented by the parties." *Mausolf v. Babbitt*, 85 F.3d 1295, 1303 (8th Cir. 1996) (citing *Mille Lacs*, 989 F.2d at 999). Although Basin Electric and East River share the same legal goal of upholding the validity of East River's contract with Dakota Energy and not allowing a buy-out, East River's financial interest is more narrow than Basin Electric's. Basin Electric has a broader interest in protecting its nine-state system that allegedly is based on contracts with language identical to that in the contract between East River and Dakota Energy. In addition, if the Court were to determine that the contract language and bylaws allow for an early termination of Dakota Energy's contract with East River, Basin's

---

[5] In its Complaint, Dakota Energy suggests a calculation for a buy out:
An equitable buy-out of Plaintiffs contractual obligations to Defendant can be calculated by subtracting Plaintiffs patronage capital in Defendant from that portion of the debt incurred to supply Plaintiff with electricity as provided in § 14 of the WPC.

(Doc. 1-1, p. 10 n.3.)

proferred calculation for a buy out could differ from East River's. The Court concludes that Basin is in the best position to defend its potentially greater financial interest, and intervention is appropriate.

### III. Permissive Intervention

In the alternative, the Court would grant Basin's motion for permissive intervention. Whether to grant permissive intervention pursuant to Rule 24(b)(2) is wholly within the court's discretion. *South Dakota ex rel Barnett v. U.S. Dep't of Interior*, 317 F.3d 783, 787 (8th Cir. 1995). A court properly grants permissive intervention where (1) the motion is timely; (2) the movant shows independent jurisdictional grounds; and (3) the movant's claim or defense and the main action share common questions of law or fact. Fed. R. Civ. P. 24(b); *Union Elec.*, 64 F.3d at 1170 n.9 (8th Cir. 1995). But the "principal consideration in ruling on a Rule 24(b) motion is whether the proposed intervention would unduly delay or prejudice the adjudication of the parties' rights." *South Dakota ex rel Barnett*, 317 F.3d at 787.

Dakota Energy does not challenge timeliness, jurisdiction, or commonality–the first three factors listed above. The Court concludes that the first three factors have been met. There is no dispute that the motion is timely, there is an independent showing of jurisdiction under the federal officer removal statute, 28 U.S.C. § 1442(a), and Basin's claims and the main action share common questions of law or fact. Thus, the Court must decide whether the intervention will unduly prejudice the adjudication of the rights of the original parties.

Dakota Energy does not argue that it would suffer prejudice should Basin Electric be allowed to intervene. Instead, it contends that intervention would be futile because the doctrine of judicial estoppel prevents Basin from arguing that Dakota Energy is bound by the FERC determination. As stated earlier, in ruling on the motion to intervene, the Court will not address the preclusive effect, if any, of the FERC orders cited by Basin and Dakota.

The Court is convinced that Dakota Energy will not be unduly prejudiced by the adjudication of Basin Electric's rights. Thus, the Court will exercise its discretion and will grant permission for Basin Electric to intervene in this case. Accordingly,

    **IT IS ORDERED**:

    1.    That Basin Electric Power Cooperative's Motion to Intervene, Doc. 22, is granted, and Basin Electric is joined as a party in this action.

2. That the caption shall be amended as subsequently Ordered. Each of the three parties shall submit simultaneous briefs within 20 days from the date of this Order setting forth their position as to the alignment of the parties and the caption to be used in this case.

3. That Basin Electric Power Cooperative's Pleading in Intervention and its attachments (Doc. 23) are deemed filed as of today's date.

4. Both Dakota Energy and East River shall answer or respond to Basin Electric's Pleading in Intervention, which the Court considers a Complaint, within the time set by the Federal Rules of Civil Procedure.

5. That this case will be set for a Rule 16 scheduling conference by separate Order.

Dated this 15th day of March, 2021.

BY THE COURT:

_____
Lawrence L. Piersol
United States District Judge

ATTEST:
MATTHEW W. THELEN, CLERK

_____