# ATTACHMENT A

## **DAKOTA ENERGY'S POSITION STATEMENT REGARDING THE CONDUCT OF DEPOSITIONS, INCLUDING ASSERTIONS OF PRIVILEGE AND INSTRUCTIONS NOT TO ANSWER**

The parties have recently begun deposition discovery in this matter. Dakota Energy seeks the Court's intervention because East River's counsel has improperly interfered with the examination of East River's witnesses. The conduct at issue is described in detail below and in Exhibits A through K. Dakota Energy requests that the witnesses be recalled to testify in front of this Court, so that cross-examination can be completed on those topics that were the subject of counsel's improper interference.[1]

### *Improper Instructions Based on Attorney/Client Privilege*

James Ryken is the Chairman of East River's Board of Directors. At his deposition, he testified to his understanding of the Wholesale Power Contract ("WPC") between Dakota Energy and East River. When he was asked what he relied on for his interpretation of the WPC, Mr. Ryken testified that it was his reading of WPC and counsel's advice. Despite having injected that advice into the proceeding, Mr. Ryken was instructed not to testify further. (*See* Exh. B.) This a pattern of conduct on the part of East River. It injects its attorneys' advice for purposes of supporting its position but then prohibits any examination concerning the advice. This is a paradigmatic example of using the attorney/client privilege as both a sword and a shield. A party is not entitled to contend that her position is supported by her attorney without giving the

---

[1] Dakota Energy initiated this process pursuant to the parties agreed process for resolution of discovery disputes. (*See* ECF No. 50.) The deposition conduct giving rise to this discovery dispute was discussed on the record at the depositions, and Dakota Energy made it clear at that time that it intended to raise these matters with the Court. East River's counsel nevertheless refused to allow the witness to answer the questions posed, offering with respect to a few questions only to "discuss the matter offline," whatever that means. Even after the parties were unable to resolve their disagreement after discussing it on the record at the depositions, Dakota Energy nevertheless proposed the parties agree to recall the witnesses to testify before the Court, where rulings could be made on East River's objections. East River did not respond to the proposal and, although invited, submitted no proposed resolution of its own. The matter is ripe for decision. (*See* Exh A.)

opposing party an opportunity to determine just how strong that support was. Did the attorney suggest it was a close call or say a court might conclude otherwise? By presenting only the portion of the advice the litigant believes is favorable to its position, the parties, the Court, and the jury are unfairly inhibited in the search for truth. *See, e.g., Fort James Corp. v. Solo Cup Co.,* 412 F.3d 1340, 1349 (Fed. Cir. 2005) ("fairness dictates that a privilege holder 'cannot be allowed, after disclosing as much as he pleases, to withhold the remainder'") (*quoting* VIII J. Wigmore, Evidence § 2291, at 636 (McNaughton rev. 1961).) If East River offers its attorneys' advice as support for its position, Dakota Energy is entitled to inquire into that advice.

Other examples of improper instructions not to answer based on the attorney/client privilege include the following:

- Mr. Boyko made notes either during or just before the deposition to assist him in testifying because he was nervous. He brought the notes into the deposition. He was instructed not to testify regarding the content of the notes because it might contain attorney/client privileged communication. (*See* Exh. C.)

- Despite telling Dakota Energy in a letter dated March 9, 2019 that its WPC doesn't permit a buyout, Mr. Ryken was prohibited from testifying about the basis for his written assertion. (*See* Exh. D.)

- Like Mr. Ryken, Mr. Boyko testified that he relied on the advice of his counsel for his interpretation of the WPC but was prohibited from discussing the advice he was relying on. (*See* Exh. E.)

### *Improper Instructions Based on Phase One Limitations*

As this Court may recall, Dakota Energy served document subpoenas on five individuals whom it suspected of colluding with East River to seek a membership vote to end this lawsuit. The individuals moved to quash the subpoenas, a motion this Court denied. (ECF No. 74.) The documents produced in response to the subpoenas, which were withheld by East River, turned out to be even worse than Dakota Energy anticipated. East River was the architect of the petition effort to amend Dakota Energy's Bylaws to prevent a decision by Judge Piersol on Dakota

Energy's right to withdraw. (*See* Exh. F.) Not only was the proposed amendment a violation of South Dakota law, it constitutes an improper and potentially tortious interference in Dakota Energy's corporate governance. Notwithstanding this Court's specific order requiring the production of these documents during Phase One discovery, East River improperly (and unilaterally) decided that certain questions about East River's involvement were beyond the scope of Phase One discovery and instructed the witness *on that basis* not to answer questions about East River's involvement. For example:

- Mr. Boyko was instructed not to answer whether East River assisted Messrs. Doak, Eide and others in identifying an attorney to represent them in the effort to amend the Dakota Energy Bylaws to preclude this lawsuit. (*See* Exh. G.)

- Mr. Boyko was instructed not to answer whether another East River employee—Chris Studer—told Mr. Boyko that he had recommended to Mr. Doak and others the petition to amend Dakota Energy's Bylaws. (*See* Exh. H.)

- Mr. Boyko, testifying as corporate designee, was instructed not to answer questions on the contents of East River communications that this Court ordered produced *during* Phase One. (*See* Exh. I.)

It should not be subject to dispute that Dakota Energy has a right to inquire about East River's efforts to interfere in this lawsuit and Dakota Energy's self-governance. Not only did this Court compel production of the communications during this phase of discovery, but if East River's contention that there is no right to withdraw is as clear as it has claimed, there would be no need for East River to try to preclude a judicial decision on that important question.

### *Improper Communication with the Witness*

In addition to improper instructions not to answer, counsel engaged in substantive communications with the witness about the subject of his testimony while the witness was on the stand. Early in his deposition, Mr. Boyko was asked multiple times whether he had spoken with Mr. Studer in preparation for his deposition, and he denied doing so. Later in the deposition, with no question prompting it, Mr. Boyko changed his testimony and said he had spoken with him in

3

preparation, but on one topic only. (*See* Exh. J.) This created concern that counsel was improperly coaching the witness. So later in the deposition, when East River's counsel asked to speak with Mr. Boyko to determine whether a conversation with the Rural Utilities Service was privileged, Dakota Energy declined, explaining that a conversation with an agency of the Federal Government could not possibly be privileged. Outside counsel for East River then asked to speak with Mr. Sahr, East River's inside general counsel. Counsel for Dakota Energy agreed to that request but remained on the record and did not break to prevent any coaching. (*See* Exh. K.) Nevertheless, local counsel for East River, Mr. Luce, communicated with the witness, and the witness thereafter changed his testimony. The witness specifically admitted speaking with Mr. Luce about the testimony even though Dakota Energy had made it very clear that it would not agree to the communication. Mr. Luce should be admonished for his conduct, which he attempted to justify by claiming he thought he was doing so during a break in the deposition. There was no break in the deposition, but even if there had been, Mr. Luce should not have been communicating with the witness about the substance of the witness's testimony. *Perry v. Leeke*, 488 U.S. 272, 279 (1989) (once a witness begins to testify, neither the witness nor his lawyer has a right to have testimony interrupted in order to give him benefits of counsel's advice). Indeed, Mr. Orr specifically stated on the record that "the sole purpose of communicating with Mr. Boyko was to make sure that … no attorney/client communication was revealed," something that plainly was not at risk in Mr. Boyko's communications with RUS. (*See* Exh. L.)

For these reasons, Dakota Energy asks that the witnesses be recalled on the record before this Court, so that cross-examination can be completed without interference.

# EXHIBIT A

**Herzog, Peter**

| | |
|---|---|
| **From:** | Herzog, Peter |
| **Sent:** | Monday, October 4, 2021 5:05 PM |
| **To:** | Orr, James; Michael Luce |
| **Cc:** | Neckers, Joel; Jasilli, Matthew; Cash, Webster; Lee Schoenbeck |
| **Subject:** | RE: Draft Discovery Dispute Package Concerning Conduct of Depositions |

James,

I'm not sure how you could possibly be surprised. Both Joel and I stated—repeatedly—on the record during the depositions why we believed your instructions (and other conduct) were improper and that we intended to address both with the Magistrate. It wasn't incumbent on us to repeat those explanations every time you gave the witness the same improper instruction. I then followed up last Friday offering a proposed resolution with respect to your instructions not to answer. You rejected the proposal without offering a counterproposal or even a timetable for a counterproposal. It appears to us that East River is simply trying to avoid a resolution of our disagreement. You will see from our position statement that we have provided multiple examples, including highlighted page and line testimony, of the challenged conduct/instructions. You will note that these excerpts include multiple instances in which we advised you then that we intended to address your conduct with the Court. We plan to submit this to Magistrate Duffy on Wednesday.

We continue to believe that the proper, and most efficient resolution, is to recall the witnesses for completion of cross-examination before Magistrate Duffy. I am hard pressed to understand your reluctance to agree to such a reasonable proposal.

Peter

**Peter W. Herzog III | Partner**
Wheeler Trigg O'Donnell LLP
211 N. Broadway | Suite 2825 | St. Louis MO  63102
St. Louis 314.326.4129 | Denver 303.244.0117 | M 314.740.2353
pherzog@wtotrial.com | wtotrial.com | vCard


**From:** Orr, James <jamesorr@eversheds-sutherland.com>
**Sent:** Monday, October 4, 2021 4:36 PM
**To:** Herzog, Peter <PHerzog@wtotrial.com>; Michael Luce <mluce@lynnjackson.com>
**Cc:** Neckers, Joel <neckers@wtotrial.com>; Jasilli, Matthew <Jasilli@wtotrial.com>; Cash, Webster <Cash@wtotrial.com>; Lee Schoenbeck <lee@schoenbecklaw.com>
**Subject:** RE: Draft Discovery Dispute Package Concerning Conduct of Depositions

**External Email**

Peter

I was surprised to see your four-page submission to Magistrate Duffy which you just sent over, particularly since your Friday email gave no indication that you would be submitting this to us if we did not respond by a certain date/time. We

1

were in the process of preparing a response to your Friday email, which is as follows. We disagree with your position. With one or two exceptions, there was no discussion or debate regarding my instructions not to answer. For the most part, you did not want to have that type of discussion, on or off the record. One of the goals for conferral is to provide the parties an opportunity to resolve discovery disputes before taking up the court's time with such matters. Your proposal that we "confer" by re-producing the witnesses for cross-examination in front of Magistrate Duffy is not a conferral at all, and would completely defeat that goal. As you requested, our proposal would be that you provide what we (and the Magistrate, if we cannot resolve our dispute) need: the page and line number of the instructions not to answer that are in dispute and a short statement of why you believe the instruction was improper. We would then provide a prompt response. This is the practice followed by the parties as to other discovery disputes. See, e.g., Joel Neckers' letter of August 17, 2021. We are still willing to engage in this type of conferral.

James

James Orr | Partner | T: +1.404.853.8578. C: +1404.358.4314

**From:** Herzog, Peter <PHerzog@wtotrial.com>
**Sent:** Monday, October 4, 2021 4:32 PM
**To:** Orr, James <JamesOrr@evershedssutherland.us>; Michael Luce <mluce@lynnjackson.com>
**Cc:** Neckers, Joel <neckers@wtotrial.com>; Jasilli, Matthew <Jasilli@wtotrial.com>; Cash, Webster <Cash@wtotrial.com>; Lee Schoenbeck <lee@schoenbecklaw.com>
**Subject:** Draft Discovery Dispute Package Concerning Conduct of Depositions

Messrs. Orr and Luce.

Please see the attached and provide us with East River's position statement on Wednesday.

Thank you.

**Peter W. Herzog III | Partner**
**Wheeler Trigg O'Donnell LLP**
211 N. Broadway | Suite 2825 | St. Louis MO 63102
St. Louis 314.326.4129 | Denver 303.244.0117 | M 314.740.2353
pherzog@wtotrial.com | wtotrial.com | vCard

 Wheeler Trigg O'Donnell LLP

Eversheds Sutherland (US) LLP is part of a global legal practice, operating through various separate and distinct legal entities, under Eversheds Sutherland. For a full description of the structure and a list of offices, please visit www.eversheds-sutherland.com.

This e-mail message, together with any attachments, is intended only for the above named recipient(s) and may contain privileged and/or confidential information. If you are not an intended recipient, you must not review, copy or show the message and any attachments to anyone. Please reply to this e-mail and highlight the mistaken transmission to the sender, and then immediately delete the message.

**Herzog, Peter**

| | |
|---|---|
| **From:** | Herzog, Peter |
| **Sent:** | Friday, October 1, 2021 4:21 PM |
| **To:** | Orr, James; Michael Luce |
| **Cc:** | Neckers, Joel; lee@schoenbecklaw.com |
| **Subject:** | RE: Discovery Issues |

James,

I disagree. I am not sure a further conferral is even required, given that you instructed the witnesses (improperly, in our view) not to answer questions that were posed to them. We then discussed and debated your instructions on the record and were unable to resolve our disagreement. Nevertheless, as an additional conferral, I proposed that East River re-produce the witnesses for cross-examination in front of Magistrate Duffy, and allow her to rule on your objections/instructions. If you are unwilling to do so, I cannot imagine what would be accomplished by an additional conferral.

If you have a specific proposal, we are certainly willing to consider it. But we are not interested in a futile discussion that results only in further delay.

Peter

**Peter W. Herzog III | Partner**
**Wheeler Trigg O'Donnell LLP**
211 N. Broadway | Suite 2825 | St. Louis MO  63102
St. Louis 314.326.4129 | Denver 303.244.0117 | M 314.740.2353
pherzog@wtotrial.com | wtotrial.com | vCard


**From:** Orr, James <jamesorr@eversheds-sutherland.com>
**Sent:** Friday, October 1, 2021 4:04 PM
**To:** Herzog, Peter <PHerzog@wtotrial.com>; Michael Luce <mluce@lynnjackson.com>
**Cc:** Neckers, Joel <neckers@wtotrial.com>; lee@schoenbecklaw.com
**Subject:** RE: Discovery Issues

**External Email**

Peter,

Just before noon ET today I received your email below. This is not a good faith conferral, as required by the agreed/ordered discovery procedure in this case and the Federal Rules. It is a non-specific, unilateral statement that if we do not accede to your demand by the end of the day, you will declare an impasse and take the matter to the Magistrate. Let us know if you would like to conduct a bona fide meet-and-confer.

James

James Orr | Partner | T: +1.404.853.8578. C: +1404.358.4314

**From:** Herzog, Peter <PHerzog@wtotrial.com>
**Sent:** Friday, October 1, 2021 11:20 AM
**To:** Orr, James <JamesOrr@eversheds-sutherland.us>; Michael Luce <mluce@lynnjackson.com>
**Cc:** Neckers, Joel <neckers@wtotrial.com>; lee@schoenbecklaw.com
**Subject:** Discovery Issues

Messrs. Orr and Luce,

Please allow this to serve as our conferral regarding the conduct of East River's counsel during the depositions of Mr. Tom Boyko and Mr. Jim Ryken. As was made clear during the depositions, Dakota Energy intends to raise with the Court your (1) instructions not to answer based on an improper assertion of the attorney/client privilege, (2) instructions not to answer based on your unilateral interpretation of the scope of Phase One discovery, and (3) your improper communications with a witness on the stand. Unless East River represents no later than 5 pm CDT today that it is willing to re-produce Messrs. Boyko and Ryken for completion of cross-examination before Magistrate Duffy, we are declaring an impasse and will submit these matters pursuant to the agreed procedure.

Peter

**Peter W. Herzog III | Partner**
**Wheeler Trigg O'Donnell LLP**
211 N. Broadway | Suite 2825 | St. Louis MO 63102
St. Louis 314.326.4129 | Denver 303.244.0117 | M 314.740.2353
pherzog@wtotrial.com | wtotrial.com | vCard



Eversheds Sutherland (US) LLP is part of a global legal practice, operating through various separate and distinct legal entities, under Eversheds Sutherland. For a full description of the structure and a list of offices, please visit www.eversheds-sutherland.com.

This e-mail message, together with any attachments, is intended only for the above named recipient(s) and may contain privileged and/or confidential information. If you are not an intended recipient, you must not review, copy or show the message and any attachments to anyone. Please reply to this e-mail and highlight the mistaken transmission to the sender, and then immediately delete the message.

# EXHIBIT B

# In The Matter Of:

*Dakota Energy Cooperative, Inc. v.*
*East River Electric Power Cooperative, Inc., et al.*

---

*James Ryken*
*September 22, 2021*
*Rough Draft*

---

*Pat Beck, Court Reporter*

Original File 092121ROUGHDRAFT.txt

Min-U-Script® with Word Index

Case 4:20-cv-04192-LLP   Document 88-1   Filed 10/06/21   Page 13 of 51 PageID #: 1606

Dakota Energy Cooperative, Inc. v.                    Rough Draft                      James Ryken
East River Electric Power Cooperative, Inc., et al.                              September 22, 2021

Page 185

1   A   Yes.
2   Q   (By Mr. Neckers) Mr. Ryken, have I treated you
3   fairly and given you a full opportunity to answer my
4   questions today?
5   A   Yes.
6       MR. NECKERS: All right.  Thank you, sir.  I
7   have no further questions.
8       MR. ORR: Let us take a break and see whether
9   we have any additional questions.
10      MR. NECKERS: You bet.
11      MR. ORR: About ten minutes, I suppose.
12      THE VIDEOGRAPHER: Can we go off the record
13  now, please?  It's about five minutes to five and
14  we're going to go off the record now.
15          (Recess taken)
16      THE VIDEOGRAPHER: All right.  The time is now
17  5:17 and we are back on the record and we can
18  proceed.
19  EXAMINATION BY MR. ORR:
20  Q   Mr. Ryken, and this is James Orr, for the
21  record, representing East River.  I do have a few
22  questions for you.  You were asked several times
23  earlier today about the bylaws, specifically
24  Article 1, Section 5A, and that's Exhibit 1 in your
25  papers.

Page 186

1   A   Yes.
2   Q   And the page number at the bottom is ER39.  Are
3   you there?
4   A   Of the bylaws?
5   Q   Maybe you have a different draft.  So it's that
6   termination of membership provision that you were
7   asked about earlier.
8   A   Okay.  Section 5.  Okay.
9   Q   Section 5A.  And then the sentence you were
10  asked about was that first sentence which states, A
11  member may withdraw from membership upon compliance
12  with such equitable terms and conditions as the
13  board of directors may prescribe, provided, however,
14  that no member shall be permitted to withdraw until
15  it has met all contractual obligations to the
16  cooperative.  "The cooperative" being East River.
17  Did I read that correctly?
18  A   Yes.
19  Q   And as you testified, certain of East River's
20  members have wholesale power contracts with East
21  River, correct?
22  A   Yes.
23  Q   And do those members have contractual
24  obligations under those wholesale power contracts?
25  A   Yes.

Page 187

1   Q   Did those obligations include purchasing their
2   power needs from East River through 2075?
3       MR. NECKERS: Objection to form.
4   A   Yes.
5   Q   (By Mr. Orr) Would you state whether -- state
6   whether your understanding is that these
7   obligations, these contractual obligations, include
8   purchasing power needs from East River through 2075?
9       MR. NECKERS: Object to form.
10  A   Yes.
11  Q   (By Mr. Orr) So is it your understanding,
12  reading this 5A, that a member would not be
13  permitted to withdraw until it has met all its
14  contractual obligations under the wholesale power
15  contract to East River through 2075?
16      MR. NECKERS: Objection to form.
17  A   Yes.
18  Q   (By Mr. Orr) And stated another way, would a
19  member have a right to withdraw, as you read this,
20  before meeting all its contractual obligations to
21  East River through 2075?
22  A   No.
23  Q   So does simply paying a portion of a member's
24  debt and outstanding invoices meet all contractual
25  obligations of a member including those under the

Page 188

1   wholesale power contract through 2075?
2       MR. NECKERS: Objection to form.
3   A   Repeat, please.
4   Q   (By Mr. Orr) Yes.  Would simply paying a
5   portion of a member's debt, the member's outstanding
6   invoices meet all of that member's contractual
7   obligations under the wholesale power contract
8   through 2075?
9       MR. NECKERS: Object to form.
10  A   No.
11      MR. ORR: Okay.  That's all I have.
12  EXAMINATION BY MR. NECKERS:
13  Q   Mr. Ryken, you just testified as to your
14  understanding of the WPC and this bylaw provision in
15  the last two minutes, right?
16  A   Yes.
17  Q   What is that understanding based on, sir?
18  A   Reading the words on Section 5A.
19  Q   Is that understanding that your counsel, James
20  Orr, just had you testify to based upon anything
21  other than you, Mr. Ryken, just sitting there and
22  reading the words on the page?
23      MR. ORR: Object to the form.
24  A   I was -- we were told by counsel that that
25  would be the case also, so...

Dakota Energy Cooperative, Inc. v.
East River Electric Power Cooperative, Inc., et al.

**Rough Draft**

James Ryken
September 22, 2021

---

Page 189

1  Q   (By Mr. Neckers) So you were also, in addition
2  to reading the words on the page, when you testified
3  about your understanding of what those words meant,
4  you were also relying on advice that you received
5  from your counsel.  Is that correct, sir?
6  A   Yes.  We were allowed to do that.
7  Q   What advice specifically did you receive from
8  your counsel as it relates to your understanding of
9  the words on the page that you just read?
10     MR. ORR: Object to the form of the question.
11  Calls for revealing attorney/client communications.
12     MR. NECKERS: And he just waived all of that,
13  James.  I'm entitled to ask him every last question
14  about it, has he ever received any communication
15  from any lawyer about the whole subject matter?
16     MR. ORR: No, you're not.  You're not -- you're
17  not allowed to do that.  You asked -- your question
18  was very specific and you're not allowed to go into
19  any and all communications he had with counsel about
20  the wholesale power contract.
21     MR. NECKERS: You guys just waived the entire
22  subject matter, and that will be taken up with the
23  Magistrate Judge.
24  Q   (By Mr. Neckers) I'm going to ask you again,
25  sir.  What communications have you had with your

---

Page 190

1  counsel about your understanding of Section 5 of the
2  bylaws that you just testified to?
3     MR. ORR: Object to the question to the extent
4  it calls for revealing attorney/client
5  communications.
6  Q   (By Mr. Neckers) Will you answer the question,
7  sir, or are you going to follow your counsel's
8  advice and not respond to that question?
9  A   I was trying to.  The advice was that it didn't
10  meet the contract --
11  Q   Sir, are you going to follow that advice?
12  A   We have so far.
13  Q   What -- are you going to follow that advice as
14  it relates to this specific instruction that Mr. Orr
15  just gave to you?
16  A   I don't understand what you're asking me.
17  Q   All right.  What lawyers have advised you as it
18  relates to Section 5 of the bylaws that you just
19  testified to?
20  A   Bob Sahr.
21  Q   Any others?
22     MR. DIRENFELD: I believe -- I mean, I'm going
23  to interject in.  I believe Mr. Orr had an
24  instruction not to answer, but, Mr. Orr, I'll allow
25  you to restate your objection.

---

Page 191

1     MR. ORR: Yeah.  I'm going to instruct the
2  witness not to answer.
3  Q   (By Mr. Neckers) When did you receive this
4  advice from your counsel?  Not what, but when.
5  A   Whenever we first discussed it.
6  Q   Any other times, sir?
7  A   I don't recall.
8  Q   How about in the last 20 minutes?
9  A   I have not talked to anyone counsel-wise.  I've
10  been -- I went to the bathroom.  I haven't talked to
11  anybody about it.
12  Q   Were those written or oral communications?
13  A   Oral.
14  Q   You said oral?
15  A   Yes.
16     MR. NECKERS: Okay.  Then as I understand it,
17  counsel will not permit the witness to answer any
18  specific questions about what he discussed with
19  Mr. Sahr and anyone else as it relates to the topics
20  we've just been discussing, so for that reason we're
21  going to leave this deposition open as well and
22  we'll have to take up this issue with the Magistrate
23  as well.
24     MR. ORR: Okay.  We believe the deposition is
25  concluded.

---

Page 192

1     MR. NECKERS: Understood.  Okay.  Subject to
2  that, I think we're done.  We can go off the record.
3     MR. ORR: All right.  Thank you.  Thank you,
4  Mr. Ryken.
5     THE WITNESS: Yes.  Thank you.
6     THE VIDEOGRAPHER: Let me conclude the
7  deposition.  It's about 5:25.  It's the end of media
8  three in the deposition of James Ryken, and we are
9  now off the record.  (Witness excused.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

# EXHIBIT C

# In The Matter Of:

*Dakota Energy Cooperative, Inc. v.*
*East River Electric Power Cooperative, Inc., et al.*

---

*Tom Boyko*
*September 20, 2021*
*Rough Draft*

---

*Pat Beck, Court Reporter*

Original File 092021ROUGHDRAFT.txt

Min-U-Script® with Word Index

Page 45

1  A   Yes.
2  Q   All right.
3  A   Correct.
4  Q   Did you make notes on any of the documents?
5  A   I might have.  I don't know.  I left -- yeah,
6  maybe.  More than likely, I guess.
7  Q   Where would those documents be now, Mr. Boyko?
8  A   At home.
9  Q   Okay.  Did you make any notes to help yourself
10  get ready to prepare today?
11     MR. ORR: Object to form.
12  Q   (By Mr. Herzog) I mean, other than the ones
13  that you may have written on the documents, did you,
14  you know, take the notice of deposition and make
15  notes?  Did you make notes on a separate piece of
16  paper, anything to help you testify today?
17     MR. ORR: Object to the form.
18  A   No, other than I got a couple notes here I just
19  wrote down.
20  Q   (By Mr. Herzog) Okay.  When did you write those
21  down?
22  A   Just sitting here.
23  Q   When?
24  A   While I was sitting here this morning.
25  Q   Before the deposition started?

Page 46

1  A   No.
2  Q   While -- while we were taking the deposition?
3  A   While we were -- yeah, while we were taking the
4  deposition.
5  Q   Okay.  And what are those notes, Mr. Boyko?
6     MR. ORR: Object to the extent -- Mr. Boyko,
7  I'm just going to object if any of those notes
8  concern attorney/client communications, but if not,
9  you can go ahead and answer.
10     MR. HERZOG: He's referring to them in the
11  deposition, Mr. Orr.
12  Q   (By Mr. Herzog) What do the notes say,
13  Mr. Boyko?
14     MR. ORR: Same objection.
15  A   Actually, it's scribbled, so two -- well, one
16  says typo.  One says contracts 75.  One says no
17  buy-out, one says fulfill contract.
18  Q   (By Mr. Herzog) Okay.  And you made those
19  during the deposition while you were on camera?
20     MR. ORR: I'm going to object to the question
21  to the extent it calls for any disclosure of any
22  attorney/client communication.
23     MR. HERZOG: I mean, it's been waived, Mr. Orr.
24     MR. ORR: No, it hasn't.  I didn't waive it.  I
25  didn't waive any objection.

Page 47

1     MR. HERZOG: The witness did.
2     MR. ORR: No, he didn't.  I asserted the
3  objection.
4     MR. HERZOG: You assert your objection.  That's
5  just specious.
6     MR. ORR: No, it's not.
7     MR. HERZOG: Yes, it is.
8  Q   (By Mr. Herzog) Mr. Boyko --
9     MR. ORR: No, it's not.
10     MR. HERZOG: Don't argue with me.
11     MR. ORR: I'm not.  I'm instructing the witness
12  that if your notes reflect attorney/client
13  communications you are not to discuss those at
14  this deposition.
15  Q   (By Mr. Herzog) Did -- you just testified,
16  Mr. Boyko, that you made those notes during this
17  deposition, didn't you?
18  A   Well, right at the beginning.  I don't know if
19  we were on video or not.
20  Q   But you made those notes to help you testify at
21  deposition; right?
22  A   It wasn't to help.  It was just -- I was just
23  sitting here.
24  Q   Well, what were you making them for, Mr. Boyko?
25  A   Sitting here kind of nervous.  Okay?

Page 48

1  Q   Right.  And I got no problem with that.
2  But that -- and, you know, witnesses do that all the
3  time, Mr. Boyko, and they make notes because they
4  don't want to forget something and that's perfectly
5  appropriate.  Is that what -- the purpose for which
6  you were making the notes, making sure you didn't --
7  you didn't forget anything?
8  A   It wasn't so I wouldn't forget anything.  It
9  was just things that were on my mind.
10  Q   Okay.  What was on your mind, sir?
11  A   This deposition.
12  Q   Okay.  So were you making the notes to help you
13  testify in the deposition?
14     MR. ORR: Object to the form of the question.
15  Asked and answered.
16  A   No, not specifically.  I was sitting here,
17  nervous, I wrote some things.  There was no reason.
18  Q   (By Mr. Herzog) All right.  Well, Mr. Boyko, do
19  you have a cell phone?
20  A   Yes, I do.
21  Q   Could you take a picture of those notes for us,
22  sir?
23     MR. ORR: Object to the form of the question.
24  We can take this up on break.  We're not --
25     MR. HERZOG: No, we're not.  No, we're not.  I

# EXHIBIT D

# In The Matter Of:

*Dakota Energy Cooperative, Inc. v.*
*East River Electric Power Cooperative, Inc., et al.*

---

*James Ryken*
*September 22, 2021*
*Rough Draft*

---

*Pat Beck, Court Reporter*

Original File 092121ROUGHDRAFT.txt

Min-U-Script® with Word Index

Dakota Energy Cooperative, Inc. v.
East River Electric Power Cooperative, Inc., et al.

Rough Draft

James Ryken
September 22, 2021

Page 105

1   this letter before you signed this?
2   A   I don't recall.
3   Q   In preparation for your deposition today, did
4   you do anything to refresh your recollection of --
5   did you do anything to refresh your recollection of
6   the topics that are included in this letter?
7        MR. ORR: Object to form.
8   A   No.
9   Q   (By Mr. Neckers) Does this letter contain your
10  own opinions or thoughts about the Dakota request
11  for a buy-out or does it contain the thoughts and
12  opinions of others?
13       MR. ORR: Object to form.
14  A   It has the opinion of the board and so, yes, it
15  has my opinion in it.
16  Q   (By Mr. Neckers) In your view, this letter
17  contains the opinion of the board of directors of
18  East River?
19  A   Yes, I was authorized to sign the letter on
20  behalf of the board.
21  Q   Was there a specific board resolution to that
22  effect?
23  A   I'm not sure.
24  Q   Do you recall either way as to whether there
25  was an affirmative vote of the East River board of

Page 106

1   directors authorizing you to send this letter?
2   A   I don't recall.
3   Q   Would it -- based on your general practice
4   working on the board at East River for the last 23
5   or so years, would it have been, in your mind,
6   within your authority as board president to send
7   this letter absent an affirmative vote of the
8   directors?
9        MR. ORR: Object to form.
10  A   Probably not, no.
11  Q   (By Mr. Neckers) Do you remember if -- do you
12  remember attending a board meeting then or having a
13  written consent authorizing you to send this letter?
14  A   I don't recall.
15  Q   Mr. Ryken, I'm not suggesting that you did
16  anything wrong here, just to be clear.  I'm just
17  trying to understand the process that went into
18  writing and sending out this letter.  Okay?
19       So what else do you recall, if anything,
20  about the process by which this letter and its
21  contents were drafted?
22  A   We had a board meeting around -- you know, I
23  don't know what day of the week March 7th is, but
24  sometime the first Thursday in March we would have
25  had a meeting.  I'm just assuming --

Page 107

1        MR. ORR: Objection.  You doesn't have to
2   assume.  And let me just caution you not to reveal
3   anything that may have been discussed in executive
4   session with counsel.
5   Q   (By Mr. Neckers) Go ahead.
6   A   As far as I know, there was discussion held and
7   I was authorized to sign the letter.
8   Q   Was there discussion held in an executive
9   session or during the regular board meeting?
10  A   Executive session.
11  Q   And do you remember -- who attends the
12  executive sessions of the board meetings at East
13  River?
14       MR. ORR: Object to form.
15  A   Depends on the situation.  Most of the time the
16  manager and, of course, the attorney and then
17  appropriate senior staff.
18  Q   (By Mr. Neckers) And so you sent this letter on
19  behalf of the East River board to Garry Dearborn who
20  is the president of Dakota Energy Cooperative at the
21  time, right?
22  A   Yes.
23  Q   When you -- and I take it you wouldn't have
24  signed this letter if you didn't think it was
25  accurate, right?

Page 108

1   A   Correct.
2   Q   When you signed this letter, what was the basis
3   for your belief that the wholesale power contract
4   between East River and Dakota Energy does not
5   provide for a buy-out as you indicated in this
6   letter?
7        MR. ORR: Object to the extent it calls for
8   revealing attorney/client communication.
9   A   The discussion was held during executive
10  session and --
11       MR. ORR: Mr. Ryken, and let me just be clear
12  that Mr. Neckers is not asking you about discussions
13  that occurred in executive session because those
14  were attorney/client privilege and so you're not
15  -- you're not to talk about discussions that were
16  held in that -- those executive sessions because it
17  would reveal attorney/client communications.
18  Q   (By Mr. Neckers) Mr. Ryken, do you have any
19  basis for the statement that is the last sentence in
20  the first full paragraph on the second page of your
21  letter for your conclusion that the wholesale power
22  contract doesn't provide for a buy-out other than
23  information you learned during executive session?
24  A   No.
25  Q   So to be clear, the conclusion that is in your

Case 4:20-cv-04192-LLP   Document 88-1   Filed 10/06/21   Page 21 of 51 PageID #: 1614

Dakota Energy Cooperative, Inc. v.
East River Electric Power Cooperative, Inc., et al.

Rough Draft

James Ryken
September 22, 2021

Page 109

1 letter that the wholesale power contract between
2 East River and Dakota does not provide for a buy-out
3 is based only on information that came out of or was
4 discussed in executive session, is that correct?
5     MR. ORR: Object to the form.
6 A   Yes.
7 Q   (By Mr. Neckers) Were you relying on anything
8 else other than that information that I'm not going
9 to ask you about that came out of executive session
10 when you signed your name to the letter offering the
11 conclusion that the supplemental wholesale power
12 contract does not contain a buy-out provision?
13 A   No.
14 Q   Has that been your position as the president of
15 the board at East River all along since the day that
16 Dakota Energy provided to East River its resolution
17 asking for a buy-out figure?
18     MR. ORR: Object to the form.
19 A   Yes.
20 Q   (By Mr. Neckers) In other words, it's been your
21 position all along, Mr. Ryken, as the president of
22 the board at East River that East River has no
23 obligation whatsoever to provide Dakota Energy with
24 a buy-out number, correct?
25     MR. ORR: Object to the form. Calls for a

Page 110

1 legal conclusion.
2 A   Yes.
3 Q   (By Mr. Neckers) Attached to that letter -- to
4 your letter of March 7th, 2019, to Dakota Energy was
5 a letter from Basin and its CEO to class A members
6 forwarding a resolution that Basin passed as well,
7 right?
8 A   Yes.
9 Q   When was the first time you heard about Basin's
10 resolution and this letter dated February 15th,
11 2019?
12 A   Around that time.
13 Q   Tell me what you remember about that.
14 A   They adopted a resolution at the Basin board
15 meeting that didn't allow buying out of an
16 all-requirements contract.
17 Q   Did you have -- other than in executive
18 session, did you have any discussions with anyone
19 about that Basin resolution?
20 A   Not that I recall.
21 Q   You didn't discuss it with Mr. Boyko or the
22 other staff at East River?
23 A   Only if Bob was around, Mr. Sahr.
24 Q   Bob Sahr?
25 A   Yes.

Page 111

1 Q   Did you discuss the resolution with Clay Union
2 Electric?
3 A   I may have mentioned that Basin passed a
4 resolution, but we didn't discuss it.
5 Q   I'm flipping now to the fourth page of tab 20,
6 which was attached to your letter. This is a copy
7 of the resolution that was passed by the Basin
8 board, is that right?
9 A   Yes.
10 Q   Do you remember when the first time it was that
11 you saw this document, sir?
12 A   I don't recall.
13 Q   Would it have been around the time that it
14 passed in February of 2019?
15 A   Yes.
16 Q   Did you rely on this resolution and the
17 information contained in here for purposes of
18 forming your own understanding as to whether there
19 was a right to withdraw from East River?
20 A   Yes.
21 Q   Did you personally have any discussions with
22 anyone from Basin about this resolution specifically
23 or the topics discussed in this resolution?
24 A   No.
25 Q   So you understood -- and this was a resolution

Page 112

1 that was forwarded to you by somebody at East River,
2 is that right?
3 A   Yes.
4 Q   Or did you receive this directly from someone
5 at Basin, Mr. Ryken?
6 A   I did not get it from Basin.
7 Q   Okay. And in the ordinary course of business,
8 I take it you'd receive documents like this from
9 people at East River as opposed to from employees or
10 representatives of Basin itself, is that fair?
11     MR. DIRENFELD: Object to form.
12 A   Yes.
13 Q   (By Mr. Neckers) Okay. Would you look at the
14 third paragraph of this document that I will -- I
15 was going to try and highlight it, but I won't do
16 that. You see the third paragraph beginning,
17 Whereas, the cooperative has been advised by?
18 A   I see it.
19 Q   And it goes on to say, The cooperative has been
20 advised by both its general counsel and its outside
21 counsel, Orrick Herrington & Sutcliffe, LLP, that
22 the all-requirements contracts of both the class A
23 members with the cooperative and the class C members
24 with the class A members do not contain any
25 provision permitting the member to buy-out of its

# EXHIBIT E

# In The Matter Of:

*Dakota Energy Cooperative, Inc. v.*
*East River Electric Power Cooperative, Inc., et al.*

---

*Tom Boyko*
*September 20, 2021*
*Rough Draft*

---

*Pat Beck, Court Reporter*

Original File 092021ROUGHDRAFT.txt

Min-U-Script® with Word Index

Dakota Energy Cooperative, Inc. v.
East River Electric Power Cooperative, Inc., et al.

Rough Draft

Tom Boyko
September 20, 2021

---

Page 213

1  that's -- if they think that's discouraging, that's
2  a different interpretation.
3  Q   (By Mr. Herzog) Do you agree or disagree that
4  East River members are entitled to information that
5  would allow them to estimate an exit charge
6  calculation?
7      MR. ORR: Object to the form.  Calls for a
8  legal conclusion.
9  Q   (By Mr. Herzog) You can answer.
10  A   They're entitled to our financial information.
11  And Basin, we provide that every month, if that's
12  what you're asking.
13  Q   No.  Do you agree or disagree that they're
14  entitled to information that would allow them to
15  estimate an exit charge calculation?
16      MR. ORR: Object to form.
17  A   I don't know what information -- I don't know
18  what information you're talking about.
19  Q   (By Mr. Herzog) You can't figure that out?
20      MR. ORR: Object to form.
21  A   They have access to all of our financial
22  information, what else are you asking?
23  Q   (By Mr. Herzog) Well, what would it cost to
24  buy-out of the contract?
25  A   Well, that would be --

---

Page 214

1      MR. ORR: Object to the form.
2  A   It's not allowed.
3  Q   (By Mr. Herzog) Okay.  It's not allowed.  So
4  let me mark for identification as Exhibit 7 this
5  document from Mr. Sukut.  And am I saying that
6  right?  Sukut?
7  A   Sukut, yes.
8  Q   He was the general manager and CEO of Basin,
9  correct?
10  A   Correct.
11  Q   And this is a -- this is a letter that he sent
12  to all class A members.  And East River is a class A
13  member, is that correct?
14  A   That's correct.
15  Q   Okay.  And Mr. Sukut provided a resolution that
16  had been passed by Basin, correct?
17  A   Correct.
18  Q   And you're familiar with this, you read this in
19  preparation for your deposition today, didn't you?
20  A   Correct.
21  Q   Are you relying on anything other than this in
22  your conclusion that the WPC between East River and
23  Dakota Energy doesn't permit any early termination?
24      MR. ORR: Object to the extent it calls for
25  revealing attorney/client communication.

---

Page 215

1  A   I just -- I read the termination provisions.
2  You have to get all your -- meet all your contract
3  requirements.
4  Q   (By Mr. Herzog) Right.  But are you relying on
5  anything other than this in your review of the
6  termination provision?
7      MR. ORR: Same objection.
8  A   Yeah.  The rest would be attorney/client.
9  Q   (By Mr. Herzog) Did you see any of the
10  information that was provided to Basin by its
11  general counsel or its outside counsel on this
12  issue?
13      MR. ORR: Object to the extent -- object to the
14  extents it's covered by the JDA.
15  A   This -- the only discussions we had on this
16  were in the JDA meetings.  That's all I had.
17  Q   (By Mr. Herzog) Okay.  Let me -- let me just
18  focus on this whereas clause of Exhibit No. 7 to
19  your deposition.  It says, Whereas, the
20  cooperative -- and you understand that's referring
21  to Basin; right?
22  A   Yes.
23  Q   Has been advised by both its general counsel
24  and its outside counsel, Orrick Herrington and
25  Sutcliff, that the all requirements contracts of

---

Page 216

1  both the class A members with the cooperative and
2  the class C members with the class A members do not
3  contain any provision permitting the member to
4  buy-out of its all requirements contract with the
5  cooperative or the class A member as applicable.  Do
6  you see that?
7  A   Yes.
8  Q   Was any information from Basin's general
9  counselor its outside counsel provided to you or to
10  East River to support this conclusion?
11      MR. ORR: Object, I believe the witness has
12  said that would be covered by the JDA and it's
13  privileged.
14  Q   (By Mr. Herzog) I didn't ask him what it was, I
15  asked him whether it was communicated?
16      MR. ORR: Same objection.
17  Q   (By Mr. Herzog) You can answer, Mr. Boyko?
18  A   Any communications we had on that were covered
19  by the JDA.
20  Q   You know, you can repeat what your counsel
21  says, Mr. Boyko, but I'm entitled to an answer.  Did
22  you receive opinions from Basin's general counselor
23  or Rick on this issue, whether, I didn't ask you
24  whether what the opinions were, I asked you whether
25  they shared them?

---

# EXHIBIT F

- Coops are good for families, family farms, small towns, rural and city folks, our kids futures.  Buying power from an investor owned, for profit, marketing firm in some distant state exposes us to a lot of risk.  "Coops are you and me".  "We look out for each other".  Will an investor owned marketer with no power system assets look out for us?  What are the hidden costs?

- Sometimes a slick salesman comes to town, promising the moon, takes your money, and slips out of town before they are discovered.  ( use examples of failed energy marketers)

- When one coop member leaves the Coop family, it undermines the strength of the other members to ensure our families future.  Marketing firms are looking to make a buck, not to look out for our families.

- ERC is not looking to make a buck off of us.

- We should think long and hard before we sever ties with ERC.  They have been our partner, our friend, for 70 years.  We can count on them.  Can we count on an investor owned power marketer?  How long has Guzman been in business?  How many customers do they have?  Do they have a marketing firm?  Do they have lobbyists?

The ERC board of directors includes folks from all 25 coop members.  That's like you and me running the show, looking out for our interests,  25 ERC member representatives from all over eastern SD and MN.  It's disingenuous to blame ERC for anything.  Like blaming your neighbor.  Just a slick way of painting a negative light on someone else.

Thanks for putting up with me Chris.  Sorry, I can't stop thinking about this.

Pat


On Nov 23, 2020, at 8:42 AM, Chris J. Studer <cstuder@eastriver.coop> wrote:


Good morning gentlemen,

Apologies for not responding over the last couple of days. A few things to answer questions and let you know what East River is willing to provide to the group.

1. Harvey Oliver (Northern attorney) has agreed to be an adviser. He would be willing to get on another conference call this week if you're available. I'm thinking next week Monday or Tuesday after the Thanksgiving holiday unless you guys think a different day would be better.

2. Harvey would be able to answer your question Jim about legal considerations of people gathering with this group if there are any.

3. Website ownership – East River is willing to pay for and host the site for the group…we wouldn't put any reference to that on the site at all.

4. Membership list – we may need to talk to Harvey Oliver about this…what is the proper purpose of using the list? Should it stay out of the hands of East River? Probably…just for separation. But how to best use it once we get down the road a bit? We could send out fliers or a postcard to all the members? Brochure? Those are things we would be able to produce, but would need to discuss. I think at this point helping to get email addresses of members through the website might be more effective and then growing the group and potentially sending something out to the entire membership later on.

5. We will be running an op-ed from Tom Boyko our GM in the Huron, Miller and Highmore papers this week explaining the issue from East River's point of view. That will run in Huron on Wednesday this week and in Highmore and Miller in their Saturday weekly edition. East River will also be releasing some social media posts throughout the week.

6. Our PR agency Paulsen Marketing has been assisting us through this…and East River will continue to solicit their assistance on messaging and tactics to help raise awareness…but the best message comes from word of mouth…so they'll help us to a point but will take direction from this group of course for any local actions.

7. Securing funding for a separate group…unless you guys are uncomfortable with it, East River (within reason) is prepared to help fund these efforts on your behalf. So we'll pay for the website…any fliers…etc. So I don't see a need for raising outside funds unless you guys think it would be beneficial.

Thanks again for all of your help…I'll send an update this morning to the broader group and see if a conference call next week would be possible. As always let me know how we can be helpful.

Thanks,
Chris


**From:** James Propst <propst@santel.net>
**Sent:** Saturday, November 21, 2020 3:02 PM
**To:** Pdoak@santel.net; Chris J. Studer <cstuder@eastriver.coop>
**Subject:** RE: A few more ideas.

***External email use caution clicking links or opening attachments***
Pat,

No need for marketers – then you get tied down to which one is right.  The burden of proof is on Guzmen with real demonstrated performance within our marketing area – SPP. We need to force their hand to go public with their numbers.  We don't get there with tit for tat between groups.

Others have a vested interest and will support, mostly in indirect ways.  If they want to engage they don't need us.

ERC will garner most of the support you refer to – Basin, et al.

**From:** PDoak@santel.net
**Date:** February 10, 2021 at 12:41:32 PM CST
**To:** Ron Miller <rhmiller@hur.midco.net>, Debby Kludt <kludt@hur.midco.net>, Bob Breen <rbreen83@santel.net>, Clarence/Judy Hanson <clarenceandjudy@yahoo.com>, Bill Folk <btfolk@hur.midco.net>, Renee Younie <ryounie@santel.net>, dneuharth@santel.net, g_bisch@hotmail.com, nick.nemec@hotmail.com
**Cc:** Jim Propst <propst@santel.net>
**Subject: Keep our Coop Website**


FYI, the keep our coop website is now active.  See below.

Pass it on please.

Please contact the Board of Directors.  I've heard that the board is "dug in".  I've written the board two weeks ago, but they didn't reply.  Hmmmmm.  They need to hear from the members reminding them who they work for.  Shouldn't they have consulted the members before initiating litigation, before trying to change our coops business model, before sending a letter of intent to Guzman?  How much has the board spent on this so far?  They hired a law firm, hired a marketing firm, without even consulting us.  What happened to "One member one vote" ?

A hand written, signed letter to the board might make an impact.  But a call or email is helpful too.

I've not ever attended an annual meeting, but I sure will this year.  You might also consider running for the board of directors.

Ive included the DE bylaws for your reference.

A key section is what members can do at meetings.  The bylaws say:

SECTON 3. PERMITTED MEMBER ACTION AT MEMBER MEETINGS. At any Annual Member Meeting, or Special Member Meeting (collectively, "Member Meeting"), Members may consider, vote, or act only upon a matter for which:
1. Unless otherwise provided in these Bylaws, the Board and Members were notified properly; or
2. The Members are authorized to consider, vote, or act.
3. At a Special Member Meeting the Members may consider, vote, or act upon only those matters properly described in the notice.

---

This email has been scanned for spam and viruses. Click here to report this email as spam.

00097DECmember

Changing the bylaws to prohibit the board of directors from breaking the contract with East River without a vote of the entire membership could be proposed and voted on at a member meeting.   Food for thought.

We have the http://www.keepourcoop.org website live! Please share as far and wide as possible as you see fit. If there's anything on there that you notice out of place let me know. And if you have stories or angles you think we can add to the site going forward also let me know.

Thanks!

Chris

Chris Studer

Chief Member & Public Relations Officer



East River Electric Power Cooperative, Inc.

P.O. Box 227, 211 S. Harth Ave., Madison, SD 57042

Office: 605.256.8016 | Cell: 605.270.4812

Visit us online: www.eastriver.coop

00098DECmember

**From:** dneuharth@santel.net
**Date:** March 28, 2021 at 9:27:10 PM CDT
**To:** PDoak@santel.net
**Subject: Petitions & Instructions -**


Did you get a lot of interest at Outdoor Show this weekend? If you did not get a lot of signatures from SW of Huron & need more I could take some time to visit neighbors. If want me to do so would appreciate reminder of 3-4 talking points that favor remaining with East River.  Dianna N.

On Mar 27, 2021 6:58 PM, Pdoak@santel.net wrote:
FYI,  see attached finalized petition.  Not sure if you got this or not so here it is again just in case.

Even if you don't circulate the petition,  you'll know what it says.
If you would like to sign the petition, please contact me.  We need 250 signatures minimum, (10% of the members) shooting for 300.
Pass it on
Pat


Begin forwarded message:

**From:** "Chris J. Studer" <cstuder@eastriver.coop>
**Date:** March 26, 2021 at 4:26:40 PM CDT
**Subject: Petitions & Instructions**


Good afternoon,


Attached you'll find finalized versions of the special member meeting petitions and the instructions for petitions circulators. These can be printed and circulated at your convenience. And please pass along to any others that would be willing to gather signatures.


Members will be working a booth at the Huron Outdoor Show at the Nordby 4-H building in Huron Saturday (10am-5pm) and Sunday (11am-3pm) gathering signatures and discussing the issue. If you're willing and able to stop by and either sign the petition or help gather signatures you're certainly welcome to.

If you begin circulating the petitions, be mindful of the instructions about witnessing the signature and getting the petition notarized once all of the signatures are gathered. You don't have to fill out the whole sheet to get it notarized. However, once it's notarized you can't get any more signatures on that petition.

If you would like hard copies sent to you I can do that as well…just let me know and I'll drop some in the mail for you.

Please let me know if you have questions. And please let me know if you have finished petitions and we'll coordinate to get them picked up. And I'll organize a call soon to get a sense of how the petition drive is going.

Thank you all and have a great weekend!

Chris

Chris Studer

Chief Member & Public Relations Officer

East River Electric Power Cooperative, Inc.

P.O. Box 227, 211 S. Harth Ave., Madison, SD 57042

Office: 605.256.8016 | Cell: 605.270.4812

Visit us online: www.eastriver.coop

00105DECmember

# EXHIBIT G

# In The Matter Of:

*Dakota Energy Cooperative, Inc. v.*
*East River Electric Power Cooperative, Inc., et al.*

---

*Tom Boyko*
*September 20, 2021*
*Rough Draft*

---

*Pat Beck, Court Reporter*

Original File 092021ROUGHDRAFT.txt

Min-U-Script® with Word Index

Case 4:20-cv-04192-LLP   Document 88-1   Filed 10/06/21   Page 34 of 51 PageID #: 1627

Dakota Energy Cooperative, Inc. v.                          Rough Draft                                    Tom Boyko
East River Electric Power Cooperative, Inc., et al.                                               September 20, 2021

**Page 61**

1  A  Their letters to the editor.
2  Q  Do you know whether Mr. Studer assisted in the
3  preparation of those letters to the editor?
4      MR. ORR: I'm going to object.  This is way
5  beyond the scope of phase one.
6      MR. HERZOG: No, it's not.  No, it's not.  Your
7  client is attempting to interfere in the governance
8  of Dakota Energy, and if there's no right to
9  withdraw, Mr. Orr, you don't have any reason to
10 interfere in the governance of Dakota Energy.
11     MR. ORR: Well, I object --
12     MR. HERZOG: It's not beyond phase one.  This
13 goes directly to the question of why you must be
14 interfering in the governance of Dakota Energy if
15 it's so clear that there's no right to withdraw.  I
16 will continue to ask my questions and if you want to
17 instruct him not to answer, that's fine.  We'll take
18 it up with the Magistrate.  Okay?
19     MR. ORR: Let me just object.  I totally
20 disagree with the premise of your comments.
21 Q  (By Mr. Herzog) Are you aware of any effort on
22 the part of Mr. Studer to encourage Mr. Doak and
23 others to prepare a member petition for purposes of
24 precluding this litigation?
25     MR. ORR: Object to the form of the question.

**Page 62**

1  Exceeds phase one.  I'll instruct the witness not to
2  answer, but happy to talk offline with counsel about
3  it.
4  Q  (By Mr. Herzog) Are you aware of any
5  correspondence -- strike that.
6      Did you review any correspondence in
7      preparation for your deposition where
8      Mr. Studer suggested to Mr. Doak the
9      possibility of amending the bylaws to preclude
10     the lawsuit?
11 A  I believe there was an e-mail to that extent,
12 but I can't recall off the top of my head.
13 Q  Did -- did Mr. -- did East River assist
14 Mr. Doak and others in identifying an attorney to
15 represent Mr. Doak and others in an effort to amend
16 the bylaws of Dakota Energy for purposes of
17 precluding this lawsuit?
18     MR. ORR: Object to the form of the question.
19 Exceeds phase one.  I'll instruct the witness not to
20 answer, but happy to talk with counsel about it
21 offline.
22 Q  (By Mr. Herzog) Are you aware of any
23 recommendation to -- that was provided by East River
24 to Mr. Doak and others about an attorney to
25 represent Mr. Doak and others in an effort to amend

**Page 63**

1  the bylaws of Dakota Energy to preclude this
2  litigation?
3      MR. ORR: Same objection.  Instruct the witness
4  not to answer.  Happy to talk with counsel offline
5  about it.
6  Q  (By Mr. Herzog) Are you aware of any
7  correspondence -- strike that.
8      Did you review any correspondence in
9      preparation for your deposition in which Pat
10     Doak and others asked for a recommendation from
11     East River for an attorney to assist them?  You
12     may answer.
13     MR. ORR: He may have lost audio.
14     THE VIDEOGRAPHER: Looks like he lost his
15 audio, so we might want to go off the record to
16 correct that somehow.
17     MR. ORR: Tom, can you speak again and let's
18 see if we can hear you?  I don't think he can hear
19 us.
20     MR. LUCE: I'll get my legal assistant in and
21 see if we can figure out what the problem is.
22     THE VIDEOGRAPHER: Can we go off the record to
23 correct this?
24     MR. HERZOG: Yes.
25     MR. ORR: Yes.

**Page 64**

1      THE VIDEOGRAPHER: We're going to go off the
2  record shortly.  We're off the record.
3          (Recess taken.)
4      THE VIDEOGRAPHER: Okay.  We're back on the
5  record.  It's now 12:00 p.m.  We are on the record.
6  Q  (By Mr. Herzog) I'm going to share my screen
7  with you again, sir.  So this is the document, it's
8  number 14 again, Mr. Boyko, that we were looking at
9  previously.  And this is the one you said that you
10 saw in preparation for your deposition; is that
11 correct?
12 A  That's correct.
13 Q  All right.  And do you remember when you saw
14 that?  Did you see that on Wednesday or on Saturday,
15 sir?
16 A  I don't recall.
17 Q  Did you look at any documents on Saturday?
18 A  Yes.
19 Q  And did you look at documents on Wednesday?
20 A  Yes.
21 Q  Okay.  And this says, Thank you -- we went over
22 this before.  Thank you you all so much for joining
23 the call tonight.  Do you see that, where I'm
24 hovering with my cursor?
25 A  Yes.

# EXHIBIT H

# In The Matter Of:

*Dakota Energy Cooperative, Inc. v.*
*East River Electric Power Cooperative, Inc., et al.*

---

*Tom Boyko*
*September 20, 2021*
*Rough Draft*

---

*Pat Beck, Court Reporter*

Original File 092021ROUGHDRAFT.txt

Min-U-Script® with Word Index

Dakota Energy Cooperative, Inc. v.
East River Electric Power Cooperative, Inc., et al.

Rough Draft

Tom Boyko
September 20, 2021

Page 109

1  Q   Do you have it, sir?
2  A   Yes.
3  Q   All right.  And is this a document that you
4  reviewed in preparation for your deposition?
5  A   Yes, I did.
6  Q   When you reviewed the documents in preparation
7  for your deposition, did they have those Bates
8  numbers on them, sir?  The one at the --
9  A   Did they have what?
10  Q   -- lower right-hand corner.
11  A   I don't know.  No idea.
12  Q   This is -- this document is another e-mail
13  exchange between Mr. Propst, Mr. Doak, and
14  Mr. Studer.  And this one is from Jim Propst to
15  Mr. Doak and Mr. Studer calling to them separately.
16  And Mr. Propst says, ERC will garner most of the
17  support you refer to, Basin, et al.  Did -- do you
18  know whether Mr. Studer told Mr. Propst that East
19  River would give Basin support for their effort?
20      MR. ORR: Object to form.
21      MR. DIRENFELD: Object to the form.
22  A   I don't recall.  I'm sure he said he's talked
23  to Basin, but that's all I know.
24  Q   (By Mr. Herzog) Did Basin offer to contribute
25  funds to your knowledge to support Mr. Doak and his

Page 110

1  group
2      MR. ORR: Object to form.
3  A   No, not -- no.  No, not to my knowledge.
4  Q   (By Mr. Herzog) Do you know if Mr. Studer asked
5  Basin if they would contribute funds to support
6  Mr. Doak and his group?
7      MR. ORR: Object to form.
8      MR. DIRENFELD: Object to form.
9  A   Not to my -- not to my knowledge.
10  Q   (By Mr. Herzog) Did you and Mr. Studer have any
11  conversation about him making such a request of
12  Basin?
13      MR. ORR: Object to the form.
14      MR. DIRENFELD: Object to the form.
15  A   No, not to my knowledge.
16  Q   (By Mr. Herzog) I'm going to show you another
17  document bearing the identifying numbers 52DEC
18  Member and 53DEC Member and so on.
19      MR. ORR: Is this number 18?
20      MR. HERZOG: This is number 18, Mr. Orr.
21      MR. ORR: Okay.  Thank you.
22  Q   (By Mr. Herzog) And this is an e-mail, if you
23  scroll to the top.  Do you have that in front of
24  you, Mr. Boyko?
25  A   Yes.

Page 111

1  Q   And it's an e-mail from Mr. Doak to Chris
2  Studer with a bunch of CCs, as you can see, and it
3  includes some information that had been passed along
4  by Mr. Studer.  Do you see that?
5  A   Yes.
6  Q   All right.  And do you see this little dash
7  that my cursor is hovering over where it talks about
8  a co-op attorney from Northern Electric?
9  A   Yes.
10  Q   And it says that a co-op attorney from the
11  Northern Electric area has pledged to help out the
12  concerned group of members from Dakota with any
13  legal advice, pro bono, things like getting
14  petitions together, if it gets to that point, and
15  other potential actions that the group might be able
16  to take.  Do you see that?
17  A   Yes.
18  Q   Did Mr. Studer and you talk about the potential
19  for Mr. Doak's group to get a petition together?
20      MR. ORR: Object to the form of the question.
21  Exceeds the scope of phase one discovery.  Hold on.
22  Could you state your question again?  I may have
23  another -- or I may have another objection.
24  Q   (By Mr. Herzog) Did you and Mr. Studer talk
25  about getting a petition -- helping the Doak group

Page 112

1  get a petition together to address the lawsuit or
2  the withdrawal?
3      MR. ORR: Same objection.  Exceeds the scope of
4  phase one, but I'll allow this answer.  Object to
5  the form also.
6  A   If I remember correctly, the members asked
7  Chris for some help and he told me about that.
8  Q   (By Mr. Herzog) What did he tell you?
9      MR. ORR: Same objection.  Go ahead.
10  A   They would like some help on ideas on what to
11  do.
12  Q   (By Mr. Herzog) And did Mr. Studer tell you
13  that he recommended a petition to amend the bylaws?
14      MR. ORR: Object to the form of the question.
15  A   I don't recall that.
16  Q   (By Mr. Herzog) Well, he -- he did.  You know
17  that, don't you, because you saw it in a document
18  you reviewed in preparation for your testimony?
19      MR. ORR: Object to the form of the question.
20      MR. DIRENFELD: Object to the form.
21  A   I saw that he talked about that with him.  I
22  can't remember who brought it up.
23  Q   (By Mr. Herzog) Mr. Studer helped them get a
24  petition to try to amend the bylaws, didn't he?
25      MR. ORR: I'm going to object to the form of

Dakota Energy Cooperative, Inc. v.
East River Electric Power Cooperative, Inc., et al.

Rough Draft

Tom Boyko
September 20, 2021

---

**Page 113**

1  the question and instruct the witness not to answer.
2  This exceeds the limitations imposed by the Court on
3  phase one discovery.
4  Q   (By Mr. Herzog) Mr. Studer told you that he had
5  recommended a petition to amend the bylaws, didn't
6  he, sir?
7       MR. ORR: Same objection.  Instruct the witness
8  not to answer.
9       MR. HERZOG: And just so I'm clear, Mr. Orr,
10  the basis of your instruction is that this exceeds
11  the scope of phase one?
12       MR. ORR: It exceeds the scope of phase one and
13  the limitation ordered by the Court with respect to
14  the scope of phase one discovery.
15       MR. HERZOG: That's all I wanted to know.
16       MR. ORR: Right.  And, I mean, I got other
17  objections, too, but that's the basis for
18  instructing him not to answer.
19       MR. HERZOG: That's all I asked you, Mr. Orr,
20  was the basis for the instruction.  I don't care
21  about the other objections.
22       MR. ORR: Right.  Just want to be clear.
23  Q   (By Mr. Herzog) Now, you said you didn't know
24  whether there were Zoom calls or telephone calls;
25  right?  Do you remember that testimony?

---

**Page 114**

1  A   Yes, I do.  Yeah.
2  Q   You reviewed this in preparation for your
3  deposition last week; right?
4  A   Yes, I did.
5  Q   And in this document it says, I'll include
6  information on another Zoom call for next Tuesday.
7  Right?  Do you see that?
8  A   That's correct.
9  Q   Do you know whether those Zoom calls were
10  recorded or not, sir?
11  A   I don't believe so.
12  Q   Did you ask Mr. Studer in preparation for your
13  deposition?
14  A   No.
15  Q   Did you ask Mr. Studer in preparation for your
16  deposition whether he had recommended a petition to
17  the members for purposes of amending the Dakota
18  Energy bylaws?
19       MR. ORR: Same objection.  Instruct the witness
20  not to answer.
21  Q   (By Mr. Herzog) Did you participate in any of
22  the Zoom calls with Pat Doak and his group,
23  Mr. Boyko?
24  A   No.
25  Q   Do you know whether anyone else from East River

---

**Page 115**

1  participated in the Zoom calls with Mr. Studer and
2  Pat Doak's group?
3  A   I am not aware of anyone else.
4  Q   Did you ask Mr. Studer how frequently he had
5  communications with Pat Doak's group in preparation
6  for your deposition today?
7  A   No, just looked at his e-mails here.
8  Q   I'm going to show you what's been produced in
9  the case pursuant to Magistrate Duffy's order as
10  document 94DEC Member and 95DEC Member.  Let me ask
11  you this before I get to this:  Were Chris Studer's
12  e-mails searched as part of the discovery process in
13  this case to produce documents that were requested?
14  A   I believe so, yeah.  I believe, but I'm not
15  sure.
16  Q   Did you review this document or e-mail in
17  preparation for your deposition, sir?  This is
18  number 19, Mr. Boyko.
19  A   I got it.  I don't remember reviewing this one.
20  I believe so, but I just don't remember it.
21  Q   So do you see on page 94DEC Member, the e-mail
22  from Chris Studer talking about the video from
23  Mr. Felderman.  Do you see that?
24  A   Yes.
25  Q   And it says, Full of half truths or

---

**Page 116**

1  straight-out inaccuracies.  Do you see that?
2  A   Yes.  Yes.
3  Q   Did you ask Mr. Studer what the half truths or
4  inaccuracies were?
5  A   I did not.
6  Q   Do you see here where I'm hovering my cursor
7  again, Mr. Boyko, that second paragraph of Mr.
8  Studer's e-mail where he says, Or maybe shoot a
9  video interview if we would produce something?  Do
10  you see that?
11  A   Yes.
12  Q   And did you understand Mr. Studer to be
13  offering for East River to produce a video on behalf
14  of Pat Doak's group?
15       MR. ORR: Object to the form.  Exceeds the
16  scope of phase one.
17  Q   (By Mr. Herzog) Go on.
18  A   He offered to produce a video.
19  Q   Did you talk to him about that in connection
20  with preparing yourself to testify about
21  communications with third parties?
22       MR. ORR: Object to the form.
23  A   No, that -- I don't think we ever produced a
24  video with the members, so I'm not --
25  Q   (By Mr. Herzog) Do you know?

---

# EXHIBIT I

# In The Matter Of:

*Dakota Energy Cooperative, Inc. v.*
*East River Electric Power Cooperative, Inc., et al.*

---

*Tom Boyko*
*September 20, 2021*
*Rough Draft*

---

*Pat Beck, Court Reporter*

Original File 092021ROUGHDRAFT.txt
Min-U-Script® with Word Index

Case 4:20-cv-04192-LLP   Document 88-1   Filed 10/06/21   Page 41 of 51 PageID #: 1634

Dakota Energy Cooperative, Inc. v.
East River Electric Power Cooperative, Inc., et al.
Rough Draft
Tom Boyko
September 20, 2021

Page 117

1 A  -- aware of anything.
2 Q  Do you know?
3 A  To the best of my recollection, no, we did not.
4 Q  Did somebody tell you that?
5 A  No.
6 Q  How would you know?
7 A  Because I didn't see one out there.
8 Q  It doesn't mean -- it might mean you never
9 released it, but it doesn't mean you didn't produce
10 it; right?
11     MR. ORR: Object.  Argumentative.
12 A  There's always that possibility, but nothing I
13 know of, I guess.
14 Q  (By Mr. Herzog) You don't know one way or the
15 other, do you, sir?
16     MR. ORR: Object to the form.
17 A  I'm not aware of producing any video.
18 Q  (By Mr. Herzog) We would have to ask Mr.
19 Studer; right?
20 A  He would -- he would know that answer.
21 Q  I'm going to turn to document number 20.  Do
22 you see that in front of you?  It's a document
23 that's from Mr. Studer with the Bates label 60DEC
24 Member and then a bunch of supporting stuff.
25 A  Yes.

Page 118

1 Q  Okay.  Did you review this in preparation for
2 your deposition?
3 A  I did look at this, yes.
4 Q  And it says, Dakota is not guaranteed
5 transmission if they leave the East River
6 membership.  Do you see that?
7 A  Yes.
8 Q  And that was something that you've told to Pat
9 Doak's group, wasn't it?  Not you personally, sir,
10 but that came from Mr. Studer and East River; right?
11     MR. ORR: Object to the form of the question.
12 A  Yes.
13 Q  (By Mr. Herzog) And that was something that
14 East River wanted to get out there to try to prevent
15 Dakota from withdrawing as a member and even getting
16 an exit charge, wasn't it?
17     MR. ORR: Object to the form of the question.
18 Exceeds the scope of phase one.
19     MR. DIRENFELD: Object to form.
20 A  No, actually, Dakota was telling their
21 membership that transition wouldn't change, they
22 would have the same rates they do today.  And their
23 membership -- and I had asked Chris -- that's not
24 right, is it?  And so he explained it.
25 Q  (By Mr. Herzog) Okay.  And are you saying that

Page 119

1 if Dakota Energy -- if this Court finds that there's
2 a right to withdraw and Dakota Energy ultimately
3 withdraws, that you're going to try to keep them
4 from getting transmission rights?
5     MR. ORR: Object to the form of the question,
6 calls for speculation, hypothetical and a legal
7 conclusion.  You do not need to answer that
8 question.
9     MR. HERZOG: On what grounds?
10     MR. ORR: Calls for a legal conclusion.  It's
11 hypothetical and exceeds the scope of phase one.
12 Phase one is about whether they have the right to
13 withdraw, not about conditions --
14     MR. HERZOG: I'm asking him about a document
15 that the Court ordered produced in phase one,
16 Mr. Orr.
17     MR. ORR: I understand that, but that doesn't
18 mean every sentence in a document produced is
19 relevant to phase one.
20 Q  (By Mr. Herzog) Are you -- is East River going
21 to preclude Dakota from accessing transmission if it
22 withdraws?
23     MR. ORR: Object to the form of the question.
24 That exceeds the scope of phase one.  It calls for a
25 legal conclusion and a hypothetical and I instruct

Page 120

1 the witness not to answer.
2     MR. HERZOG: What's the basis of the
3 instruction?
4     MR. ORR: Exceeds the limitation that the court
5 imposed on phase one discovery.
6 Q  (By Mr. Herzog) What do you understand, in your
7 role as the CEO of East River, Mr. Boyko, is a
8 member's right to access transmission if they
9 withdraw as a member?
10     MR. ORR: Objection.  You're just asking the
11 same question a different way, Counsel.
12     MR. HERZOG: I'm entitled to.  You're not
13 entitled to instruct him on this stuff and you know
14 it.  It's just bad faith.
15     MR. ORR: No, it's not bad faith.
16     MR. HERZOG: It is bad faith, Mr. Orr, and I'm
17 sick and tired of it.  These are documents that the
18 Magistrate ordered produced in phase one and all
19 you're doing is interfering in this examination and
20 you've been interfering in it from the start of the
21 deposition.
22     MR. ORR: No.  And I would ask you not to raise
23 your voice with me, Counsel.
24     MR. HERZOG: You're right on that.  I
25 apologize.  I shouldn't have.

# EXHIBIT J

# In The Matter Of:

*Dakota Energy Cooperative, Inc. v.*
*East River Electric Power Cooperative, Inc., et al.*

---

*Tom Boyko*
*September 20, 2021*
*Rough Draft*

---

*Pat Beck, Court Reporter*

Original File 092021ROUGHDRAFT.txt

Min-U-Script® with Word Index

Case 4:20-cv-04192-LLP   Document 88-1   Filed 10/06/21   Page 44 of 51 PageID #: 1637

Dakota Energy Cooperative, Inc. v.                    Rough Draft                                    Tom Boyko
East River Electric Power Cooperative, Inc., et al.                                       September 20, 2021

Page 89

1  initiated that call?
2  A  No.
3  Q  Who did?
4  A  The manager.
5  Q  Who is the manager?
6  A  Char Hager.
7  Q  Okay.  And who did he speak with?
8  A  It was a she.  She talked to me.
9  Q  I'm sorry.  Who did she speak with?  You,
10 Mr. Boyko?
11 A  Yes.
12 Q  Did she tell you that Mr. Oliver was prepared
13 to be an adviser to Mr. Doak and his group?
14 A  No.
15 Q  So do you see the number two here that I've got
16 my cursor hovering over?  It says, Harvey would be
17 able to answer your question, Jim, about legal
18 considerations of people gathering with this group
19 if there are any.  Do you see that?
20 A  Yes.
21 Q  Do you have an understanding what Mr. Studer
22 was referring to there?
23     MR. ORR: Object.  Calls for speculation.
24     MR. HERZOG: Well, he's supposed to know about
25 this stuff.

Page 90

1     MR. ORR: Object, Counsel.  He doesn't -- his
2  knowledge doesn't have to extend to every line of
3  every e-mail that was exchanged between East River
4  and somebody else.
5  Q  (By Mr. Herzog) Do you know what Mr. Studer was
6  referring to there?
7  A  I think he just gave Harvey's name to ask
8  questions.
9  Q  Yeah, but it says, Answer your question, Jim,
10 about legal considerations of people gathering with
11 this group.  Did you have an understanding of what
12 Jim Propst had asked of Chris Studer?
13     MR. ORR: Object to the form.
14 A  No, not specifically, no.
15 Q  (By Mr. Herzog) Did you call Mr. Studer and ask
16 him about it?  Did you ask him anything about this
17 communication in preparation for your deposition
18 today?
19 A  No.  Not specifically, no.
20 Q  Is Mr. Studer --
21 A  Wait.  Yes.  Yes, I did.  On one of these --
22 one item.
23 Q  Which one?
24 A  Number seven.
25 Q  Now, Mr. Boyko, you've told me a number of

Page 91

1  times already this morning that you didn't call
2  Mr. Studer to talk with him about anything in
3  preparation for the deposition.  Are you now telling
4  me that you did?
5  A  Sir, when you asked me that, it was when the
6  deposition started Wednesday.  I don't know all
7  these terms.  I'm trying to get this as straight as
8  possible for you.
9  Q  And I get it.  I'm just asking you:  You told
10 me multiple times before that you haven't talked to
11 Mr. Studer in preparation for your deposition and
12 now I understand you to be testifying differently;
13 is that correct?
14     MR. ORR: Object to the form.  Mischaracterizes
15 his testimony.
16 A  I asked one question on number seven.  I didn't
17 share with him or anything else.
18 Q  (By Mr. Herzog) I'm not -- there's nothing
19 wrong with you sharing it with him.  I'm asking.
20 Okay?  Did you talk with Mr. Studer in preparation
21 for your deposition testimony here today?  Yes or
22 no?
23     MR. ORR: Object to the form of the question.
24 A  I asked him on one question.
25 Q  (By Mr. Herzog) So is that a yes?

Page 92

1  A  Yes.  I asked him on one question, yes.
2  Q  Okay.  Did you call him on the telephone and
3  ask him about something?
4  A  No.
5  Q  Did you see him in person and ask him about it?
6  A  Yes.  He stopped by my office.
7  Q  Okay.  And is the only thing that you talked
8  with Mr. Studer about what you referred to just a
9  moment ago as number seven?
10 A  Yes.
11 Q  Okay.  Didn't ask him about any other aspect of
12 this document, just item number seven?
13 A  That's correct.
14 Q  Okay.  And --
15 A  And to be fair, it was the issue in item number
16 seven.  It wasn't that question.  It was just to
17 make sure I understood the issue.
18 Q  And so if --
19     MR. ORR: I think he was -- I'm not sure he was
20 finished, Counsel.
21     MR. HERZOG: Okay.  I think he was.
22 Q  (By Mr. Herzog) If you're not, Mr. Boyko, go
23 ahead and finish.
24 A  It was the issue surrounding seven, not the
25 question itself is what I asked.

# EXHIBIT K

# In The Matter Of:

*Dakota Energy Cooperative, Inc. v.*
*East River Electric Power Cooperative, Inc., et al.*

---

*Tom Boyko*
*September 20, 2021*
*Rough Draft*

---

*Pat Beck, Court Reporter*

Original File 092021ROUGHDRAFT.txt

Min-U-Script® with Word Index

Case 4:20-cv-04192-LLP    Document 88-1    Filed 10/06/21    Page 47 of 51 PageID #: 1640

Dakota Energy Cooperative, Inc. v.
East River Electric Power Cooperative, Inc., et al.

Rough Draft

Tom Boyko
September 20, 2021

Page 153

1  A   Yes.
2  Q   Mr. Boyko, how did you know -- and who was on
3  it, it was you and Mr. Dudke and who, Mr. Sahr?
4  A   I believe my general counsel.
5  Q   Is that Mr. Sahr?
6  A   Yes.
7  Q   Okay.  You, Mr. Dudke and Mr. Sahr.  Anybody
8  else?
9  A   We had an attorney from Sutherland.
10 Q   Okay.  Who?
11 A   I believe it was Peter.  I don't remember his
12 last name.
13 Q   Peter who?
14 A   Peter -- I don't remember his last name.
15 Q   How did you know who to call at RUS?
16 A   I don't know.  Our attorneys lined it up.
17 Q   Okay.  So Sutherland lined it up?
18 A   I think so.  I don't recall exactly.
19 Q   Okay.  And how long did the conversation last,
20 approximately?
21 A   I don't remember.  It was short.  Five minutes,
22 ten minutes.
23 Q   And what was the subject of the conversation?
24 A   Just in general, we're a borrower, what's their
25 concern level --

Page 154

1  MR. ORR: I'm going to -- I'm going to -- let
2  me object.  I think I need to talk to the witness
3  about this call.  And I understand that -- I just
4  need to make sure he's not inadvertently disclosing
5  some attorney/client communication.
6  MR. HERZOG: I mean, it's a conversation, James
7  I'm not going to -- I'm not going to agree to this
8  one.  It's a conversation with RUS.  There's no
9  possible privilege that could apply.
10 MR. ORR: Hold on.  Hold up.
11 MR. HERZOG: James, I don't want this time used
12 against me.
13 MR. ORR: Yes, I know.  I'm trying to do it by
14 text so that I don't break.
15 MR. HERZOG: I see.
16 MR. ORR: We won't count this against you.  I
17 appreciate your patience.  I need to just call Bob
18 Sahr, if I may, if we can just --
19 MR. HERZOG: James, he testified about a
20 conversation that he had on the telephone with RUS.
21 MR. ORR: Right.
22 MR. HERZOG: What possible claim to privilege
23 could there be?
24 MR. ORR: Okay.  I just want -- I need to
25 clarify something with Bob Sahr.  There may not be

Page 155

1  any possible claim for privilege.  I just need to
2  clarify something with Bob Sahr before we go
3  forward, so let me do that.  I'll be brief.
4  MR. HERZOG: All right.  Doug, I'm going to put
5  myself on mute and run to the men's room real quick
6  so we don't have to take another break.  If James
7  comes back, I'll be right back.  Okay.
8  THE VIDEOGRAPHER: We'll just stay on the
9  record and keep rolling.
10 MR. HERZOG: Okay.
11 MR. LUCE: Mike Luce is, too.
12 MR. ORR: I apologize for the interruption.
13 Please proceed.
14 Q   (By Mr. Herzog) All right.  So about six months
15 ago you had a conversation with RUS; correct?
16 A   Yeah.  Yeah, we did.
17 Q   And you called them to talk about the Dakota
18 Energy request for buy-out?
19 A   About the lawsuit.
20 Q   And the request for a buy-out; right?
21 A   Well, it was about the lawsuit.
22 Q   What's the difference?
23 A   I don't know.  Why are you asking it?  There's
24 a lawsuit --
25 Q   You keep quibbling with me whether it's a

Page 156

1  lawsuit or the buy-out.  The lawsuit requests a
2  buy-out; right?
3  MR. ORR: Object to the form of the question.
4  A   Well, we told them there's a lawsuit against us
5  by Dakota Energy.  I don't remember talking
6  specifically on the buy-out.
7  Q   (By Mr. Herzog) Did you tell them what the
8  lawsuit was about, Mr. Boyko?
9  A   I'm sure we did, I guess.
10 Q   Okay.  And what did you tell them the lawsuit
11 was about?
12 A   That Dakota wanted to get out of the contract.
13 Q   And what did RUS say?
14 A   Basically from what I recall, it wasn't big
15 enough for them to get too concerned about and they
16 left it there.
17 Q   Okay.  And was there any memorialization of
18 that discussion with RUS?
19 A   Not that I remember, no.
20 Q   Okay.  And so you came away from that
21 understanding that RUS wasn't terribly concerned
22 about it given the size of Dakota Energy; true?
23 MR. ORR: Object to the form.
24 MR. DIRENFELD: Object to form.
25 A   They weren't concerned with the remaining loan

# EXHIBIT L

# In The Matter Of:

*Dakota Energy Cooperative, Inc. v.*
*East River Electric Power Cooperative, Inc., et al.*

---

*Tom Boyko*
*September 20, 2021*
*Rough Draft*

---

*Pat Beck, Court Reporter*

Original File 092021ROUGHDRAFT.txt

Min-U-Script® with Word Index

Dakota Energy Cooperative, Inc. v.
East River Electric Power Cooperative, Inc., et al.

Rough Draft

Tom Boyko
September 20, 2021

---

Page 157

1  portfolio they had with East River because of the
2  size.
3  Q.  (By Mr. Herzog) Did they tell you there's no
4  right to withdraw or buy-out of your contract?
5  A.  We didn't ask them that.
6  Q.  Did they tell you that?
7  A.  Not that I recall.
8  Q.  And why wouldn't you ask them that question,
9  Mr. Boyko?
10  MR. ORR: Objection to the form of the
11  question.
12  MR. DIRENFELD: Object to form.
13  A.  It's our contract with the member.
14  Q.  (By Mr. Herzog) Yeah, but it's guaranteeing the
15  RUS debt; right?
16  A.  Yeah, that's why we talked to them.
17  Q.  And -- right.  And you understand that these
18  contracts are financing instruments; right?
19  MR. ORR: Object to the form of the question.
20  Calls for a legal conclusion.
21  Q.  (By Mr. Herzog) Go ahead, Mr. Boyko.
22  A.  Understand they used the contracts to get the
23  financing, yes.
24  Q.  Okay.  I mean, you know Duane Heile over at
25  Tri-State, don't you?

---

Page 158

1  A.  I think I met him once.  That's about it.
2  Q.  Mr. Heile testified they're financing
3  instruments; right?  Would you disagree with that?
4  MR. DIRENFELD: Object to form.
5  MR. ORR: Object to form.
6  A.  I don't know what he testified, but I wouldn't
7  disagree that they're financing instruments.
8  Q.  (By Mr. Herzog) Okay.
9  A.  They're more than that.  They're contracts.
10  Q.  -- so you don't recall the name of the
11  individual that you spoke with at RUS?
12  A.  No, I don't.
13  Q.  Who would know the name?
14  A.  Probably Dustin Zubke.
15  Q.  Okay.  Now, do you know how to get ahold of
16  Dustin?
17  A.  Yes.
18  Q.  Okay.  Do you see number two here, any
19  discussion, whether oral or in writing, involving
20  East River and any lender regarding any actual,
21  potential, or proposed withdrawal or the terms of
22  any actual, potential, or proposed withdrawal of any
23  member from East River or Basin Electric?  Did you
24  call Mr. Dudke in preparation for your testimony
25  here today and ask him, Hey, who was that fellow or

---

Page 159

1  that woman that we talked to at RUS that said they
2  weren't that concerned about it given the size of
3  Dakota Energy?  Did you do that?
4  MR. ORR: Object to the form.
5  A.  No.
6  Q.  (By Mr. Herzog) Is there a reason you didn't do
7  that?
8  A.  We asked him if he contacted the lenders and he
9  said yes.
10  Q.  Well, you were on the phone call with RUS and
11  you can't remember the name of the individual who
12  you spoke with, and you didn't think that that might
13  be of interest to us in discovery?
14  MR. ORR: Object to the form of the question.
15  A.  Actually, yeah, I don't remember who we talked
16  to or if I was just briefed afterwards, no, I don't.
17  Q.  (By Mr. Herzog) Now, wait a minute.  You're
18  changing your testimony again.  Were you on the call
19  or were you not on the call?
20  A.  I -- I know the call took place.  We -- we had
21  talked -- we talked -- or staff at least talked to
22  them and the result was they weren't concerned.
23  Q.  Right.
24  A.  I thought I was on.  I honestly don't remember.
25  Q.  Did you speak with anybody while we were

---

Page 160

1  waiting for Mr. Orr to get back to us about whether
2  this was attorney/client privilege?  Did you speak
3  with Mr. Sahr or did you speak with Mr. Orr or Mr.
4  Luce while we were waiting for him to return?
5  A.  Yes.  I saw them in the hallway on the way to
6  the bathroom, but they did not direct me to do
7  anything, no.
8  MR. HERZOG: Fellas, that's just totally
9  improper.  That is completely and totally unethical
10  and I'm going to raise it with the Court.  I told
11  you I didn't want you discussing this with the
12  witness because of the problems that we've had
13  previously with the witness changing his testimony.
14  And you've got a witness on the stand, we are on the
15  record, and one of you communicated with the witness
16  in direct violation of my request.
17  A.  They did not talk about this.
18  MR. ORR: I disagree.
19  Q.  (By Mr. Herzog) You just testified they did.
20  A.  I said I saw them when I went to the bathroom.
21  MR. HERZOG: This is a very, very troubling
22  issue and I intend to raise it with the Magistrate.
23  If you did not speak with Mr. Boyko, then please put
24  that on the record because what he just testified to
25  was that one of you communicated with him on his way

---

Dakota Energy Cooperative, Inc. v.
East River Electric Power Cooperative, Inc., et al.

Rough Draft

Tom Boyko
September 20, 2021

Page 161

1  to the restroom about a subject that was a current
2  and pending question, we never went off the record
3  and I specifically said I wasn't willing to go off
4  the record because of my concern about prior
5  testimony changing during breaks.
6      MR. ORR: No, you didn't say that. I don't
7  recall you saying that.
8      MR. HERZOG: I did. I didn't say that. I said
9  I'm not willing to have you go speak with the
10  witness. I'm not going to agree to that. That's
11  what I said. You told me you were talking to Bob
12  Sahr.
13      MR. ORR: Yeah, I did.
14      MR. HERZOG: Okay. And if Mr. Sahr or Mr. Luce
15  spoke with the witness, I'm taking it up with the
16  Magistrate, and I want to know whether you did or
17  you didn't.
18      MR. HERZOG: Mr. Luce, did you speak with the
19  witness?
20      MR. LUCE: Yes, I saw him.
21      MR. HERZOG: Did you speak with him?
22      MR. LUCE: I just said I did. I saw him.
23      MR. HERZOG: Okay. I'm going to take this up
24  with the Magistrate?
25      MR. LUCE: That's fine. We were on break as I

Page 162

1  understood it.
2      MR. HERZOG: No, we weren't on break, Mr. Luce.
3      MR. LUCE: You were gone. I walked out
4  wondering where everybody was and I saw him.
5      MR. HERZOG: That's an absolute falsehood and I
6  know you know, that, sir, because you were on --
7      MR. LUCE: No, I don't know that and --
8          (Crosstalk)
9      MR. ORR: We're going to take a break. This
10  has gotten too heated. We're going to take a break.
11      MR. HERZOG: I'm taking it up with the
12  Magistrate, Mr. Luce.
13      THE VIDEOGRAPHER: Are we going to take a
14  break, then? We're all in agreement?
15      MR. ORR: Yes. Yes. We're going to take a
16  five-minute.
17      MR. HERZOG: Mr. Orr, it's only by agreement
18  and I will agree to a five-minute break and that's
19  it.
20      THE VIDEOGRAPHER: Okay. Then we're taking a
21  five-minute break. We're going off the record.
22  It's 3:45.
23          (Recess taken.)
24      THE VIDEOGRAPHER: Okay. We're ready to go.
25  Please standby. Okay. We're back on the record.

Page 163

1  It's 3:54 p.m. Please proceed.
2      Q (By Mr. Herzog) Did you have any conversations
3  with your attorneys during that break?
4      A Yes, just briefly.
5      Q With whom?
6      A Just that I said, We're ready to go. I went to
7  the bathroom. They met separately.
8      Q Who did you have conversations with --
9      A Bob Sahr.
10      Q -- the most recent break?
11      A Bob Sahr said we're ready to go.
12      Q All right.
13      A Out in the hallway.
14      MR. ORR: Peter, can we -- I'd like to go --
15  I'd like to clarify the prior break because I know
16  you had concerns about that. When I asked for a
17  break, I was aware that there was more than one
18  phone call. And the sole purpose of communicating
19  with Mr. Boyko was to make sure that there was no --
20  no attorney/client communication was revealed. Some
21  phone calls that related --
22      MR. HERZOG: No, no, no. You can tell it to
23  the Magistrate, too, Mr. Orr because we've done
24  this. We did not go off the record at any time,
25  specifically you knew that. You told me you were

Page 164

1  talking to Mr. Sahr. I want to proceed with my
2  deposition. I don't want to discuss this any
3  further. You can put whatever information you want
4  to put into your response to the Magistrate. Now, I
5  am going to conduct the deposition of Mr. Boyko and
6  I'm going to ask you to stop interfering in that
7  examination.
8      MR. ORR: I haven't been interfering, but
9  please go ahead.
10      Q (By Mr. Orr) Mr. Boyko, if we could turn please
11  to number two of Exhibit No. 1. Any discussion,
12  whether oral or in writing, involving East River and
13  any lender regarding any actual potential or
14  proposed withdrawal, is RUS a current lender of East
15  River?
16      A Yes.
17      Q And you had a conversation with that lender RUS
18  about the potential withdrawal of Dakota Energy;
19  fair?
20      MR. ORR: Object to the form.
21      A We had a question about the lawsuit, yes.
22      Q (By Mr. Orr) Okay. And the lawsuit involves
23  the potential withdrawal. Why do you keep quibbling
24  with me about that, Mr. Boyko? Do you think the
25  lawsuit has something to do with -- with something