**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH DAKOTA**
**SOUTHERN DIVISION**

| | |
|---|---|
| DAKOTA ENERGY COOPERATIVE, INC., <br><br> *Plaintiff/Counter-Claim Defendant,* <br><br> v. <br><br> EAST RIVER ELECTRIC POWER COOPERATIVE, INC., <br><br> *Defendant/Counter-Claim Plaintiff/Cross-Claim Defendant,* <br><br> v. <br><br> BASIN ELECTRIC POWER COOPERATIVE, <br><br> *Intervenor Defendant/Counter-Claim Plaintiff/Cross-Claim Plaintiff.* | Case No. 4:20-cv-04192-LLP <br><br> **Basin Electric Power Cooperative's Brief in Support of Motion for Summary Judgment** |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION ............................................................................................................ 1

BACKGROUND .............................................................................................................. 1

    Longterm Wholesale Power Contracts Are The Backbone Of The Electric
    Cooperative System That Provides Power To Rural America ............................... 1

    Basin Relies On A Series Of Interlocking Wholesale Power Contracts To Ensure
    The Steady Stream Of Revenue Necessary For Largescale Electricity
    Generation And Transmission Across The Upper Midwest. ................................. 3

    Dakota Tells The Federal Government There Is No Early Termination Provision
    In The Basin Contract That Would Allow A Class Member To Cut Short
    Its Wholesale Power Contract With Basin ............................................................ 6

    Dakota Nevertheless Files This Suit Claiming That It Can Terminate Its Contract
    With East River Before The Term Expires; This Court Allows Basin To
    Intervene To Prevent Dakota From Unraveling The Basin System. .................... 7

LEGAL STANDARD ....................................................................................................... 7

ARGUMENT ................................................................................................................... 8

    I.     Dakota's Wholesale Power Contract Unambiguously Precludes Dakota
          From Terminating It Before The End Of The Term. ........................................ 9

          A.     The contract runs through December 31, 2075, and does not grant
               Dakota a right to terminate the contract earlier. ...................................... 9

          B.     Dakota's contrary textual argument is based not on the contract but
               the misreading of a single line in the Bylaws. ...................................... 14

    II.    Dakota's Proffered Extrinsic Evidence Is Inadmissible And Does Not
          Establish A Right To Early Termination In Dakota's Wholesale Power
          Contract. ........................................................................................................ 17

          A.     Dakota's proffered evidence is inadmissible because it does not
               resolve any ambiguity in the contract and is not tied to a particular
               word or term. .......................................................................................... 17

          B.     Dakota's proffered extrinsic evidence of an industry custom is
               inadmissible because it does not, as a matter of law, establish an
               industry custom. ..................................................................................... 20

CONCLUSION ............................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alabama Power Co. v. Alabama Elec. Co-op., Inc.*,
394 F.2d 672 (5th Cir. 1968) ...................................................................................................2

*Alberts v. Mut. Serv. Cas. Ins. Co.*,
123 N.W.2d 96 (S.D. 1963) ...............................................................................................20, 21

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)...............................................................................................................8

*Arnold v. Groose*,
109 F.3d 1292 (8th Cir. 1997) .............................................................................................14

*Ascente Bus. Consulting, LLC v. DR myCommerce*,
9 F.4th 839 (8th Cir. 2021) .................................................................................................23

*Black Hills Excavating Servs., Inc. v. Retail Constr. Servs., Inc.*,
877 N.W.2d 318 (S.D. 2016) ...........................................................................................17, 18

*Bone v. Refco, Inc.*,
774 F.2d 235 (8th Cir. 1985) ...............................................................................................10

*Brown v. Cont'l Res., Inc.*,
No. 5:18-CV-05048-KES, 2021 WL 1192615 (D.S.D. Mar. 30, 2021) .................................18

*Cambee's Furniture, Inc. v. Doughboy Recreational, Inc.*,
825 F.2d 167 (8th Cir. 1987) ...............................................................................................10

*Carstensen Contracting, Inc. v. Mid-Dakota Rural Water Sys., Inc.*,
653 N.W.2d 875 (S.D. 2002) .................................................................................................9

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)...........................................................................................................8, 20

*City of Morgan City v. S. Louisiana Elec. Co-op. Ass'n*,
31 F.3d 319 (5th Cir. 1994) .................................................................................................12

*Cotton v. Manning*,
600 N.W.2d 585 (S.D. 1999) ...............................................................................................10

*Faloni & Assocs., LLC v. Citibank N.A.*,
No. CIV 19-4195, 2020 WL 4698475 (D.S.D. Aug. 13, 2020).........................................18, 19

*Fuchs v. Rural Elec. Convenience Co-op. Inc.*,
858 F.2d 1210 (7th Cir. 1988) .........................................................................................11, 12, 24

*Gores v. Miller*,
    875 N.W.2d 34 (S.D. 2016) ...................................................................................9

*Harksen v. Peska*,
    581 N.W.2d 170 (S.D. 1998) ...............................................................................10

*Hot Stuff Foods, LLC v. Houston Cas. Co.*,
    771 F.3d 1071 (8th Cir. 2014) ...............................................................................8

*Jay Cty. Rural Elec. Membership Corp. v. Wabash Valley Power Ass'n, Inc.*,
    692 N.E.2d 905 (Ind. Ct. App. 1998)....................................................................12

*Jensen v. Pure Plant Food Int'l Ltd.*,
    274 N.W.2d 261 (S.D. 1979) ...............................................................................18

*Krenik v. County of Le Sueur*,
    47 F.3d 953 (8th Cir. 1995) ...................................................................................8

*LaMore Rest. Grp. LLC v. Akers*,
    748 N.W.2d 756 (S.D. 2008) ...............................................................................18

*Martin v. Equitable Life Assurance Soc'y*,
    553 F.2d 573 (8th Cir. 1977) ...............................................................................10

*Mid-Am. Real Est. Co. v. Iowa Realty Co.*,
    406 F.3d 969 (8th Cir. 2005) ...............................................................................20

*Mosley v. City of Northwoods*,
    415 F.3d 908 (8th Cir. 2005) .................................................................................8

*Nelson v. Schellpfeffer*,
    656 N.W.2d 740 (S.D. 2003) ...............................................................................10

*Pesicka v. Pesicka*,
    618 N.W.2d 725 (S.D. 2000) .................................................................................9

*PNC Bank, Nat'l Ass'n v. Liberty Mut. Ins. Co.*,
    912 F. Supp. 169 (W.D. Pa. 1996)........................................................................23

*Raben v. Schlottman*,
    88 N.W.2d 205 (S.D. 1958) ...............................................................................24

*Roseth v. Roseth*,
    829 N.W.2d 136 (S.D. 2013) .....................................................................18, 19, 20

*Ross v. Philip Morris & Co.*,
    328 F.2d 3 (8th Cir. 1964) ...................................................................................14

*Sacred Heart Health Servs., Inc. v. Yankton Cty.*,
  951 N.W.2d 544 (S.D. 2020) ...................................................................10

*Standard Fire Ins. Co. v. Cont'l Res., Inc.*,
  898 N.W.2d 734 (S.D. 2017) ...................................................................18

*Tri-State G&T Ass'n, Inc. v. Shoshone River Power, Inc.*,
  805 F.2d 351 (10th Cir. 1986) .................................................................12

*Tri-State G&T Ass'n, Inc. v. Shoshone River Power, Inc.*,
  874 F.2d 1346 (10th Cir. 1989) ......................................................1, 2, 3, 11

*United States v. Sw. Elec. Co-op., Inc.*,
  869 F.2d 310 (7th Cir. 1989) .................................................1, 3, 11, 12, 24

*Upper Missouri G&T Elec. Co-op. v. McCone Elec. Co-op., Inc.*,
  157 Mont. 239 (1971) ...............................................................12, 15, 16, 24

*Upper Missouri G&T Elec. Co-op. v. McCone Elec. Co-op., Inc.*,
  160 Mont. 498 (1972) ...............................................................12, 16, 19, 20

*Vetter v. Cam Wal Elec. Co-op., Inc.*,
  711 N.W.2d 612 (S.D. 2006) .....................................................................9

*Weitzel v. Sioux Valley Heart Partners*,
  714 N.W.2d 884 (S.D. 2006) ...................................................................16

**Statutes**

S.D. Codified Laws § 47-21-72 ...................................................................17

**Rules and Regulations**

7 C.F.R. § 1786.28(c)(6) ............................................................................12

Fed. R. Civ. P. 56(a) ..................................................................................8

Fed. R. Civ. P. 56(c) ..................................................................................8

Fed. R. Evid. 702 .....................................................................................17

Proposed Rule, *Wholesale Contracts for the Purchase and Sale of Electric Power
  and Energy*, 55 Fed. Reg. 38,930 (Sept. 21, 1990)...........................................2, 12

**Other Authorities**

National Rural Electric Cooperative Association, *Electric Co-op Facts & Figures*
  (Oct. 22, 2021), https://perma.cc/F2KB-TB6S ...............................................3

## INTRODUCTION

This is a simple case of contract interpretation. Dakota's all-requirements power supply contract runs through December 31, 2075, and makes no provision for early termination. East River (the seller) is upholding its end of the bargain, but Dakota (the buyer) now believes that it can get a better deal elsewhere, and so asks this Court to allow it to unilaterally terminate the contract. Recognizing that the contract unambiguously gives it no such right, Dakota strings together extra-contractual arguments related to separate membership bylaws, purported extrinsic evidence offered through the voice of its designated experts, and even a random statutory provision with no relation whatsoever to the legal question of contract interpretation at hand. Even if the Court reaches those arguments—which it need not—they fail as a matter of law to establish a right for Dakota to terminate its contract before the end of the term. Accordingly, Basin requests that the Court grant summary judgment in favor of Basin on its claims against Dakota and against Dakota on its claims against East River.

## BACKGROUND

***Longterm Wholesale Power Contracts Are The Backbone Of The Electric Cooperative System That Provides Power To Rural America.***

"When Congress enacted the [Rural Electrification Act] in 1936, ninety percent of rural residents were without electric power." *United States v. Sw. Elec. Co-op., Inc.*, 869 F.2d 310, 313 (7th Cir. 1989) (quotation marks omitted). The Act "created the Rural Electrification Administration (REA) [now known as the Rural Utilities Service] and authorized the REA to make and guarantee loans that would enable rural communities to obtain electric power." *Tri-State G&T Ass'n, Inc. v. Shoshone River Power, Inc.*, 874 F.2d 1346, 1348 (10th Cir. 1989). Rural communities across America formed nonprofit electric distribution cooperatives to take advantage of those loans and to provide electric power to consumers. Those distribution cooperatives then "banded together to form central generation and transmission cooperatives (G&Ts)," who would generate the power and transmit it to the distribution cooperatives to provide to their customers. *Id.* As G&Ts, rather than disparate individual distribution

1

cooperatives, they could "secure and more economically obtain a long-term source of power." *Id.* Thus, "[t]he REA program and formation of central G&Ts made it possible for rural communities to obtain … needed help and financial aid." *Id.* at 1349.

A G&T's ability to secure and maintain necessary financing depends on its longterm requirements "wholesale power contracts," which require the distribution cooperatives to purchase all the power they need for their customers over lengthy, fixed periods from the G&T. G&Ts generally operate on small margins and do not have high levels of equity, which ordinarily would make borrowing difficult if not impossible. *Id.* at 1349 n.3. But because lenders "look to the revenue stream under the all-requirements contracts as an assured source of repayment and security for the loans and as an essential factor to the cohesiveness and financial strength of the G&T systems," G&Ts are able to secure "long-term, low-interest loans." *Id.* at 1349-50.

"[T]he assurance of a long-term source of power and a long-term revenue stream is the very essence of the all-requirements contract and the [G&T] system." *Id.* at 1359. That is why "[i]t has been the practice of every REA Administrator since 1950 to require as a condition for making or guaranteeing G&T loans … that the G&T shall obtain long-term contracts with its members obligating them to purchase all of their electric requirements … [until] the date that the last payment is due to be made on the loan." Proposed Rule, *Wholesale Contracts for the Purchase and Sale of Electric Power and Energy*, 55 Fed. Reg. 38,930, 38,931 (Sept. 21, 1990). These "life-of-loan contracts" "assure that the G&T will have a market for the power generated and transmitted by the REA-assisted facilities and thus be able to repay the loan" while ensuring "that electric distribution borrowers will have an adequate source of reasonably priced dependable power with which to generate retail sales that will provide the primary source o[f] revenue for repaying their own obligations." *Id.*; *see Alabama Power Co. v. Alabama Elec. Co-op., Inc.*, 394 F.2d 672, 676 (5th Cir. 1968) (describing REA's "customary and long-established" practice of requiring longterm all-requirements contracts to secure loans). Because wholesale power contracts play such a central role in the financing and operation of G&Ts, both courts and lenders have recognized that the "cooperative nature of the [G&T] system is dependent on the

continuance of each member's contract." *Shoshone River Power*, 874 F.2d at 1359; *see Sw. Elec. Co-op., Inc.*, 869 F.2d at 313.

As a result of all the above, the REA's promotion of rural electrification through cooperatives has been a tremendous success. Cooperatives "serve 42 million people across 2,500+ counties," "power[ing] over 20 million businesses, homes, schools and farms in 48 states." National Rural Electric Cooperative Association, *Electric Co-op Facts & Figures* (Oct. 22, 2021), https://perma.cc/F2KB-TB6S. The system includes 63 G&Ts, as well as 832 distribution cooperatives nationwide. *Id.*

**Basin Relies On A Series Of Interlocking Wholesale Power Contracts To Ensure The Steady Stream Of Revenue Necessary For Largescale Electricity Generation And Transmission Across The Upper Midwest.**

*Wholesale Power Contracts.* Basin Electric Power Cooperative ("Basin") is a G&T; it generates electric power that it then sells and transmits to Basin Class A Members, who resell and retransmit it to Basin Class C Members (distribution cooperatives) to sell to customers. Basin Statement of Material Facts ("56.1 Stmt.") ¶¶ 1-2, 4. Every Class A G&T Member of Basin has a longterm requirements wholesale power contract ("WPC") with Basin. *Id.* ¶ 7. Under those WPCs, Basin sells and transmits to every Class A Member (with one exception not relevant here) all the electricity that member requires (over and above any small amount of federal hydropower the member may be allocated to receive from the Western Area Power Administration). *Id.* Each Class A Member has a corresponding longterm requirements WPC with Basin Class C Members, under which the Class A Member supplies all (or nearly all) of the Class C Member's electricity requirements. *Id.* ¶¶ 4, 14; *see, e.g.*, *id.* ¶ 16.

Defendant East River Electric Power Cooperative, Inc. ("East River") is a Basin Class A Member. *Id.* ¶ 3. Basin and East River have had a longterm requirements WPC since 1962 for East River to purchase from Basin all the electric power it requires (over and above its small allocation from the Western Area Power Administration). *Id.* ¶ 8. The WPC originally provided that it would run until January 1, 2002 and would continue to run "thereafter" until terminated by either party upon six months' written notice. *Id.* ¶¶ 7-8. Basin and East River have extended the

term of the WPC numerous times.  The current operative WPC runs until December 31, 2075, and only "thereafter" may the WPC be terminated by either party.  *Id.* ¶¶ 9-10.  The WPC contains no provision for *early termination* of the WPC prior to the end of the term.  *Id.* ¶ 13.

Plaintiff Dakota Energy Cooperative, Inc. ("Dakota") is a Basin Class C Member.  *Id.* ¶¶ 5-6.  As a Class C Member, Dakota has a longterm all-requirements WPC with a Basin Class A Member (East River) to purchase "all [the] electric power and energy [Dakota] shall require." *Id.* ¶¶ 14-16.  Dakota entered into its WPC with East River in 1995.  *Id.* ¶ 15.  The WPC at that time provided that it would run through December 31, 2038, "and thereafter" until terminated by either party upon six-months' written notice.  *Id.* ¶ 16.  East River and Dakota have twice amended the WPC to extend the term.  *Id.* ¶ 20.  As most recently amended, the term of the Dakota-East River WPC runs until December 31, 2075.  *Id.*  Like the Basin-East River WPC, the Dakota-East River WPC contains no provision for termination of the contract prior to the end of the contract term on December 31, 2075.  *Id.* ¶ 21.

Basin depends on the revenues from its WPCs with its members, and the revenue from those members' WPCs with their members, to operate, maintain, and improve the Basin electrical system, which supplies power to over three million users across nine states.  *See id.* ¶¶ 11-12.  The WPCs make that purpose explicitly clear.  For example, the 2015 amendment to the Basin-East River WPC explains that Basin "is planning for the eventual retirement of its existing generation sources and replacement with new sources that will require substantial financing," and, in order to finance those investments, "[Basin] and [its] lenders are relying on the [WPC] with [East River], and similar commitments from other members, to purchase power and energy for their present and future load requirement as security for the financing of [Basin's] facilities."  *Id.* ¶ 12.  Correspondingly, the 2015 Amendment to the Dakota-East River WPC explains that "the [WPC] between [East River] and [Dakota] provides the means for [East River] to meet its financial obligations to Basin … and, extending the [WPC] with [Dakota] will enable [East River] to extend its [WPC] with Basin."  *Id.* ¶ 24.

East River also depends on its WPCs with Dakota and its other members to operate,

maintain, and improve its electric transmission system.  *See id.* ¶¶ 22-24.  As the Dakota-East River WPC explains, East River has financed, and will finance in the future, construction of its electric transmission system using loans and loan guarantees secured with WPCs from members, like Dakota, and serviced by the payments from those agreements.  *Id.* ¶ 22.

***Membership bylaws.***  Membership in Basin and membership in its Class A cooperatives is governed by the Basin Bylaws and the Bylaws of the Class A Member, respectively.  *See* Ex. 8 to Affidavit of Mark D. Foss (Basin Bylaws) at Art. I;[1] Ex. 11 to Affidavit of Meredith A. Moore (East River Bylaws) at Art. I; 56.1 Stmt. ¶¶ 25-34.  Basin members must agree to Basin's Bylaws and agree to purchase their electric service from either Basin (if they are a Class A Member) or from a Class A Member (if they are a Class C Member).  56.1 Stmt. ¶¶ 26-27.[2]  Accordingly, Basin's Bylaws, which bind both East River and Dakota as Basin members, require East River (an A Member) to purchase its electric power from Basin and require Dakota (a C Member) to purchase its electric power from a Class A member, such as East River—in both cases pursuant to a WPC.  *Id.* ¶ 27.  The Basin Bylaws also govern withdrawal from and termination of *membership* in Basin—though not termination of the WPC itself, which is governed by the terms of the WPC.  *Id.* ¶¶ 28-29.  Basin's Bylaws provide that members "may withdraw from membership upon compliance with such equitable terms and conditions as the Board of Directors may prescribe; provided, however, that no Member shall be permitted to withdraw until it has met all its contractual obligations to [Basin]."  *Id.* ¶ 28 (quoting Basin Bylaws, Art. I, § 8).

East River's Bylaws are in accord. East River's Bylaws bind Dakota as a member and require it to "purchase from [East River] all electric power and energy required by the member to serve all its electric loads …."  *Id.* ¶¶ 30-31 (quoting East River Bylaws, Art. I, § 4(a)).  And, just

---

[1] Except for exhibits where the document has its own numbering (i.e., internal paragraph or section numbers, deposition transcript pages), the exhibit is cited using the pagination from the stamp in the bottom right corner of the exhibit: "Basin MSJ Exhibit _, Page _ of _."

[2] Though not relevant here, Basin also has Class B and Class D members.  Class B members are municipalities or associations of municipalities that are a member of a Basin Class A Member.  Class D members are incorporated cooperatives, municipalities, or associations of municipalities who are not members of a Basin Class A Member.

like Basin's Bylaws, East River's Bylaws govern termination of *membership* in the East River cooperative:  "A member may withdraw from membership upon compliance with such equitable terms and conditions as the Board of Directors may prescribe, provided, however, that no member shall be permitted to withdraw until it has met all contractual obligations to [East River]."  *Id.* ¶ 32 (quoting Art. I, § 5(a)).  East River's Bylaws are emphatic that termination of membership has no bearing on the independent WPC between East River and its member:  "Termination of membership in any manner shall not release a member from any liability, debts, or other obligations due [to East River]."  *Id.* ¶ 33 (quoting Art. I, § 5(b)).

### *Dakota Tells The Federal Government There Is No Early Termination Provision In The Basin Contract That Would Allow A Class Member To Cut Short Its Wholesale Power Contract With Basin.*

In 2019, Basin came under the exclusive regulatory jurisdiction of the Federal Energy Regulatory Commission ("FERC"), which required Basin to file its wholesale power rates with the Commission for approval.  Moore Ex. 19 (Sept. 14, 2020 FERC Order ¶¶ 5-8).  As part of this process, FERC reviewed Basin's WPCs with its Class A Members (like East River).  *Id.* ¶ 2.  Dakota, as a Basin Class C Member, moved to intervene in the FERC proceeding, filed a Protest, and joined in the Protest of another Class C Member (McKenzie Electric Cooperative, Inc. ("McKenzie")).  56.1 Stmt. ¶¶ 35-36.

The McKenzie Protest—adopted by Dakota—alleged that Basin's WPCs with Class A Members "do not provide any mechanism for Members to withdraw from the cooperative system and terminate their wholesale contracts," *id.* ¶ 35 (quoting McKenzie Protest at 27)—precisely the opposite argument Dakota is making here with regard to its WPC with East River, *see* Dakota Compl. ¶ 30, ECF 1-1.  FERC disagreed with Dakota that the absence of any such early termination mechanism rendered Basin's WPCs unreasonable, emphasizing that it had "not previously mandated that a … [WPC] include procedures for determining exit charges and withdrawal provisions."  56.1 Stmt. ¶ 37 (quoting Sept. 14, 2020 FERC Order ¶ 87); *see id.* ¶ 38 (FERC reciting that "there are many long-term [WPCs] on file with [FERC] that do not specify exit charges or include early termination provisions." (quoting Feb. 18, 2021 FERC Order ¶ 34)).

Dakota also asserted that Basin's Bylaws "clearly allow for voluntary withdrawal from Basin" and early termination of its WPC. *Id.* ¶¶ 35-36 (quoting McKenzie Protest at 29). Again, FERC rejected the argument, writing that contrary to Dakota's arguments, "Basin's Bylaws … do not require that the Wholesale Power Contracts provide for early termination and withdrawal[;] [i]ndeed, … Basin's Bylaws provide[] … that 'no Member[] shall be permitted to withdraw until it has met all its contractual obligations to the Cooperative.'" *Id.* ¶ 37 (quoting Sept. 14, 2020 FERC Order ¶ 87 (quoting Basin Bylaws, Art. I, § 8)).

***Dakota Nevertheless Files This Suit Claiming That It Can Terminate Its Contract With East River Before The Term Expires; This Court Allows Basin To Intervene To Prevent Dakota From Unraveling The Basin System.***

Undeterred by the contrary position it took before FERC, Dakota filed this action against East River, seeking to use one term in East River's Bylaws—the very same language that FERC found does *not* provide a right to early termination and withdrawal from Basin's WPCs—to try to prematurely terminate its WPC and membership with East River. *See* Dakota Compl. Prayer for Relief b.i-v, ECF No. 1-1. Given Basin's "significant interest in the outcome of this case"—in light of the "revenue" it receives from "the member-contracts" that Dakota is "jeopardiz[ing]," the importance of those longterm contracts for securing the financing necessary "to support a nine-state electrical power system," and the danger that Dakota's suit (if successful) could "upend[]" and unravel "[t]he continued existence of WPCs" on which the cooperative depends—this Court allowed Basin to intervene. *See* Order Granting Intervention, ECF No. 38 at 12, 15, 17. Basin filed a pleading seeking declaratory judgment that the Dakota-East River WPC does not allow Dakota to terminate or withdraw from the WPC prior to December 31, 2075, and that Basin and East River have no obligation to provide Dakota a buyout number to allow early termination of Dakota's WPC. *See* Basin Pleading for Declaratory Relief, ECF No. 23 at 12. Basin now seeks summary judgment on its own claims for declaratory judgment and against Dakota's claims for relief.

## LEGAL STANDARD

"Summary judgment is granted when there is no genuine issue of material fact and the

moving party is entitled to judgment as a matter of law." *Hot Stuff Foods, LLC v. Houston Cas. Co.*, 771 F.3d 1071, 1076 (8th Cir. 2014) (citing Fed. R. Civ. P. 56(a)). Summary judgment is also warranted where "the nonmoving party … fail[s] to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing Fed. R. Civ. P. 56(c)). "The nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005) (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)). The only factual disputes that may properly preclude summary judgment are disputes of "material" facts "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Mosley*, 415 F.3d at 910.

## ARGUMENT

**I.** The unambiguous terms of the Dakota-East River WPC resolve this contract dispute. The WPC obligates Dakota to purchase all its power from East River through December 31, 2075, and provides Dakota with no right to buy out of and terminate the WPC prior to the end of that term—a fact that Dakota effectively acknowledged before FERC. And while Basin's and East River's Bylaws do not form part of the contract, they confirm that members must fulfill their contractual obligations and have no right to terminate at-will their WPC. Dakota's asserted "right" to prematurely terminate its contract upon paying an "equitable buyout" is contrary to the plain language of the WPC and the Bylaws as well as the overwhelming weight of authority.

**II.** Dakota effectively acknowledges the total lack of textual support for its arguments and seeks to rewrite the contract through purported extrinsic evidence of an industry custom to create a right to early termination where none exists. Dakota's proffered evidence is inadmissible and cannot establish a right to early termination. First, there is no ambiguity in the WPC (or Bylaws) that would open the door to any extrinsic evidence, much less improper extrinsic evidence untethered to any purportedly ambiguous term. Second, even if extrinsic evidence were appropriate, Dakota's proffered evidence fails, as a matter of law, to establish an

8

industry custom.

**I.     Dakota's Wholesale Power Contract Unambiguously Precludes Dakota From Terminating It Before The End Of The Term.**

**A.     The contract runs through December 31, 2075, and does not grant Dakota a right to terminate the contract earlier.**

Whether the Dakota-East River WPC allows Dakota to terminate the contract is a question of contract interpretation.  Under South Dakota law, which governs here, 56.1 Stmt. ¶ 17, "contract interpretation" presents "a question of law that is based on the language used in the contract rather than the parties' subjective belief."  *Gores v. Miller*, 875 N.W.2d 34, 39 (S.D. 2016).  Accordingly, courts "seek to ascertain and give effect to the intention of the parties" by "rely[ing] on the contract language they actually used."  *Carstensen Contracting, Inc. v. Mid-Dakota Rural Water Sys., Inc.*, 653 N.W.2d 875, 877 (S.D. 2002).  Courts are "not free to vary or embellish" contracts as they are "written."  *Vetter v. Cam Wal Elec. Co-op., Inc.*, 711 N.W.2d 612, 619 (S.D. 2006).

**1.** The contract analysis begins and ends with the text of the WPC.  *See Pesicka v. Pesicka*, 618 N.W.2d 725, 727 (S.D. 2000) (holding that because key provision could only mean one thing, the "inquiry ends" there).  Not only does the WPC contain no provision that would allow Dakota to terminate the contract early, the WPC unambiguously precludes early termination by requiring Dakota to purchase all of its power from East River through at least the contract term, which ends December 31, 2075.

There are two key provisions.  The first is Section 1 of the WPC, which requires Dakota to "purchase and receive from East River, *all* electric power and energy which [Dakota] shall require to serve all of [Dakota's] electric loads" through at least the contract term.  56.1 Stmt. ¶ 16 (emphasis added) (quoting WPC § 1).  The second is Section 10, which defines the contract term.  When Dakota signed the original WPC in 1995, the contract provided that the Agreement would "remain in effect until December 31, 2038."  *Id.* (quoting WPC § 10) ("Term").  As most recently amended, the operative term of the WPC now runs until December 31, 2075.  *Id.* ¶ 20 (citing WPC 2015 Amendment).  Accordingly, Dakota's obligation to purchase "all" its electric

9

power and energy from East River "remain[s] in effect until [December 31, 2075]."  *See id.*

¶¶ 16, 20.  The express language of the contract as well as its fixed-term nature demonstrate that

the WPC is not subject to early termination.  Had the parties intended a contract that was

"terminable at will," they would have agreed to a contract with "no fixed term."  *Cambee's*

*Furniture, Inc. v. Doughboy Recreational, Inc.*, 825 F.2d 167, 172 (8th Cir. 1987) (South Dakota

law) (citing *Martin v. Equitable Life Assurance Soc'y*, 553 F.2d 573, 574 (8th Cir. 1977)).

 The text of the WPC "Term" provision further demonstrates that Dakota is not permitted

to terminate before the end of the term in 2075.  The provision states that the WPC "shall remain

in effect until December 31, 2075, and *thereafter until terminated by either Party* … [upon] six

months' written notice."  *See* 56.1 Stmt. ¶ 20 (quoting WPC § 10, as amended) (emphasis

added).  In other words, the WPC runs at least through 2075, and it is only after 2075 that a party

can terminate the Agreement.  That the WPC expressly provides for termination *after* the term

has ended and makes no such provision for termination *before* that date demonstrates that the

parties deliberately chose not to permit early termination in these circumstances.  *See Sacred*

*Heart Health Servs., Inc. v. Yankton Cty.*, 951 N.W.2d 544, 549-50 (S.D. 2020) (endorsing

"*expressio unius est exclusio alterius*" canon as a "useful" tool for "shed[ding] light on" the

drafters' "intent" because "expression of one thing is the exclusion of another").

 Because the WPC does not provide for early termination, this Court cannot create that

right in the WPC.  *Cotton v. Manning*, 600 N.W.2d 585, 588-89 (S.D. 1999) (Courts applying

South Dakota law may "not read exceptions into [a contract] ... when the language is clear on its

face." (quoting *Harksen v. Peska*, 581 N.W.2d 170, 174 (S.D. 1998))).

 **2.**  Additional text in the WPC confirms that there is no right to the early termination that

Dakota seeks here.  The right Dakota claims to exit the WPC early and prematurely cease

purchasing electricity from East River would be contrary to the purpose of the WPC as expressed

in the terms of the contract.  *See Nelson v. Schellpfeffer*, 656 N.W.2d 740, 744 (S.D. 2003)

(interpreting contract in accordance with its "stated purpose"); *cf. Bone v. Refco, Inc.*, 774 F.2d

235, 245 (8th Cir. 1985) (interpreting contract under Arkansas law in light of "introductory

'whereas' clauses").  The WPC explains that one of its purposes is to permit East River to have a stable and predictable stream of income so East River can secure financing for its electric-power transmission system, including additional transmission infrastructure as necessary.  *See* 56.1 Stmt. ¶ 22 ("[the WPC] and payments [from Dakota] due to East River under [the WPC] shall be pledged and assigned to secure [loans]" that have already been taken and will be taken in the future to finance construction of East River's electric transmission system, which East River uses "for the purpose … of supplying electric power and energy to its Members" (quoting WPC Whereas Clauses)); *id.* ¶ 23 (quoting 2006 Amend. No. 2 at 1-2) (similar).  Because the Dakota-East River WPC (like East River's WPCs with its other members) requires Dakota to buy all its electricity from East River over a fixed term, East River has a steady and predictable stream of revenue that it can use to, among other things, obtain financing and pay the "principal and interest" on that financing.  *Id.* ¶ 22 (quoting WPC § 4(b)(5)).

Against that backdrop, it is plain that East River's WPC with Dakota, like its WPCs with its other members, does not permit early termination.  Were it otherwise, parties could cut short their WPCs, eliminating the security for the loans and depriving East River of the critical revenue it needs to repay the loans.  Indeed, the continued adherence of a member to the all-requirements WPC for the term of the contract is so critical to securing and repaying the loans that East River needs to supply electric power to its members that the Dakota WPC includes a "specific performance" provision that requires Dakota to keep purchasing all its electric power from East River during the term of the WPC.  56.1 Stmt. ¶ 18 (quoting Suppl. Agmt. at 2).

Courts around the country have recognized similar considerations in rejecting the occasional attempt by a cooperative member to evade its all-requirement obligations in a WPC. *See Fuchs v. Rural Elec. Convenience Co-op. Inc.*, 858 F.2d 1210, 1212 n.8 (7th Cir. 1988) (collecting cases); *see, e.g.*, *Shoshone River Power*, 874 F.2d at 1359 (Tenth Circuit rejecting distribution cooperative's claim that it had a contractual right to cease buying power from its G&T prior to the expiration of the wholesale power contract); *Sw. Elec. Co-op, Inc.*, 869 F.2d at 313 (Seventh Circuit rejecting distribution cooperative's claim that its contract was void due to

mutual mistake and frustration of purpose); *Upper Missouri G&T Elec. Co-op. v. McCone Elec. Co-op., Inc.*, 160 Mont. 498 (1972) ("*Upper Missouri II*") (Montana Supreme Court rejecting distribution cooperative's argument that public policy entitled it to terminate its contract early); *see also* 55 Fed. Reg. at 38,931 ("REA life-of-loan, all-requirements contracts have been repeatedly upheld by Federal and state courts in a series of decisions beginning in 1968.").[3]  As those courts have explained, "withdrawal of any distribution co-op from the system … raises the possibility of default, with potentially disastrous results for the system."  *Sw. Elec. Co-op., Inc.*, 869 F.2d at 313 (quoting *Fuchs*, 858 F.2d at 1212 n.8); *accord* 55 Fed. Reg. at 38,931.  A member's early termination of the WPC undermines the cooperative system, even where the member's share of the "loans [are] paid in full," due to "lost economies of scale," "higher … costs" for other members, and the danger that one withdrawal could "pave the way" for other withdrawals, *City of Morgan City v. S. Louisiana Elec. Co-op. Ass'n*, 31 F.3d 319, 324 (5th Cir. 1994) (quotation marks omitted); *see Sw. Elec. Co-op., Inc.*, 869 F.2d at 313-14—thereby triggering acceleration clauses that are common in G&T financing instruments, *see, e.g.*, 7 C.F.R. § 1786.28(c)(6) ("right to accelerate").  The Montana Supreme Court was confronted with a situation similar to the one here, where a cooperative member tried to break a WPC because it "want[ed] a better deal elsewhere."  *Upper Missouri G&T Elec. Co-op. v. McCone Elec. Co-op., Inc.*, 157 Mont. 239, 250 (1971) ("*Upper Missouri I*").  As that court recognized, "[i]f every contract could be declared void because of a showing" that the party "could save money by breaking it, chaos would result." *Id.*

**3.** Additional proof that the parties did not provide for the early termination and buyout that Dakota seeks here is found in the Basin and East River Bylaws.  Though the Court need only look to the WPC (for the reasons discussed above), both sets of Bylaws confirm that Dakota has no right to unliterally withdraw prior to December 31, 2075.  Distinct from the WPC, which

---

[3] Courts have even preliminarily enjoined member cooperatives from prematurely terminating their all-requirements contracts.  *See Jay Cty. Rural Elec. Membership Corp. v. Wabash Valley Power Ass'n, Inc.*, 692 N.E.2d 905, 914 (Ind. Ct. App. 1998); *Tri-State G&T Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 356 (10th Cir. 1986).

governs Dakota's obligation to purchase electric power from East River, the Bylaws set out the terms of Dakota's *membership* in both Basin and East River.  Neither set of Bylaws purports to give Dakota any right to unilaterally turn its back on its obligations under the WPC. Instead, they make clear that, except in the case of two specific exceptions not implicated here,[4] "[e]ach member shall purchase from [East River] all electric power and energy required by the member to serve all its electric loads."  *E.g.*, 56.1 Stmt. ¶ 31 (quoting East River Bylaws, Art. I, § 4(a)).

Unsurprisingly then, both sets of Bylaws permit termination of membership in the Basin and East River cooperatives only once contractual obligations have been satisfied.  For example, the East River Bylaws provide that "[a] member may withdraw from membership upon compliance with such equitable terms and conditions as the Board of Directors may prescribe, provided, however, that no member shall be permitted to withdraw *until* it has *met all contractual obligations to* [East River]."  *Id.* ¶ 32 (emphasis added) (quoting Art. I, § 5(a)); *accord id.* ¶ 28 (quoting Basin Bylaws, Art. I, § 8) (same).  Dakota's contractual obligation to East River includes purchasing all its electric power and energy from East River until the end of 2075.  Accordingly, Dakota cannot terminate its membership in East River until after 2075.  Even were that not so—that is, even if Dakota could terminate its *membership* in East River before 2075—the East River Bylaws state explicitly that "[t]ermination of *membership* in any manner shall *not release* a member from *any* liability, debts, or other *obligations* due [to East River]."  *Id.* ¶ 33 (emphasis added) (quoting East River Bylaws, Art. I, § 5(b)).  The Bylaws are, therefore, unambiguous that Dakota is required to continue to purchase all its electric power from East River through the end of 2075—just as Dakota agreed to do in its WPC.

**4.** Finally, Dakota admitted to FERC that it had no right to early termination when it argued that Basin's WPCs (which Dakota has conceded are "the same" as the Dakota-East River

---

[4] One of the two exceptions applies only to Class D members, *see* Moore Ex. 11 (East River Bylaws, Art. I, § 4(c))—and Dakota is a Class C member.  The other involves mergers and corporate consolidations, *see id.* (Art. I, § 4(b)), which does not apply here.  Notably, even in the case of that exception, the Bylaws require the member to "clearly demonstrate that the merger, consolidation or acquisition shall *not negatively impact* the existing [WPC] between [East River] and the member." *Id.* (emphasis added).

WPC in all material respects, Moore Ex. 9 (Ringelstetter 30(b)(6) Dep. 123)) "do not provide any mechanism for Members to withdraw from the cooperative system and terminate their wholesale contracts."  56.1 Stmt. ¶ 36 (quoting McKenzie Protest at 27 (adopted by Dakota)). Dakota's statement to FERC that there is no early termination is an "admission[] by a party opponent" that is admissible "against" Dakota here.  *Arnold v. Groose*, 109 F.3d 1292, 1296-97 (8th Cir. 1997); *accord Ross v. Philip Morris & Co.*, 328 F.2d 3, 15 (8th Cir. 1964).

For all the reasons above, the Dakota-East River WPC unambiguously requires Dakota to purchase its power from East River through 2075 and makes no provision for Dakota to terminate the WPC early.

### B.    Dakota's contrary textual argument is based not on the contract but the misreading of a single line in the Bylaws.

Dakota does not point to anything in the actual contract at issue (the Dakota-East River WPC) that grants it the right of early termination that it seeks here.  Indeed, Dakota's primary textual argument does not involve the WPC at all, but instead East River's Bylaws.  *See* Dakota Compl. ¶ 5, ECF No. 1-1 ("East River's refusal to provide Dakota Energy with equitable terms and conditions for withdrawal—and specifically a buyout price—is a violation of East River's Bylaws and constitutes an anticipatory breach of contract [i.e., the Bylaws] under South Dakota law.").  The Bylaws do not alter, much less supersede, Dakota's obligation in the WPC to purchase its electric power and energy from East River through 2075.  The Bylaws do not create an exception in the WPC where none exists.  Indeed, the Bylaws emphasize at every turn that nothing in the Bylaws undermines or modifies those obligations.  *Supra* at 5-6 (discussing East River Bylaws, Art. I, §§ 4(a), 5(a), 5(b)).  And, in any event, the provision of the Bylaws that Dakota relies on is irrelevant, as that provision governs termination of *membership* in East River, not termination of the WPC which is governed by the terms of the WPC.

Because Dakota recognizes that the WPC provides it no basis for termination of the WPC, Dakota seeks to collapse the distinction between termination of membership under the Bylaws and termination of the WPC.  But Dakota's efforts to "terminate" the WPC simply by

"terminating" its membership under the Bylaws fail on their own terms.  As the East River Bylaws make clear:  "Termination of membership … shall not release a member from any … obligations due to [East River]."  56.1 Stmt. ¶ 33 (quoting East River Bylaws Art. I, § 5(b)).

As for termination of membership, the Basin and the East River Bylaws both provide only three ways for Membership to be terminated: (1) a Member ceasing to exist as a corporate entity, (2) voluntary withdrawal, or (3) involuntary expulsion.  *Id.* ¶ 32 (citing East River Bylaws, Art. I, § 5(b)); *id.* ¶ 28 (citing Basin Bylaws, Art. I, §7).  None of them apply here.  The first and third are plainly inapplicable on their face, and Dakota does not contend otherwise.  As for voluntary withdrawal, it is only permitted once the Member has met all of its contractual obligations to East River:  "A member may withdraw from membership upon compliance with such equitable terms and conditions as the Board of Directors may prescribe, *provided*, however, that *no member shall be permitted to withdraw until it has met all contractual obligations to [East River]*."  *Id.* ¶ 32 (emphasis added) (quoting East River Bylaws, Art. I, § 5(a)); *accord id.* ¶ 28 (quoting Basin Bylaws, Art. I, § 8).  Regardless of what the "equitable terms and conditions" may be that a member must *also* satisfy to voluntarily withdraw from its membership, the condition precedent is clear—complete satisfaction of the member's contractual obligations under its WPC.

At least one other court construing identical proviso language in another G&T's bylaws concluded that that language means exactly what it says:  "Section 5 clearly gives the board of trustees the right to set reasonable conditions" on withdrawal of membership that a member must satisfy to withdraw, and there is "*no right* [to withdraw] where the contractual obligations have not been met."  *Upper Missouri I*, 157 Mont. at 249.  The question of what those contractual obligations *are* is governed by the WPC, which requires Dakota to buy all its power from East River through 2075.  Accordingly, Dakota cannot withdraw from membership in East River until it purchases from East River all the electric power it needs through 2075.

*Upper Missouri I* forecloses Dakota's argument in another way, too.  Dakota focuses on the half sentence from the East River Bylaws that "[a] member may withdraw from membership

upon compliance with such equitable terms and conditions as the Board of Directors may prescribe."  Moore Ex. 11 (East River Bylaws, Art. I, § 5(a)).  Even putting aside the proviso, *Upper Missouri I* explains that the Bylaws do not require the Board to prescribe terms and conditions for withdrawal—the provision is permissive ("may prescribe")—and, if the Board chooses not to prescribe terms and conditions for withdrawal, then Dakota by definition cannot satisfy them.  As *Upper Missouri I* held, Upper Missouri's "refus[al] to release the defendant from membership … and refus[al] to set forth any equitable terms or conditions upon which [the defendant] might withdraw from membership" was entirely permissible and *not* at all "contrary to the by-laws."  157 Mont. at 248; *see Upper Missouri II,* 160 Mont. at 505 (affirming trial court's grant of summary judgment to Upper Missouri after remand).

 To the extent Dakota attempts to ground its assertion of a right to early termination in the WPC itself, the best Dakota can do is Section 14, but that provision says nothing about early termination and is plainly inapplicable here in any event.  Section 14, by its terms, applies only where a member seeks to "reorganiz[e] or … consolidate with or merge into any corporation, or to sell, lease, or transfer … all or a substantial portion of its assets."  Moore Ex. 12 (WPC § 14(a)).  Section 14 is inapplicable because, as Dakota admits, none of the conditions exists here.  Moore Ex. 25 (Dakota's Resps. to Basin's RFAs Nos. 3-5).  And even if they did, Section 14 nowhere mentions termination of the WPC.  *Cf. supra* at 13 n.4 (noting the East River Bylaws require member to show a merger, consolidation or acquisition will not negatively impact the existing WPC).

 Dakota's claim for anticipatory breach fails for all the reasons discussed above.  An "anticipatory breach" is a "breach of contract caused by a party[] … indicating that [it] will not perform *when performance is due*."  *Weitzel v. Sioux Valley Heart Partners*, 714 N.W.2d 884, 894 (S.D. 2006) (emphasis added).  But here there is no "enforceable promise" that either East River or Basin must perform and have "indicate[d] that [they] will not."  *Id.*  As discussed, neither the Dakota-East River WPC nor the Basin or East River Bylaws provide Dakota with any applicable right to withdraw from membership or prematurely terminate its WPC in the

16

circumstances present here.  Accordingly, neither East River nor Basin has any contractual

obligation to provide Dakota a buyout figure to allow it to prematurely terminate its WPC.  Basin

and East River cannot, therefore, have anticipatorily breached any of their contractual obligations

by failing to do so.[5]

## II.   Dakota's Proffered Extrinsic Evidence Is Inadmissible And Does Not Establish A Right To Early Termination In Dakota's Wholesale Power Contract.

Unable to find any textual support in the WPC for its position, Dakota seeks to rewrite

the contract through purported extrinsic evidence, trying to create a right to early termination

where none exists.  Dakota's evidence takes the form of the reports of two purported experts—

Sandra Ringelstetter Ennis and Karl Rábago—who claim there is an industry custom of early

terminations and equitable buyouts of distribution cooperatives' WPCs that is so overwhelming

that it must be read into the Dakota WPC.  As explained in the contemporaneously filed *Daubert*

motions, Dakota's expert testimony is inadmissible under Rule 702 of the Federal Rules of

Evidence.  If those opinions are excluded, Dakota lacks any basis to challenge summary

judgment for Basin (and East River).  Even assuming the opinions can withstand *Daubert*

gatekeeping, however, they cannot preclude summary judgment because they are inadmissible as

improper extrinsic evidence and, in any event, cannot change the meaning of the WPC, which

forecloses Dakota's claims.

### A.   Dakota's proffered evidence is inadmissible because it does not resolve any ambiguity in the contract and is not tied to a particular word or term.

In South Dakota, "extrinsic evidence" (including parol, course of dealing, and trade usage

evidence) "is not considered" "[w]hen contract language is unambiguous," "because the intent of

the parties can be derived from within the four corners of the contract."  *Black Hills Excavating*

*Servs., Inc. v. Retail Constr. Servs., Inc.*, 877 N.W.2d 318, 322 (S.D. 2016) (quotation marks

---

[5] Similarly, there is simply no basis for Dakota's contention that the WPC "violates SDCL 47-21-72, which requires that East River be operated for the 'mutual benefit' of its members." Dakota Compl. ¶ 30.  Even if Dakota could explain why a *statutory* provision gave it an enforceable *contractual* right, the statutory provision in question relates to a cooperative's "[d]isposition of revenues" and nonprofit status, *see* S.D. Codified Laws § 47-21-72—issues that Dakota has not raised in this litigation.  So this argument is wholly irrelevant.

17

omitted).  Extrinsic evidence is "resorted to" only to "dispel[]" "ambiguity [in a contract]" by "show[ing] what the parties meant by what they said." *Roseth v. Roseth*, 829 N.W.2d 136, 142 (S.D. 2013) (quotation marks omitted).  It "may not be admitted to vary the terms of a written instrument," *LaMore Restaurant Group LLC v. Akers*, 748 N.W.2d 756, 764 (S.D. 2008) (quoting *Jensen v. Pure Plant Food Int'l Ltd.*, 274 N.W.2d 261, 263-64 (S.D. 1979)), or to show that the parties "meant something other than what they said," *Roseth*, 829 N.W.2d at 142-43 (quotation marks omitted); *accord Faloni & Assocs., LLC v. Citibank N.A.*, No. CIV 19-4195, 2020 WL 4698475, at *7 (D.S.D. Aug. 13, 2020) ("[T]he Court may not look to the parties' [extrinsic evidence] as evidence that the parties intended a meaning contrary to what is expressed in the Agreement.").

Accordingly, "before extrinsic evidence can be heard[,] the contract must be deemed uncertain or ambiguous." *LaMore*, 748 N.W.2d at 765.  Ambiguity "does not arise merely because different interpretations of the contract are offered," *Standard Fire Ins. Co. v. Cont'l Res., Inc.*, 898 N.W.2d 734, 738 (S.D. 2017), or "the parties do not agree on [the contract's] proper construction or their intent upon executing the contract," *Brown v. Cont'l Res., Inc.*, No. 5:18-CV-05048-KES, 2021 WL 1192615, at *6 (D.S.D. Mar. 30, 2021) (quoting *Roseth*, 829 N.W.2d at 142).  "Rather, a contract is ambiguous when application of rules of interpretation leave[s] a genuine uncertainty as to which of two or more meanings is correct." *Standard Fire Ins. Co.*, 898 N.W.2d at 738 (alterations and quotation marks omitted); *accord Brown*, 2021 WL 1192615, at *6.

Under South Dakota law, Dakota's proffered extrinsic evidence may not be considered for two reasons.  First, as explained above, there is no "genuine uncertainty" as to the meaning of the parties' contract; the WPC unambiguously requires Dakota to purchase all its electric power from East River through 2075 without any provision for unilateral early termination.  Because there is no ambiguity, this Court should look no further than "the four corners of the contract" to determine the parties' intent.  *Black Hills Excavating Servs.*, 877 N.W.2d at 322.

Second, Dakota's proffered evidence is not offered to interpret any term in the WPC.

18

Dakota identifies no word or phrase in the WPC that could possibly be construed as allowing unilateral early termination, *see* Moore Ex. 22 (Ringelstetter Expert Dep. 94-95)—and, as discussed, Dakota has represented to FERC that Basin's materially identical WPC contains no such right.  *See* 56.1 Stmt. ¶¶ 35-36; Moore Ex. 9 (Ringelstetter 30(b)(6) Dep. 123) (conceding that Basin's WPCs are "the same" as the Dakota-East River WPC in all material respects). Nevertheless, Dakota seeks to introduce extrinsic evidence purporting to show that such a right to early termination is, to use the words of one of its experts, "*inherent* in … the WPC between Dakota Energy and East River," Moore Ex. 23 (Rábago Rpt. ¶ 12) (emphasis added); Moore Ex. 24 (Rábago Expert Dep. 80).  Indeed, at his deposition, Rábago admitted that there was no "particular term of art used" in the WPC or the Bylaws on which he was "rendering an expert opinion."  *See* Moore Ex. 24 (Rábago Expert Dep. 57-59).  Likewise, Dakota's other expert (Ringelstetter Ennis) concedes her opinion is untethered to any "specific word" or term in the WPC.  Moore Ex. 22 (Ringelstetter Expert Dep. 94-95).  Thus, Dakota's proffered evidence is not being offered to "show what the parties meant by what they said," *Roseth*, 829 N.W.2d at 142 (quotation marks omitted), but rather to impermissibly suggest "that the parties intended a meaning contrary to what is expressed in the" WPC, *Faloni & Assocs.*, 2020 WL 4698475, at *7.

In circumstances much like these, the Montana Supreme Court rejected a distribution cooperative's effort to vary with extrinsic evidence the unambiguous terms of a longterm wholesale power contract.  In *Upper Missouri II*, a distribution cooperative (McCone) attempted to use parol evidence to support its position that it could terminate its wholesale power contract with Upper Missouri before the term expired.  160 Mont. 498.  The Montana court emphatically rejected McCone's gambit, holding that "the wholesale power contract … is enforceable under its terms," and McCone could not "vary by parol evidence the unimpeachable intent of the parties, as evidenced by … the contract."  *Id.* at 503-05.  The court therefore affirmed the grant of summary judgment, which held that "the notice of withdrawal submitted … by [McCone] is of no legal effect" and that the "wholesale power contract between the plaintiff and defendant is valid, binding and subsisting."  *Id.* at 500, 505.

Dakota then turns not to the WPC but to the East River Bylaws, focusing on the Bylaws' reference to "equitable terms and conditions" for withdrawal from membership that the Board of Directors may prescribe.  *See* Dakota Compl. ¶¶ 21-22; Tr. of Hr'g, May 24, 2021 at 12.  As discussed above (at 14-15), it is irrelevant what the Bylaws say because it is the WPC that controls Dakota's obligation to purchase electric power.  *Cf. Mid-Am. Real Est. Co. v. Iowa Realty Co.*, 406 F.3d 969, 973 (8th Cir. 2005) (rejecting extrinsic evidence that is "irrelevant" to the "meaning of the contract").  But even if the meaning of the Bylaws somehow changes the meaning of the WPC, the result would be the same.  That is because, regardless of what "equitable terms and conditions" for withdrawal may mean, the remainder of the Bylaws make it clear that the terms and conditions cannot include *terminating early* Dakota's obligation to purchase its electric power through 2075 from East River.  *Supra* at 15.  Any extrinsic evidence supposedly interpreting "equitable terms and conditions" to permit Dakota to avoid purchasing its electricity from East River through 2075 would therefore contravene the plain language of the WPC and Bylaws and thus be improper and inadmissible.  *See Roseth*, 829 N.W.2d at 142.[6]

### B.   Dakota's proffered extrinsic evidence of an industry custom is inadmissible because it does not, as a matter of law, establish an industry custom.

Dakota's proffered evidence is also inadmissible because it does not meet the threshold legal requirements for evidence of an industry custom.

The purported industry custom "must appear … so general that the parties are presumed to have knowledge of it."  *Alberts v. Mut. Serv. Cas. Ins. Co.*, 123 N.W.2d 96, 103 (S.D. 1963).  If an industry custom is to be "established by specific instances," those instances must (a) be "numerous enough to base an inference of systematic conduct," and (b) "have occurred under substantially similar circumstances, so as to be naturally accountable for by a system only, and not as casual recurrences."  *Id.* (quotation marks omitted).  The opinions of Dakota's experts

---

[6] Because the Board of Directors has no obligation to prescribe any equitable terms and conditions for withdrawal, *supra* at 15-16, even if "equitable terms and conditions" means what Dakota says it does, that would not allow Dakota to withdraw on those terms unless Dakota adduces evidence that the Board prescribed those terms and conditions.  Dakota has presented no such evidence, which is fatal on summary judgment.  *See Celotex*, 477 U.S. at 323.

utterly fail to satisfy these threshold requirements.

    ***Ringelstetter Ennis***.  Ringelstetter contends that there is a "growing trend of distribution cooperatives withdrawing as member-owners from their G&T"—as evidenced by nine "case studies" in which a distribution member has either sought to withdraw or has purportedly withdrawn from a G&T upon paying a buyout fee.  *See* Moore Ex. 21 (Ringelstetter Rpt. 7-14).  That falls far short of an industry standard.  For one thing, it is not "numerous enough to base an inference of systematic conduct."  *See Alberts*, 123 N.W.2d at 103.  There are "over 800" distribution cooperatives (like Dakota) in the United States and 63 G&Ts (like East River).  *See* Moore Ex. 22 (Ringelstetter Expert Dep. 126, 130).  Ringelstetter identifies only ten distribution cooperatives that purportedly have negotiated early withdrawals, and another 13 that have "requested," but not received, an exit fee (nine of those from a single G&T, Tri-State G&T).  *See* Moore Ex. 21 (Ringelstetter Rpt. 8-14).  That's less than 3% of the nation's distribution cooperatives—and less than one instance per year in the 24 years she examined.  Such a tiny sum is not, as a matter of law, "numerous enough."  *See Alberts*, 123 N.W.2d at 103; *cf.* Moore Ex. 22 (Ringelstetter Expert Dep. 71-72) (agreeing that if "10 people [in an office] always eat lunch at their desk" and "the other 90 always go out for lunch," then "the general practice is to go out to lunch").

    Second, Ringelstetter's "case studies" do not create a "presum[ption]" of the parties' knowledge at the time of contracting.  *See Alberts*, 123 N.W.2d at 103.  Ringelstetter's entire notion of a "growing trend," is contrary to an established industry custom because a growing trend now necessarily means the custom was otherwise previously.  That explains why every single buyout and requested buyout Ringelstetter cites occurred *after* Dakota and East River entered into their WPC in 1995.  And all but four took place *after* they last extended their contract in 2015.  Those after-the-fact events cannot show what Dakota and East River intended or understood their WPC to mean at the time they agreed to it.

    Moreover, the purported industry custom Ringelstetter asserts is not—as Dakota wishes it would be—that WPCs have early termination clauses or that early termination clauses are read

into WPCs.  As Ringelstetter concedes, WPCs are typically structured as longterm agreements that allow G&Ts to "recover the cost of long-lived investments through utility rates over time" and "facilitate financing," Moore Ex. 21 (Ringelstetter Rpt. 4)—and the overwhelming judicial and administrative authorities cited above demonstrate that courts routinely reject distribution cooperatives' efforts to terminate early their requirement WPCs, *supra* at 11-12.  What Ringelstetter means is that there is a growing "industry trend" where parties choose at some later date to negotiate a buyout and thus enter into a separate "[early] withdrawal agreement" for early termination of their WPC.  *See* Moore Ex. 22 (Ringelstetter Expert Dep. 97-99).  Notably, she admits that a member cannot just unilaterally "withdraw [early] without having [such] an agreement," *id.*, which is exactly what Dakota is trying to do.  That some G&Ts have decided it is in their business interest to offer a buyout or early termination does not establish an industry custom based on "similar circumstances" that distribution cooperatives have such an entrenched right to a buyout or early termination that it must be present in the Dakota-East River WPC.

Nor is Ringelstetter correct that FERC has recognized that distribution cooperatives have a "right to exit or withdraw from membership."  *See* Moore Ex. 21 (Ringelstetter Rpt. 12). FERC explained—in the very case in which Dakota intervened and filed a protest—that "there are many long-term wholesale contracts on file with the Commission that do not specify exit charges or include early termination provisions" and that it was unaware of "any court or Commission precedent that a wholesale supplier must include such an option—and associated option pricing—for a long-term wholesale contract to meet the requirements" of the Federal Power Act.  Moore Ex. 20 (Feb. 18, 2021 FERC Clarification Order) ¶ 34 (quoted, in part, by 56.1 Stmt. ¶ 38); *accord* 56.1 Stmt. ¶ 37 (noting FERC's observation that it had "not previously mandated that a … [WPC] include procedures for determining exit charges and withdrawal provisions" (quoting Sept. 14, 2020 FERC Order ¶ 87)).

*Rábago*.  Rábago argues that "a WPC that does not include a right to withdraw from the

contract[] is fundamentally inconsistent" with the so-called "Seven Cooperative Principles"[7]—a set of "guiding principles or lenses through which the operation of [cooperatives] should be viewed." Moore Ex. 23 (Rábago Rpt. ¶¶ 14, 17). The report fails to establish any industry custom or usage evidence establishing an early termination right.

First, the Seven Principles—which Rábago must concede are "worded pretty generally," Moore Ex. 24 (Rábago Expert Dep. 65)—*nowhere* state that a member cooperative has a right to prematurely terminate its contract. Rábago's argument (that the Seven Principles are a prism through which the WPC "should be" interpreted) is "no more than additional legal argument as to the correct interpretation of the applicable law [i.e., contract]," *PNC Bank, Nat'l Ass'n v. Liberty Mut. Ins. Co.*, 912 F. Supp. 169, 177 (W.D. Pa.), *aff'd*, 101 F.3d 691 (3d Cir. 1996) (Table). Such legal arguments about the correct interpretation of a contract are "inappropriate material for [this court's] consideration … [on] summary judgment." *Id.*; *see Ascente Bus. Consulting, LLC v. DR myCommerce*, 9 F.4th 839, 848 (8th Cir. 2021) (holding that "expert testimony on legal matters"—including questions of contract interpretation—"is inadmissible").

Second, Rábago has not identified a single instance in which the Seven Principles have informed the construction of a WPC, much less been used to create a right to early termination in a fixed-term WPC. Rábago contends that the Seven Principles govern all the actions of every cooperative throughout the world, but he concedes they are only "aspirational"—not binding, Moore Ex. 24 (Rábago Expert Dep. 65)—and he has never once seen them "expressly integrated" into a WPC, *id.* 77.

Third, Rábago's argument fails on its own terms. Dakota voluntarily contracted to purchase its power from East River through 2075 without a provision for early termination. Holding Dakota to the terms of the commitment it willingly accepted does nothing to (a) violate "generally accepted principles of contracting," (b) create an "exploitive" "contract of adhesion,"

---

[7] The Seven Cooperative Principles are: (1) open and voluntary membership; (2) democratic member control; (3) members' economic participation; (4) autonomy and independence; (5) education, training, and information; (6) cooperation among cooperatives; and (7) concern for community. Rábago Rpt. ¶ 15.

(c) conflict with "local" or "democratic" "control" of the cooperative, (d) eliminate "voluntary and open membership" in the cooperative, or (e) inhibit Dakota's attempts to "secur[e] optimal economics and operational performance." *See* Moore Ex. 23 (Rábago Rpt. ¶¶ 18-46). And, even if it did, that would not be a basis to excuse Dakota from its contractual commitments or to rewrite the contract. *See Upper Missouri I*, 157 Mont. at 250; *see also Raben v. Schlottman*, 88 N.W.2d 205, 208 (S.D. 1958) ("The rights of the parties may not be resolved … by what the court may have regarded as abstract fairness; in other words, a court cannot make a contract for the parties that they did not make for themselves.").

***

In sum, neither Rábago's attenuated legal arguments about the Seven Cooperative Principles nor Ringelstetter's handful of inapposite "case studies" establish an industry custom that WPCs like Dakota's must permit early termination when the distribution cooperative thinks it can get a better deal elsewhere. Rather, "[t]his dispute is … but one variation of the periodic conflicts occurring between" G&Ts and member cooperatives who wish to terminate their "long-term contracts" because they are "are disgruntled with their rates." *Sw. Elec. Co-op., Inc.*, 869 F.2d at 313 (quoting *Fuchs*, 858 F.2d at 1212-13 n.8). Courts have consistently rejected such attempts, and this Court should too.

## CONCLUSION

For the foregoing reasons, Basin requests that the Court grant its motion for summary judgment in Basin's favor on its claims against Dakota and against Dakota on Dakota's claims against East River. Basin respectfully requests that the Court enter a declaratory judgment in favor of Basin, declaring that

1.     the Wholesale Power Contract ("WPC") between East River and Dakota does not allow Dakota to terminate or withdraw from the WPC prior to December 31, 2075; and

2.     Basin has no obligation to provide a buyout number to East River for East River to provide to Dakota to allow Dakota to terminate early the Dakota-East River WPC.

Dated: December 15, 2021      Respectfully Submitted,

*/s/ Meredith A. Moore*
Meredith A. Moore

CUTLER LAW FIRM, LLP

MEREDITH A. MOORE
140 N. Phillips Ave., 4th Floor
PO Box 1400
Sioux Falls, SD 57101-1400
T:  +1 605 335 4995
F:  +1 605 335 4961
meredithm@cutlerlawfirm.com

ORRICK, HERRINGTON & SUTCLIFFE LLP

J. PETER COLL, JR. (*pro hac vice*)
ELYSE D. ECHTMAN (*pro hac vice*)
ANDREW D. SILVERMAN
(*pro hac vice* admission pending)
51 West 52nd Street
New York, NY 10019-6142
T:  +1 212 506 5000
F:  +1 212 506 5151
pcoll@orrick.com
eechtman@orrick.com
asilverman@orrick.com

JONATHAN A. DIRENFELD (*pro hac vice*)
1152 15th St NW
Washington, D.C. 20005-1706
T:  +1 202 339 8400
F:  +1 202 339 8500
jdirenfeld@orrick.com

MATTHEW D. LABRIE (*pro hac vice*)
222 Berkeley Street, Ste. 2000
Boston, MA 02116
T:  +1 617 880 1800
F:  +1 617 880 1801
mlabrie@orrick.com

*Counsel for Basin Electric Power Cooperative*