UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| DAKOTA ENERGY COOPERATIVE, INC., | 4:20-CV-4192-LLP |
| Plaintiff / Counter-Claim Defendant, | |
| vs. | MEMORANDUM OPINION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT |
| EAST RIVER ELECTRIC POWER COOPERATIVE, INC., | |
| Defendant / Counter-Claim Plaintiff / Cross-Claim Defendant, | |
| vs. | |
| BASIN ELECTRIC POWER COOPERATIVE, | |
| Intervenor-Defendant / Counter-Claim Plaintiff / Cross-Claim Plaintiff | |

Plaintiff, Dakota Energy Cooperative, Inc., ("Dakota Energy"), brought this action against Defendant, East River Electric Power Cooperative, Inc. ("East River"), pursuant to a Wholesale Power Contract ("WPC") between the parties. The original (1995) WPC between the parties was for a term of 43 years, through December 31, 2038. The parties extended the term to December 31, 2058 and, ultimately, to December 31, 2075. Dakota Energy is now seeking to withdraw from East River and buy-out of the WPC so that it can buy power elsewhere. Dakota Energy sued East River for anticipatorily breaching its Bylaws and violating SDCL 47-21-72 by refusing Dakota Energy's request for a buy-out dollar amount that would allow it to withdraw as a member of East River and terminate the WPC. In addition to its claim for anticipatory breach of contract, Dakota Energy seeks a declaratory judgment on the following issues: "(a) whether the terms of the Bylaws permit Dakota Energy to withdraw from East River on equitable terms and conditions, and if so, (b) what is the amount of an equitable exit charge that Dakota Energy must pay to discharge its contractual obligations to, and withdraw from, East River." (Doc. 1-1, p. 10.)

East River's Answer includes a counterclaim seeking a declaratory judgment that: 1) the WPC between East River and Dakota Energy does not allow for a buy-out or early termination, and 2) East River's Bylaws do not permit Dakota Energy to withdraw before fulfilling its obligations under the Wholesale Power Contract. (Doc. 10, p. 19.)

East River moves for summary judgment on Dakota Energy's claims against East River and on East River's declaratory judgment claims against Dakota Energy, arguing that the WPC unambiguously precludes Dakota Energy from terminating the agreement, and that the Bylaws only address withdrawal from membership in East River, not termination of the WPC.

Basin Electric Power Cooperative ("Basin Electric") was allowed to intervene in this lawsuit. (Doc. 38.) Basin Electric generates power which it sells and transmits in high voltage to its Class A Members, including East River, for resale and retransmission in high voltage to its Class C Members, including Dakota Energy. Dakota Energy then transmits to its members. Basin Electric has a long-term, all-requirements WPC with East River which has been extended to December 31, 2075. Pursuant to that agreement, East River has agreed to purchase substantially all of its required electricity from Basin Electric.

Basin Electric also moves for summary judgment, asking the Court to enter declaratory judgment in favor of Basin Electric and against Dakota Energy declaring that: 1) the WPC between East River and Dakota Energy does not allow for Dakota Energy to terminate or withdraw from the WPC prior to December 31, 2075; and 2) Basin Electric has no obligation to provide a buyout number to East River to provide to Dakota Energy to allow an early termination of Dakota's WPC with East River.

The parties have fully briefed the issues, and they presented argument at a motion hearing on March 29, 2022. For the reasons stated below, East River and Basin Electric's motions for summary judgment are granted.

The background of this case was set forth in this Court's Memorandum Opinion and Order issued on March 15, 2021, and it will not be repeated here. Simply put, the subject of this case is whether Dakota Energy is allowed to buy out of and terminate the WPC with East River prior to December 31, 2075. The parties agree on the language of the WPC and the East River Bylaws, but they disagree whether the language allows Dakota Energy to buy out of the WPC before the

end of its term. East River and Basin argue that the language of the WPC unambiguously prohibits termination before December 31, 2075, and that Dakota Energy is precluded from withdrawing as a member of East River before that time. Dakota Energy argues that the WPC unambiguously allows for early termination, or, at a minimum, it is ambiguous with respect to early termination. Furthermore, Dakota Energy contends that when the WPC is read in tandem with East River's Bylaws, the ambiguity in the WPC becomes clearer because East River's interpretation would read the withdrawal provision out of its Bylaws. East River and Basin Electric disagree.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The moving party can meet this burden by presenting evidence that there is no dispute of material fact or by showing that the nonmoving party has not presented evidence to support an element of its case on which it bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

To avoid summary judgment, "[t]he nonmoving party may not rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005) (quotation omitted). Demonstrating only "some metaphysical doubt as to the material facts" is not sufficient. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Crawford–El v. Britton*, 523 U.S. 574, 600 (1998) (in the face of a properly supported motion, requiring a nonmoving party to "identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden of pro[of]"); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986) (if evidence supporting a claim "is merely colorable or is not significantly probative, summary judgment may be granted") (citing *First Nat'l Bank v. Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968); *Dombrowski v. Eastland*, 387 U.S. 82 (1967) (per curiam)). If a party bears the burden of proof at trial, summary judgment is appropriate against that party if it "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp.*, 477 U.S. at 322.

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or

3

unnecessary will not be counted." *Anderson*, 477 U.S. at 248 (citing 9A Charles Alan Wright et al., Federal Practice and Procedure § 2725, at 93–95 (3d ed. 1983)). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247–48.

In ruling on a motion for summary judgment, the Court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts. *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987). All facts presented to the district court by the non-moving party are accepted as true if properly supported by the record. *See Beck v. Skon*, 253 F.3d 330, 332–33 (8th Cir. 2001). Moreover, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. The court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

## DISCUSSION

### I. The Contract Language is Plain and Unambiguous

The parties agree that South Dakota law governs the Court's review of the WPC. Under South Dakota law, interpretation of a contract is a question of law for the court. *Ziegler Furniture and Funeral Home, Inc. v. Cicmanec*, 709 N.W.2d 350, 354 (S.D. 2006) (citations omitted). Parties are bound by the plain terms of their contract. *See Coffey v. Coffey*, 888 N.W.2d 805, 809 (S.D. 2016). Courts possess no authority to rewrite a contract or add to its language. *Culhane v. W. Nat. Mut. Ins. Co.*, 704 N.W.2d 287, 297 (S.D. 2005) (quoting *American Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 160–62 (Tex. 2003)).

"When the meaning of contractual language is plain and unambiguous, construction is not necessary. If a contract is found to be ambiguous the rules of construction apply. Whether the language of a contract is ambiguous is . . . a question of law." *Ziegler Furniture*, 709 N.W.2d at 354. The mere fact that the parties differ on their interpretations of an instrument does not create an ambiguity:

> A contract is not rendered ambiguous simply because the parties do not agree on its proper construction or their intent upon executing the contract. Rather, a contract is ambiguous only when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement.

*Dowling Family P'ship v. Midland Farms,* 865 N.W.2d 854, 860 (S.D. 2015) (quoting *Pesicka v. Pesicka,* 618 N.W.2d 725, 727 (S.D. 2000)).

There are no factual disputes other than when it comes to the extrinsic evidence that Dakota Energy urges the Court to consider. Under South Dakota common law, courts may consider extrinsic evidence only when confronting an ambiguous contract provision, and courts are barred from using the evidence to create an ambiguity to rewrite a contractual provision. *See LaMore Restaurant Group, LLC v. Akers,* 748 N.W.2d 756, 764–65 (S.D. 2008). *See also City of Watertown v. Dakota, Minnesota & Eastern R. Co.,* 551 N.W.2d 571, 576 (S.D. 1996) ("Parol evidence is not admissible where the agreement to be interpreted is integrated, unambiguous and the parties' intent is clear."). Accordingly, the Court first will address whether ambiguity exists with respect to whether Dakota Energy is entitled to early termination of the WPC.

The WPC term provision states:

> Term. This Agreement shall become effective only upon approval in writing by the Administrator of the Rural Utilities Service and shall remain in effect until December 31, 2075, and thereafter until terminated by either Party giving to the other not less than six month's written notice of its intention to terminate.

(Doc. 10-4, WPC § 10.) East River contends that summary judgment is appropriate because Section 10 of the WPC unambiguously prohibits early termination. Dakota Energy disagrees.

Dakota Energy first relies on Section 14(a) of the WPC which provides:

> The Member agrees that during the term of this Agreement, so long as any of the Notes are outstanding, the Member will not, without the approval in writing of East River and the Administrator, take or suffer to be taken any steps for reorganization or to consolidate with or merge into any corporation, or to sell, lease, or transfer (or make any agreement therefore), all or a substantial portion of its assets, whether now owned or hereafter acquired. Notwithstanding the foregoing, the Member may take or suffer to be taken any steps for reorganization or to consolidate with or merge into any corporation or to sell, lease, or transfer (or make any agreement therefore), all or a substantial portion of its assets, whether now owned or hereafter acquired, so long as the Member shall pay such portion of the outstanding indebtedness on the Notes as shall be determined by East River with

5

> the prior written consent of the Administrator and shall otherwise comply with such reasonable terms and conditions as the Administrator and East River may require.

(Doc. 10-4, WPC § 14(a).)

Dakota Energy highlights the second sentence of Section 14(a), stating that the Member may engage in certain transactions (reorganization, consolidation with or merger into any corporation or sell, lease, or transfer (or make any agreement therefore), all or a substantial portion of its assets), "so long as the Member shall pay such portion of the outstanding indebtedness on the Notes as shall be determined by East River with the prior written consent of the Administrator and shall otherwise comply with such reasonable terms and conditions as the Administrator and East River may require." Dakota Energy admits it has not undertaken any of the transactions listed in Section 14(a). It argues, however, that it is consistent with the plain language of Section 5(a) of the Bylaws to allow a Member to withdraw from East River in the same manner that is allowed under Section 14(a) of the WPC, by paying "such portion of the outstanding indebtedness on the Notes as shall be determined by East River."

Section 5(a) of East River's Bylaws provides: "A member may withdraw from membership upon compliance with such equitable terms and conditions as the Board of Directors may prescribe, provided, however, that no member shall be permitted to withdraw until it has met all contractual obligations to the Cooperative." (Doc. 10-1, East River Bylaws, Art. I, § 5(a).)

Dakota Energy highlights the language in Section 5(a) of the Bylaws requiring only that a departing member meet "all contractual obligations to the Cooperative." It argues that Section 5(a) does not limit the means to withdraw. Dakota Energy asserts there are multiple ways to meet contractual obligations, and that buying out of the WPC by paying its portion of indebtedness is one of them. Because Section 5(a) is silent about how a member must meet its contractual obligations as part of withdrawing from membership, Dakota Energy argues it is ambiguous. Dakota Energy also contends that interpreting the contract to preclude termination of the WPC until its term expires renders the membership withdrawal rights conferred by Section 5(a) of the Bylaws meaningless, and South Dakota law prohibits interpreting a contract in a manner that renders a portion of it meaningless.

Dakota Energy's interpretation of Section 14(a) of the WPC and Section 5(a) of the Bylaws is untenable. The WPC does provide for early withdrawal in Section 14. But the withdrawal

provided for in Section 14 is not what is presented here, as Section 14 is only applicable to a reorganization or consolidation with or merger into any corporation, or to sell, lease or transfer all or a substantial portion of Dakota Energy assets. No other provisions provide for any other basis for early withdrawal.

In addition, there is no separate provision in the Bylaws which provides for early withdrawal as is demanded by Dakota Energy in this case. And when the WPC and the Bylaws are read together there is no basis for withdrawal as demanded here.

To say that the term provision in the WPC is ambiguous because the Bylaws do not describe how a member can meet "all contractual obligations to the Cooperative" before withdrawing would rewrite the term provision in the WPC. Silence in Section 5(a) of the Bylaws as to how a member must meet its contractual obligations does not create ambiguity as to the term of the WPC. Section 10 of the WPC specifically provides that the contract remains in effect until December 31, 2075 "and thereafter until terminated by either Party giving to the other not less than six month's written notice of its intention to terminate." The WPC wherein Dakota Energy agreed to "purchase and receive from East River, all electric power and energy which [Dakota Energy] shall require" until December 31, 2075, clearly meets the definition of a contractual obligation under Section 5(a) of the Bylaws.

Similarly, the argument that the plain language of Section 5(a) of the Bylaws should allow a Member to withdraw from East River in the same manner that is allowed under Section 14(a) of the WPC, by paying "such portion of the outstanding indebtedness on the Notes as shall be determined by East River," would rewrite Section 14(a) to add a transaction (early buy-out) that is not an event that is included in the plain language of Section 14(a). Nowhere do either the WPC or the Bylaws indicate that buying out the debt would satisfy all of Dakota Energy's contractual obligations to East River. In fact, Section 4(b) of the WPC indicates that Dakota Energy's obligations to East River cover far more than debt services. They help to "pay the cost of the operation and maintenance (including but not limited to renewals, replacements, insurance, taxes, and administrative and general overhead expenses) of the transmission system and related facilities of East River;" "pay the cost of related services deemed advisable by the Board of Directors of East River;" "pay the cost of any power and energy purchased for resale hereunder by East River," "pay the cost of transmission service," "pay principal and interest payments on all indebtedness of

7

East River," "pay the amounts which must be realized by East River to meet the requirements of any rate covenant or coverage of debt service covenant with respect to any contract between East River and other party or parties," and "to provide for the establishment and maintenance of reasonable margins and reserves." (Doc. 104, p. 5.)

The WPC and the Bylaws are well-drafted. The term of the WPC is described in plain and understandable language in Section 10, stating that it "shall remain in effect until December 31, 2075, and thereafter until terminated by either Party giving to the other not less than six month's written notice of its intention to terminate." There are no facts relating to the term provision for a jury to find, and the meaning of it is a matter of law rather than fact.

### II.     Wholesale High Voltage Electricity is Not a Good

Dakota Energy argues that the Uniform Commercial Code "(UCC)" applies to the WPC because electricity is a "good," the sale of which is governed by the UCC.[1] UCC Article 2 "applies to transactions in goods." SDCL 57A-2-102. "Goods means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale." SDCL 57A-2-105(1).  East River and Basin Electric argue that wholesale electricity is not a "good."

The UCC allows consideration of evidence of course of performance, course of dealing, or usage of trade to explain or supplement a written contract, but the contract "may not be contradicted" by such evidence. *See* SDCL 57A-2-202. Dakota Energy urges the Court to apply the UCC and to look beyond the contract language to extrinsic evidence of industry custom and practice, also known as trade usage, which Dakota Energy claims would allow it to buy out of its WPC with East River. Dakota Energy relies in part on commentary note 1(c) to SDCL 57A-2-202 which states: "This section definitely rejects: . . . The requirement that a condition precedent to the admissibility of [evidence of course of performance, course of dealing, or usage of trade] is an original determination by the court that the language used is ambiguous."

There is a split of authority on the issue whether electrical energy is a "good" under the UCC. All three of the parties cite cases from other jurisdictions that support their positions on the

---

[1] The Bylaws are a governing document for membership in the cooperative, not a sale of goods, and clearly are not subject to the UCC.

8

issue. The Court has reviewed numerous cases determining whether electricity should be considered a "good" under the UCC. In many of the cases the decision whether electricity is a "good" under the UCC depends on whether the electricity was delivered to the consumer's residence and metered, or whether the electricity was in its raw state on a transmission wire or in the distribution system. *See, e.g., Cincinnati Gas & Elec. Co. v. Goebel*, 502 N.E.2d 713,715 (Ohio M.C. 1986) (distinguishing between electricity in its raw state from metered amounts passing though utility property into the homes of consumers and determining that electricity passed into the home of the consumer is "goods" as defined by the UCC).

The parties agree that there are no South Dakota cases addressing whether electricity is a "good" under the UCC. Dakota Energy argues, however, that the South Dakota Supreme Court's decision in *Dakota Pork Indus. v. City of Huron*, 638 N.W.2d 884 (S.D. 2002), supports its position that electricity is a "good." There, the parties entered into a contract whereby the City of Huron ("City") would supply Dakota Pork water for its operations in exchange for Dakota Pork's rights in the James River. After it was later determined that the water supplied by the City was contaminated, Dakota Pork brought suit against the City arguing that the City breached an express warranty regarding the quality of the water to be supplied, and that it breached an implied warranty of fitness for a particular purpose.[2] The Supreme Court upheld the trial court's grant of summary judgment on both breach of warranty claims.

Before addressing the breach of warranty claims, the South Dakota Supreme Court stated that "the sale of water by a municipality is the sale of goods and a transaction which is governed by the UCC." *Id.* at 886. In so holding, the Court cited a pre-UCC case from New York state court which held that water is a good under the Uniform Sales Act. *See Canavan v. City of Mechanicville*, 128 N.E.882 (N.Y. 1920).[3] The South Dakota Supreme Court also cited an Oregon case in support of "the other viewpoint," that water is not a good under the UCC. *See Coast Laundry v. Lincoln City*, 497 P.2d 1224 (Or.App. 1972). The *Dakota Pork* Court held that the contract was silent as to any express warranties relating to water quality and that extrinsic evidence

---

[2] Dakota Pork also asserted a negligence claim against the City but that claim is not relevant here.

[3] The Second Circuit has recognized that "the UCC does not apply to sale of electricity which is a service under New York law." *Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 163 F.3d 153, 155 (2d Cir. 1998) (citing *Bowen v. Niagara Mohawk Power Corp.*, 183 A.D.2d 293, 590 N.Y.S.2d 628, 631 (4th Dep't 1992)).

of such a warranty was inadmissible because it would contradict the express terms of the contract, which would violate the UCC's parol evidence rule. The trial court's grant of summary judgment on the claim for breach of express warranty was upheld.

Next, the South Dakota Supreme Court held that no implied warranty of fitness for a particular purpose existed for the City's furnishing of water to Dakota Pork. *Dakota Pork*, 638 N.W.2d at 887. In reaching this conclusion, the Court cited *Coast Laundry* for the proposition that "because the sale of water was *not* the sale of goods, it carried no implied warranties of merchantability or fitness for a particular purpose." *Id.* (emphasis added). The courts are split on this issue, but South Dakota law is that for a consumer of water, water is not a good. If water was a good, the claim for breach of implied warranty of fitness for a particular purpose would have survived summary judgment in the *Dakota Pork* case.

By way of analogy, there are a variety of cases involving South Dakota consumer claims against electric suppliers for personal injury or property damage. These consumer electric cases have proceeded as negligence claims. The South Dakota Supreme Court has consistently rejected strict liability claims against the utilities and proceeded with negligence claims. *See, e.g., Ashby v. Northwestern Public Service Co.*, 490 N.W.2d 286, 290 (S.D. 1992) ("We have previously refused to impose strict liability on the electrical provider and we again decline to do so.") (citing *Lovell v. Oahe Elec. Coop*, 382 N.W.2d 396, 398 (S.D. 1986); *Ward v. LaCreek Elec Ass'n*, 163 N.W.2d 344, 347 (S.D. 1968)). No breach of warranty claims were recognized. The South Dakota Supreme Court has not specifically held that electricity is not a "product" for purposes of strict liability, but refusing to recognize strict liability claims against electric suppliers for personal injury or property damage implies that the Court would so hold.[4] This is not conclusive on the issue whether electricity is a "good" for purposes of the UCC, but the South Dakota Supreme

---

[4] The Ohio Supreme Court has held that electricity, for strict products liability purpose, is a service, not a good. *Otte v. Dayton Power & Light Co.*, 523 N.E.2d 835 (Ohio 1988). The court reasoned that "[a] 'product' is anything made by human industry or art. Electricity appears to fall outside of this definition . . . because electricity is the flow of electrically charged particles along a conductor." *Id.* at 838. The court held that the defendant does "not manufacture electrically charged particles, but rather, sets in motion the necessary elements that allow the flow of electricity." *Id.* Accordingly, the court found that there was a defect in the "distribution system. Such a system is, in our view, a service." *Id.*

Court's view of electricity for products liability purposes persuades this Court that it would hold electricity is not a "good" for UCC purposes.

After reviewing the cases cited by the parties and considering the parties' arguments on the issue, the Court concludes that a contract for the provision of wholesale high voltage electricity between suppliers of electric energy is not subject to the UCC under South Dakota law.

### III.   Extrinsic Evidence Would Not Be Considered Even if UCC Applied

Dakota Energy argues that the Court should consider trade usage evidence extraneous from the WPC and the Bylaws to find that a buyout and early withdrawal from the WPC is allowed because of trade usage despite the contract and Bylaw provisions. The extrinsic evidence that Dakota Energy urges the Court to consider includes:

- Expert testimony by Sandy Ringelstetter, based on her industry experience, illustrative case studies, and other supporting evidence, that the general custom and practice in the rural electric cooperative industry includes an expectation that, if a member-owner of a G&T decides to withdraw pursuant to the bylaws, it will be able to do so on equitable terms and conditions that include a payment for terminating its WPC;

- Expert testimony by Karl Rabágo that, based on industry custom and practice, the WPC does not contain a surrender of the right to withdraw as a member, and the claim that it does is inconsistent with six of the Seven Cooperative Principles to which Dakota Energy, East River, and Basin all subscribe;

- In 1994, the Rural Utilities Service ("RUS") adopted a regulation requiring that the WPC template include language allowing WPC buyouts by paying a pro rata share of the G&T cooperative's debt, and that language is contained in Section 14(a) of the WPC between East River and Dakota Energy;

- The 1997 Soyland Withdrawal Policy—drafted and endorsed by the law firm currently representing East River—allowing termination of a WPC premised on the same bylaw language at issue here and by which three Soyland members withdrew and terminated their WPCs;

- Loan agreement provisions between East River and its lenders, and Basin and its lenders, that anticipate the early termination of a WPC in connection with member withdrawals;

- East River admissions by conduct (calculating a preliminary WPC buyout amount and, together with Basin, presenting the number to Dakota's Energy's Board), all of which constitute both party-opponent admissions and evidence of custom and practice by an industry member;

11

- Basin admissions by conduct (not objecting to other retail cooperative withdrawals and adopting Board Policy 15, which implicitly concedes the existence of a right to withdraw and buy out of a WPC), all of which constitute both party-opponent admissions and evidence of custom and practice by an industry member; and

- Judicial and quasi-judicial decisions (from agencies like FERC) construing language similar to that at issue here and reflecting existing industry custom and practice to allow withdrawal and a buy out of the WPC.

(Doc. 178, p. 2-3.)

Dakota Energy relies in part on *Ducheneaux v. Miller*, 488 N.W.2d 902 (S.D. 1992), for the proposition that its extrinsic evidence is admissible. The *Ducheneaux* case is distinguishable for several reasons. First, the UCC applied to the contract for sale of cattle in that case. *Ducheneaux*, 488 N.W.2d at 916 n.14 ("Cattle meet the definition of goods as set out in SDCL 7A-2-105(1) (1988). The U.C.C. does apply.") In contrast, the high voltage wholesale electricity at issue here is not a "good" and the UCC does not apply. Second, the phrase "clean bill of health" in the *Ducheneaux* contract was ambiguous. In order to interpret the meaning of "clean bill of health" according to the intention of the parties, the trial court relied on trade usage evidence through testimony of a veterinarian about the meaning of "clean bill of health." In contrast, there is no language in the WPC or the Bylaws that is ambiguous and thus there is no need to rely on trade usage to interpret the agreement. In fact, the extrinsic evidence put forth by Dakota Energy does not point to any claimed ambiguous language. Instead, Dakota Energy claims that the right to buy out of the WPC is an industry custom and practice that should be observed here even though not provided for in the WPC or the Bylaws. To say that such an absence of a buyout or withdrawal provision presents a jury question as to ambiguity goes too far and is not supported by South Dakota law.

For example, the UCC contract at issue in *Dakota Pork* was silent as to any representations of water quality. The City denied making any oral guarantees as to the quality of the water being supplied. In addition, the City argued that, because the contract was a complete and exclusive statement of the parties' agreement, the UCC's parol evidence rule barred the consideration of any prior oral statements allegedly made during negotiations. The South Dakota Supreme Court agreed with the City, citing the UCC version of the parol evidence rule:

> Supplemental terms cannot be introduced through contemporaneous statements because, in this case, the written contract was a complete and exclusive statement of terms. Furthermore, when asked to identify any express warranties relating to water quality, Dakota Pork simply referred to the contract, which was silent. Dakota Pork produced no evidence that City made or breached an express warranty, Dakota Pork's alleged oral understanding with City is not consistent with the written contract. The express terms of the contract control in the face of inconsistency.

*Dakota Pork*, 638 N.W.2d at 886 (citing SDCL 57A-1-205(4)). Thus, even applying the UCC to the breach of express warranty claim, the South Dakota Supreme Court did not allow introduction of extrinsic evidence to contradict the unambiguous contract which was silent as to express warranties. The WPC and the Bylaws in the present case likewise are silent as to a buyout or early termination of the agreement, and *Dakota Pork* illustrates that any evidence to the contrary is inadmissible.

The South Dakota Supreme Court has explained:

> This court has long held that custom and practice is immaterial when a contract explicitly deals with the matter claimed to be the subject of custom and practice. For example, in *Swiden Appliance & Furniture Inc. v. National Bank of South Dakota*, 357 N.W.2d 271 (S.D. 1984), this court held that "obligations created under course of dealing and usage of trade are subordinate to any terms of an express agreement with which the parties' conduct or a trade usage disagree" and that "express terms of the contracts control in the face of inconsistency" with any alleged custom and practice. *Id.* at 274, 275 (citing SDCL 57A–1–205(4) and *United States v. E.W. Savage & Son, Inc.*, 343 F.Supp. 123 (D.S.D. 1972), *aff'd* 475 F.2d 305 (8th Cir. 1973)). *See also Bickett v. Borah*, 77 S.D. 140, 87 N.W.2d 552 (1958) (custom and usage on farm owner's entitlement to crop share could not vary express cash rent provision of lease). This court has also held that evidence offered to show the alleged custom and practice "was irrelevant and immaterial." *Swiden*, 357 N.W.2d at 275. *See also S & S Trucking v. Whitewood Motors, Inc.*, 346 N.W.2d 297, 299–300 (S.D. 1984) (testimony to show industry custom and usage is inadmissible when it conflicts with the express terms of a contract).

*Western States Land & Cattle Co. v. Lexington Ins. Co.*, 459 N.W.2d 429, 434 (S.D. 1990) (rejecting consideration of extrinsic evidence to prove claim that calculating the return premium is contrary to industry custom and practice because terms of the insurance policy were clear that the return premium was to be calculated on a short-rate basis, and the extrinsic evidence "cannot vary the explicit language of the contract"). Dakota Energy's proposed extrinsic evidence, if given

effect, could substantially change the unambiguous terms of the WPC. Thus, the evidence is irrelevant and immaterial even if the UCC did apply to the contract.[5]

### IV. Summary Judgment Will Not Be Denied Pursuant to Rule 56(d)

Dakota Energy asks the Court to deny East River and Basin Electric's motions for summary judgment pursuant to Federal Rule of Civil Procedure 56(d) because it contends that additional discovery of trade usage is required to respond to the motions. (Doc. 150.) As discussed above, extrinsic evidence of trade usage is irrelevant and immaterial, and the motions for summary judgment will not be denied pursuant to Rule 56(d).

### CONCLUSION

Given that the UCC is not applicable to this dispute, whether the language of the WPC and the Bylaws is ambiguous is a question of law for the Court. The Court holds that there is no ambiguity. The WPC obligates Dakota Energy to purchase all its power from East River through December 31, 2075. The WPC and the Bylaws do not allow Dakota Energy to buy out of and terminate the WPC prior to the end of that term. Accordingly,

### IT IS ORDERED:

1. That the joint motion to exclude the testimony of Karl Rabago and Sandra Ringelstetter Ennis (Doc. 122) is granted.

2. That Basin Electric's motion for summary judgment is granted. (Doc. 108.)

3. That East River's motion for judgment is granted. (Doc. 112.)

4. That East River's claims for declaratory judgment that the Wholesale Power Contract ("WPC") does not allow for early termination, and that the Bylaws do not permit Dakota Energy to withdraw before fulfilling its obligations under the WPC, are granted.

5. That Basin Electric's claims for declaratory judgment that the WPC between East River and Dakota Energy does not allow for Dakota Energy to terminate or withdraw from the WPC prior to December 31, 2075, and that Basin has no obligation to provide a buyout number to East River to provide to Dakota Energy to allow an early termination of Dakota Energy's WPC with East River, are granted.

---

[5] Because testimony on trade usage is not admissible where it conflicts with the express terms of the contract, the Court will grant the joint motion to exclude the testimony of Karl Rabago and Sandra Ringelstetter Ennis.

Dated this 11th day of April, 2022.

BY THE COURT:

/s/ Lawrence L. Piersol
Lawrence L. Piersol
United States District Judge

ATTEST:
MATTHEW W. THELEN, CLERK

/s/ Matthew Thelen